**No. 25-2014**

# United States Court of Appeals for the Third Circuit

JOHN DOE,

*Plaintiff-Appellant,*

v.

PRINCETON UNIVERSITY TRUSTEES,

*Defendant-Appellee.*

On Appeal from the U.S District Court for the
District of New Jersey,
No. 3:24-cv-7125 (Hon. Zahid N. Quraishi, U.S.D.J.)

## BRIEF OF APPELLANT JOHN DOE

JUSTIN DILLON
CHRISTOPHER MUHA
KIMBERLY BLASEY
Dillon PLLC
1717 K Street NW
Washington, DC 20006
(202) 787-5872
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

JAMIE SOLANO
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
jsolano@dynamisllp.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant John Doe states that he is not a nongovernmental corporate party and that no party possesses a financial interest in the outcome of the litigation.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES PRESENTED....................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ...............................2

STATEMENT OF THE CASE.........................................................................2

    I.    The Incidents ..............................................................................3

        A.  Sarah..................................................................................3

        B.  Jane...................................................................................4

    II.    The Investigation .......................................................................6

    III.   The Final Evidence Packet .........................................................9

    IV.   The Hearing ............................................................................13

    V.    The Rationale..........................................................................15

    VI.   The Appeal..............................................................................16

    VII.  Procedural History ..................................................................16

SUMMARY OF ARGUMENT........................................................................17

ARGUMENT ..............................................................................................20

I.     Standard of Review ................................................................. 20

II.    The District Court Erred in Dismissing John's Breach of Contract Claims. 21

    A.   Princeton Failed to Apply the "Clear and Persuasive Evidence"
Standard. ................................................................................. 23

    B.   Princeton Wrongly Denied John Doe's Appeal. ......................... 29

III.   The Court Also Erred in Dismissing John's Implied Covenant Claim. ....... 35

IV.   The "Total Mix of Information" Alleged in the Complaint Amply States a
Title IX Claim. ....................................................................... 39

    A.   John Has Amply Pled Multiple Sources of Clear "Procedural Irregularity"
Indicative of Bias. ................................................................... 43

    B.   Princeton Engaged in Those Acts of Bias Against a Backdrop of Gender-
Based Pressure. ....................................................................... 47

    C.   The District Court Wrongly Analyzed Each Irregularity in Isolation,
Rather Than as a "Total Mix" of Evidence. .................................. 50

CONCLUSION ...................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aman v. Cort Furniture Rental,*
   85 F.3d 1074 (3d Cir. 1996) ................................................................. 39

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................. 20

*Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.,*
   351 A.2d 349 (N.J. 1976) ..................................................................... 35

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,*
   864 A.2d 387 (N.J. 2005) ................................................................. 36, 38

*Doe v. American Univ.,*
   2020 WL 5593909 (D.D.C. Sept. 18, 2020) ...................................... 41, 42

*Doe v. Baum,*
   903 F.3d 575 (6th Cir. 2018) ............................................................ 47, 51

*Doe v. Coll. of New Jersey,*
   2023 WL 2812362 (D.N.J. Apr. 6, 2023) .......................................... 40, 45

*Doe v. Columbia Univ.,*
   831 F.3d 46 (2d Cir. 2016) ............................................................... 39, 49

*Doe v. Oberlin College,*
   963 F.3d 580 (6th Cir. 2020) ....................................................... 41, 43, 43

*Doe v. Princeton Univ.,*
    30 F.4th 335 (3d Cir. 2022) ........................................................... passim

*Doe v. Princeton Univ.,*
   2021 WL 194806 (D.N.J. Jan. 20, 2021) ..................................... 18, 28, 34

*Doe v. Purdue Univ.,*
   928 F.3d 652 (7th Cir. 2019) ............................................................ 43, 46

iv

*Doe v. Regents of the Univ. of Cal.*,
  23 F.4th 930 (9th Cir. 2022) ........................................................... 40

*Doe v. Stonehill College, Inc.*,
  55 F. 4th 302 (1st Cir. 2022) ..................................................... 26, 49

*Doe v. Univ. of Ark.*,
  974 F.3d 858 (8th Cir. 2020) ......................................................... 43

*Doe v. University of the Sciences*,
  961 F.3d 203 (3d Cir. 2020) ................................. 17, 19, 20, 28, 39, 48

*Doe v. William Marsh Rice Univ.*,
  67 F.4th 702 (5th Cir. 2023) ......................................................... 40

*Flowers v. Mississippi*,
  588 U.S. 284 (2019) ................................................................. 39, 40

*Menaker v. Hofstra Univ.*,
  935 F.3d 20 (2d Cir. 2019) ................................................ 32, 41, 43, 47

*Norton v. Sam's Club*,
  145 F.3d 114 (2d Cir. 1988) ......................................................... 39

*Roebuck v. Drexel University*,
  852 F.2d 715 (3d Cir. 1988) ......................................................... 48

*Schiebel v. Schoharie Cent. Sch. Dist.*,
  120 F.4th 1082 (2d Cir. 2024) ............................................. 20, 42, 51

*Schwake v. Arizona Bd. of Regents*,
  967 F.3d 940 (9th Cir. 2020) ......................................................... 21

*Stewart v. Rutgers Univ.*,
  120 F.3d 426 (3d Cir. 1997) ..................................................... 42, 44

*Vengalattore v. Cornell Univ.*,
  36 F.4th 87 (2d Cir. 2022) ....................................................... 41, 46

v

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................................ 39, 44

*Wade v. Kessler Inst.*,
   798 A.2d 1251 (N.J. 2002) ............................................................................ 35

*Wilson v. Amerada Hess Corp.*,
   773 A.2d 1121 (N.J. 2001) ............................................................................ 36

## **Statutes**

28 U.S.C. § 1291 ............................................................................................. 1

## **Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................ 21

**JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered judgment on April 28, 2025, and John Doe filed a timely notice of appeal on May 23, 2025.

**STATEMENT OF THE ISSUES PRESENTED**

1. Whether the district court erred in dismissing John's breach of contract claim despite the fact that his allegations mirror those in *Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) ("*Princeton III*"). This issue was raised below at JA 177-83 and ruled upon by the court at JA 16-19.

2. Whether the district court erred in dismissing John's claim for breach of the implied covenant of good faith and fair dealing even though here, too, his allegations mirror those in *Princeton III*. This issue was raised below at JA 183-85 and ruled upon by the court at JA 19-21.

3. Whether the district court erred in dismissing John's Title IX claim by analyzing each source of alleged bias in a vacuum, rather than as a "total mix of information," *Princeton III*, 30 F.4th at 345. This issue was raised below at JA 185-96 and ruled upon by the court at JA 11-16.

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not previously been before this Court, and Appellant is aware of no related case or proceeding that is completed, pending, or about to be presented in any state or federal court or agency.

**STATEMENT OF THE CASE**

John Doe was not actually the first person Jane Roe ever falsely accused of choking.

In 2023, after a male friend at another university upset her, Jane falsely accused him of threatening to choke her. JA 30 (¶4).[1] When she found out that he was about to sue her for defamation, she texted John for advice. *See* JA 55 (¶85). She said she would lie under oath if she had to and deny she ever said it. "'[H]e can't prove [I said it],'" she told John. JA 30 (¶4). "'[I]f it even got to court, which I doubt, . . . all I would say is 'no I didn't.'" *Id.* She also told John she could get Sarah Smith to lie for her too. JA 30 (¶4).

Less than a month later, Jane did the same thing to John after learning he had badmouthed her to another friend over the summer. JA 53 (¶76), JA 62 (¶114). She told Princeton that John had choked her (in public, no less) back in April, when she had come to visit him on campus. JA 62 (¶115). And just as she had told John she

---

[1]    Citations to "JA" refer to the Joint Appendix filed with this brief. Where applicable, paragraph numbers of the Complaint are included in parentheses after the JA citations.

could get Sarah to lie for her in the earlier case, she got Sarah to lie for her in this one, too—by convincing Sarah to claim that John had choked her in public, too.

## I.    The Incidents

### A. Sarah

Sarah's alleged incident happened on March 3, 2023, when she and John were at a party surrounded by many other students, not a single one of whom would ultimately testify that they saw this happen. JA 56 (¶88), JA 75 (¶158). A mutual female friend of theirs, Student 3, "had recently been harassed at a different" event "and felt uncomfortable." JA 56 (¶88). John had asked Sarah to keep an eye on Student 3 for the remainder of the night. *Id*. Sarah did so, but so lackadaisically that John was worried something would happen to Student 3 again. JA 56 (¶89). So he confronted her somewhat angrily about it. *Id*. A security guard who was standing nearby and had a direct line of sight to the argument did not intervene, and Princeton would not interview him. *Id*. Sarah subsequently left the party, after which John texted her to make sure she had gotten home. JA 56-57 (¶90). Sarah angrily (and accurately) complained to her roommates that John had yelled at her, but—by her own admission—said nothing about the incident having a physical component, let alone "choking." *Id*. She also confronted John about the incident the very next day—yet, again, said nothing at all about alleged choking. JA 57 (¶91).

3

### B. Jane

The incident with Jane happened on April 1-2, 2023. JA 57 (¶93). Jane and John were close friends from back home. JA 53 (¶76). Jane came to visit John at Princeton for a week, where she met Sarah and some of John's other friends. JA 57 (¶93). On Jane's second night there, they had drinks with Sarah, Student 3 (who had a crush on John), Student 4, and Student 5. JA 57 (¶94). As the group (minus Student 5) walked to an eating club, John kissed Jane. JA 57 (¶95). This upset Student 3, who walked away from the group. *Id.* A little while later, Sarah and Jane shared a romantic kiss. JA 57-58 (¶96.) John and Jane argued about the kiss for some time as Sarah lay drunkenly on the ground. JA 58 (¶97). Jane then "suddenly collapsed backwards into John, then fell to the ground screaming and crying loudly." JA 58 (¶98).

Sarah would later admit that John looked genuinely bewildered when this happened. JA 58 (¶99). Student 4, who was the only person looking at John and Jane when it happened, would later say he saw no choking or assault at all. JA 30 (¶2), JA 58 (¶99). Jane was on the ground appearing to have some sort of traumatic flashback, saying "He choked me" and "Z choked me," referring to a past boyfriend. JA 58 (¶100). She laid there yelling and crying for 1-2 hours as John and his Princeton friends catered to her. JA 58 (¶101). Jane would later tell John she had no actual memory of being choked that night, but knew it happened only

4

because Student 3 told her it had. JA 70 (¶141). Yet Student 3, for her part, said that would consistently that she never actually saw what happened. JA 70-71 (¶141), JA 75 (¶157).

The whole situation, to put it mildly, was very strange.

The next day, Jane confronted John and accused him of having choked her. JA 59 (¶104). John—not yet suspecting Jane of ill intent—gently told her he had zero memory of anything like that happening. *Id*. Jane would later privately text a friend saying John truly "seemed not to remember having allegedly choked her." *Id.* Sarah then chimed in that she believed John could have choked Jane because, a month earlier, she had choked him, too. JA 59 (¶105).

For the next month or so, Jane—who had an unusually controlling relationship with John, *see* JA 53-55 (¶¶76-87)—tried to get John to admit via text message that he had choked her, JA 59-61 (¶¶107-13).  But John consistently refused to do that. *Id.* Still taking Jane at face value as acting in good faith but just being a little troubled, he would deflect with statements like, "it's probably that . . . I haven't processed what I must have done that night." JA 60 (¶108). When she texted him later that he had "'literally choked [her] out'" and that he didn't think he had done "'anything that wrong,'" he responded by saying he knows he's "acted wrong on many things" but refused to admit to what Jane was demanding. JA 60 (¶109). He told her, "'I sincerely believed I didn't hurt you.'" *Id.*

Despite claiming John had violently choked her in April, Jane repeatedly sought to spend time with him—even alone—over the summer. JA 61 (¶113). In May, he was the one she turned to when she needed an emergency ride home from the airport. JA 54 (¶78). In June, she "discussed ideas for vacation trips for her and John to go on together." JA 54 (¶79). In July, she asked him to meet her at a party at 1:20 a.m. and said he was her "best friend." JA 54 (¶80). Then in August, she, John and Sarah went on a camping trip together, which Jane posted about on Instagram. JA 55 (¶83). Later that month, she and Sarah would both "stay at his family home for several nights" with John and his family. *Id.* This happened a full month after the date on which Jane would later lie and tell Princeton that she had cut off all contact with John (a lie no one in the disciplinary process would ever ask her about). JA 31 (¶6), JA 74 (¶155).

Around that time, John said some unflattering things about Jane to a male friend of hers, word of which got back to Jane. JA 62 (¶114). She filed a complaint against John at Princeton in September. JA 62 (¶115). Sarah would be interviewed as part of Jane's investigation, and when she disclosed that John supposedly had choked her as well, a second complaint was opened and resolved jointly. *Id.*

## II.    The Investigation

Princeton investigated both women's claims. JA 62 (¶115). It required John to sit for an interview on September 29 before telling him anything about the

allegations. *See* JA 63 (¶117). When he asked the next day how long he had to submit evidence, he was simply told "as soon as you can." JA 63 (¶118.) He submitted a written response the very next day that attached all the evidence he could find, including a letter from Student X accusing Jane of defaming him. *Id*. John heard nothing more until October 23, when Dean Joyce Chen asked to meet with him. JA 64 (¶120.) The next day, she told him that his hearing would take place just three days later, on October 27. *Id.* John still had not been formally charged or provided with written notice of the actual allegations against him. *Id*.

John finally received formal notice of the charges against him and the evidence that the school had collected on October 25—just two days before the hearing. JA 64 (¶122). He was told that if he wanted any further investigating to take place, he had to let the school know as soon as possible. *Id*. He barely had time to review the evidence, let alone figure out what additional investigation should take place. He asked to push the hearing back so he could meaningfully review the evidence and prepare for the hearing. JA 64 (¶121). Princeton did so, but only by five days, to November 1. *Id*.

As John reviewed the large volume of evidence, he asked for the hearing to be further extended to November 3 or November 6. JA 65 (¶124). Yet by October 31, the day before the hearing, he had received no response to this request. JA 65 (¶125). So that day, he submitted a supplemental statement addressing the

7

allegations and again asked for the hearing to be postponed. *Id*. He also asked how to call Student X as a witness at the hearing. *Id*. Dean Chen instead sent him 60 additional pages of evidence, without responding to his request to postpone the hearing. JA 66 (¶126). John again asked for more time to prepare for the hearing, especially in light of the new evidence. JA 67 (¶127). Dean Chen responded later that night that she did not know if the hearing could be delayed, even though she had literally just sent him 60 pages of new evidence. *See* JA 66-67 (¶128). Instead, she sent John still more evidence about 20 minutes later. JA 67 (¶129). And she told John that Student X could not testify because he had not been interviewed. JA 66-67 (¶128).

The following afternoon, just six hours before the hearing would start, Dean Chen postponed it until November 6 or 7. JA 67 (¶130). Princeton then spent the next few days attempting to collect evidence favorable to Jane and Sarah, JA 66-68 (¶¶131-32), yet did not seek to interview Student X, even though John had expressly asked for him to be a witness at the hearing and was told his not being interviewed was the only barrier to that. JA 66 (¶128). Dean Chen told John that the new evidence collected for Jane and Sarah was not evidence they had requested, but instead was evidence Dean Chen took upon herself to collect in light of statements that John had made. JA 67-68 (¶132).

8

### III.    The Final Evidence Packet

The final evidence packet showed how strongly the evidence supported John, despite how one-sided Princeton's investigation had been. Princeton had interviewed John just once, before even telling him what he was being accused of. JA 68 (¶134). It also interviewed Student 4, the only eyewitness to Jane's incident, just once. JA 68-69 (¶135). And it didn't interview male witnesses who could confirm or deny that Jane had bruising on her neck. JA 32 (¶12).

By contrast, Princeton interviewed Jane three times and Sarah twice. JA 68 (¶134). It gave them far more notice than it had given John, telling them what John had said in response to their allegations, precisely so that they could respond to it before the hearing—an unusual courtesy never extended to John. *Id.* Princeton also interviewed all of the female roommates and potential witnesses who might corroborate Jane's and Sarah's stories. JA 32 (¶12). Those witnesses were given as much attention as the actual eyewitness to Jane's incident. And they received far more attention than similarly situated male witnesses John had identified and who could have confirmed or denied parts of Jane's story.

The evidence packet showed an astounding number of provable lies and contradictions by Jane and Sarah, despite its one-sided nature. Jane had told no fewer than three different stories about the choking: first, that she had no memory of it; second, that John had lifted her almost fully off the ground by her throat for

9

five or six seconds (a highly improbable feat of physical strength); and third, that John had neither squeezed her neck nor lifted her up, but rather had just pushed against her throat from the front. JA 30 (¶3). Jane also told two different stories about what happened next: first, that she had immediately collapsed to the ground, and second, that she had immediately tried to put distance between herself and John, but that John then grabbed her by the waist and pulled her backwards. JA 72 (¶¶148-49). Knowing that Sarah would support her, Jane claimed in her first interview that Sarah directly witnessed the choking. *See* JA 74-75 (¶156). But in an April 2 text message included in the evidence packet, Jane had actually told John that Sarah had not witnessed the incident at all—meaning that Jane knew she was lying in her interview. *Id*. Jane also claimed in her first interview that when they got back to the dorm immediately after the incident, she asked to speak with John and was "furious" with him—but claimed in her third interview that she did not remember anything about the night until she had gone to sleep and woken up the following day, which means she couldn't have been "furious" with John immediately after they had gotten back. JA 72 (¶149).

The evidence also showed that John was bewildered by Jane's having collapsed to the ground in a crying fit that night and that Jane believed John had no memory of allegedly choking her. *See* JA 73 (¶151). Jane told a friend in private text messages that John "'doesn't even remember'" choking her. *Id.* She texted still

10

another friend that John "'didn't believe her'" when she said he'd choked her. *Id*. And even Sarah admitted that John looked "'bewildered'" when Jane started crying and that he "'expressed shock'" when Jane claimed that he had choked her. *Id*. Even Jane's parents, of all people, reacted skeptically when she told them John had choked her: Jane's father responded that "[John] is ok" and her mother asked, "[D]id you guys make up?" JA 73-74 (¶152).

Jane lied about other things as well. She claimed she spent every single night after the incident sleeping in someone else's room; John submitted evidence showing that she'd actually stayed in his room, of all places, on at least two of those nights. JA 74 (¶154). She claimed she had stopped talking to John midway through the summer; John submitted evidence showing she had stayed at his parents' home for several nights nearly a month later than that, and that they had been in friendly contact up until the week before Jane made her report. JA 74 (¶155). She even sought advice from John about Student X. JA 55 (¶85).

The evidence packet also contained the testimony of Student 8, who said that, the day after Jane's incident, both Jane and Sarah had separately told her that John's mentioning the name of Jane's ex-boyfriend (referred to as "Z"), who had allegedly choked her during their relationship, had triggered the reaction she had that night. JA 75 (¶157).

11

Even the evidence Jane tried to use against John undercut her credibility. She submitted a voice recording John had made of a call with his parents, which he made because Jane said she would report him to Princeton if he did not. JA 61 (¶111). In the call, he told his parents he had "'damaged her windpipe ever so slightly'" as he "'pull[ed] [her] in to talk to her.'" *Id.* That story didn't match Jane's allegations at all—yet Jane never told John it was inaccurate or never told him to do it again, as she would have if John had refused to tell his parents what Jane had demanded. *Id.*

The evidence showed Sarah to be no more credible than Jane. She, too, had changed her story. She said in her first interview that John had "his hand on her throat" and was using that hand to literally "hold her in place." JA 75-76 (¶158). But she said in her second interview that he never "meant to choke her," that he never "grasped" or "squeezed" her neck, but merely "was pushing" on her—a change oddly similar to the one Jane had made. *Id.* And like Jane, she claimed that she had "spoke[n] little with John [over] the summer," but John produced evidence that she had spent several nights with him and Jane at his parents' house in August and that they had spent time alone together in September. JA 76 (¶¶159-60).

Sarah also changed her testimony about Jane's allegations: She said in her first interview that she "'did not see marks on Jane's throat,'" yet said in her second interview—undoubtedly after talking to Jane—that she "saw a slight bruise

12

on the left side of Jane's neck." JA 72-73 (¶150). Yet as noted above, by Jane's third interview, she denied that John had squeezed her neck *at all*, meaning it would have been impossible for Sarah to have seen a bruise on the side of her neck.

## IV.    The Hearing

Princeton's Committee on Discipline ("Committee") conducted a joint hearing on Jane's and Sarah's claims, despite their lack of factual overlap and the clear risk of prejudice. JA 76 (¶162). They began the hearing at approximately 7:30 p.m. *Id.* The panel aggressively questioned John for an hour and a half. JA 77 (¶164). When, for example, he listed the many contradictions in Sarah's story, the panel demanded that he explain why she would make it up—as if he could possibly know that. JA 77-78 (¶167). When John noted that neither Jane nor Sarah had claimed that they had tried to show him the bruises on Jane's neck when John did not believe that he had choked her, the panel responded by asking whether it was not also assault if he had really pressed against her neck from the front. JA 78 (¶168). In short, the panel simply did not care that Jane and Sarah had changed their stories; it had already decided in their favor and cared only whether whatever story they landed on still constituted assault.

The panel spent an extraordinary amount of time trying to establish a collateral issue that would help Jane and Sarah—specifically, that John was the

13

controlling one in the relationship. JA 81-82 (¶¶177-80). When John responded that he was hearing this allegation for the first time and had text messages on his phone that would disprove it, the panel refused to consider them. JA 82 (¶180).

The panel questioned Student 4 in the same hostile manner. *See* JA 83 (¶182). They tried to make him admit he could not have seen what he claimed. *Id.* They pressed him on a statement in his interview summary which said that, if something had happened between John and Jane, it could not have been that severe. JA 83-84 (¶183). When he tried to explain what he meant, panelist Elizabeth Harman cut him off, noted it was already 10:03 p.m., and said the hearing needed to conclude that night. *Id.* (She would later fall asleep on camera. JA 33 (¶13).)  Student 4 then added that he had been misquoted by the investigator, but the panel continued to press him. JA 84 (¶183). Student 4 was testifying from overseas at 4:00 a.m. his time. JA 33 (¶13).

Despite the panel's concerns about the time, and despite the fact that Sarah herself had not yet been questioned, the panel called the investigator as an impromptu witness to challenge Student 4's statement that he had been misquoted. JA 85 (¶187). When the panel asked the investigator if her interview summary was accurate, she unsurprisingly responded that it was and that it reflected what was in her notes—which the panel never asked to see, and which John was never shown. *Id.* On any point that favored Jane and Sarah, the panel was happy to take a

14

witness's testimony at face value. On points that did not, the panel aggressively pushed back and searched for reasons to discredit it. *See, e.g.*, JA 80-81 (¶176).

The final witness was Sarah. She was questioned for fewer than 30 minutes. JA 85 (¶188). She was never asked about the change in her testimony regarding how she supposedly was choked. JA 86 (¶190). She was never asked about the change in her testimony regarding Jane's bruising. JA 86 (¶191). Instead, she was mostly asked questions about John's character. JA 86 (¶190).

As for Jane, who had kicked the whole thing off?  She did not even bother to appear. JA 31 (¶7).

## V.    The Rationale

The hearing concluded at 11:30 p.m., and the panel announced its decision just 11 hours later. JA 87 (¶¶192, 194). It found John responsible for assaulting both Jane and Sarah and suspended him for two years. JA 89 (¶203). Its "rationale" was only three sentences long. JA 87 (¶¶195, 196). It found John responsible based on two things: "'the women's continued and consistent descriptions of the incidents'" and John's supposed "'admissions and acknowledgments . . . in text messages.'" JA 88 (¶196). The decision letter said nothing about the changes to Jane's and Sarah's stories, or how their testimony could be characterized as consistent in the light of those changes. JA 88 (¶197). Unsurprisingly, the panel did not rely at all on the recorded call, since it could not be squared with Jane's actual

15

allegations. *See* JA 88 (¶196). The rationale did not say anything about Student 4's testimony or why it was being disregarded. *Id.* It didn't even say which of Jane's or Sarah's version of events it believed—whether John had supposedly grabbed Jane's throat and lifted her off the ground for 5-6 seconds, or whether he had instead pushed against it from the front. JA 88 (¶198).

## VI.    The Appeal

John timely appealed the Committee's decision. JA 97 (¶239). He argued, among other things, that it had been wrong not to call Student X as a witness and wrong not to collect the male witness testimony described above. JA 91 (¶209). His appeal was denied. JA 92-93 (¶217).

## VII.    Procedural History

John Doe filed suit on June 20, 2024, alleging that Princeton was liable for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Title IX, and gross negligence. JA 105. Princeton filed a motion to dismiss on September 13, 2024, and briefing on the motion was completed on September 30. JA 107-213. On December 5, John filed a letter with the court requesting leave to commence discovery, and in particular to depose Jane Roe, after learning that she, "under penalty of perjury," had "retracted her allegation against the other male student." JA 202. That request was denied in a text order on December 23, 2024. JA 26.

16

The district court granted Princeton's motion on April 28, 2025. JA 22. It dismissed John's first breach of contract claim (failure to apply the "clear and persuasive evidence" standard), reasoning that the Committee "made credibility determinations based on the evidence before it." JA 18. It dismissed his second contract claim (failure to grant his appeal, which had argued the proceeding was not "fair") on the basis that the proceeding was, in fact, fair. *See* JA 18-19. It dismissed his Title IX claim on the basis that each stick in the bias bundle alleged by John, when viewed individually, was not necessarily *gender* bias, and that the only evidence that was (external pressure) was not sufficient to state a claim. JA 13-16. And it dismissed his gross negligence claim on the basis that Princeton did not owe John a duty of care. JA 21-22. John now appeals his contract, covenant, and Title IX claims.

## SUMMARY OF ARGUMENT

In *University of the Sciences* and *Princeton III*, this Court adopted clear approaches for analyzing breach of contract, implied covenant, and Title IX claims stemming from university disciplinary action. Because the district court disregarded those approaches when analyzing Mr. Doe's contract and Title IX claims, this Court should reverse its decision to dismiss his case.

In *Princeton III*, this Court held that for breach of contract claims based on Princeton's "Rights, Rules & Responsibilities" (the "RRR")—the same contract at

17

issue here—courts must look beyond the mere *quantity* of process Princeton purported to give a plaintiff and analyze its actual quality. *Princeton III*, 30 F.4th at 346-48. In that case, the district court had dismissed a student's breach of contract claim because Princeton had collected a lot of evidence ("16 witnesses interviewed") and had purported to make credibility determinations based on it. *Doe v. Princeton Univ.*, No. 3:20-cv-4352-BRM, 2021 WL 194806, at *9 (D.N.J. Jan. 20, 2021), *vacated and remanded*, 30 F.4th 335 (3d Cir. 2022). But this Court reversed because the plaintiff there had alleged that Princeton, despite the quantity of that process, had "applied inconsistent standards to assess . . . credibility" and "disregarded compelling exculpatory evidence." *Princeton III*, 30 F.4th at 347-48. John Doe alleges those same things here, in great detail. *See infra at* 23-26. But the district court dismissed his contract claim because Princeton "had a large amount of evidence before it" and purported to have based its decision on it, JA 17-18—the very same "quantity over quality" error this Court reversed in *Princeton III*.

With respect to breach of the implied covenant of good faith and fair dealing, *Princeton III* identified three categories of allegations that served to adequately plead an implied covenant claim based on the RRR: that Princeton "subjected Doe to a discriminatory disciplinary process;" "disregarded exculpatory evidence for Doe and incriminating evidence against Roe]" and "construed all discrepancies and inconsistencies in Roe's favor." *Princeton III*, 30 F.4th at 348

18

(cleaned up). John also pleaded all of those allegations in great detail. *See infra at* 23-26, 29-31. But the district court again dismissed the claim because, in its view, the quantity of process meant that "the Complaint does not plausibly allege unfairness," JA 20—which, again, is the same error this Court corrected in *Princeton III*.

Finally, with respect to Title IX, *University of the Sciences* and *Princeton III* adopted what might be characterized as a "bundle of sticks" approach for analyzing Title IX cases in the Third Circuit: courts must test the strength of such claims not by picking each stick out of the bundle and seeing whether *it* will break, but by viewing the bundle *as a whole*. *Doe v. University of the Sciences*, 961 F.3d 203, 211 (3d Cir. 2020) (plaintiff's allegations "combined" to state a Title IX claim); *Princeton III*, 30 F.4th at 345 ("total mix of information" stated a Title IX claim). Here, however, the district court failed to do that. It concluded that, because each "procedural irregularity" Princeton engaged in did not, when viewed individually, reveal a connection to *gender* bias, John failed to state a claim. *See, e.g.*, JA 13 (dismissing claim because John "fails to connect how pointed or confrontational questioning amounts to bias against men"). What it was required to do was consider that evidence in the light of the rest of John's allegations—as a "total mix of information," *Princeton III*, 30 F.4th at 345—which included evidence of sustained pressure at Princeton to act in gender-biased ways. *See infra*,

19

at 43-50. That gender-specific pressure allows the "procedural irregularities" to plausibly be viewed as stemming not just from any bias, but from gender bias. *See, e.g.*, *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1096 (2d Cir. 2024) ("The procedural flaws suggest that the discipline was erroneously or selectively imposed—and thus indicate the presence of discrimination—and the additional evidence allows the inference that the discrimination was based on sex."). The district court's divide-and-conquer approach violated this Court's clear instructions in *University of the Sciences* and *Princeton III*.

For these reasons, the district court's decision should be reversed.

## ARGUMENT

### I.    Standard of Review

This Court "review[s] the grant of a motion to dismiss de novo." *Princeton III*, 30 F.4th at 341. "On a motion to dismiss, a court must accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Id.* at 340 (cleaned up). A complaint survives when the pleaded facts "support a plausible inference" of a legal wrong. *Id.* at 343. Legal wrongdoing need not be "the only plausible explanation . . . or even the most plausible . . . to survive a Rule 12(b)(6) motion to dismiss." *Id.* at 344. Rather, a complaint states a claim when there is "more than a sheer possibility" of a violation, even if other explanations are plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "There is

no heightened pleading standard for Title IX claims." *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020).

## II.    The District Court Erred in Dismissing John's Breach of Contract Claims.

Under this Court's decision in *Princeton III*, John has clearly pled sufficient facts to survive a motion to dismiss.  In *Princeton III*, this Court undertook a thorough analysis of how New Jersey contract law applies to violations of Princeton's RRR, the same document at issue here. *Princeton III*, 30 F.4th at 345-47. It held that while "New Jersey courts do not describe the relationship between a private university and its students in pure contract or associational terms," private secondary schools are liable for breach of contract when they fail to "follow [their] own established procedures" or provide a process "that is fundamentally fair." *Id.* at 345-46 (cleaned up). Because it was not necessary in *Princeton III* to "outline all of the more aggressive protections" that students at private universities have compared to students at private secondary schools, the Court held that "New Jersey law requires at least that the school follow its own established procedures and that those procedures be fundamentally fair." *Id.* at 346 (cleaned up) (internal quotations marks omitted). It then applied that standard to the plaintiff's allegations regarding his own disciplinary process and found that the plaintiff had plausibly alleged that Princeton was liable for breach of contract for failing to follow the procedures promised in the RRR. *Id.* at 347-48.

The allegations this Court relied on in *Princeton III* were not that Princeton had denied him some specific procedure that the RRR promised him—by, for example, refusing to let him request witness interviews. What he alleged—and what the Court said stated a breach of contract claim—was that Princeton had *purported* to adhere to certain promises in the RRR but had actually failed to do so. *See id.* at 347-48. Specifically, the plaintiff in *Princeton III* alleged that Princeton, while purporting to apply the "preponderance of evidence" standard promised him by the RRR, had in fact "disregard[ed] evidence that tended to . . . exculpate" him—meaning it had not, in fact, *actually* applied the preponderance standard to him. *Id.* at 347. He also alleged that Princeton, while purporting to provide him with "impartial and unbiased" panelists, in fact gave him panelists who "applied inconsistent standards to assess [his] credibility" and otherwise acted impartially. *Id.* (cleaned up). The Court held that allegations of that nature stated a claim for breach of the RRR. *Id.* at 347-48.

John Doe advances two distinct breach of contract claims, which track both categories of allegations that *Princeton III* held to state a claim. Indeed, his allegations as to both claims go well beyond what sufficed in that case, making the district court's decision all the more difficult to understand.

### A. Princeton Failed to Apply the "Clear and Persuasive Evidence" Standard.

John first alleges that Princeton breached its contractual promise to apply the "clear and persuasive evidence" standard when weighing the evidence. *See, e.g.*, JA 87-90 (¶¶195-205), JA 96 (¶¶233-37). In *Princeton III*, this Court found it plausible that Princeton had "ignored" an even *lower* standard of proof—preponderance of the evidence—based on the following allegations:

- that Princeton had "disregarded evidence that tended to . . . exculpate Doe";

- that it had "failed to consider the entirety of the evidence with a neutral gaze"; and

- that it had "rendered inconsistent and skewed credibility determinations."

*Princeton III*, 30 F. 4th at 347 (cleaned up) (internal quotations marks omitted). If allegations of that kind suffice to state a breach of the "preponderance of the evidence" standard, then they state a breach of the higher "clear and persuasive evidence" standard.

And John pled far more than the *Princeton III* plaintiff. He pled that Princeton unfairly "disregarded" the testimony of Student 4, the only eyewitness to Jane's allegations, by interviewing him only once (while interviewing Student 3 twice), then questioning him more aggressively at the hearing than any other witness besides John. JA 68-69 (¶135), JA 83 (¶¶182-84). The Committee's

rationale failed even to address Student 4's testimony. JA 88 (¶197). Princeton also "disregarded" the testimony of Student X, which showed that Jane had a history of leveling false choking allegations against men who angered her—and promising to get other people to lie for her, too. JA 69 (¶136). And it disregarded (by failing to seek it) the testimony of Student 5, who could have resolved whether it was John or Jane who was telling the truth about whether Jane slept in John's room after the alleged assault. JA 69-70 (¶139). All of that evidence tended to "exculpate Doe," and it was all disregarded by the Committee without explanation.

For those same reasons, the Committee "failed to consider the entirety of the evidence with a neutral gaze." *Princeton III*, 30 F.4th at 347. It also did so by failing to account for the fact that Jane spent time with John alone after the alleged assault, JA 54-55 (¶¶78-83), and that she literally slept at his house *with Sarah*—but lied about that to Princeton, JA 31 (¶6), JA 55 (¶83). And it did so when it concluded that John had "admi[tted]" to choking Jane in their text messages, JA 88 (¶196), even though *Jane herself* privately told others he had not realized what he had supposedly done, JA 73 (¶151), and even though their texts repeatedly show him avoiding that question, JA 59-61 (¶¶106-10). The Committee gave Jane and Sarah every benefit of the doubt despite the evidence to the contrary, and it never explained why.

Finally, Princeton "rendered inconsistent and skewed credibility determinations." *Princeton III*, 30 F.4th at 347. It found Jane "consistent" despite her having told no fewer than three different stories about how John supposedly choked her. *See* JA 34 (¶14), JA 88 (¶197). It found Sarah "consistent" despite having changed her story about whether or not John grabbed her, whether she saw bruising on Jane's neck, and whether she said anything about being choked to her roommates in the days afterwards. *Id.*

Together with the above, John amply pleads a breach of contract under *Princeton III*. He would do so even if the evidentiary standard at issue had been simply preponderance of the evidence instead of the higher "clear and persuasive evidence" standard.

But that is not all, because John alleged more than just the above. He also plausibly alleged that the Committee's stated reasons for its decision were completely divorced from the actual evidence that had been presented to it. As explained above, the Committee's rationale rested on just two things: Jane and Sarah's purportedly being "consistent" and John's supposedly "admi[tting]" his guilt "in text messages" JA 88 (¶196). The Complaint plausibly and *with specificity* alleged why neither of those things was true, as explained above.[2] That is not just

---

[2] At least one court has recognized that a school's failure to explain why such "mea culpa" texts—texts that try to make someone feel better but stop short of admitting guilt—can be viewed as admissions can support a breach of contract claim. *See*

25

an attack on *how* a conclusion was reached, as in *Princeton III*; it is a direct refutation of the conclusion on its own terms. If it is true that Jane and Sarah were *not* consistent (which they were not), and if it is true that John did *not* admit to assault in his text messages (which he did not), then those purported facts cannot constitute "clear and persuasive evidence" of his guilt.

The district court's rationale for denying this first breach of contract claim was unusually brief and improperly made factual findings in Princeton's favor. After explaining the law governing breach of contract claims in general, JA 16-17, and summarizing some of John's allegations with respect to this claim, JA 17, the court spent only two sentences analyzing and dispensing of the claim:

> [T]he Complaint makes clear that the Committee had a large amount of evidence before it, including Plaintiff's statement and supplemental statement, a letter from Student X as to his defamation claim against Jane, interviews of Plaintiff, Jane, Sarah, and multiple witnesses including men and women, and the testimonies given at the hearing. The Complaint demonstrates that the Committee made credibility determinations based on the evidence before it.

JA 17-18. The court did not cite a single paragraph in the Complaint to support its assertion that the "credibility determinations" were "based on the evidence." JA 18.

---

*Doe v. Stonehill College, Inc.*, 55 F. 4th 302, 325 (1st Cir. 2022) (college breached contract with student by failing to explain why it rejected his explanation for "mea culpa" texts sent to complainant after the incident). John, in any event, has alleged that these texts were *not* admissions, and that allegation controls here. *See Princeton III*, 30 F.4th at 342.

26

Its only support for that assertion was its own preceding sentence—that "the Committee had a large amount of evidence before it." JA 17-18. But just because the Committee "had a large amount of evidence before it," it does not follow that credibility determinations were actually "based on" it. That is an inference that the court improperly drew in Princeton's favor. Just because a decisionmaker hears a lot of evidence does not mean it based its decision on that evidence. It could have based its decision on bias, or a mistake, or something else entirely. The Complaint alleged that the basis was gender bias. *See* JA 96 (¶236).

The court's rationale here just does not hold up—just like the Committee's decision. As explained above, the Committee's stated basis for finding in favor of Jane and Sarah was that they were "consistent." John has thoroughly and specifically alleged that they were not.[3] And at this motion to dismiss stage, it is his allegations, not the Committee's explanation, that control. *Princeton III*, 30 F.4th at 342 ("When the truth or facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail.");

---

[3] *See, e.g.*, JA 34 (¶15) (panel's decision "said nothing about all of the ways the evidence had contradicted them"); JA 71 (¶146) (evidence packet "showed that Jane had repeatedly changed her stories"); JA 74-75 (¶156) ("The evidence also repeatedly contradicted Jane about how she supposedly initially learned she had been choked."); JA 77-78 (¶167) ("It didn't matter to the panel *that* Sarah had contradicted herself, unless *John* could explain *why*."); JA 99 (¶247) ("the evidence proved they'd contradicted themselves"); JA 72-73 (¶150) ("Sarah fundamentally changed the testimony she offered in support of Jane's story").

*see also id.* at 343 (explaining how, in *University of the Sciences*, this Court "accepted facts in the university's Title IX investigator's report as true" *except* when they were "challenged by the plaintiff"). The district court was not permitted to infer that the Committee's findings were actually based on an accurate, unbiased review of the evidence. That is what discovery is for. *See Princeton III*, 30 F.4th at 340 (vacating dismissal "at this early stage" and remanding "for the rest of the story to develop" via discovery).

Ironically, the district court's error is the same one committed by the trial court in *Princeton III*. In that case, the trial court held that because the Princeton panel had a large amount of evidence before it ("16 witnesses interviewed, one of whom was Plaintiff's mother"), and said it found the witnesses "generally credible," the plaintiff's claim of "inconsistent credibility determinations and prejudicial conclusions" had to fail. *Doe v. Princeton Univ.*, No. 3:20-cv-4352-BRM, 2021 WL 194806, at *9 (D.N.J. Jan. 20, 2021), *vacated and remanded*, 30 F.4th 335 (3d Cir. 2022). This Court reversed because the plaintiff's allegations, if true, would nevertheless suggest that the panel "ignored [the preponderance of the evidence] standard" in reviewing that evidence. *Princeton III*, 30 F.4th at 347. Concluding that the "credibility determinations" here were in fact "based on the evidence before it," JA 18, is an inference that has to be drawn, and one that cannot be drawn in Princeton's favor based simply on the volume of evidence it reviewed.

28

## B. Princeton Wrongly Denied John Doe's Appeal.

John also plausibly alleged that Princeton violated the RRR when it denied his appeal of the Committee's decision. *See, e.g.*, JA 91-95 (¶¶209-29), JA 97 (¶¶ 238-41). The RRR states that appeals will be granted if "[t]he procedures" used to investigate and resolve the matter "have not been fair and reasonable." JA 37 (¶32). In *Princeton III*, this Court held that "Princeton failed to provide Doe with the promised fair and impartial proceeding" based on the three categories of allegations discussed immediately above in Section II.A. *Princeton III*, 30 F.4th at 347-48. Those same types of allegations also, therefore, plausibly show the breach of a contractual provision that requires granting an appeal when a proceeding was not "fair." John has plausibly alleged the same types of unfairness as the plaintiff in *Princeton III*—and then some.

Like the plaintiff there, John has alleged that Princeton "applied inconsistent standards to assess [Roe]'s and [Doe]'s credibility." *Princeton III*, 30 F.4th at 347. Princeton found Jane and Sarah to be "consistent" despite their repeatedly contradictory accounts, and Princeton refused to find John credible despite his actual consistency, the testimony of Student 4 (the only eyewitness), and the rest of the supporting evidence. JA 30-31 (¶¶4-6), JA 88 (¶197), JA 91 (¶¶209-11). Also like the plaintiff in *Princeton III*, John alleged that Princeton "overlooked or minimized glaring and substantial factors that would tend to undermine [Roe]'s

veracity" and "disregarded compelling exculpatory evidence." *Princeton III*, 30 F.4th at 347-48. He alleged, among other things, that Princeton "overlooked or minimized" Jane's and Sarah's contradictory accounts of their incidents; "disregarded" the testimony of Student 4 (again, the only eyewitness), who saw no assault on Jane; and "disregarded" the testimony of Student X, whom Jane had falsely accused of the same kind of thing. JA 69 (¶136). Those are concrete instances of the same type of allegations that sufficed to plead an unfair application of Princeton's disciplinary process in *Princeton III*.

John's appeal also alleged additional unfairness not present in *Princeton III*. Jane and Sarah were interviewed three times, giving them multiple chances to respond to his evidence before the hearing; John was interviewed only once, and before even being told what the investigation was about. JA 62 (¶¶116-17), JA 91 (¶209). A key female witness for the complainants was likewise interviewed multiple times, whereas the only eyewitness—John's male friend—was interviewed just once. *Id.* Princeton sought interviews from multiple female witnesses for the complainants "but ignored Mr. Doe's request to interview a male exculpatory witness." JA 91 (¶210). And the panel was "presented with prejudicial information" stating that others believed John was racist and sexist, which was not just prejudicial and untrue, but also had nothing whatsoever to do with the allegations against him. JA 91 (¶211). Those things make it even more plausible

30

that his proceeding was not "fair," and therefore that Princeton breached its contract by denying his appeal.

Like its rejection of John's first contract claim, the district court's rejection of this claim was brief and impermissibly drew inferences in Princeton's favor. After summarizing this claim, the court once again disposed of it with just two sentences of analysis:

> In support of this claim, Plaintiff asserts that the investigatory procedure was unfair, and the Committee failed to pursue relevant testimony. (Compl. ¶239). The Court finds, however, that the information Plaintiff claims the Committee failed to pursue—testimony from Student X—was due to Plaintiff's own failure to submit Student X to be interviewed. (Compl. ¶¶122, 125, 128.) Additionally, as explained above, the Court finds that the Complaint does not sufficiently allege that the investigation or procedure was unfair or not in accordance with the Code.

JA 18-19. Three problems exist with that cursory analysis.

First, in finding that the absence of Student X at the hearing "was due to Plaintiff's own failure," the district court impermissibly found facts and drew inferences in Princeton's favor. The paragraphs upon which the district court relied—paragraphs 122, 125 and 128—nowhere state that it was a rule that witnesses had to be interviewed to testify at hearings, let alone that such a rule was ever communicated to John. Paragraph 122 says only that John was told that if he wanted any additional interviews, "he needed to let [Dean Chen] know as soon as possible." JA 64 (¶122). It does *not* say he was told that anyone who was not

31

interviewed could not testify at the hearing, or even that that was an uncommunicated rule. *Id.* Paragraph 125 then states that, six days later, John asked Dean Chen "how to call Student X as a witness." JA 65 (¶125). And Paragraph 128 simply recounts how Dean Chen later told John that Student X could not testify live "because he was not interviewed." JA 66-67 (¶128). Neither those paragraphs nor any other state that this was a hard and fast rule—as opposed to a flexible practice, or simply a practice adopted for John's case—let alone a rule that was ever communicated to John. *Cf. Menaker v. Hofstra Univ.*, 935 F.3d 20, 35 (2d Cir. 2019) (faulting trial court for "draw[ing] an affirmative conclusion . . . from an apparent omission" on motion to dismiss). And the RRR, which the Complaint incorporates, makes no mention of such a rule either. *See* JA 142-62. But the district court improperly *inferred* that it was a rule, and an inflexible one at that.

The court also had to implicitly infer that the only way a student could be interviewed was if a *party* requested it. But there is no basis for that conclusion in the Complaint either, and as explained above, there is affirmative evidence—which John discussed in his district court briefing—that Princeton took the initiative to collect relevant evidence that was never requested by a party. *See* JA 67 (¶132). The most reasonable inference, and certainly a plausible one, is that Princeton could have interviewed Student X whether or not John ever requested it. And since

32

that is true, it is equally plausible that it was Princeton's fault that this obviously relevant interview was never conducted.

The district court's finding further required the implicit assumption that, on the date John asked for Student X to testify at the hearing, there was not time for Princeton to interview him before the hearing and thus cure this "defect." But as also explained above, the Complaint contains evidence that there was actually *plenty* of time to interview Student X before the hearing. Dean Chen first told John to request additional interviews "as soon as possible" on October 25—seven days before the hearing. JA 64 (¶122). And she rejected John's request on October 31— seven days before the rescheduled hearing date of November 7. JA 66 (¶128). It is thus more than merely "plausible" that Princeton had time to interview him before November 7, or that it could have postponed the hearing date a little further.

John raised these points in his opposition to Princeton's motion to dismiss. *See* JA 163-199. The district court's decision to draw an affirmative conclusion the other way was impermissible at the motion-to-dismiss stage.

Second, the district court wrongly implied that the only information Plaintiff alleged that Princeton failed to pursue was the testimony of Student X. *See* JA 18-19 ("the information Plaintiff claims the Committee failed to pursue—testimony from Student X—was due to Plaintiff's own failure"). But that simply is not accurate: John alleged that the Committee "ignored Mr. Doe's request to interview

a male exculpatory witness," Student 5. JA 69-70 (¶139), JA 91 (¶210). The district court said nothing about why it was "fair" or "reasonable" for Princeton to refuse to seek testimony from Student 5, given that the parties disagreed about Jane's sleeping in John's room after the incident.

Third, the district court's conclusion that, "as explained above, the Court finds that the Complaint does not sufficiently allege that the investigation or procedure was unfair or not in accordance with the Code," does not resolve the issue. The reasons the court found the process was not unfair were that:

> Plaintiff received notice of the charges filed against him (Compl. ¶126), was given all the evidence collected (*id.*), had the opportunity to submit a statement and otherwise respond to the charges (*id.* ¶¶118 131), and could identify witnesses as sources of potential favorable information to him to be interviewed (*id.* ¶122). Plaintiff was additionally afforded a hearing and the ability to confront one of his accusers (Sarah) as well as other witnesses.

JA 15. But that was the wrong level of generality at which to analyze the question, focusing on Princeton's supposed *thoroughness* than its *fairness*. Not all thorough proceedings are fair. The *Princeton III* court, in analyzing whether the proceeding there had been "fair and impartial," did not find it relevant to analyze whether Princeton had given the plaintiff "notice" of the charges (it had),[4] "the opportunity to . . . respond to the charges" (it had),[5] or a chance to "identify witnesses . . . to be

---

[4] *See Doe v. Princeton*, 2021 WL 194806, at *3 (describing the "Notice of Allegations").

[5] *See id.* at *9 (noting that Princeton interviewed the plaintiff's mother).

interviewed" (it had).[6] It asked whether, *despite* all of that, and *despite*

interviewing "16 witnesses,"[7] and *despite* pursuing a counterclaim on the

plaintiff's behalf, the proceeding was nonetheless not "fair."[8] And it concluded that

the plaintiff had plausibly alleged that Princeton, despite the *amount* of process it

had given the plaintiff, had "applied inconsistent standards to assess [Roe]'s and

[Doe]'s credibility," "overlooked or minimized glaring and substantial factors that

would tend to undermine [Roe]'s veracity," and "disregarded compelling

exculpatory evidence," thereby breaching its contract with the plaintiff. *Princeton*

*III*, 30 F.4th at 347-48. What mattered was how Princeton had *actually carried out*

its process, not how much process it had given the plaintiff.

## III.    The Court Also Erred in Dismissing John's Implied Covenant Claim.

The Complaint also states a claim for breach of the covenant of good faith

and fair dealing. In New Jersey, every contract contains within it an implied

covenant of good faith and fair dealing. *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259

(N.J. 2002). The covenant prohibits a party from complying with the terms of a

contract in a way that has "the effect of destroying or injuring the right of the other

party to receive the fruits of the contract." *Id.* (quoting *Bak-A-Lum Corp. of Am. v.*

*Alcoa Bldg. Prods., Inc.,* 351 A.2d 349, 352 (N.J. 1976)). It thus "differs from a

---

[6] *Id.*

[7] *Id.*

[8] *Id.* at *3.

35

'literal violation of a contract.'" *Id.* (quoting *Bak–A–Lum Co.,* 351 A.2d at 352). It means that "when [a] party is vested with the exercise of discretion under a contract," it "must exercise discretion reasonably with proper motive, not arbitrarily, capriciously, or in [a] manner inconsistent with [the] reasonable expectations of parties." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1128 (N.J. 2001). The covenant thus "allow[s] redress for the bad faith performance of an agreement." *Princeton III*, 30 F.4th at 348. And "bad faith" is satisfied even when a party engages in "[s]ubterfuges and evasions in the performance of a contract[,] . . . believ[ing] his conduct to be justified." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (citation and internal quotations marks omitted)

*Princeton III* identified three categories of allegations that served to adequately plead an implied covenant claim based on the RRR: that Princeton "[s]ubject[ed] [Doe] to a discriminatory disciplinary process;" "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe];" and "constru[ed] all discrepancies and inconsistencies in [Roe's] favor." *Princeton III*, 30 F.4th at 348. John's covenant claims—failure to provide a fair investigation, a fair hearing, and a meaningful rationale, JA 97-100 (¶¶242-51)—capture all three of those categories. He was subjected to a discriminatory process that favored Jane and Sarah—whether due to sex, their status as complainants, or both—by giving

them more opportunities to explain themselves before the hearing, proactively seeking testimony for them, and treating John and his witnesses far more harshly at the hearing. JA 33 (¶13), JA 67-68 (¶132), JA 68 (¶134). He pled that Princeton "disregarded exculpatory evidence" by failing to collect it in the investigation, failing to press Sarah on it at the hearing, and ignoring it completely in its rationale. JA 33 (¶12), JA 85-87 (¶¶188-91), JA 88 (¶196). And he pled that Princeton "construed all discrepancies" in favor of Jane and Sarah in the decision letter, labeling their testimony "consistent," without explanation, when it was anything but, and refusing even to say which versions of their stories it believed to be true, so as not to label the other a lie. JA 88 (¶196).

The district court's rationale for dismissing John's covenant claims largely tracks its rationale for dismissing his contract claims and is wrong for the same reasons. It rejected the claim that John had been denied "a fair investigation or hearing" because it had "already determined that the Complaint does not plausibly allege unfairness." JA 20. And it rejected his claim that his rationale was not meaningful because John "does not plausibly allege that the Committee acted in bad faith or with malice toward Plaintiff." JA 20-21.

But neither of those things is accurate. As explained in the previous section, John more than plausibly alleged that the process was unfair. The district court acknowledged that a student plausibly pleads breach of the covenant by alleging

37

his process was "'discriminatory,'" that it "'disregarded exculpatory evidence,'" and that it "'construed all discrepancies and inconsistencies in the complainant's favor.'" JA 20 (cleaned up, quoting *Princeton III*, 30 F.4th at 348). John amply pled all three. A proceeding is not purified of those defects by the mere quantity of process surrounding them.

Likewise, the district court's conclusion that John did not allege "bad faith" in the Committee's formulation of his rationale is incorrect. John alleged that the rationale was so bad that it could not even conclude *what he had actually done to Jane*, that it called Jane and Sarah "consistent" despite their being the opposite (which is why the Committee could not conclude what had actually happened), and that it closed its eyes to the only eyewitness testimony to Jane's incident, among other things. *See supra* at 16-17, 23-25. As John noted in his district court briefing, "bad faith" is satisfied when a party engages in "[s]ubterfuges and evasions in the performance of a contract," even if he "believes his conduct to be justified." *Brunswick Hills Racquet Club, Inc.*, 864 A.2d at 396; JA 184. Subterfuge and evasion are precisely what the Committee engaged in when it called Jane and Sarah "consistent" without explaining how, elided what it actually thought John did to Jane, and ignored the only eyewitness testimony.

38

**IV.    The "Total Mix of Information" Alleged in the Complaint Amply States a Title IX Claim.**

The district court also erred in dismissing John's Title IX claim. Title IX "bar[s] the imposition of university discipline when sex is a motivating factor in the decision to discipline." *Doe v. Univ. of the Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). As in related contexts, sex bias is a "motivating factor" under Title IX when it is responsible for a decision "at least in part." *Columbia Univ.*, 831 F.3d at 53, 56; *cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (Equal Protection Clause "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes").

Invidious discrimination is rarely overt. "[D]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." *Aman v. Cort Furniture Rental Co.*, 85 F.3d 1074, 1082 (3d Cir. 1996); *see also Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1988) (one "who discriminates is unlikely to leave a smoking gun . . . attesting to a discriminatory intent"). From the outside, an action motivated by bias can look the same as one motivated by valid purposes. To sift the permissible from the discriminatory, courts therefore refuse, in a wide variety of areas, to view acts of alleged discrimination one-by-one, but instead view them in their totality—as a *bundle* of sticks, not as one stick at a time. *See, e.g., Flowers v. Mississippi*, 588 U.S. 284, 310, 314 (2019)

("The disparate questioning or investigation of black and white prospective jurors may reflect ordinary race-neutral considerations," but "can be telling" and indicate discrimination when viewed in the light of "other evidence of discrimination."). That is why, under Title IX, courts must view acts of alleged discrimination through "the total mix of information"—not just individual ingredients in the mix—to determine whether they were plausibly motivated by gender bias. *Princeton III*, 30 F. 4th at 345; *see also Doe v. William Marsh Rice Univ.*, 67 F.4th 702, 711 (5th Cir. 2023) ("'At some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding.'") (quoting *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022) (cleaned up)).

In the Title IX context, courts have therefore held that all manner of actions by a school that may seem gender-neutral standing alone are things that, when viewed along with the totality of the evidence, plausibly suggest that a disciplinary decision was motivated in part by gender bias. To borrow the language of *Flowers*, a school's "disparate questioning or investigation" of male and female parties to a proceeding "may reflect ordinary [gender]-neutral considerations," but may also suggest bias. 588 U.S. at 310; *see also Doe v. Coll. of New Jersey*, 22-cv-3283 (MAS) (LHG), 2023 WL 2812362, at *6 (D.N.J. Apr. 6, 2023). So, too, a school's decisions on what evidence to pursue may also plausibly suggest bias. *See, e.g.*,

40

*Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107 (2d Cir. 2022) (lopsided investigation supported inference of gender bias). Or the way in which it judges the parties' credibility. *See, e.g.*, *Doe v. American Univ.*, No. 19-cv-03097 (APM), 2020 WL 5593909, at *7 (D.D.C. Sept. 18, 2020) (unbalanced credibility analysis supported inference of gender bias). Or further still, its issuance of a rationale that favors one side over the other in an "inexplicable" fashion. *See, e.g.*, *Doe v. Oberlin College*, 963 F.3d 580, 587-88 (6th Cir. 2020).

The clearer and more significant that any one of these "procedural irregularities" is in a plaintiff's disciplinary process, the less external support it needs to plausibly suggest gender bias. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("when combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination") (emphasis in original). When procedural unfairness is especially egregious, numerous courts have even held that such unfairness plausibly betrays gender bias *even absent any gender-specific evidence of intent*. In *Oberlin College*, for instance, the Sixth Circuit held that the school's "arguably inexplicable" rationale was evidence not just of procedural irregularity but was "the strongest evidence" of "*sex* bias" in that case. 963 F.3d at 587-88 (emphasis added). In *Doe v. American University*, the court found that the

41

"major inconsistencies" in the school's credibility determinations were so bad that they sufficed, by themselves, to make gender bias plausible. 2020 WL 5593909, at *7-8; *see id.* at *9 (further finding that the gender-based pressure on the school "bolster[ed] the *already plausible* allegations of discrimination based on sex" stemming from the credibility findings) (emphasis added). This principle is not unique to the Title IX context. *See, e.g.*, *Stewart v. Rutgers Univ.*, 120 F.3d 426, 433-34 (3d Cir. 1997) (fact that tenure decision "could not have been reached by reasonable evaluators" was sufficient evidence of racial bias under Title VII to survive summary judgment).

Typically, however, courts require plaintiffs to pair procedural irregularities with some gender-specific evidence to plausibly allege a Title IX claim. As the Second Circuit has succinctly put it, "[t]he procedural flaws suggest that the discipline was erroneously or selectively imposed—and thus indicate the presence of discrimination—and the additional evidence allows the inference that the discrimination was based on sex." *Schiebel*, 120 F.4th at 1096. The "total mix" of the irregularities and gender-specific evidence, *Princeton III*, 30 F.4th at 345, allows for those irregularities to plausibly allege gender bias.

John Doe has amply alleged that here. He alleges procedural irregularities that are egregious enough, standing alone, to plausibly support an inference of

42

gender bias. And he pairs them with two sources of gender-specific evidence. The "total mix" of that evidence plausibly states a Title IX claim.

### A. John Has Amply Pled Multiple Sources of Clear "Procedural Irregularity" Indicative of Bias.

As explained above, John's disciplinary proceeding was rife with unfairness in many different ways. Princeton's actions fall into three well-recognized categories of bias that courts have routinely recognized as supporting valid Title IX claims.

First, multiple courts of appeals have recognized that when the rationale for disciplining a student is irrational, illogical, or departs significantly from the evidence before the decisionmaker, the rationale itself supplies strong evidence bias. *See, e.g.*, *Doe v. Univ. of Ark.*, 974 F.3d 858, 864 (8th Cir. 2020) (rationale that went "against the substantial weight of the evidence" was evidence of bias); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) ("perplexing" basis of school's decision was evidence of bias); *Oberlin Coll.*, 963 F.3d at 587 (finding it a "matter of common sense" that the "merits of [a] decision itself" can be strong evidence of bias); *Menaker*, 935 F.3d at 34 ("[w]hen the evidence substantially favors one party's version of a disputed matter," but the decision comes out the other way, "it is plausible to infer . . . that the evaluator has been influenced by

43

bias").[9] Indeed, as mentioned above, *Oberlin College* held that the "arguably inexplicable" rationale in that case was evidence of "sex bias"—in fact, the "strongest evidence" of sex bias in that case. 963 F.3d at 587-88. That was so even though the rationale in that case was gender-neutral on its face—it was simply that the complainant there had been "incapacitated," *id.* at 585, even though the evidence supported a far less significant level of intoxication, *id.* at 584-85.

Princeton's rationale here was just as inexplicable, if not more so. It was based on just two "findings": (1) that Jane and Sarah had been "consistent"; and (2) that John had supposedly admitted guilt in "text messages." JA 88 (¶196). But the evidence showed precisely the opposite: both women had significantly changed their stories (Jane especially so), and John had repeatedly dodged Jane's demands for an admission in their texts—so much so that Jane *actually told a friend that John didn't think he had choked her.* JA 59-62 (¶¶107-10), JA 89 (¶201). The Committee's failure to address either of those things, or to address the other obviously exculpatory evidence—Student 4's eyewitness testimony, Jane's and Sarah's overnight trip to John's family home months later, Student X's testimony— adds further to its inexplicable nature. *Oberlin Coll.*, 963 F.3d at 587 ("the failure

---

[9] The same is true in related contexts. *See, e.g.*, *Stewart*, 120 F.3d at 433-34 (Section 1983); *Vill. of Arlington Heights*, 429 U.S. at 267 (factors to consider in determining whether "discriminatory purpose was a motivating factor" under Equal Protection Clause include "[s]ubstantive departures" from the evidence).

of the hearing panel even to comment on the flat contradiction" by complainant "provide[d] strong support for Doe's claim of bias").

But what truly sets the rationale in this case apart is that the Committee *could not say what it thought John had actually done*. It could not say whether John had wrapped his hand around Jane's throat and literally lifted her up for 5-6 seconds (her deeply implausible second story, after initially claiming she had no memory of it), or whether he instead had pushed against her throat from the front (her third story). JA 34 (¶¶14-15). Picking between those would have had highlighted how inconsistent Jane had been, so the panel made *no finding* about what John had even done. It is hard to get more "inexplicable" than not explaining.

Second, the Complaint demonstrates how Princeton gave preferential treatment to Jane and Sarah over John in their disciplinary proceeding. *Princeton III* recognized that the disparate treatment of a male respondent vis-à-vis a female complainant is potential evidence of gender bias. *See Princeton III*, 30 F.4th at 344; *see also Coll. of New Jersey*, 2023 WL 2812362, at *6 (school's failure "to ask Roe any questions that would challenge her credibility" and "to question Roe about her inconsistent statements throughout the investigation" supported inference of gender bias). Jane and Sarah were given multiple chances during the investigation to address the evidence; John was given only one, and that one without any notice. JA 32 (¶12), JA 62-63 (¶¶116-17). Dean Chen proactively went to Jane and Sarah

45

when John offered evidence that contradicted them, to give them a chance to respond before the hearing. JA 67-68 (¶132). She never did that for John. Then, at the hearing, John was aggressively questioned for an hour and a half while Sarah was gently questioned for 30 minutes and Jane refused to show up. JA 83 (¶181), JA 85 (¶188); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (citing "the panel members' hostility toward John" as "further support[ ] . . . that Jane's allegation was all they needed to hear to make their decision"). Those allegations are evidence of bias.

Third, the Complaint details how Princeton treated John's male witnesses very differently than it treated Jane's and Sarah's female witnesses. *See, e.g.*, JA 32 (¶12). Princeton interviewed several female witnesses who were expected to provide support for Jane's and Sarah's claims, yet failed to interview a number of male witnesses it knew could confirm or deny parts of their stories, including whether Jane had bruises on her neck, whether Jane refused to sleep in John's dorm the rest of the week as she'd claimed, and whether she had falsely accused another male friend of choking. JA 69 (¶136), JA 69-70 (¶139); *see also Vengalattore*, 36 F.4th at 107 (lopsided investigation supported inference of gender bias where school failed to "interview certain witnesses or ask certain questions that could have produced information favorable to" male respondent). Likewise, Dean Chen took proactive steps to seek out evidence (from Jane and Sarah) in response to

46

other evidence she had heard in the case, JA 67-68 (¶132), but did not do so for John when he asked for a critical witness (Student X) to testify at the hearing, JA 66-67 (¶128), JA 69 (¶136); *see Menaker*, 935 F.3d at 34 (fact that panel "declined even to explore the testimony of [the accused's] witnesses" gave "plausible support to the proposition that they were motivated by bias"). The Committee also refused to credit the only eyewitness to Jane's incident—a male witness for John—yet never explained why. JA 88 (¶197). Its decision in the end to credit exclusively female testimony and to reject all male testimony is further support for John's claim of bias. *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (reversing dismissal of Title IX claim based solely on school's having "credited exclusively female testimony (from Roe and her witnesses) and rejected all male testimony (from Doe and his witnesses)" against backdrop of "pressure on the university" to vigorously enforce such claims).

### B. Princeton Engaged in Those Acts of Bias Against a Backdrop of Gender-Based Pressure.

Even if the collective weight of all of those irregularities were not enough to state a Title IX claim, they overwhelmingly do so when viewed through the lens of the pressure Princeton was under to favor claims of assault brought by women against men and to battle "toxic masculinity." *See* JA 48 (¶65), JA 101 (¶256). As the district court recognized, the nationwide pressure exerted on schools by the Education Department's implementation of the 2011 "Dear Colleague Letter"

47

(DCL), *see* JA 39-42 (¶¶37-46), is widely recognized as lending support to an inference of gender bias, even after the letter's rescission. *See, e.g., Univ. of the Sciences*, 961 F.3d at 209-10; JA 16 (DCL pressure "factors into the total mix").[10]

The Complaint also explains how high-level Princeton administrators wanted to hew to that biased regime and took significant steps to do so even when the federal government allowed schools to end it. JA 42-44 (¶¶47-52), JA 47-49 (¶¶62-64); *see, e.g., Roebuck v. Drexel University*, 852 F.2d 715, 733 (3d Cir. 1988) (single statement by university president five years before plaintiff's denial of tenure was evidence of racial bias under Title VII because "jury was entitled to infer" he "had a significant influence on the attitudes and procedures of the tenure decisionmakers"). Princeton administrators immediately said that Princeton "would not change its policies and procedures" because "its DCL-era procedures were 'working well' and were 'fair.'" JA 43 (¶50). In 2019, Princeton formally opposed the new federal regulations that would replace the DCL regime. JA 44 (¶53). When those new regulations became effective, Princeton responded by

---

[10] The district court reasoned that it is "unclear how probative this allegation is in this case" since John was not charged specifically under Title IX. JA 16. But sex discrimination (or any form of discrimination) can be present in the application of *any* policy, not just sex-based ones. Moreover, any ambiguity in that regard must be resolved in John's favor at the motion to dismiss stage. And as explained further below, the pressure at Princeton extended beyond Title IX to things like "toxic masculinity" more generally.

48

"adopting an admittedly 'complicated' two-track system" that would apply the new regulations *only* to claims of sexual misconduct that fell strictly within the jurisdiction of the new regulations, ensuring that the DCL-era procedures would still be used in as many instances as possible. JA 48 (¶64).

The Complaint also explained how Princeton was under significant *internal* pressure to favor assault claims brought by women against men in the run-up to John's proceeding. JA 43-52 (¶¶51-73); *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 336 (1st Cir. 2022) (explaining why internal campus pressure typically is even more suggestive of bias than nationwide government pressure); *Columbia Univ.*, 831 F.3d at 58. The PIXR protests, which began in May 2019 and blamed sexual assault in part on "'toxic masculinity,'" became a touchstone on campus for how to view the problem of sexual assault, so much so that in May 2023—just four months before John's proceeding—they were the subject of a lengthy article in the *Daily Princetonian*, JA 52 (¶73), which had been repeatedly critical of Princeton's handling of sexual assault. JA 47-52 (¶¶61-72). Princeton responded to that pressure by commissioning two reviews, one of which explicitly recommended training on "toxic *masculinity*." JA 46 (¶60) (emphasis added).

This pressure plausibly casts the procedural irregularities above in a new light. It makes it at least plausible to infer that when Princeton pursued evidence for female complainants but not John; questioned John and his male witness more

49

harshly at the hearing; disregarded the male eyewitness's testimony without explanation; and issued an unsupported rationale in the female complainants' favor, it was motivated, at least in part, by gender bias. That is what it means to view acts of bias through the lens of the "total mix of information" available—to look at the bundle, not just at each stick. *Princeton III*, 30 F.4th at 345.

### C. The District Court Wrongly Analyzed Each Irregularity in Isolation, Rather Than as a "Total Mix" of Evidence.

The district court misapplied that standard in dismissing John's Title IX claim. It viewed each source of bias in isolation—stick by stick—and held that, because each one did not *itself* reveal a connection to gender, John's claim must fail. It rejected Princeton's lopsided questioning of the parties because John "fail[ed] to connect how pointed or confrontational questioning amounts to bias against men[.]" JA 13. It ignored Princeton's unsupported rationale because such allegations, standing alone, "[did] not demonstrate bias against Plaintiff on account of his status as a male student." JA 14. And it rejected the otherwise lopsided nature of the process because such allegations, standing alone, "do not give rise to an inference of gender bias." JA 15. That left just the background pressure on Princeton, which courts have said is never enough, standing alone, to state a claim in an individual case. JA 15-16.

But that is not what it means to consider the "total mix" of evidence. The district court was required to take the irregularities before it—which reveal some

form of bias—and ask whether it was plausible to infer, at the motion-to-dismiss stage, that anything external to them "allows the inference that [they] were based on sex." *Schiebel*, 120 F.4th at 1096; *Baum*, 903 F.3d at 586 ("this specific allegation of adjudicator bias [*i.e.*, crediting all females and discrediting all males], *combined with* the external pressure facing the university, makes Doe's claim plausible") (emphasis added); *Erny v. Board of Trustees of Indiana University,* 1:22-cv-00524, ECF No. 98 at 24-25 (S.D. Ind. June 3, 2024) (denying summary judgment because, while "each of the individual categories of evidence identified by Plaintiff—the external pressure evidence, the University data showing sex-based decision-making, and the panel's decision—could not, alone, support an inference of sex bias, . . . taken together and viewed in the light most favorable to Plaintiff," they permit reasonable jury to infer sex bias). But the district court wholly failed to do that, and in doing so violated this Court's instructions in *Princeton III*.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that this Court reverse the district court's dismissal of his breach of contract, breach of the implied covenant, and Title IX claims.

DATED:  August 11, 2025

Respectfully submitted,

/s/ Justin Dillon
Justin Dillon
Christopher C. Muha
Kimberly Blasey
Dillon PLLC
1717 K Street, Suite 900
Washington, DC 20005
(202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
jsolano@dynamisllp.com

*Attorneys for Plaintiff John Doe*

52

## CERTIFICATE OF COMPLIANCE

I, Jamie Hoxie Solano, Esq., hereby certify that:

(1)    this brief contains 12827 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and thus does not exceed the 13,000-word limit prescribed in Federal Rule of Appellate Procedure 32(a)(7);

(2)    this brief complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using a proportionally spaced typeface, Times New Roman, with 14-point font, using Microsoft Word;

(3)    the text of the electronic PDF brief is identical to the text of the paper copies; and

(4)    the electronic PDF brief has been prepared on a computer that is automatically protected with a virus detection program, namely Microsoft Defender, and no virus was detected.

s/ Jamie Hoxie Solano
Jamie Hoxie Solano, Esq.

Dated: August 11, 2025

53

## CERTIFICATE OF BAR MEMBERSHIP

Jamie Hoxie Solano, Esq., Justin Dillon, Esq., Christopher C. Muha, Esq., and Kimberly Blasey, Esq., are members in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

s/ Jamie Hoxie Solano
Jamie Hoxie Solano, Esq.

Dated:  August 11, 2025

## **CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on August 11, 2025, I caused the foregoing Brief and the Joint Appendix to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, and thereby to be served upon all counsel appearing in this case, and to have seven paper copies of the Brief and four paper copies of the Joint Appendix delivered to the Court.

s/ Jamie Hoxie Solano
Jamie Hoxie Solano, Esq.

Dated:  August 11, 2025

**No. 25-2014**

# United States Court of Appeals for the Third Circuit

JOHN DOE,
*Plaintiff-Appellant,*

v.

PRINCETON UNIVERSITY TRUSTEES,
*Defendant-Appellee.*

On Appeal from the U.S District Court for the
District of New Jersey,
No. 3:24-cv-7125 (Hon. Zahid N. Quraishi, U.S.D.J.)

## JOINT APPENDIX VOLUME I

JUSTIN DILLON
CHRISTOPHER MUHA
KIMBERLY BLASEY
Dillon PLLC
1717 K Street NW
Washington, DC 20006
(202)787-5872
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

JAMIE SOLANO
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
jsolano@dynamisllp.com

# TABLE OF CONTENTS

I.May 23, 2025 Notice of Appeal ........................................................................ JA1

II.April 28, 2025 District Court Order ............................................................ JA3

III.April 28, 2025 Opinion ............................................................................... JA4

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

JOHN DOE,
Address Withheld,

           Plaintiff,

           v.

THE TRUSTEES OF PRINCETON
UNIVERSITY,
Princeton, NJ 08544

           Defendant.

**Case No. 3:24-cv-07125-ZNQ-TJB**

## NOTICE OF APPEAL

Notice is hereby given that plaintiff, John Doe, intends to stand on the allegations in the dismissed complaint and hereby appeals to the United States Court of Appeals for the Third Circuit from the Order and accompanying Opinion, dated April 28, 2025, of the U.S. District Court, District of New Jersey (ECF Nos. 24, 25), dismissing this action in its entirety.

DATED:  May 23, 2025

          Respectfully submitted,

          DILLON PLLC
          Justin Dillon (*pro hac vice*)
          Christopher C. Muha (*pro hac vice*)
          Kimberly Blasey (*pro hac vice*)
          1717 K Street, Suite 900
          Washington, DC 20005
          T: (202) 787-5858
          jdillon@dillonpllc.com
          cmuha@dillonpllc.com
          kblasey@dillonpllc.com

          /s/ Jamie Hoxie Solano
          Jamie Hoxie Solano (NJ Bar No.
          426422024)

**JA 1**

2

DYNAMIS LLP
11 Park Place
New York, NY 10007
T: (973) 295-5495
jsolano@dynamisllp.com

*Attorney for Plaintiff John Doe*

2

**JA 2**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN DOE,** | |
| Plaintiff, | Civil Action No. 24-7125 (ZNQ) (TJB) |
| v. | **ORDER** |
| **THE TRUSTEES OF PRINCETON UNIVERSITY,** | |
| Defendant. | |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendant The Trustees of Princeton University. ("Motion," ECF No. 16.) For the reasons set forth in the accompanying Opinion,

**IT IS** on this **28th** day of April 2025,

**ORDERED** that Defendant's Motion (ECF No. 16) is hereby **GRANTED**;

**ORDERED** that Plaintiff's Complaint (ECF No. 1) is hereby **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that Plaintiff will be given leave to file a First Amended Complaint to address the deficiencies set forth in the accompanying Opinion within thirty (30) days from the date of this Order.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**JA 3**

<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **JOHN DOE**, | |
| Plaintiff, | Civil Action No. 24-7125 (ZNQ) (TJB) |
| v. | **OPINION** |
| **THE TRUSTEES OF PRINCETON UNIVERSITY**, | |
| Defendant. | |

**<u>QURAISHI, District Judge</u>**

**THIS MATTER** comes before the Court upon a Motion to Dismiss ("Motion", ECF No. 16) filed by Defendant The Trustees of Princeton University ("Defendant"). Defendant filed a brief in support of its Motion. ("Moving Br.", ECF No. 16-1.) Plaintiff John Doe ("Plaintiff") filed an opposition. ("Opp'n Br.", ECF No. 17.) Defendant filed a reply. ("Reply Br.", ECF No. 18.)

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[1] For the reasons set forth below, the Court will **GRANT** the Motion.

I.    **<u>BACKGROUND</u>**

This matter arises out of Princeton University's (the "University") investigation and disciplinary sanction of Plaintiff, a male undergraduate student, after two women accused him of

---

[1] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure unless otherwise noted.

**JA 4**

assault.  The University ultimately found Plaintiff in violation of its code of conduct and imposed a two-year suspension.  Plaintiff now brings this suit, claiming, among other things, that the University's investigation and decision were rife with gender bias in violation of Title IX of the Education Amendment Act of 1972, 20 U.S.C. §§ 1681–88.

### A.     FACTUAL HISTORY[2]

In September 2023, the University's Office of the Dean of Undergraduate Students received a report that Plaintiff had physically assaulted two women.  (Compl. ¶¶ 116–117, ECF No. 1.)  The alleged victims were a University student, Sarah, and a non-student, Jane Doe ("Jane").  (*Id.* ¶ 117.)[3]  Sarah accused Plaintiff of choking her on March 3, 2023, at an eating club party (*id.* ¶ 115) and Jane accused Plaintiff of choking her on the night of April 1, 2023, while she was visiting Plaintiff at the University (*id.*).

### 1.     March 3, 2023, Incident

On March 3, 2023, Plaintiff, Sarah, and their mutual friend, referred to as Student 3, attended a party at a University eating club.  (*Id.* ¶ 88.)  Student 3 had allegedly been harassed at a prior eating club event and Plaintiff therefore asked Sarah to "keep an eye on Student 3."  (*Id.*)  Plaintiff, in his own words, believed that "Sarah was not doing a good job of keeping an eye on Student 3" and "confronted Sarah in actions he would come to regret," speaking "closely and loudly" with Sarah.  (*Id.* ¶ 89.)  Three female students walked by and asked Sarah if she was okay.  (*Id.*)  Sarah later reported that, in addition to yelling at her, Plaintiff choked her.  (*Id.* ¶ 115.)

---

[2] For the purposes of considering the Motion, the Court accepts all factual allegations in the Complaint as true.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).
[3] The Court refers to "Sarah" to be consistent with the Complaint.

**JA 5**

### 2. April 1-2, 2023, Incident

On April 1, 2023, Jane was at the University visiting Plaintiff while she was on spring break. (*Id.* ¶ 93.) That night, Plaintiff, Jane, Sarah, Student 3 (from the March 3 incident), and two other students—Student 4 and Student 5 (Plaintiff's roommate)—were drinking in Plaintiff's room. (*Id.* ¶ 94.) The group, with the exception of Plaintiff's roommate, then left Plaintiff's room and began to walk to an event at an eating club on campus. (*Id.*) As they walked, Plaintiff and Jane "kissed briefly," causing Students 3 and 4 to break from the group. (*Id.* ¶ 95.) Jane and Sarah then kissed, which caused an argument between Plaintiff and Jane. (*Id.* ¶ 96.) As Plaintiff and Jane argued, Sarah "in her drunken state, lay[ed] on the ground." (*Id.* ¶ 97.) Jane later reported to the University that "she had not reciprocated Plaintiff's kiss, and that after she kissed Sarah, [Plaintiff] became upset with her and choked her." (*Id.* ¶ 115.)

Plaintiff alleges that "after some amount of arguing," Jane "suddenly collapsed backwards into [him], then fell to the ground screaming and crying loudly." (*Id.* ¶ 98.) Student 4 witnessed the incident as he was walking back to the group. (*Id.* ¶ 99.) As Sarah and Student 4 rushed to her, Jane started to say, "Z choked me," and "[h]e choked me." (*Id.* ¶ 100.)

Jane confronted Plaintiff about the incident the next day and Plaintiff responded that he had "zero memory of anything like that happening." (*Id.* ¶ 104.) Plaintiff then called his parents, allegedly under duress by Jane, whereby he claimed to have been "trying to pull [Jane] in to talk to her and, like, damaged her windpipe ever so slightly." (*Id.* ¶ 111.)

### 3. The University's Code of Conduct

As a student, Plaintiff was subject to the University's code of student conduct entitled "Rights, Rules, Responsibilities." ("Code", ECF No. 16-1, Ex. A.)[4] Among other things, the Code

---

[4] Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleading," *Doe v. Princeton Univ.*, 30 F.4d 335, 342 (3d Cir. 2022) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

**JA 6**

lays out the University's investigatory process and disciplinary proceedings for alleged violations of the Code, and notes that the Faculty-Student Committee on Discipline ("Committee") is responsible for its administration. (*Id.* at 50, subsection 2.5.1.) The Code provides that a Dean or University investigator will investigate alleged infractions.[5] (*Id.* at 50–51, subsection 2.5.2.) Following an investigation and a hearing before the Committee, "to find that a student has violated a University Rule, a majority of the voting members present must conclude that the evidence presented constitutes a clear and persuasive case in support of the charges against the student." (*Id.* at 52.) The Committee then determines the proper penalty. (*Id.*) If the Committee finds a student violated the Code, the student has the right to appeal the decision to a three-member "impartial and unbiased" panel. (*Id.*)

### 4. Investigation

On September 26, 2023, a University investigator contacted Plaintiff about the reports. (*Id.* ¶ 116.) On September 29, 2023, the investigator interviewed Plaintiff and informed him of the charges against him. (*Id.* ¶ 117.) Plaintiff submitted a written statement to the investigator as well as a letter from "Student X," a student whom Jane alleged threatened to choke her, accusing Jane of defaming him. (*Id.* ¶ 118.) Thereafter, Deputy Dean of Undergraduate Students Joyce Chen ("Dean Chen") provided Plaintiff with a formal notice of the charges and packets of evidence that had been collected during the University's investigation, including written statements of the

---

1426 (3d Cir. 1997)), but where the document is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment" under Rule 56. *id.* (quoting *Doe v. University of Sciences*, 961 F.3d 203, 208 (3d Cir. 2020)). Because the Code, which Defendant attached excerpts of to its Motion, is cited and relied upon in the Complaint, the Court may consider it.

[5] The Committee is generally responsible for administering the Code, assessing reported violations and assigning any penalties. (Code at 50, subsection 2.5.1.) When charges are raised in connection with an investigation under the University's Title IX sexual harassment and sexual misconduct policies, however, the Title IX coordinator "may direct a Title IX panel to investigate and adjudicate charges normally handled by the [Committee]." (*Id.*) Such a transfer never took place here because Plaintiff was charged with violating the Code's Personal Safety and Alcohol policies, not its Title IX policy. (*See* Moving Br. at 20.)

alleged victims and summaries of the witnesses interviewed. (*Id*. ¶ 126.) Dean Chen told Plaintiff "to let her know as soon as possible if he wanted any additional interviews to be conducted based on the information in the packet." (*Id*. ¶ 122.)

The Committee formally charged Plaintiff with two violations of the University's Code. (*Id*. ¶ 123.) First, Plaintiff was charged with a violation of the Code's Personal Safety Policy for his actions on March 3, 2023, and April 1, 2023, when he allegedly choked Sarah and Jane, respectively.[6] (*Id*.) Plaintiff was additionally charged with a violation of the Code's Alcohol Policy for allegedly hosting a "pregame" in his dorm room on the night of April 1, 2023, and serving alcohol to minors.[7] (*Id*.)

In advance of a hearing before the Committee on the alleged charges, Plaintiff asked Dean Chen if he could call Student X as a witness. (*Id*. ¶ 125.) Dean Chen responded that he could not because Student X was not interviewed but suggested that Student X "submit a written statement with any information he would like to share with the committee." (*Id*. ¶ 128.) Dean Chen further informed Plaintiff that he could prepare to ask questions at the hearing of any individuals who were interviewed. (*Id*.) Plaintiff submitted a supplemental statement as well as materials related to Student X. (*Id*. ¶ 131.)

### 5. Disciplinary Hearing

On November 6, 2023, the Committee—a panel of two faculty members, three students, and Dean Chen—held a hearing on the charges against Plaintiff. (*Id*. ¶ 162.) Plaintiff was

---

[6] Subsection 1.2.5(5) of the Code provides that certain "actions that threaten or endanger in any way the personal safety or security of others will be regarded as serious offenses," including, "[a]ny physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results." (Code at 37–38.)

[7] Subsection 2.2.9(2)(d) provides that a violation occurs "when alcohol is served, provided, or made available by or to persons under the age of 21. Violations involving juveniles, such as high school applicants or visitors to the University, will be deemed particularly serious." (*Id*. at 46.) Under the Code, consequences for violating the Alcohol Policy include suspension. (*Id*.)

**JA 8**

accompanied by a student adviser. (*Id.* ¶ 128.) The hearing panel asked Plaintiff a series of questions about the incidents and the following four students testified: Student 4 (testified as a witness to the incident between Jane and Plaintiff); Student 6 (testified that Jane had a raspy voice when he saw her after the incident); Student 7 (testified that Sarah told her Plaintiff choked her); and Sarah (testified about Plaintiff's character). (*Id.* ¶¶ 181–182, 190, 192.) Jane was not present at the hearing and did not testify. (*Id.* ¶162.)

On November 8, 2023, the Committee issued its formal decision via a letter in which it found Plaintiff responsible for two violations of the Code's Personal Safety Policy and one violation of the Code's Alcohol Policy. (*Id*. ¶ 195.) As a result of these determinations, the University suspended Plaintiff for two years. (*Id.* ¶ 203.)

> 6.     Internal Appeal

Plaintiff appealed the Committee's decision, arguing that the investigator "treated male and female witnesses differently during the investigation" and that he was not offered the chance to "respond to the statements the complainants had made in their interviews." (*Id.* ¶ 209.) On December 20, 2023, the review panel upheld Plaintiff's two-year suspension. (*Id*. ¶ 217.)

## B.     PROCEDURAL HISTORY

On June 20, 2024, Plaintiff filed a four-count Complaint against Defendant, alleging: breach of contract (Count One) (*id.* ¶¶ 230–251); breach of the implied covenant of good faith and fair dealing (Count Two) (*id.* ¶¶ 242–251); gender discrimination, in violation of Title IX, 20 U.S.C. § 1681(a) (Count Three) (*id.* ¶¶ 252–258); and gross negligence (Count Four) (*id.* ¶¶ 259–265). The crux of the Complaint alleges that Defendant's decision to sanction Plaintiff was erroneous. (*See generally* Compl.)

In lieu of an answer, Defendant now moves to dismiss the Complaint pursuant to Rule 12(b)(6), contending that the Complaint has not plausibly alleged that it violated its own policy in

**JA 9**

its investigation or demonstrated that sex was a motivating factor in its decision to discipline Plaintiff. (Moving Br. 9–21.)

## II.     SUBJECT MATTER JURISDICTION

The Court has subject-matter jurisdiction over Plaintiff's federal claim under 28 U.S.C. § 1331. This Court also has subject-matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.[8]

## III.     LEGAL STANDARD

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. When considering a motion under Rule 12(b)(6), a district court conducts a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed me. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556

---

[8] Plaintiff is a citizen of a State other than New Jersey (Compl. ¶ 18), and the University is a private university located in Princeton, New Jersey (*id.* ¶19).

**JA 10**

U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## IV.     **DISCUSSION**

The Court begins its discussion of the Motion with Plaintiff's federal claim and then proceeds to the state law claims.

### A.     **GENDER DISCRIMINATION UNDER TITLE IX (COUNT THREE)**

Count Three of the Complaint alleges that the Committee's findings and the sanction imposed were the product of gender bias in violation of Title IX. (*Id.* ¶¶ 252–258.)

Title IX of the Education Amendment Act of 1972 states that "[n]o person . . . shall, on the basis of sex, be excluded, from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Among other things, it "bars the imposition of university discipline where sex is a motivating factor in the decision to discipline." *Doe v. Princeton Univ.*, 30 F.4th 335, 343 (3d Cir. 2022) (*Princeton III*) (quoting *Doe v. Univ. of Sciences.*, 961 F.3d 203, 209 (3d Cir. 2020)) (*USciences*). In *USciences*, the Third Circuit adopted a "straightforward pleading standard" for Title IX claims: "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." 961 F.3d at 209.

"A plaintiff must 'cast some articulable doubt on the accuracy of the disciplinary proceeding' and then show 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 773 (3d. Cir. 2020) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). A plaintiff may make this

**JA 11**

showing in various ways, including by alleging "procedural flaws in the investigatory and adjudicative process; noting errors or inconsistencies in the adjudicator's oral or written findings; or challenging the overall adequacy and reliability of the evidence." *Doe v. Coll. of New Jersey,* Civ. No. 22-3282, 2023 WL 281262, at *6 (D.N.J. April 6, 2023) (citing *Doe v. Marymount Univ.,* 297 F. Supp. 3d 573, 584 (E.D. Va. 2018)). Generalized and conclusory allegations are insufficient to raise an inference of disparate treatment where a male plaintiff "alleged no facts reflecting that the disciplinary process and results for female victims are different from men." *Doe v. Princeton Univ.,* 790 F. App'x 379, 383 (3d Cir. 2019) (*Princeton II*) (affirming dismissal of Title IX claim because allegations that the plaintiff "would not have been subject to Princeton's discriminatory acts if he were a female victim," and that the university "does not believe male students can be victims," were insufficient to survive a motion to dismiss).

Plaintiff alleges that the University violated Title IX by discriminatorily investigating and adjudicating the reports against him. (Compl. ¶ 252–258.) In support of his Title IX claim, Plaintiff alleges that the University was pressured to respond deferentially to female accusers of assault, the University investigator and Committee were biased, the Committee used a conclusory and unsupported rationale to find Plaintiff responsible, and the sanction imposed was disproportionate to his violations. (*Id.* ¶ 256.) Plaintiff alleges that (1) the investigation was biased because he was questioned "more pointedly and confrontationally" than Jane or Sarah, (2) Jane and Sarah were found credible despite inconsistencies in their stories, (3) "exculpatory witnesses" were not pursued, (4) male witnesses were not asked questions about whether Jane had any bruising on her neck, and (5) female witness were pursued "on behalf of Jane and Sarah but not similarly situated male witnesses on behalf of [Plaintiff]." (*Id.*)

**JA 12**

In its Motion, Defendant argues that the Complaint does not support an inference that it discriminated against Plaintiff based on sex and that, at most, Plaintiff has suggested that the University is biased in favor of complaining parties. (Moving Br. at 22, 26.) Defendant additionally argues that the allegations as to external pressure focus on the University's responses to claims of sexual misconduct and sexual assault and "this is not a sexual assault case." (*Id.* at 27.)

Here, the Court finds that the Complaint does not support a plausible inference of sex discrimination and thus does not give rise to a Title IX claim. Plaintiff fails to allege how the purported difference in his alleged treatment by the Committee is tied to gender. *See Verdu v. Trs. of Princeton Univ.*, Civ. No. 19-12484, 2020 WL 1502849, at *5 (D.N.J. March 30, 2020) ("Having considered Plaintiff's allegations, I cannot find that the Complaint supports a plausible inference that, *because of his gender*, Plaintiff was found to have violated the University's Sexual Misconduct Policy.").

Taking Plaintiff's allegations in turn—first, that he was questioned "more pointedly and confrontationally" than Sarah or Jane (Compl. ¶ 256)—the Court finds that such an allegation does not evince gender bias. Significantly, the Complaint alleges that Jane did not even testify at the hearing on November 6, 2023. (*Id.* ¶ 162.) The Court additionally finds that Plaintiff fails to connect how pointed or confrontational questions amounts to bias against men rather than an intent to thoroughly investigate two accusations of assault. "Indeed, courts have stressed that '[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students.'" *Doe v. Rider Univ.*, Civ. No. 16-4882, 2018 WL 466225, at *10 (D.N.J. Jan. 17, 2018) (quoting *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015)). Plaintiff's

**JA 13**

allegations of differential treatment, at best, reflect a bias against alleged perpetrators and in favor of complainants and indicate nothing about gender discrimination. And where there are allegations of bias in favor of victims, without further allegations specifically regarding gender, courts have held these claims have failed to adequately plead a Title IX claim. *See Doe v. Princeton Univ.*, Civ. No. 22-5887, 2023 WL 8755232, at *9 (D.N.J. Dec. 19, 2023) ("[T]he Court is loathe to accept the assertion that the panel chose to believe [the complainant's] account over Plaintiff's as evidence of gender bias given the Supreme Court's admonition that 'courts should refrain from second-guessing the disciplinary decisions made by school administrators.'") (quoting *Davis ex rel. LaShonda D v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 648 (1999))).

Second, Plaintiff alleges that the Committee found Jane and Sarah credible despite "changes to their stories." (Compl. ¶ 256.) The Court finds again that these allegations do not demonstrate bias against Plaintiff on account of his status as a male student. *St. Joseph's Univ.*, 832 F. App'x at 774–75 (noting that the university panel's investigation, which failed to question the complainant's credibility or memory, may have been "shoddy," but did not give rise to gender bias where, like here, the "allegations" did not "relate to bias on account of sex") (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016)). Like in *Doe v. St. Joseph's University*, none of Plaintiff's allegations about the investigation or adjudication support a plausible inference that the University discriminated against him based on sex. *See also Gendia v. Drexel Univ.*, Civ. No. 20-1104, 2020 WL 5258315, at *4 (E.D. Pa Sept. 2, 2020) (finding that the plaintiff did not connect a credibility determination or inclusion or exclusion of certain evidence against the plaintiff to gender).

To the extent that Plaintiff attempts to allege that the process was one-sided or irregular, the Complaint reveals that Plaintiff received notice of the charges filed against him (Compl. ¶ 126),

**JA 14**

was given all the evidence collected (*id*.), had the opportunity to submit a statement and otherwise respond to the charges (*id.* ¶ 118, 131), and could identify witnesses as sources of potential favorable information to him to be interviewed (*id*. ¶ 122). Plaintiff was additionally afforded a hearing and the ability to confront one of his accusers (Sarah) as well as other witnesses. (*Id.* ¶ 128.) *Cf. Collick v. William Paterson Univ.*, Civ. No. 16-471, 2016 WL 6824374 (D.N.J. Nov. 17, 2016) (finding that the plaintiffs pled a Title IX claim where the alleged perpetrators were not given an opportunity to respond or explain themselves, did not receive proper notice of the charges, were not permitted to confront or cross examine their accuser, and no investigation was performed). Accordingly, Plaintiff's allegations of a flawed process are conclusory and otherwise do not give rise to an inference of gender bias. *See Rider Univ.*, 2018 WL 466225, at *9 ("[S]pecific allegations of procedurally flawed proceedings coupled with conclusory allegations of gender discrimination are not sufficient to survive a motion to dismiss."); *see also Yusuf*, 35 F.3d at 715 ("Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome *combined* with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. . . . A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.").

Lastly, Plaintiff references the 2011 Department of Education's Dear Colleague Letter ("2011 Letter"),[9] to suggest that the University was induced to discriminate against male students like Plaintiff who are accused of assault. (*See* Compl. ¶¶ 38, 39, 47–52, 256); *see also Princeton III*, 30 F.4th at 345 (explaining that the 2011 Letter "ushered in a more rigorous approach to

---

[9] As alleged, "[b]eginning in 2011, Princeton came under heavy pressure from the federal government to appear tough at all costs on claims of sexual assault, especially those brought by women against men. That pressure was exerted primarily through enforcement of a 'Dear Colleague Letter' . . . published by the Education Department's Office for Civil Rights (OCR) in April of that year, which concerned the ways schools were to enforce Title IX and address claims of sexual assault on their campuses." (Compl. ¶ 38.)

**JA 15**

campus sexual misconduct allegations") (citations omitted). This allegation alone, however, cannot support a plausible claim of Title IX discrimination but "factors into the total mix of information." *USciences*, 961 F.3d at 210. It is further unclear how probative this allegation is in this case since Plaintiff was not charged with a violation of the University's Title IX policies on sexual misconduct or sexual assault.

Accordingly, the Court will dismiss Count Three without prejudice.

## B.     BREACH OF CONTRACT (COUNT ONE)

In Count One, Plaintiff asserts a breach of contract claim, alleging that he and the University were parties to a contract, which included the University's Code.[10] (Compl. ¶¶ 230–241.) Plaintiff alleges that the University breached its duty under the contract by failing to apply the clear and persuasive evidence standard when it found Plaintiff responsible for misconduct and in the denial of Plaintiff's appeal. (*Id.* ¶¶ 233–240.) Defendant argues in its Motion that the Committee and the appeals panel "follow[ed] its own established procedures" and required steps under the Code including use of the clear and persuasive standard and adherence to the Code's prescribed grounds for appeal. (Moving Br. at 10–13.) Defendant contends that Plaintiff's disagreement with the outcome does not amount to a claim for breach of contract. (*Id.* at 13.)

For contract claims relating to discipline of a student for misconduct, New Jersey courts have "warned against a rigid application of the law of contracts."[11] *Princeton III*, 30 F.4th at 346.

---

[10] Defendant contends that Plaintiff "fails to adequately plead exactly what the 'contract' is in this case" but nevertheless responds substantively to Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims. (*See* Moving Br. at 18.) Given that the Third Circuit has construed a student handbook to bind universities and students and has entertained breach of contract claims in this context, the Court accepts that the relationship between Plaintiff and the University was contractual. *See USciences*, 961 F.3d at 211–12 (under Pennsylvania contract law); *Princeton III*, 30 F.4th at 346–48 (under New Jersey contract law); *see also Gendia*, 2020 WL 5258315, at *5 ("A student handbook may constitute a contract between a school and its students, and, where a handbook promises that Title IX claims will be investigated and adjudicated fairly, a school may breach its contractual duty towards its students by not investigating and adjudicating such claims fairly.") (citing *USciences*, 961 F.3d at 212).

[11] The parties do not dispute that New Jersey law applies.

**JA 16**

(citations omitted). The role of the courts is therefore limited to determining whether the University "follow[ed] its own established procedures," and that those procedures were "fundamentally fair." *Id.* (citations omitted); *see also Princeton II*, 790 F. App'x at 385 ("[F]or contract claims relating to discipline for misconduct, courts will examine whether the 'institution violate[d] in some substantial way its rules and regulations.'") (quoting *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 698 (N.J. Super. Ct. App. Div. 1998)). Accepting the allegations in the Complaint as true, the Court finds that the Complaint does not sufficiently allege that the University failed to apply the clear and persuasive standard or that the denial of Plaintiff's appeal was unfair.

First, Plaintiff alleges that the Committee did not follow its own procedure when it failed to apply the clear and persuasive evidence standard. In support, Plaintiff contends that the Committee was "aware of a large amount of evidence that called Jane's and Sarah's credibility into question and undermined their claims." (Compl. ¶ 234.) Plaintiff alleges, for example, that Jane told the investigator that Plaintiff "grabbed my throat and lifted me off the ground" but said in a later interview that Plaintiff "did not squeeze the sides of my neck with his fingers." (*Id.* ¶ 147.) As for Sarah, Plaintiff alleges that Sarah claimed in her first interview that Plaintiff "had his hand on her throat and was using that hand to hold her in place" but in her second interview said that Plaintiff was "pushing" her neck. (*Id.* ¶ 158.) According to Plaintiff, Jane's and Sarah's stories were inconsistent, and thus the evidence before the Committee was not clear or persuasive.

The Court finds that the Complaint does not sufficiently allege that the Committee failed to apply the clear and persuasive standard. In fact, the Complaint makes clear that the Committee had a large amount of evidence before it, including Plaintiff's statement and supplemental statement, a letter from Student X as to his defamation claim against Jane, interviews of Plaintiff,

**JA 17**

Jane, Sarah, and multiple witnesses including men and women, and the testimonies given at the hearing. The Complaint demonstrates that the Committee made credibility determinations based on the evidence before it. "The fact that the University did not reach the conclusion Plaintiff desired is not a breach of contract especially since the University followed its procedures as outlined in the [Code]." *Doe v. Princeton Univ.*, Civ. No. 17-1614, 2018 WL 2396685 (D.N.J. May 24, 2018), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) (dismissing a breach of contract claim that alleged a violation of the Code where Princeton investigated, made factual findings, and provided a remedy). Moreover, the University held a live hearing on the charges against Plaintiff and Plaintiff had the opportunity to question any individual at the hearing who was interviewed. (Compl. ¶¶ 120, 128.) *See USciences*, 961 F.3d at 2015 (holding that, in the context of Title IX sexual-misconduct proceedings, "fairness" requires a "real, meaningful hearing" and "the opportunity for cross-examination of witnesses"). In short, the allegations do not adequately allege that the Committee failed to find the evidence before it clear and persuasive. Thus, the Court finds that the Complaint does not sufficiently allege that the University did not "follow its own established procedures," or that the procedure was unfair.

Second, the Complaint, moreover, does not reveal that the University breached its contract with Plaintiff by not reversing the Committee's decision on appeal. As outlined by the Code, there are three distinct grounds for appeal: 1) the procedures have not been fair and reasonable; 2) substantial relevant information exists that was not, and could not have been, presented to the Committee; and 3) the imposed penalty does not fall within the range of penalties imposed for similar conduct. (Code at 52 subsection 2.5.2.) In support of this claim, Plaintiff asserts that the investigatory procedure was unfair, and the Committee failed to pursue relevant testimony. (Compl. ¶ 239.) The Court finds, however, that the information Plaintiff claims the Committee

**JA 18**

failed to pursue—testimony from Student X—was due to Plaintiff's own failure to submit Student X to be interviewed. (Compl. ¶¶ 122, 125, 128.) Additionally, as explained above, the Court finds that the Complaint does not sufficiently allege that the investigation or procedure was unfair or not in accordance with the Code. Therefore, the appeals panel was not in breach for rejecting an appeal on fairness grounds.

In sum, Plaintiff has not alleged facts sufficient to demonstrate that the University breached the Code in its disciplinary process or in consideration of his appeal. The Court will therefore dismiss Count One without prejudice.

### C. BREACH OF GOOD FAITH AND FAIR DEALING (COUNT TWO)

In Count Two, Plaintiff asserts a claim for breach of the implied covenant of good faith and fair dealing, arguing that the University failed to conduct a fair investigation, hearing, or provide a meaningful rationale for its decision to suspend Plaintiff. (Compl. ¶¶ 242–251.) In its Motion, Defendant argues that Plaintiff fails to adequately allege that it acted with "bad faith" or had a "malicious motive", and Plaintiff is simply "repackaging" his breach of contract claim. (Moving Br. at 18.)

"In New Jersey, '[e]very contract contains an implied covenant of good faith and fair dealing.'" *Princeton III*, 30 F.4th at 348 (quoting *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002)). The implied covenant requires both parties to a contract to act in "good faith . . . [by] adher[ing] to community standards of decency, fairness, or reasonableness." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007) (citations and quotation marks omitted); *see Kenny v. Onward Search*, Civ. No. 15-456, 2015 WL 1799593, at *3 (D.N.J. Apr. 15, 2015) ("[A] contract[] include[s] an implied covenant that the parties to the contract will act in good faith."). As such,

**JA 19**

"the covenant 'allow[s] redress for the bad faith performance of an agreement.'" *Princeton III*, F.4th at 348.

In *Princeton III*, the Third Circuit held that the plaintiff adequately pled a breach of good faith and fair dealing claim where the complaint alleged that Princeton "[s]ubjected [the plaintiff] to a discriminatory disciplinary process, [d]isregard[ed] exculpatory evidence for [the plaintiff] and incriminating evidence against [the complainant], constru[ed] all discrepancies and inconsistencies in [the complainant's] favor, and ignor[ed] evidence corroborative of [plaintiff's] counter claims." *Id.* (internal quotations omitted). The Third Circuit further found that although this claim and the breach of contract claim, "share[d] some events and circumstances," the facts were not "redundant of one another." *Id.* (internal quotations and citations omitted). The Circuit Court, thus, allowed both claims to proceed. *Id.*; *see also Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 463 (D.N.J. 2020) ("The plaintiff cannot maintain a breach of the implied covenant of good faith and fair dealing claim that is duplicative of its breach of contract claim."); *Ohm Systems, Inc. v. Senergene Sols., LLC*, Civ. No. 23-1340, 2023 WL 8437279, at *3 (D.N.J. Dec. 5, 2023) (dismissing breach of good faith and fair dealing claim where "Plaintiff [did] not plead any additional facts to distinguish the claim from its breach of contract claim").

Here, Plaintiff's breach of the implied covenant of good faith and fair dealing claim is not duplicative of its breach of contract claim but the Court finds that it is nevertheless not adequately pled. Plaintiff contends primarily that the University breached the covenant of good faith and fair dealing for its failure to conduct a fair investigation or hearing and to provide a "meaningful rationale." (Compl. ¶¶ 244, 246, 248.) As for failure to conduct a fair investigation or hearing, the Court has already determined that the Complaint does not plausibly allege unfairness in the disciplinary process or procedure. Moreover, as to the failure to provide a meaningful rationale,

**JA 20**

although the Complaint alleges that the Committee's rationale and imposition of a two-year suspension was deficient, the Complaint does not plausibly allege that the Committee acted in bad faith or with malice toward Plaintiff.  Accordingly, the Court will dismiss Count Two without prejudice.

### D.      GROSS NEGLIGENCE (COUNT FOUR)

Finally, Count Four alleges gross negligence.  (Compl. ¶¶ 259–265.)  Defendant argues that universities owe no duty of care to students when carrying out disciplinary procedures and Plaintiff's gross negligence claim must be dismissed with prejudice.  (Moving Br. at 29.)  Notably, Plaintiff has not set forth any authority on whether a private university or its employees owe a certain duty of care to its students under New Jersey law in carrying out disciplinary procedures. The Court has identified at least one decision from this district that has declined to find such a duty exists.  *See Donohue v. Capella Univ.*, Civ. No. 22-5634, 2023 WL 5425503, at *7 (D.N.J. Aug. 22, 2023).  As in *Donohue*, Plaintiff here cites the University's alleged failure to act fairly in its investigation and adjudication of the charges against him as a basis for its negligence claim. "Plaintiff, however, cannot convert claims sounding in breach of contract to negligence claims simply by contending that failure to abide by contractual terms amounts to a breach of a legal duty." *Id.*

Plaintiff fails to cite, and the Court has not identified, any legal authority indicating what duty of care is owed to students in disciplinary proceedings.  Nor does Plaintiff otherwise assert allegations that are not subsumed by his contract-related claims.  Accordingly, Plaintiff's gross negligence claim will be dismissed without prejudice.  *See Minella v. Electron Microscopy Scis.*, Civ. No. 21-15906, 2022 WL 4300222, at *4 (D.N.J. Sept. 19, 2022) ("[Under New Jersey law,] a plaintiff is barred from asserting a tort claim arising from a contractual relationship unless the

**JA 21**

breaching party owed a duty independent of the duties that arose under the contract. . . . '[M]ere failure to fulfill obligations encompassed by the parties' contract, including the implied duty of good faith and fair dealing, is not actionable in tort.'" (quoting *Perkins v. Washington Mut., FSB*, 655 F. Supp. 2d 463, 471 (D.N.J. 2009))).

## V.     CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendant's Motion, and the Complaint will be dismissed without prejudice.  Plaintiff will be given leave to file a First Amended Complaint to address the deficiencies set forth in this Opinion within thirty (30) days from the date of the accompanying Order.  An appropriate Order will follow.

Date: April 28, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**JA 22**