**No. 25-2014**

# United States Court of Appeals for the Third Circuit

JOHN DOE,
*Plaintiff-Appellant,*

v.

PRINCETON UNIVERSITY TRUSTEES,
*Defendant-Appellee.*

On Appeal from the U.S District Court for the
District of New Jersey,
No. 3:24-cv-7125 (Hon. Zahid N. Quraishi, U.S.D.J.)

## JOINT APPENDIX VOLUME II

JUSTIN DILLON
CHRISTOPHER MUHA
KIMBERLY BLASEY
Dillon PLLC
1717 K Street NW
Washington, DC 20006
(202) 787-5872
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

JAMIE SOLANO
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
jsolano@dynamisllp.com

# TABLE OF CONTENTS

**I.District Court Docket Sheet, 24-cv-07125-ZNQ-TJB** ........................................... **JA23**

**II.June 20, 2024 Complaint** ...................................................................................... **JA28**

**III.Sept. 13, 2024 Motion to Dismiss** ........................................................ **JA107**

**IV.September 23, 2024 Opp'n to Motion to Dismiss** ................................................ **JA163**

**V.September 30, 2024 Reply in Support of Motion** ................................................ **JA200**

**VI.Pl.'s 12/5/25 Ltr to the Court**.................................................................................. **JA214**

Query     Reports     Utilities     Help     Log Out

APPEAL,CLOSED

# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
### CIVIL DOCKET FOR CASE #: 3:24-cv-07125-ZNQ-TJB

DOE v. PRINCETON UNIVERSITY
Assigned to: Judge Zahid N. Quraishi
Referred to: Magistrate Judge Tonianne J. Bongiovanni
Case in other court: Third Circuit, 25-02014
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 06/20/2024
Date Terminated: 04/28/2025
Jury Demand: None
Nature of Suit: 448 Civil Rights: Education
Jurisdiction: Federal Question

**Plaintiff**

**JOHN DOE**

represented by **BRYAN W. MCCRACKEN**
Ford O'Brien Landy LLP
275 Madison Ave
Ste Floor 24
New York, NY 07302
908-635-9829
Email: bmccracken@fordobrien.com
*TERMINATED: 04/16/2025*

**JAMIE HOXIE SOLANO**
DYNAMIS LLP
11 PARK PLACE
NEW YORK, NY 10007
214-454-8829
Email: JSolano@dynamisllp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**THE TRUSTEES OF PRINCETON
UNIVERSITY**

represented by **JAMES ANDREW KELLER**
SAUL EWING ARNSTEIN & LEHR LLP
1500 MARKET STREET
3800 CENTRE SQUARE WEST
PHILADELPHIA, PA 19102
215-972-1964
Fax: 215-972-4152
Email: james.keller@saul.com
*LEAD ATTORNEY*

JA 23

*ATTORNEY TO BE NOTICED*

**AMY L. PICCOLA**
SAUL EWING LLP
3800 CENTRE SQUARE WEST
1500 MARKET STREET
PHILADELPHIA, PA 19102
215-972-7777
Fax: 215-972-1871
Email: amy.piccola@saul.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/20/2024 | 1 | COMPLAINT against PRINCETON UNIVERSITY ( Filing and Admin fee $ 405 receipt number ANJDC-15459210), filed by JOHN DOE. (Attachments: # 1 Civil Cover Sheet)(SOLANO, JAMIE) (Entered: 06/20/2024) |
| 06/20/2024 | 2 | MOTION For Leave to Proceed Under Pseudonym by JOHN DOE. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order)(SOLANO, JAMIE) (Entered: 06/20/2024) |
| 06/20/2024 | | Judge Zahid N. Quraishi and Magistrate Judge Tonianne J. Bongiovanni added. (kht) (Entered: 06/20/2024) |
| 06/20/2024 | 3 | SUMMONS ISSUED as to THE TRUSTEES OF PRINCETON UNIVERSITY. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (kht) (Entered: 06/20/2024) |
| 06/20/2024 | | Set Deadlines as to 2 MOTION For Leave to Proceed Under Pseudonym . Motion set for 7/15/2024 before Magistrate Judge Tonianne J. Bongiovanni. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (kht) (Entered: 06/20/2024) |
| 07/01/2024 | 4 | NOTICE of Appearance by JAMES ANDREW KELLER on behalf of THE TRUSTEES OF PRINCETON UNIVERSITY (KELLER, JAMES) (Entered: 07/01/2024) |
| 07/01/2024 | 5 | NOTICE of Appearance by AMY L. PICCOLA on behalf of THE TRUSTEES OF PRINCETON UNIVERSITY (PICCOLA, AMY) (Entered: 07/01/2024) |
| 07/01/2024 | 6 | Application and Proposed Order for Clerk's Order to extend time to answer as to Answer to Complaint.. (KELLER, JAMES) (Entered: 07/01/2024) |
| 07/02/2024 | 7 | SUMMONS Returned Executed by JOHN DOE. THE TRUSTEES OF PRINCETON UNIVERSITY served on 6/21/2024, answer due 7/12/2024. (SOLANO, JAMIE) (Entered: 07/02/2024) |
| 07/02/2024 | | Clerk`s Text Order - The document 6 Application for Clerk's Order to Ext |

JA24

| | | |
|---|---|---|
| | | Answer/Proposed Order submitted by THE TRUSTEES OF PRINCETON UNIVERSITY has been GRANTED. The answer due date has been set for 7/26/2024. (jal, ) (Entered: 07/02/2024) |
| 07/11/2024 | 8 | NOTICE of Appearance by BRYAN W. MCCRACKEN on behalf of JOHN DOE (MCCRACKEN, BRYAN) (Entered: 07/11/2024) |
| 07/26/2024 | 9 | Letter from Defendant Trustees of Princeton University. (KELLER, JAMES) (Entered: 07/26/2024) |
| 07/31/2024 | 10 | Letter from Plaintiff, John Doe re 9 Letter. (SOLANO, JAMIE) (Entered: 07/31/2024) |
| 08/01/2024 | 11 | CONSENT ORDER granting pro hac vice admission as to Justin Dillon, Christopher Muha, and Kimberly Blasey. Signed by Magistrate Judge Tonianne J. Bongiovanni on 8/1/2024. (jdg) (Entered: 08/01/2024) |
| 08/07/2024 | | Pro Hac Vice fee received as to Justin Dillon, Christopher Muha, and Kimberly Blasey: $ 750, receipt number 139784. (jdg) (Entered: 08/07/2024) |
| 08/20/2024 | 12 | Notice of Request by Pro Hac Vice Kimberly Blasey to receive Notices of Electronic Filings. (SOLANO, JAMIE) (Entered: 08/20/2024) |
| 08/20/2024 | 13 | Notice of Request by Pro Hac Vice Justin Dillon to receive Notices of Electronic Filings. (SOLANO, JAMIE) (Entered: 08/20/2024) |
| 08/20/2024 | 14 | Notice of Request by Pro Hac Vice Chris Muha to receive Notices of Electronic Filings. (SOLANO, JAMIE) (Entered: 08/20/2024) |
| 08/21/2024 | | Pro Hac Vice counsel, KIMBERLY BLASEY, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jdg, ) (Entered: 08/21/2024) |
| 08/21/2024 | | Pro Hac Vice counsel, JUSTIN DILLION and CHRISTOPHER MUHA, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (mlh) (Entered: 08/21/2024) |
| 08/23/2024 | 15 | TEXT ORDER that the Court has considered the parties' letters 9 and 10 regarding Defendant's anticipated Motion to Dismiss. The Court hereby WAIVES the requirement for a pre-motion conference. Defendant shall file any Motion to Dismiss (limited to the bases for dismissal articulated in its letter 9 ) by no later than 09/13/2024, to be made returnable 10/07/2024. So Ordered by Judge Zahid N. Quraishi on 08/23/2024. (Gonzalez, P) (Entered: 08/23/2024) |
| 09/13/2024 | 16 | MOTION to Dismiss by THE TRUSTEES OF PRINCETON UNIVERSITY. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service) (KELLER, JAMES) (Entered: 09/13/2024) |
| 09/13/2024 | | Set Deadlines as to 16 MOTION to Dismiss . Motion set for 10/7/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided |

JA 25

| | | | |
|---|---|---|---|
| | | | on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 09/13/2024) |
| 09/23/2024 | 17 | | RESPONSE in Opposition filed by JOHN DOE re 16 MOTION to Dismiss (SOLANO, JAMIE) (Entered: 09/23/2024) |
| 09/30/2024 | 18 | | RESPONSE in Support filed by THE TRUSTEES OF PRINCETON UNIVERSITY re 16 MOTION to Dismiss (Attachments: # 1 Certificate of Service)(KELLER, JAMES) (Entered: 09/30/2024) |
| 12/05/2024 | 19 | | Letter from Plaintiff John Doe Requesting a Pretrial Conference. (SOLANO, JAMIE) (Entered: 12/05/2024) |
| 12/19/2024 | 20 | | ORDER Granting 2 Plaintiff's Motion to Proceed Pseudonymously. Signed by Magistrate Judge Tonianne J. Bongiovanni on 12/19/2024. (amv) (Entered: 12/19/2024) |
| 12/23/2024 | 21 | | TEXT ORDER: The Court is in receipt of Plaintiff John Doe's ("Plaintiff") Letter filed on December 5, 2024. (Docket Entry No. 19 ). In same, Plaintiff requests that the Court schedule an Initial Rule 16 Pretrial Conference to allow the parties to move forward with discovery. Defendant The Trustees of Princeton University ("Defendant") opposes Plaintiff's request. After review of the parties' positions, and as Defendant's Motion to Dismiss (Docket Entry No. 16 ) is pending, Plaintiff's request is denied. Discovery is stayed pending the Court's decision on Defendant's Motion to Dismiss. However, discovery may proceed if the parties consent to same. So Ordered by Magistrate Judge Tonianne J. Bongiovanni on 12/23/2024. (jem) (Entered: 12/23/2024) |
| 04/08/2025 | 22 | | MOTION to Withdraw as Attorney by JOHN DOE. (MCCRACKEN, BRYAN) (Entered: 04/08/2025) |
| 04/09/2025 | | | Set Deadlines as to 22 MOTION to Withdraw as Attorney . Motion set for 5/5/2025 before Magistrate Judge Tonianne J. Bongiovanni. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 04/09/2025) |
| 04/16/2025 | 23 | | LETTER ORDER granting 22 Motion to Withdraw as Attorney. Attorney BRYAN W. MCCRACKEN terminated. Signed by Magistrate Judge Tonianne J. Bongiovanni on 4/16/2025. (mlh) (Entered: 04/16/2025) |
| 04/28/2025 | 24 | | OPINION Filed. Signed by Judge Zahid N. Quraishi on 4/28/2025. (jal, ) (Entered: 04/28/2025) |
| 04/28/2025 | 25 | | ORDER granting 16 Motion to Dismiss; Plaintiff's 1 Complaint is dismissed without prejudice; Plaintiff is given leave to file a first Amended Complaint within 30 days from the date of this Order. Signed by Judge Zahid N. Quraishi on 4/28/2025. (jal, ) (Entered: 04/28/2025) |
| 05/23/2025 | 26 | | NOTICE OF APPEAL as to 24 Opinion, 25 Order on Motion to Dismiss, by JOHN DOE. Filing fee $ 605, receipt number ANJDC-16288315. The Clerk's Office hereby |

**JA 26**

| | | |
|---|---|---|
| | | certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. Appeal Record due by 6/6/2025. (SOLANO, JAMIE) (Entered: 05/23/2025) |
| 05/27/2025 | 27 | USCA Case Number 25-2014 for 26 Notice of Appeal (USCA), filed by JOHN DOE. USCA Case Manager Carmella (Document Restricted - Court Only) (Entered: 05/27/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/07/2025 17:36:00 | | | |
| **PACER Login:** | Dynamisllp23 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-07125-ZNQ-TJB Start date: 1/1/1980 End date: 8/7/2025 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

JA 27

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN DOE,<br>Address Withheld,<br><br>        Plaintiff,<br><br>     v.<br><br>THE TRUSTEES OF PRINCETON<br>UNIVERSITY,<br>Princeton, NJ 08544<br><br>        Defendant. | **Civil Action No.:** |

## <u>COMPLAINT</u>

John Doe, by his counsel, files this Complaint against The Trustees of Princeton University ("Princeton" or "the University") for breach of contract, gender-based discrimination in violation of 20 U.S.C. § 1681 (commonly known as Title IX), and negligence.  In support of his Complaint, Mr. Doe alleges as follows:

**JA 28**

**TABLE OF CONTENTS**

**INTRODUCTION** ......................................................................................................... 1

**PARTIES** ...................................................................................................................... 5

**JURISDICTION AND VENUE** ................................................................................... 6

**STATEMENT OF FACTS** ............................................................................................ 6

    I.  Princeton's Code of Conduct: "Rights, Rules & Responsibilities" ................................ 6

    II. Disciplinary Bias at Princeton ................................................................................. 8

    III. Jane's Manipulative Relationship With John .......................................................... 24

    IV. The "Incidents" as They Actually Happened ........................................................ 27

    V. John's Texts With Jane in the Following Weeks ...................................................... 30

    VI. The Incidents are Reported and Investigated ........................................................ 33

    VII. The Hearing ....................................................................................................... 47

    VIII. The Panel's Decision and Sanction ................................................................... 58

    IX. The Appeal .......................................................................................................... 61

**CAUSES OF ACTION** ................................................................................................ 66

    Count I – Breach of Contract .................................................................................... 66

    Count II – Breach of the Covenant of Good Faith and Fair Dealing .............................. 68

    Count III – Violation of Title IX (20 U.S.C. § 1681) ................................................. 71

    Count IV – Gross Negligence .................................................................................... 73

**PRAYER FOR RELIEF** ............................................................................................. 75

**INTRODUCTION**

1.       Princeton convicts 98% of the students it puts through its student conduct process. In 2023, it convicted John Doe, too, and suspended him for two years. It did this after two friends, working together, filed separate and false charges against him alleging curiously similar behavior—that he had choked each of them in public, one (Jane Roe) in the middle of the high traffic public sidewalk, and one (Sarah Smith) at a crowded party.

2.       Jane's allegations were almost comically weak. The only non-party eyewitness to the alleged choking, Student 4, told Princeton that John never choked Jane at all. Instead, he said that Jane, who was drunk and upset, collapsed to the ground in a crying fit after arguing with John.

3.       At first, even Jane herself told several people she didn't remember what had happened. Then, during the investigation, her story see-sawed wildly—first accusing John of having "grabbed [her] throat and ***lifted [her] off the ground***" for "5-6 seconds," then later of not having squeezed her neck at all, but rather just "press[ed] from the front" as they talked, and that she "was mostly upset about how he handled the aftermath."

4.       On a not unrelated note, Jane has settled a defamation suit against her by *another* student, Student X, whom she *similarly* falsely accused of threatening to choke her. When she found out she was about to be sued, she texted John saying she would lie about it under oath if she had to: "[H]e can't prove [I said it]" and "[I]f it even got to court, which I doubt, . . . all I would say is 'no I didn't.'" She also told John she could get Sarah—John's other accuser—to lie for her, too. The panel that found John responsible saw all of those texts but refused John's request to call Student X as a witness at the hearing.

1

5.      Then there are Sarah's allegations.  She, too, first claimed that John had "choked" her in public at a crowded party, but by the end of the investigation—after being confronted by evidence showing that story was ridiculous—changed her story in *exactly the same way that Jane did*.  What started as a choking became John's pressing against her neck from the front as they talked and that, in fact, he hadn't actually "***meant** to choke [her]*" at all.

6.      As this Complaint will detail below, those glaring inconsistencies are only the tip of the iceberg.  Highlights include:

- Jane told Princeton that she first found out she'd been choked when Sarah told her about it.  Yet the day after the incident, she'd admitted in a text to John that Sarah had told her she'd seen no such thing.

- Jane told Princeton she'd cut off all contact with John in late July of 2022, but John submitted photos showing that he, Jane, and Sarah traveled together after that and even stayed with his family for several nights in late August.

- In her first interview, Sarah told Princeton that Jane didn't have any bruises on her neck after the alleged choking—a fact confirmed by contemporaneous photographs.  But in a later interview, Sarah changed her story and claimed that Jane *did* have bruising, but she had covered it with makeup and turtlenecks.

7.      By the time the hearing on her allegations occurred, **Jane had changed her testimony so many times that she didn't even bother to show up for the hearing**.

8.      Under Princeton's code of conduct, there had to be "clear and persuasive" evidence—far more than just a "preponderance"—to find John guilty.

9.      The evidence came nowhere close to that.  But what John didn't know is that he had at most a 2% chance of prevailing, because he was a respondent appearing before Princeton's Committee on Discipline ("COD").  And notwithstanding its exacting evidentiary standard, the COD—in more than 700 cases resolved by it in academic year 2021-2022—convicted *more than 98% of the respondents who appeared before it*.

2

**JA 31**

10.     But John had it still worse, because he wasn't just a respondent being judged by the COD.  He was a man accused of assaulting two women, and Princeton for years had been under *additional* pressure to appear tough at all costs on claims of assault brought by women against men.  *See, e.g., Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

11.     Amid that prejudgment and pressure, the COD poisoned John's well from the very start: It resolved to conduct a *joint* investigation and hearing on Jane's and Sarah's claims, despite the fact that Sarah's allegation occurred weeks earlier and had *zero* factual overlap with Jane's.

12.     Forcing the joinder of two unrelated cases had exactly the same prejudicial effect here that it has in criminal cases.  The investigation was rife with procedural irregularities and treated John as if he were already guilty:

- While the investigator interviewed John only once, she interviewed both Jane and Sarah multiple times, giving them repeated opportunities to respond to what John said and reshape their stories accordingly.

- The investigator also interviewed Student 4 only once, despite the fact that he was the only non-party eyewitness to John's alleged choking of Jane.

- The investigator interviewed Sarah's female roommates for testimony supportive of Sarah's claims but refused to interview John's male roommate for testimony supportive of John's claims.

- The investigator asked several female witnesses who had seen Jane after the incident whether they noticed bruising on her neck, yet failed to ask either of the male witnesses who had seen her afterwards whether *they* noticed any bruising.

- The investigator failed to interview Student X, who had threatened (and would later settle) a defamation lawsuit against Jane and whom John told Princeton could provide evidence showing that Jane had also falsely accused him.

- The final evidence packet sent to the hearing panel contained unredacted testimony falsely accusing John of being racist, despite its complete lack of relevance to the case. Princeton redacted numerous portions of the evidence that it deemed prejudicial or irrelevant—yet intentionally left these allegations of racism unredacted.

3

**JA 32**

13.      Like the investigation, John's hearing was also rife with bias and prejudgment. According to a source involved in the panel's deliberative process, most of the panel members had decided John was guilty before the hearing even started, and one of them—Professor Elizabeth Harman—even gave an impassioned speech arguing not just that John was guilty, but that it would be a "moral failing" to vote for anything other than *expulsion*, which the source believed intimidated the student members of the panel into finding him responsible.  Not surprisingly, the hearing was anything but fair to John:

- The hearing was to start at *7:15 p.m.*, which meant that people would inevitably get tired, panel members would pay less attention, and witness testimony would get cut short—all of which happened.

- As shown in a screenshot below, Professor Harman—who aggressively questioned John, but not Jane or Sarah—literally *fell asleep* while Sarah (the only complainant who appeared at the hearing) was testifying.



- The hearing panel denied John's request to call Student X as a witness.

- The panel questioned John and Student 4 (the lone eyewitness to Jane's incident) in an incredibly hostile manner—something it did to no other witnesses.  And its questioning of Student 4 occurred around 3:00-4:00 a.m. local time for Student 4.  The panel repeatedly suggested that to be found innocent, John had to offer some explanation *why* Jane had made things up—as though the burden of proof were his or the allegations alone were "clear and persuasive" evidence of their truth.

4

**JA 33**

14.     The panel's decision finding John responsible for assaulting both Jane and Sarah betrayed its prejudgment and bias all the more.  Its entire rationale was only three sentences long, and the primary basis for it was, amazingly, "the women's continued and consistent descriptions of the incidents"—words no objective observer could possibly have used to describe accounts that literally changed as to *whether there was ever any choking at all*.

15.     The panel made *no* attempt to actually grapple with the changing stories Jane and Sarah had told, even though John had teed them up clearly in his written submissions and testimony.  It said nothing about all of the ways the evidence had contradicted them.  It didn't even say *which* version of each of their stories it was crediting:  Was it finding John responsible for having literally *lifted Jane off the ground while choking her* for 5-6 seconds?  Or was it instead for having pressed against her neck from the front?  The panel refused to say.  Instead, it threw up its hands said, "Well, you clearly did *something*."

16.     The panel suspended John from Princeton for two full years.  That finding and sanction are now a part of John's permanent record at Princeton.  As such, they will follow him around for life, ensuring that any transfer school, graduate school, or employer will learn what Princeton found him responsible for.  They will permanently alter the course of his career and his life.

17.     That finding and sanction are the result of violations of John's common law and statutory rights.  John respectfully comes to this Court for redress.

**PARTIES**

18.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a citizen of a State other than New Jersey.  He matriculated as a freshman at Princeton in September of 2022.

19.    Defendant Princeton University is a private university located in Princeton, New Jersey.

## JURISDICTION AND VENUE

20.    The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Mr. Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because Mr. Doe is a citizen of a State other than New Jersey, Princeton has its principal place of business in the State of New Jersey, and the amount in controversy exceeds $75,000.

21.    The Court also has supplemental jurisdiction over Mr. Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

22.    Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

**I.    Princeton's Code of Conduct: "Rights, Rules & Responsibilities"**

**A.    The Contractual Relationship Between Mr. Doe and the University**

23.    Under New Jersey law, the University's codes and policies are terms in a contractual relationship between Mr. Doe and the University.  That includes the code of conduct at issue here: Princeton's Rights, Rules & Responsibilities (hereafter the "Code").

24.    That contractual relationship began in at least September of 2022, when Mr. Doe matriculated as a freshman at Princeton.  The terms of that contract include various University publications that Princeton gives to its students.

25.    Upon his matriculation, Mr. Doe received a copy of the Code.

26. In consideration for his tuition and attendance at the University each year, Mr. Doe received and was given assurances by the University that it would follow and comply with the numerous policies and procedures adopted and put forth by the school in place at the time he paid that tuition, including those promises in its Code.

27. The Code proscribes certain conduct by Princeton students, including "[a]ny physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results."

28. The Code promises that Princeton will "investigate alleged infractions" of the Code.

29. The Code also states that disciplinary charges will be resolved by being "presented to . . . the Committee on Discipline" at a hearing. It says little about the conduct of those hearings, except (1) that an accused student may offer opening and closing statements, ask questions of witnesses, and in turn be questioned; (2) that "any person with information about the matter before the committee may be requested to appear by the student . . . subject to reasonable limits agreed on by the committee"; and (3) that the accused student "may be accompanied by an advisor," but not one with professional training—the advisor must be "a current member of the resident University community."

30. The Code promises that the University will not find a student responsible for misconduct unless "the evidence presented constitutes a clear and persuasive case in support of the charges against the student."

**JA 36**

31.    The Code states that the committee must "inform[] the student promptly of the decision" and, "[i]f a penalty is imposed," make a "special effort . . . to ensure that the student fully understands why the penalty was imposed[.]"

32.    The Code also promises that disciplinary decisions may be appealed on three grounds, including that "[t]he procedures" used to investigate and resolve the complaint "have not been fair and reasonable," and that "[t]he imposed penalty does not fall within the range of penalties imposed for similar misconduct."

## II.    Disciplinary Bias at Princeton

33.    In recent years, the COD has been heavily criticized by Princeton students for being biased against respondents—especially when it comes to allegations of assault.[1] In 2023, an anonymous member of the COD said they often felt pressured to go into hearings with the assumption that the student is guilty, and claimed that they had been encouraged in pre-hearing COD meetings to prepare questions derived from a presumption of guilt.[2] They noted that the COD members lack "even a pretense of impartiality," which plays out in questions by the COD members that take for granted that the student is guilty. The *Daily Princetonian* demanded an investigation into the COD's impartiality, which has not been conducted to date.

34.    Moreover, former professor in the School of Public and International Affairs Joshua Katz has repeatedly criticized the COD for its bias against defendants and its apparent presumption of guilt. He told the *Daily Princetonian*, "I think they're biased against

---

[1] https://www.dailyprincetonian.com/article/2023/06/princeton-opinion-committee-on-discipline-reform-impartiality-mental-health (May 31, 2023).
[2] https://www.dailyprincetonian.com/article/2023/06/princeton-opinion-committee-on-discipline-reform-impartiality-mental-health (May 31, 2023).

8

**JA 37**

defendants…So I thought it was very important to provide assistance to students who found themselves attempting to defend themselves against discipline charges."[3]

36.    One of the few changes the COD has made in recent years was to allow accused students to be represented at a hearing by a "Peer Representative"—but that change was only approved in 2022 after Dean Joyce Chen Shueh was convinced that Peer Representatives would not *defend* accused students, but would just provide them with support.[4] One Peer Representative stated that previous perceptions of the student group as a team of "gung ho defense attorneys that were very adamant about the rights of the student and their ability to remain innocent" impeded the Peer Representative's involvement with the COD. *Id*. But "after conversations," Dean Chen Shueh saw the benefits that a student representative can have and understood that Peer Representatives were "not interested in defense [or] getting people off," but were simply "interested in providing compassionate care." *Id*. To ensure Peer Representatives do not defend students and merely provide compassionate care, Dean Chen Shueh trains them to do just that. *Id*.

36.    Indeed, the statistics released by the COD reflect that it has become increasingly biased against respondents in recent years.  In the 2021-2022 academic school year, the COD heard 742 cases of health and safety allegations and found 730 of the students responsible—a whopping 98.4% conviction rate.[5] On the other hand, of the cases that went before the Honor

---

[3] https://www.dailyprincetonian.com/article/2023/04/princeton-university-peer-representatives-retrospective-explainer (April 25, 2023).

[4] https://www.dailyprincetonian.com/article/2022/11/princeton-peer-representatives-committee-of-discipline-honor-committee (November 15, 2022).

[5] https://www.dailyprincetonian.com/article/2023/10/princeton-data-committee-on-discipline-honor-committee-punishments.

Committee—which hears cases of academic misconduct that occurred in the classroom—less than 20% of students were found responsible.

37. Princeton has also been under separate pressure to appear tough at all costs on claims of assault brought by women against men. For years, a steady stream of statements, directives, and actions by the University and its constituents has also shown that Princeton's response to claims of violence brought by women against men is deeply informed by gender bias.

38. Beginning in 2011, Princeton came under heavy pressure from the federal government to appear tough at all costs on claims of sexual assault, especially those brought by women against men. That pressure was exerted primarily through enforcement of a "Dear Colleague Letter" (DCL) published by the Education Department's Office for Civil Rights (OCR) in April of that year, which concerned the ways schools were to enforce Title IX and address claims of sexual assault on their campuses.

39. Enforcement of the DCL's gender-biased regime was stepped up when Catherine Lhamon became the head of OCR in 2013. (Out of office during the Trump administration, she reclaimed the position in October of 2021.) As one national media outlet reported in October 2016, in a story on OCR's Title IX campaign:

> Lhamon says she is frustrated. As she sat in her Washington, D.C. office during an interview with SI.com, she said she couldn't help but to think about the women who are suffering every day.

40. Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will raise awareness about sexual assault and highlight men's roles in preventing

10

**JA 39**

sexual violence."[6] And in August 2015 she would tell a different national media publication, "'We don't treat rape and sexual assault as seriously as we should,'" citing a statistic about the rate of unwanted sexual activity experienced specifically by college women.[7]

41.    Ms. Lhamon also left no doubt about the consequences schools faced if they failed adequately to heed OCR's mandates: They would lose all of their federal funding. "Do not think it's an empty threat," she told a group of university administrators in July 2014.[8] "There is 'a need to push the country forward,'" she said in August 2015, echoing the same sentiment.[9] "It's nice when you carry the big stick of the federal government," she would say

---

[6] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rights-catherine-e-lhamon-visit-two-california-universities-highlight-successes-addressing-community-responses-sexual-assault, last visited January 25, 2018).

[7] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

[8] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault Complaints*, USA TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/ (last visited January 25, 2018); Robin Wilson, *2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited January 25, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html (last visited January 25, 2018).

[9] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

again in October 2016, leaving no doubt that the threat of having one's federal funding yanked remained very real.[10]

42.     That pressure was brought to bear directly upon Princeton.  In 2010 and 2011, it was the subject of three separate OCR complaints.  In response, OCR launched a multi-year investigation into Princeton's enforcement of Title IX and its handling of claims of sexual assault.  That investigation resulted in a finding, in November 2014, that Princeton had been in violation of Title IX and in a resolution agreement under which Princeton agreed to make critical changes skewed towards complainants, including the elimination of live hearings and adoption of a preponderance of evidence standard in place of the higher evidentiary standard it had used in such cases.  Upon information and belief, the resolution agreement required Princeton to submit documentation to OCR regarding its response to claims of sexual assault for some time after the signing of the agreement, ensuring it would remain under OCR pressure to vigorously enforce its gender-biased regime.

43.     Princeton continued to receive attention and pressure related to claims of sexual assault on its campus, and in particular sexual assault by males against females.

44.     On November 5, 2014, for example, a news article reported alleged sexual misconduct at one of Princeton's eating clubs, the Tiger Inn, stating that "an intoxicated first year female student" was photographed performing a sex act, and the photograph was subsequently distributed.[11]

---

[10] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited January 25, 2018).

[11] *See* Peter Jacobs, *Princeton Eating Club Under Investigation For Allegedly Distributing Photo Of Lewd Sex Act,* Business Insider (Nov. 5, 2014), https://www.businessinsider.com/princeton-eating-club-under-investigation-for-allegedly-distributing-photo-of-sexual-assault-2014-11.

45.    Likewise, upon information and belief, in May 2016, another complaint was filed with OCR alleging Princeton failed to adequately respond to a female student's claims of sexual misconduct by a male, and an investigation was opened in August 2016.

46.    Similarly in 2017, Princeton received widespread attention and pressure when it initially declined to terminate or suspend a male faculty member accused of sexual misconduct by a female graduate student.  The backlash led Princeton to adopt a default sanction of suspension for such violations.  That pressure motivated Princeton to be particularly harsh in its approach to claims of assault brought by women against men.

47.    That pressure continued in late 2017, when the Education Department rescinded the DCL and announced its intent to establish new regulations governing schools' responses to claims of sexual misconduct.  Students and administration leaders alike responded to rescission of the DCL by insisting that Princeton adhere to—or even exceed—the DCL's gender-biased regime, and exhibited the gender bias that informed Title IX enforcement at Princeton in other ways as well.

48.    Rescission of the DCL and its eventual replacement were motivated by a desire to provide common sense procedural protections to students accused of sexual misconduct, procedures widely viewed as appropriate to truth-seeking and taken for granted in so many contexts.  Secretary Betsy DeVos's press release preceding rescission of the DCL acknowledged the massive pressure the DCL had improperly placed on universities ("[n]o school or university should deprive any student of his or her ability to pursue their education because

13

the school fears shaming by—or loss of funding from—Washington") and noted that due process

had to be "the foundation of any system of justice that seeks a fair outcome.[12]

49.    Even before the DCL was rescinded, Princeton's school newspaper, the *Daily Princetonian*, was warning the student body to be leery of any changes Secretary DeVos might make to the DCL, particularly given "the facts on the ground" that the DCL was meant to address: that "between 18 and 20 percent of women experience rape or some other form of sexual assault while in college."[13]

50.    Not surprisingly, then, the rescission of the DCL's gender-biased regime was overwhelmingly attacked at Princeton.  Administrators immediately stated that Princeton would not change its policies and procedures, insisting that its DCL-era procedures were "working well" and were "fair."[14]

51.    Indeed, in early 2018, the *Daily Princetonian*'s Editor-in-Chief penned an op-ed stating that Princeton's DCL-required Title IX procedures were not *biased enough* towards "the victims, the survivors."[15]  And when the Education Department published its new proposed regulations later that year, she wrote another, specifically noting that "[w]omen's rights groups" opposed the changes.[16]  She lamented that victims will have to "show[] they are indeed a victim" and that accused students would be "protect[ed]" by such basic procedural protections as "cross-examin[ation]." *Id.*

---

[12] Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

[13] https://www.dailyprincetonian.com/article/2017/02/dump-devos (Feb. 8, 2017).

[14] https://www.dailyprincetonian.com/article/2017/09/devos-reverses-campus-sexual-assault-rules (Sept. 22, 2017).

[15] https://www.dailyprincetonian.com/article/2018/01/in-response-to-an-honor-code-fairer-than-title-ix-proceedings (Jan. 6, 2018).

[16] https://www.dailyprincetonian.com/article/2018/11/protect-our-students-protect-our-survivors (Nov. 21, 2018).

52.     Other articles in the *Daily Princetonian* warned of the backlash the University would face if it refused to toe the line drawn by the DCL: "The University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement, making the relaxation of policy all the more unlikely."[17]

53.     Not surprisingly, Princeton itself, as an institution, formally criticized the proposed regulations twice.  In January 2019, in conjunction with several other universities, it attacked the regulations' (1) requirement that schools provide for live cross-examination at disciplinary hearings, and (2) bar on using a lower standard of proof in sexual assault proceedings than in proceedings involving other student conduct violations.[18]  And in conjunction with the New Jersey State Bar Association, it again attacked the proposed regulations on those same grounds later that month.[19]

54.     Those actions did not appease student leaders, who continued to exert very public pressure on Princeton to make its handling of sexual assault still more biased in favor of complainants and women, just months before Jane would file her formal complaint.

55.     In May of 2019, a group called Princeton Students for Title IX Reform (PIXR) protested outside the University president's building for more than 200 hours straight and issued

---

[17] https://www.dailyprincetonian.com/article/2018/11/title-ix-changes-are-going-to-hurt-those-that-need-the-enforcement-the-most (Nov. 28, 2018).

[18] https://www.aau.edu/key-issues/aau-comments-department-educations-proposed-title-ix-rule (Jan. 24, 2019).

[19] https://tcms.njsba.com/personifyebusiness/Portals/0/NJSBA-PDF/Reports%20&%20Comments/CommentsProposedAmendmentsHigherEducation.PDF (Jan. 30, 2019).

15

**JA 44**

a list of 11 demands.[20]  Those demands included, among other things: (1) a complete external audit of Princeton's Title IX regime; (2) social workers dedicated to helping "survivors" (but not respondents); (3) a fund to support "survivors'" mental health; and, most tellingly, (4) the "immediate departmentalization of the Program in Gender and Sexuality Studies" as a "key step in challenging **dominant paradigms of toxic masculinity**, homophobia, transphobia, and gender-based violence on campus."[21]  They also demanded the immediate firing of Princeton's Title IX Coordinator, Regan Crotty.  Their protest gained widespread support: more than 1,700 Princeton students and alumni pledged, at the protesters' request, not to give any money to the University until the protesters' demands were met.[22]

56.     PIXR specifically insisted that Princeton adhere to its current Title IX procedures as much as possible, "in spite of" the proposed regulations.[23]  It complained that those current procedures themselves were insufficient and that things would only become worse under the proposed regulations.  *Id.*

57.     After 200 hours of continuous presence outside his administrative building, Princeton's president, Christopher Eisgruber, agreed to meet with six representatives of PIXR.[24] As explained further below, he would agree to commission two reviews of Princeton's Title IX regime as a result.

---

[20] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).
[21] https://docs.google.com/document/d/1nnilcneEcs-nKKdTIxTc0nEK26OKYjLHzBg6VS-mfsA/edit (emphasis added).
[22] https://www.change.org/p/princeton-university-princeton-title-ix-reform?recruiter=958527092&recruited_by_id=707a4290-714a-11e9-9617-5982860e6a9b&utm_source=share_petition&utm_medium=copylink&utm_campaign=psf_combo_share_initial&utm_term=share_petition (last visited May 2, 2022).
[23] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).
[24] https://www.dailyprincetonian.com/article/2019/05/title-ix-office-protests-come-to-a-close-after-demonstration-in-front-of-prospect-house (May 16, 2019).

16

58.    Pressure on Princeton came from other quarters as well.  At the 2019 Baccalaureate, approximately 200 students silently protested that year's speaker (Pulitzer Prize-winning columnist and author George Will) because of his prior statements on the treatment of campus sexual assault.[25]  That same weekend, a panelist on a panel about sexual assault walked off of the panel because one of her fellow panelists (renowned attorney Beth A. Wilkinson) had defended a man accused of sexually assaulting a woman and had been asked to discuss the need for fair procedures for adjudicating such claims.[26]  The panelist was followed out by dozens of students.  *Id.*

59.    In the wake of PIXR's very public criticism of Princeton's process and those implementing it—criticism expressly informed by gender bias—Princeton announced the following year, when the Education Department promulgated its final rule, that it would nonetheless strive to adhere as closely as possible to its "current system[]" in implementing that final rule.[27]  The *Daily Princetonian* quoted the President and CEO of the National Women's Law Center as stating that the final rule would "protect[] abusers and harassers" and noted that the DCL had warned against some of the procedural protections contained in the final rule.  *Id.*  It also quoted a Princeton administrator as explaining, as if by way of apology, that Princeton was "required" to now implement such safeguards.  *Id.*

60.    Princeton showed itself to be highly susceptible to the pressure PIXR was exerting.  It responded by authorizing two separate reviews of its Title IX regime, one external

---

[25] https://www.dailyprincetonian.com/article/2019/06/george-will-gs-68-speaks-at-2019-baccalaureate-amid-student-protest (June 3, 2019).

[26] https://www.dailyprincetonian.com/article/2019/06/students-alumni-walk-out-of-metoo-panel-protest-at-p-rade-for-title-ix-reform (June 3, 2019).

[27] https://www.dailyprincetonian.com/article/2020/05/u-to-amend-sexual-misconduct-policy-after-devos-releases-new-title-ix-regulations (May 6, 2020).

17

**JA 46**

and one internal.[28]  Both reviews resulted in lengthy reports that proposed various ways

Princeton might better address sexual misconduct, including by offering training sessions on

"toxic masculinity" and encouraging students "to attend functions at Princeton Women*s

Center."[29]

     61.     PIXR continued to exert pressure on Princeton in other ways.   A piece written by

its members was published in the *Daily Princetonian* and claimed that the final version of the

regulations published by the Education Department was "clearly aimed at silencing survivors"

and called for increased funding for Princeton's Women's Center.[30]  It insisted that Princeton

reduce violence by "tackling destructive campus norms" via "increased funding to the Gender

and Sexuality Studies Program," echoing the gender bias it had advanced the year before.  *Id.*

The article insisted that Princeton use whatever discretion was left to it to limit the scope of the

new regulations.  *Id.*

     62.     Princeton administrators responded accordingly the following month.  Its Vice

Provost for Institutional Equity and Diversity, Michelle Minter, labeled the new regulations

"problematic in a number of ways" in explaining how they would be implemented at Princeton.[31]

     63.     The following month, the *Daily Princetonian* ran yet another piece critical of the

new regulations, one that contrasted the protections for survivors under the DCL with the new

rules that had "cast them out to sea."[32] It stated that "[o]ne in five women are sexually assaulted

---

[28] https://www.dailyprincetonian.com/article/2019/10/title-ix-reports (Oct. 24, 2019).
[29] https://sexualmisconduct.princeton.edu/sites/sexualmisconduct/files/external-review-report.pdf
[30] https://www.dailyprincetonian.com/article/2020/05/pixr-title-ix-devos-regulations (May 11, 2020).
[31] https://www.dailyprincetonian.com/article/2020/06/usg-town-hall-title-ix-policy-changes (June 15, 2020).
[32] https://www.dailyprincetonian.com/article/2020/07/resetting-sexual-misconduct-to-the-title-ixs (July 30, 2020).

during their time in college" and claimed that the new rules would prevent survivors from coming forward. *Id.* It reiterated the need for students and alumni to sign the petition PIXR had circulated the year before and for the University to accede to PIXR's demands. *Id.*

64.    Princeton, in the wake of all of that pressure, chose to comply with the new regulations by adopting an admittedly "complicated" two-track system for resolving claims of sexual misconduct.[33] Under that system, the procedural protections required by the new regulations would apply to only the narrowest set of claims required by those regulations. *Id.* The rest would be resolved under a separate set of procedures that did not provide parties with, among other things, the right to conduct live cross-examination through their advisors. *Id.*

65.    The pressure on Princeton to combat sexual assault in gender-biased ways continued. The *Daily Princetonian* ran an article on August 16, 2020, lamenting the sexual misconduct training incoming freshmen had received and insisting that prevention required addressing "the harmful implication of underlying causes like toxic masculinity."[34]

66.    Then, in December of 2021, a female student filed a lawsuit against Princeton, detailing a string of "highly improper" victim-blaming questions she had to answer in her sexual assault hearing, including questions about her sexual history and past abuse.[35] She claimed that the school failed to properly train its staff which led to hearings that unfairly targeted victims. *Id.* She complained that as a result of Princeton's failure to properly train its staff, staff members incorrectly advised her to refrain from involving faculty members as witnesses and that there was

---

[33] https://www.dailyprincetonian.com/article/2020/08/princeton-sexual-harassment-misconduct-betsy-devos-cross-examination (August 3, 2020).

[34] https://www.dailyprincetonian.com/article/2020/08/misconducting-sexual-misconduct-education-not-anymore (August 16, 2020).

[35] https://www.nj.com/education/2021/12/princeton-u-hearing-on-alleged-rape-turned-into-victim-blaming-ex-student-says-in-lawsuit.html (December 2, 2021).

19

**JA 48**

no need for her to undergo a "rape kit" because it could not be admitted in a campus disciplinary hearing. *Id*. When she lost the hearing, Princeton told her that there was no avenue to appeal the decision. *Id*.

67.    In January of 2022, the *Daily Princetonian* published an account of a sexual assault survivor demanding that the University policy be changed.[36] The University had dismissed her complaint because the respondent did not attend Princeton. *Id*. The author accused the school of skirting liability by not investigating those who no longer attend Princeton and by ignoring commonly delayed reporting times of sexual assault. *Id*. The author felt that Princeton "broke" her by not investigating her delayed complaint, which she was unable to report closer to the time of the assault because she was not in a position to face reality. *Id*. She felt Princeton's actions failed to protect survivors and cited a study that found 27% of Princeton female undergraduates were sexually harassed or assaulted in 2017. *Id*.

68.    Princeton's Vice Provost for Institutional Equity and Diversity, Michele Minter, responded to the survivor's account the next day in a Letter to the Editor.[37] Minter explained that the University loses jurisdiction over respondents who no longer attend Princeton at the time a complaint is filed, but assured readers that a long-term persona non grata could still be issued through the school and that the school always provides complainants with information to make reports to local law enforcement. *Id*. She empathized with the writer of the January opinion and stated that "Princeton's efforts to prevent sexual misconduct and support those who have

---

[36] https://www.dailyprincetonian.com/article/2022/01/princeton-sexual-assault-policy-anonymous-student (January 26, 2022).
[37] https://www.dailyprincetonian.com/article/2022/01/princeton-titleix-sexual-misconduct-policy-support (January 27, 2022).

**JA 49**

experience sexual misconduct are ongoing projects" and that the school is committed to make the University a safe environment for everyone. *Id.*

69.    But the criticisms continued. In November of 2022, the *Daily Princetonian* released another Op-Ed entitled "The Graduate School and Title IX Office failed to keep me safe."[38] In it, the writer details allegations of being choked and strangled by a Princeton graduate student, causing her to be unable to breathe. *Id.* The writer stated that Princeton's process "failed to keep [her] safe" and she "would not wish the process [she] had to go through on anyone." *Id.* She stated that she had told many individuals in her life about the incident and those individuals did not believe her and accused her of lying and retaliation, yet they were called as witnesses at her hearing, which created a process that was not "trauma-informed." *Id.* Despite accusing her of lying about being strangled, the witnesses became teaching assistants for undergraduate classes at Princeton, which the writer criticized as the University's failure to protect its students. *Id.* The writer explained that she also had to answer difficult questions posed by the investigators in her case, which made her felt shamed and caused her to consider ending her own life. *Id.* The investigation dragged on for over five months, causing the writer depression, anxiety, PTSD, and multiple thoughts of suicide. *Id.* Her Princeton-contracted lawyer told her that she did not have corroborating witnesses and the writer felt that because she had not "invite[d] in a voyeur during [her] strangulation," her perpetrator was going to be found not responsible. *Id.* As such, she felt forced to resolve her case through alternative resolution, and wrote, "The University might like to pretend the process is now more humane and fair. I know that's not the case. Princeton needs to do so much better." *Id.*

---

[38] https://www.dailyprincetonian.com/article/2022/11/princeton-graduate-school-title-ix-sexual-assault-failure (November 3, 2022).

21

**JA 50**

70.    A week later, the *Daily Princetonian* released another piece, criticizing Princeton for making it difficult for complainants to obtain No Contact Orders.[39] And in December of 2022, it released a similar piece titled "Princeton administrators and students alike must do better to protect survivors of sexual violence,"[40] which criticized the University of disempowering survivors and failing to use a trauma-informed process.

71.    A few months passed, and female complainants *still* felt the process was unfair towards them. In April of 2023, the *Daily Princetonian* released an Op-ed entitled, "Dear Princeton, you must do more on Title IX."[41] The author wrote that Princeton has repeatedly failed survivors of sexual violence and issued a list of demands, including that investigators be limited in the types of questions they can ask survivors, that there be enhanced sanctions for multiple offenses and patterns of sexual violence, and that the process provide increased support to those who experienced intersectional harm (i.e. providing resources for students whose race, sexual orientation, and other intersectional identities compound the violence they experience). *Id*.

72.    Nine days later, the paper released yet another piece attacking Princeton's handling of sexual violence complaints—this time, the writer complained that, as a result of Princeton's complying with the federal regulations requiring live hearings, and allowing months-long investigations, and upsetting interviews for complainants, the number of students who had experienced sexual violence and pursued the formal Title IX process had dropped drastically.[42]

---

[39] https://www.dailyprincetonian.com/article/2022/11/no-communication-orders-change-difficult-safety (November 10, 2022).

[40] https://www.dailyprincetonian.com/article/2022/12/editorial-board-titleix-sexual-misconduct-princeton-university (December 21, 2022).

[41] https://www.dailyprincetonian.com/article/2023/04/princeton-must-do-more-on-title-ix (April 3, 2023).

[42] https://www.dailyprincetonian.com/article/2023/04/title-ix-investigation-formal-process-alternate-resolution-sexual-assault-survivors-princeton-dilemma (April 12, 2023).

The piece quoted one student who said "the people within the Title IX office had no experience of handling gendered violence or trauma." *Id*. The writer complained that in 2017, only two students were found responsible for non-consensual sexual penetration, that investigators often asked questions that were "difficult and personal," and that complainants' character were often questioned during the process. *Id*.

73.     A month later, in May of 2023, the *Daily Princetonian* released an Opinion titled "Four years after we demanded change, survivors are still being failed by the University."[43] It explained the 2019 PIXR-led 200-hour protest and stated, "In the four years since the protest, the Princeton community has learned that we cannot rely on the University to ensure or provide opportunities for justice, healing, protection, or prevention." It detailed various complaints made by survivors about Princeton's Title IX process, including that the process penalized survivors for not being able to remember details about their assault, allowed intimidating, invasive, and survivor-blaming questioning, ignored complaints of misconduct, and dismissed racist harassment that occurred alongside sexual misconduct. *Id*. It noted that "[t]he University has no grievance process for intersectional sexual violations (i.e. sexual misconduct that also includes racists, homophobic, and ableist violence)." *Id*. It also stated that "[t]he University has made no effort to publicly maintain its commitment to protecting survivors' rights as outlined in current Title IX policies in the face of national rollback efforts." *Id*.

74.     In October of 2023, the University released the findings of an online survey called "We Speak: Attitudes on Sexual Misconduct at Princeton," which ended a five-year hiatus of not

---

[43] https://www.dailyprincetonian.com/article/2023/05/princeton-opinion-sexual-assault-title-ix-reform (May 11, 2023).

23

**JA 52**

administering the survey.[44] The *Daily Princetonian* commented on the survey's findings, noting that sexual violence is pervasive and often goes unreported, as demonstrated by the fact that 17% of the survey respondents said they had experienced sexual violence, but in the 2021-2022 academic year, Princeton investigated just three cases of sexual misconduct and settled 16 cases through the alternate resolution process. *Id*.

75.     Princeton, in short, has implemented a COD disciplinary system that is extraordinarily biased against respondents in general, and it has simultaneously bowed to special pressure to resolve claims of violence by women against men in gender-biased ways that consciously skew in favor of complainants.  Those forces converged to deny John anything close to a fair hearing on Jane's and Sarah's allegations.

## III.    Jane's Manipulative Relationship With John

76.     Jane and John met when they were juniors in high school.  Jane was John's first close female friend, and he would eventually develop romantic feelings for her.  Jane sensed John's dependency on her and emotionally manipulated him, in ways he did not then appreciate, for her own social and emotional needs.  She did so both before—and *for months after*—John supposedly assaulted her.  When John finally became a hindrance to, rather than a crutch for, those needs, she retaliated and reported him for assault, just like she did with Student X.

77.     That dynamic is amply illustrated in texts that John submitted as evidence to Princeton but that were completely ignored by the COD.  For months after John supposedly assaulted her, Jane swung erratically between guilting him into catering to her needs, often at great cost to John, and threatening him with the very allegations at issue here.

---

[44] https://www.dailyprincetonian.com/article/2023/12/princeton-data-adpol-we-speak-title-ix-survey-2022 (December 7, 2023).

24

78.     On May 30, for instance, when Jane's ride from the airport cancelled on her, she asked John to pick her up instead, which he immediately agreed to do.  "[Y]ou are a life saver," she texted him.

79.     In late June, Jane discussed ideas for vacation trips for her and John to go on together.  She sent him pictures of places she wanted to go, with captions like, "CAN WE" and "[T]hese are not subtle hints.  [I]n fact, these are suggestions."

80.     On July 6, when Jane was drunk at a party at 1:20 a.m., it was John whom she asked to pick her up and hang out with her.  John demurred at first, given the hour.  But Jane continued to beg ("pls come hangout with me"; "this sucks").  She played on his feelings for her, telling him—months after the alleged assault—that he was "[her] best friend."  She then called him and begged him on the phone for four straight minutes until he finally relented.

81.     Then on July 12, when she was feeling down, she guilted John into taking care of her yet again, despite the toll it would take on him.  He told her he should "go to sleep soonish" if he was really going to drive to see her and asked if she still wanted that.  Jane told him he was the only "friend who recharges [her]," except perhaps for Sarah.  "I'm just worried about burning out at work," she continued.  John again relented and agreed to visit her "to help you recharge."

82.     Still later that summer, on July 16, she told John, "[I] want you around all the time."  She wanted John to make her life easier in the midst of a tough job.  "[I] feel like I'm going to scream because work is so stressful . . . so I normally would always prefer hanging out with you."  Later that summer, she asked him to drive to see her—a 25-minute drive for him—so that she could "pseudo cry in [his] car" unless he "need[ed] [Jane] space," acknowledging how much she drained him emotionally.  John again agreed ("If you need me to come get you for a bit, I can").

25

83. Then on August 23—nearly a month after Jane learned John had stopped attending therapy—she posted an Instagram story, *which John submitted to the COD*, showing him visiting a state park with both Jane and Sarah. In fact, both Jane and Sarah stayed at his family home for several nights, a fact he would *also* document for the COD with photo evidence.

84. Around that same time, John caused friction between Jane and another friend of hers. By then, she had developed another "co-dependent" friend—Sarah—and no longer needed John. As she had done when Student X had also threatened one of her friendships, she retaliated and falsely reported John for assault.

85. Yet *even then* she used John right up to the last minute—asking his advice on September 22 on how to deal with Student X's threatened lawsuit, **after** she (unknown to John) had already reported him to Princeton for assault—yet another fact documented for the panel through text messages.

86. Whether part of her original plan or not, Jane also used her allegations to threaten and control John and keep him close to her on her terms. Texts that were shared with the COD amply illustrated this: Just *two weeks* after John supposedly choked her, Jane was demanding that John visit her at her university with Sarah, because Jane wasn't sure that Sarah would make the trip alone. She told John he "choked out two" people and "I don't particularly see you trying to make amends." John responded that he was "trying to understand why you are inviting me," given what she was claiming. Jane not-so-subtly threatened to end the friendship if he didn't bend the knee, telling him, "I think being around you will probably determine if I can remain friends with you." And John, as always, complied: "I'm not understanding why being unsure on going to [your school] is such a huge mistake. But I see that it was. I'd like to at least fix that

26

**JA 55**

mistake and agree to go to [your school].” “If going to [your school],” he continued, “is the way to improve or make you feel better or increase the chances we stay friends then I want to go.”

87.     Jane, in short, see-sawed as needed between trying to manipulate John by playing on his past (and in her mind, continuing) feelings for her and by threatening him with harm.

## IV.     The "Incidents" as They Actually Happened

### A.     The Incident with Sarah on March 3, 2023

88.     On the night of March 3, John and Sarah attended a party at a Princeton eating club.  Their mutual friend, Student 3, had recently been harassed at a different eating club event and felt uncomfortable.  John wanted to ask a mutual male friend of theirs to keep an eye on Student 3 at the party so that she would feel comfortable.  When Student 3 said she didn't want the male friend following her around, John then asked Sarah if she would keep an eye on Student 3 instead.  Sarah agreed.

89.     Sometime later, John believed Sarah was not doing a good job of keeping an eye on Student 3.  Worried about Student 3, he confronted Sarah in actions he would come to regret. He spoke closely and loudly with Sarah, in part out of anger and in part because the noise of the party required it.  Three female students who walked by asked Sarah if she was okay, and she said that she was.  An event security guard who was standing nearby and could observe the interaction did not intervene.

90.     Sarah left the party, and John texted her multiple times to ensure she'd gotten home safely.  Sarah almost immediately complained to her roommates about how John had angrily yelled at her.  Multiple roommates of hers would testify that Sarah—even while angrily complaining about John's actions—said nothing about the incident having a physical component

**JA 56**

to it, let alone that it involved John choking her. In her words, "'I only told them [John] yelled at me, not about the choking.'"

91.    By Sarah's own admission, she was not afraid to confront John about the incident; she did so the very next day. And when she did so, she "did not mention" an alleged choking, but "only discussed the fact he had been screaming at her."

92.    All of the above was presented to the COD, and none of it was in dispute by the parties during John's disciplinary proceeding.

**B.    The Incident With Jane on April 1-2, 2023**

93.    At the end of March Jane came to stay with John for an entire week at Princeton during her spring break. This was Jane's first time visiting John at Princeton, and she arrived to find John well settled with a new group of friends, including Sarah Smith. This was the first time Jane had met Sarah, then one of John's closest friends at Princeton. This was also the first time she had met Student 3, a female student at Princeton who had a crush on John. Jane's position as the only young woman in John's life had clearly changed.

94.    On Jane's second night there, the two of them had drinks with Sarah, Student 3, and Student 4 in John's dorm room. John's roommate, Student 5, was also present. The entire group (minus Student 5) then left to walk to an event at an eating club.

95.    As they walked, John and Jane kissed briefly before Jane broke away. Student 3—who had previously told John she was in love with him—became highly upset upon seeing it and broke a bit from the group. Student 4 stayed with her to console her.

96.    As John, Sarah and Jane kept walking, Jane and Sarah, who had just met each other the day before, shared a romantic kiss. This hurt John, not only because he had feelings for

28

**JA 57**

Jane, but because Sarah—one of his best friends at Princeton—*knew* he had feelings for Jane. Sarah was more than moderately intoxicated.

97.    John and Jane got into an argument about the kiss.  Sarah, in her drunken state, lay on the ground as John and Jane argued.

98.    After some amount of arguing, Jane—whether to end the argument, to bind her newfound Princeton friends to her, or because she was having some sort of genuine incident—suddenly collapsed backwards into John, then fell to the ground screaming and crying loudly.

99.    John was completely bewildered, as was Student 4, who (as he would later tell the investigator) saw the whole thing as he was walking back towards John and Jane with Student 3. No one else ever saw, or would even claim to have seen, what transpired between John and Jane immediately before she collapsed to the ground.  Sarah would testify that John looked genuinely "bewildered" when she looked at him after she heard the commotion.

100.    When Sarah, Student 3 and Student 4 got to her, Jane—purporting to have a traumatic flashback—was saying words to the effect of, "Z choked me," and, "He choked me." "Z" was a former boyfriend of Jane's.  Jane, who admitted to being highly intoxicated, would claim in her first interview that she was "having flashbacks and did not remember where [she] was" and "was having PTSD from her prior rape when she had been choked."

101.    Jane then spent the next 1-2 hours on the ground as the group catered to her.  By Sarah's own admission, John appeared genuinely "bewildered" at what was happening.

102.    **All of the above was presented to the COD and was not disputed by the parties.**

103.    The group then took Jane to Sarah's dorm, where it was agreed by everyone that she would sleep for the night.  Jane—by her own admission in her first interview—then asked to

29

speak to John, *alone*, in a common room near Sarah's room. She would never be asked why she felt safe being alone in a room with him after he had supposedly choked her, nor how she could be "furious" at him if she had no memory of what had occurred due to her purported PTSD reaction.

104. At dinner the following night, Jane raised with John her claim that he had choked her. John—who as yet had no reason to doubt Jane's sincerity, but knew he'd done nothing like that—told Jane he had zero memory of anything like that happening. As Jane would report privately to non-Princeton friends by text message in the following days—texts that would be shared with Princeton—John genuinely seemed not to remember having allegedly choked her.

105. At that point, Sarah—who had kissed Jane the night before, was now sharing a room with her, and with whom she would immediately become extremely close—said it was believable to her that John had choked Jane, because John had supposedly also choked *her* (Sarah) back at the eating club in March. This was the first time Sarah had ever accused John of that.

106. John already felt bad about having yelled at Sarah, and he now felt bad about having yelled at Jane, too. He apologized for how he treated them but refused to admit to choking either of them—because he hadn't. As Jane's texts to her non-Princeton friends would reveal, he insisted he had no memory whatsoever of having done anything like that, and he seemed sincere.

## V.    John's Texts With Jane in the Following Weeks

107. In the ensuing weeks, Jane repeatedly tried, unsuccessfully, to get John to admit to violently choking her. As illustrated above, she sometimes used those claims as leverage to get John to do things she wanted him to do for her. John knew he could not possibly have

30

**JA 59**

choked Jane, but he still had no reason to doubt Jane's sincerity.  He knew he'd been angry with her and thought he may have genuinely triggered some sort of reaction in her by something he'd said.  So when she made these claims he repeatedly apologized to her, while consistently refusing to adopt her characterization of the event.

108.    For example, on April 2 Jane tried to get John to admit that he had choked her. John responded as delicately and apologetically as he could without agreeing to something he knew hadn't happened: "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done last night."  That refusal to agree to what she claimed, in a way that was consistent with the genuine sympathy he felt for how upset Jane was that night, characterized all of his responses to such accusations.

109.    To take another example, on April 24 Jane again claimed that John had "literally choked [her] out," which even Jane knew wasn't true given that she never claimed to have lost consciousness.  When John didn't agree that he'd choked her, Jane replied that he "d[id]n't even think [he] did anything that wrong."  John responded, "I've acted wrong on many things," but again refused to concede he had choked her in any way.   As he had told Jane on April 2 "I have no memory of that" and "I told everyone I didn't hurt you because I sincerely believed I didn't hurt you."

110.    Even when Jane demanded that John go to therapy (or else she'd report him to Princeton), he agreed to go, *but still refused to agree he had done anything like choke her*.  And when John stopped going to therapy, and Jane claimed he "violently choked [her] and then quit therapy," he *again* did not respond by agreeing he had choked her, but instead replied that the reason he quit is that he didn't think he was benefiting from it.  *He then expressly told Jane* that he thought the purpose of therapy was "for the sake of becoming a better person" generally and

31

that *she was not the reason* he wanted to be better ("I don't want to be a better person for you necessarily. I just want to be a better person."). Jane responded by again relying on a characterization of her allegations that not even *she* believed, now telling him, preposterously, that he had "almost fucking murdered two women in cold blood." John *still* did not agree that he had choked her.

111. The closest Jane got to manufacturing an "admission" out of John was when she demanded, under threat of reporting him to the University, that he call his parents, tell them he'd choked her, record the call, and send it to her. John felt he had no choice but to comply with this completely bizarre blackmail request. *Yet even then, John refused to adopt Jane's characterization of the event.* He said in that recording that on the night in question he was "trying *to pull [Jane] in to talk to her* and, like, damaged her windpipe *ever so slightly*." That description is at *complete odds* with Jane's own claim to Princeton that he grabbed her out of *anger*—not to talk to her—and literally lifted her off the ground by her neck for 5-6 seconds, rendering her virtually unable to talk the next day (never mind that she was able to scream and cry loudly for hours as soon as she collapsed to the ground).

112. Yet Jane never claimed she told John, "That's wrong, do it again," or, "That's not good enough." Even when Jane *proved* she could blackmail John into doing something as strange as calling his parents, randomly saying he did something wrong, and recording it, *he still refused to admit to what she'd been claiming.*

113. Instead, as described above in paragraphs 43-54, Jane in fact spent an *extensive* amount of time with John, both in groups and alone with him, through the end of the summer. She sought his attention, affection, and care repeatedly. Her actions spoke far louder than her words—words that John repeatedly, even under threat, refused to ratify.

32

**JA 61**

**VI.**    **The Incidents are Reported and Investigated**

114.    During the summer of 2023, when John and Jane were spending a lot of time together, John became friends with one of Jane's other male friends, Person A.  Towards the end of the summer, John and Person A commiserated about their tumultuous relationship with Jane and how they were both, for obvious reasons, a little scared of her.  Upon information and belief, this conversation got back to Jane and was the precipitating factor in Jane's reporting John to Princeton five months after he supposedly assaulted her.

115.    Sometime before September 12, Jane reported to Princeton that John had choked her on the night of April 1-2.  She claimed she had not reciprocated John's kiss, and that after she kissed Sarah, John became upset with her and choked her.  When interviewed in the ensuing investigation, Sarah reported that at the eating club party on March 3, John had choked her as well.  Despite the fact that they had sat on those allegations for several months, Princeton conducted a rushed investigation that showed it cared little for ensuring that John had a fair and adequate chance to defend himself.

**A.**    **Evidence Collection**

116.    On September 26, 2023, Mr. Doe received an email from Jamie Sandman, the investigator assigned to the case, stating that the Office of the Dean of Undergraduate Students received a report about him and asking that Mr. Doe schedule an interview with her that very same day.  She did not attach a written notice of the allegations against him or give him any details regarding what this was about.  Mr. Doe responded that he would like to consult with a lawyer before the interview and requested a time for September 29. Ms. Sandman agreed to schedule the interview on the 29th and then informed Mr. Doe that while he could consult with a

lawyer, his lawyer could not attend the interview or participate in any part of the disciplinary process.  John asked if he could instead have a parent present and was also told no.

117.    On September 29, Mr. Doe attended his interview, without knowing anything about the allegations. During the interview, Ms. Sandman informed him that a report had been made against him by two students for allegedly choking them on separate occasions months prior. The first was Jane, who claimed that Mr. Doe had choked her on April 1, 2023, almost six months prior to her report. The second accuser, Sarah, was a friend of John's who attended Princeton. Sarah claimed that Mr. Doe choked *her* almost seven months prior, on March 3, 2023. Mr. Doe heard these allegations for the first time during the interview and responded to them to the best of his ability.

118.    After his interview, on September 30, Mr. Doe emailed Ms. Sandman asking about the deadline to submit evidence to defend himself. Ms. Sandman responded the next day without providing a deadline and instead said that she wanted to "wrap up this investigation promptly" and Mr. Doe should provide any documentation "as soon as you can." Mr. Doe then prepared a written response and collected evidence, which he submitted the very next day on October 2, 2023.  This evidence included, among other things, a letter from Student X's attorneys to Jane accusing her of defaming Student X by claiming he assaulted and threatened to choke her.  Ms. Sandman responded that she would send the information to the Office of the Dean of Undergraduate Studies with the summary of Mr. Doe's interview.

119.    On October 7, 2023, Mr. Doe asked about the status of the investigation, and Ms. Sandman informed him that it was not yet closed because the Office of the Dean of Undergraduate Studies requested additional interviews from witnesses. She did not indicate which witnesses, if any, were being interviewed for a second time.

120. On October 23, 2023—still without having been formally charged or provided any written notice of the allegations—Deputy Dean of Undergraduate Students Joyce Chen emailed Mr. Doe asking him to schedule a meeting with her to discuss how concerns are resolved by the Committee on Discipline. Mr. Doe met with her the next day, and she informed him that he would be receiving a packet of the evidence soon and that there would be a hearing on this matter just three days later, on Friday, October 27. The hearing would be held by the Faculty-Student Committee on Discipline, composed of two faculty members and three students, as well as Princeton Dean Deignan, who serves as the Chair of the Committee. Mr. Doe requested that the hearing be in person, rather by Zoom.

121. After the meeting, Mr. Doe sent Dean Chen an email requesting that the hearing be scheduled a few days later so that he could have more than three days to review the evidence. Dean Chen agreed and scheduled the hearing for Wednesday, November 1.

122. On October 25, Dean Chen sent Mr. Doe an email denying his request that the hearing be in person rather than by Zoom, stating that other recent hearings had been conducted over Zoom and it was difficult to orchestrate an in-person hearing. She also attached a packet of the evidence that had been collected. She said that if Mr. Doe wanted any additional interviews to be conducted based on the information in the packet, he needed to let her know as soon as possible. She also sent Mr. Doe, *for the first time*, a formal written notice of the charges.

123. According to the notice, Mr. Doe was charged with a violation of the University Policy on Personal Safety (specifically, assault) in that: in early April 2023 (on or about the evening of April 1 or early morning hours of April 2, 2023), possibly while intoxicated, Mr. Doe allegedly placed his hands around the neck of a non-student who was visiting from another University and applied pressured and/or choked her; and/or 2) on or about March 3, 2023 Mr.

35

Doe, possibly while intoxicated, allegedly placed his hand around the neck of another student and applied pressure and/or choked her. Pursuant to the notice, Mr. Doe was also charged with a violation of the University's Alcohol Policy based on his alleged hosting of a "pregame" in his room in early April 2023, where he allegedly served vodka, tequila, and mixers to individuals who were underage.

124.    After receiving the notice and evidence packet, Mr. Doe requested that the hearing be moved a few days to November 3 or November 6 due to the large amount of evidence that he needed to review, all while still doing his normal courseload. Given that he was not permitted to have an attorney or parent with him, he named another Princeton student as his advisor. Dean Chen did not respond to Mr. Doe's email.

125.    On October 31, Mr. Doe submitted a supplemental statement addressing the allegations and again asked if the hearing could be rescheduled to provide him with additional time to prepare. He also asked Dean Chen the following questions, including how to call Student X as a witness, given that Jane had also falsely accused Student X of choking and he was suing her for defamation:

- I was not permitted to have any attorney present when I was interviewed by Investigator Jamie Sandman, but may I have an attorney present for the hearing?
- Will there be an audio recording or transcript of the hearing that I can access at a later date?
- I would like to call ▮▮▮▮(Student 4) and ▮▮▮▮▮▮(X) as witnesses at the hearing. Other than letting you know, is there anything else I need to do to request these witnesses' attendance?
- I understand that the COD may call additional witnesses at the hearing. Can you or the committee let me know at least 24 hours in advance of the hearing who those witnesses will be so that I can prepare questions for those witnesses?
- I understand that the circumstances of my probation are not before the COD at this time, but may be put before the committee if they must decide on a punishment for me – is that accurate? If so, what information about my probation would be put before the COD at the punishment phase?
- What is Princeton's / the COD's retention policy for records relating to this type of disciplinary proceeding?

36

126.    At 3:57 p.m. on the day before the scheduled hearing, Dean Chen—still without responding to either of Mr. Doe's requests that the hearing be postponed nor his list of questions—sent an updated version of the evidence packet to Mr. Doe, which contained 60 additional pages of evidence, including interview summaries of witnesses whom the accusers had requested be interviewed. She also updated the charge letter to indicate that Mr. Doe may have been intoxicated during one or both of the incidents for which he was charged. Finally, she indicated that Jane declined to attend the hearing, but that the hearing would nonetheless address Jane's accusations—even though neither Mr. Doe nor the hearing committee would have an opportunity to question her.

127.    Mr. Doe responded, asking if Dean Chen had received his statement or his request that the hearing be delayed. He asked to delay the hearing so he could respond to the 60 additional pages of evidence he had received.

128.    At 6:24 p.m., Dean Chen sent Mr. Doe another email, saying that she did not know if the hearing could be delayed but would let him know as soon as a determination was made. As to Mr. Doe's previous questions, she stated that he could not bring an attorney to the hearing, but could bring his Princeton student advisor. She said that there would be an audio recording made of the hearing that Mr. Doe could listen to if he needed to appeal the committee's decision. As to Mr. Doe's request that Student X be called as a witness, Dean Chen responded that because he was not interviewed, he could not be called as a witness. She suggested that Student X submit a written statement with any information he would like to share with the committee. Dean Chen refused to tell Mr. Doe which other witnesses would be called at the hearing and indicated that he did not need to ask questions of the witnesses, but he could prepare to ask questions of any individual who was interviewed. She noted that the hearing board

would *not* be informed about a prior disciplinary issue Mr. Doe faced unless he was found responsible, but did not explain what information concerning that disciplinary issue would be put before the COD in such event.

129. At 6:47 p.m., Dean Chen sent Mr. Doe yet *another* updated evidence packet containing still more evidence. Mr. Doe responded and asked whether he would be permitted to submit an additional statement responding to the additional evidence.

130. The next day, November 1, at 12:39 p.m.—just six hours before the hearing was scheduled to begin—Dean Chen emailed Mr. Doe stating that his request to delay the hearing was granted and the hearing would be on November 6 or 7 at 7:15 p.m.. She sent another email at 12:41 p.m., stating, "You had mentioned wanting to write another statement—again, you should not be repeating or reiterating information you have already submitted in your previous two statements." She stated that he could submit any additional statement by Friday November 3 at 9 a.m.—fewer than 48 hours away.

131. Later on November 3, Dean Chen sent Mr. Doe yet *another* updated evidence packet containing his statement, as well as a new statement from Sarah. Despite her previous indication that the committee would not be informed of Mr. Doe's prior disciplinary issue, she stated, "The committee has a packet that has references to your prior disciplinary incident redacted but does contain names." Mr. Doe submitted his supplemental statement and materials related to Student X, and asked how his information would be submitted to the committee with redactions to which Dean Chen responded that the redacted evidence packet Mr. Doe received would be the same one provided to the committee.

132. On November 4—two days before the newly scheduled hearing—Dean Chen sent *another* updated evidence packet to Mr. Doe containing 20 additional pages of evidence. She

stated that Mr. Doe had brought up certain points in his statement about the lack of evidence submitted by the accusers, so Dean Chen took it upon herself to relay those arguments to both women so they could address them in writing before the hearing. As such, Sarah submitted a 20-page response to the arguments Dean Chen relayed to her.

133.    On November 6, *just 45 minutes before the hearing*, Dean Chen emailed Mr. Doe that he was not permitted to use leading questions during the hearing. Mr. Doe asked which witnesses would be called, and Dean Chen did not inform him who would be called other than noting the witnesses who were on standby for the hearing. Then, just minutes before the hearing started, Dean Chen, unprompted, emailed Mr. Doe: "I wanted to mention that regarding the alcohol charge, our alcohol policy incorporates housing/dorm regulation policies that indicate that a student is responsible for violations that occur in their room. When a violation occurs in the room, the host is responsible, regardless of whether he purchases the alcohol."

### B.    The Evidence Packet

134.    The final evidence packet that the committee received reflects that **Ms. Sandman interviewed Jane and Sarah, the two female complainants, three separate times each, and provided them with the opportunity to respond to written and oral statements Mr. Doe had made. Mr. Doe was only interviewed one time by Ms. Sandman and was never asked to respond to the complainants' statements.** The first time he was provided access to their statements was in the evidence packets he received shortly before the various scheduled hearings.

135.    Moreover, the evidence packet reflects that Student 4, a male student who witnessed the alleged incident between Mr. Doe and Jane, was only interviewed once. On the other hand, a female student who was involved in Mr. Doe's prior unrelated disciplinary issue,

and had no eye-witness knowledge of the charged incidents with Jane and Sarah, was interviewed twice, despite Mr. Doe originally being told that his prior disciplinary issue would be brought to the attention of the committee only if he were found responsible.

136. The evidence packet also demonstrates that Ms. Sandman interviewed five students identified by the female complainants (Students 6, 7, 8, 9, and 10) who had no first-hand knowledge of the alleged incidents. They did not interview Student X, the individual identified by Mr. Doe who brought a defamation lawsuit against Jane for falsely accusing him of choking her, or Mr. Doe's roommate, who interacted with Jane and Sarah in the days after the alleged incident with Jane.

137. Moreover, the evidence packet demonstrates that none of the male witnesses who interacted with Jane after the alleged incident were asked about bruising on her neck, including Student 4, 6, and Mr. Doe, while female witnesses were asked about bruising on Jane's neck and provided conflicting reports.

138. Furthermore, just before the hearing, Princeton had interviewed all of Sarah's roommates in order to rehabilitate Sarah's story after John had pointed out that she'd told none of them he'd supposedly assaulted her. Dean Chen herself was even brought in to conduct some of those interviews, given how little time was left before the hearing.

139. Yet Princeton did not similarly interview John's roommate, Student 5, on two critical points that Jane and Sarah had disputed: whether Jane slept in John's room the rest of the week after the incident, and whether she had any bruising on her neck. Student 5 could have confirmed or denied that Jane slept there (as John's photo evidence effectively proved) and—since he therefore would have seen her—*whether Jane had any bruises on her neck*. As it did

40

with the parties themselves, Princeton gave Jane's and Sarah's witnesses ample opportunity to rebut critical testimony, yet never sought to do the same with witnesses on John's side.

140.    Next, the evidence packet reflects that, while many redactions were made to information, prejudicial information about Mr. Doe was left unredacted. For instance, Jane's opinion that Mr. Doe had a relationship that "ended badly," was "inclined to violence towards women," was "big on boy culture," and "often made sexist or racist remarks" were left unredacted, despite the statements having nothing to do with whether Mr. Doe choked Jane or Sarah. Additionally, Sarah's opinion that Mr. Doe had a "superiority complex" and Student 7's opinion that Mr. Doe was "racist and sexist," had a "male savior complex," was "very opinionated and believed women were weak," made "pro-life comments," and made "a racist comment in Spanish class" were left unredacted.

141.    Finally, the evidence packet shows that Ms. Sandman did not probe inconsistencies in female witnesses' stories. For instance, Jane initially claimed to Mr. Doe that she "didn't remember anything" about what happened that night due to her intoxication, but that Student 3, who admitted she did not witness the incident, told her what happened. But later, Jane claimed that she remembered that Mr. Doe was trying to flirt with her and accidentally grabbed her too hard and let go quickly. On another occasion, she texted Mr. Doe that he almost "murdered two women in cold blood." And then, in her first interview with Ms. Sandman, Jane claimed that Mr. Doe was yelling at her, grabbed her by her throat, and *lifted her off the ground* as he choked her. Jane stated that she was straining on her tip toes to get the pressure off of her neck. Then, in her second interview, she claimed that she actually remembered that Mr. Doe was angry about Jane kissing Sarah and was expressing his anger physically. She said she initially did

41

**JA 70**

not think he was being serious, but then, she recalled, it became clear he was furious as he choked her for 5-6 seconds.

142.    Ms. Sandman never asked Jane about any of those changes in her story.

143.    Additionally, Ms. Sandman never probed Jane about the fact that she said Sarah actually saw Mr. Doe choke her, but in a text message submitted into evidence, Jane said that Sarah did *not* see the incident.

144.    Moreover, Ms. Sandman never probed Sarah as to why she never mentioned to Mr. Doe that he had choked her, or why her text messages only reflected that she was angry with Mr. Doe on the night of the incident for having his friend "hover" over Sarah. Ms. Sandman did not ask Sarah about why she cropped the text messages she submitted to Ms. Sandman, cutting out her responses to Mr. Doe's questions.

145.    On the other hand, Ms. Sandman probed Mr. Doe about various potential inconsistencies, such as why there were text messages where Mr. Doe appeared to have admitted his culpability to Jane, why he texted Jane that he wasn't "actively violent," why he took "space" from Jane, as well why there was an audio recording that Jane submitted between Mr. Doe and his parents where he seemed to admit his culpability.

### C.    The Evidence Overwhelmingly Undermines Jane's Allegations

146.    The final evidence packet presented to the panel showed that Jane had repeatedly changed her stories and was repeatedly contradicted by the evidence on points that were central to her story.  No reasonable, objective adjudicator could have found her testimony to be consistent or credible.

147.    For example, as to how John allegedly choked her, Jane said in her first interview that he "grabbed my throat and lifted me off the ground," such that she was literally "straining

42

on her tip toes to get the pressure off her neck."   Doing that would obviously require John to squeeze her neck on both sides.  But after seeing the initial round of evidence, she said in her third interview that John  "***did not*** squeeze the sides of her neck with his fingers" but instead just "press[ed] from the front as we were facing each other," making it impossible for him to have actually lifted her at all.

148.    As to what happened when John allegedly stopped choking her, Jane said in her second interview that John "released her ***and she fell to the ground*** screaming and crying." But in her third interview—after seeing John's and Student 4's testimony that she strangely fell backwards into his arms—she changed her testimony to say that after John released her, she instead "immediately tried to put some distance between herself and [John]" by "turn[ing] away from him," that John then "grabbed my torso," and that she only *then* "started screaming and fell to the ground."

149.    As to what Jane remembered after the alleged choking, she said in her second interview that she remembered "ask[ing] to be alone with [John]" in a common room to confront him about the choking.  "It was very clear I was furious," she said in that interview.  But in her third interview, she claimed that "because of the PTSD attack" that the choking immediately gave her, she "initially did not remember anything," not even "where I was when I first woke up" the next morning.

150.    The evidence also showed that Sarah fundamentally changed the testimony she offered in support of Jane's story.  She expressly said in her first interview that she "did not see marks on [Jane]'s throat," which would surely have been present if John had literally lifted Jane off the ground.  Undoubtedly after hearing Jane's specific story to the investigator, she then said in her second interview that she in fact "saw a slight bruise on the left side of [Jane]'s neck."

43

Not only did that squarely contradict her earlier testimony, it would also contradict Jane's own changed version of her story, in which she would claim John *did not squeeze the sides of her neck*. Indeed, John submitted two photos of Jane from that week in which her neck was entirely visible—and had no bruising whatsoever.

151. The evidence undermined Jane's story in a host of other ways as well. First, it repeatedly showed—from witnesses adverse to John—that John expressed genuine shock and disbelief when Jane claimed he'd choked her. Jane told a friend in a *private* text that John "doesn't even remember" choking her. She texted still another friend that John "didn't believe [her]" the next day when she told him he'd choked her—not that he "pretended not to believe her," but that he "didn't." Sarah likewise admitted in her first interview that John genuinely "looked bewildered" when Jane collapsed and started crying and that he "did not believe he had choked" Jane. Sarah also admitted in her second interview that John "expressed shock" when later told that he'd supposedly choked Jane.

152. Next, the evidence showed that not even Jane's own parents quite believed her when she first told them John had supposedly choked her. Her mother's first reaction was to say, "oh [John], what a weird thing to do to people," and later to ask Jane if she was "still thinking of leaving [Princeton] early or did you guys make up?" The response of Jane's father betrayed a similar skepticism, as evidenced by Jane's response to him that her "best friend choked [her] out, that should have gotten more than 'busy night' ☹". Jane's father further replied, "I think [John] is OK."

153. The evidence also by the investigator confirmed that John and Jane kissed in a common room after the incident, just as John had testified. Sarah testified in her first interview that "[w]hile back in [her] dorm, [John] and [Jane] kissed briefly." Student 6, a friend of

44

**JA 73**

Sarah's, also said in her interview that she recalled "making out" being mentioned as part of the interaction that night. And Jane herself, when directly asked, said only that she "did not recall kissing [John]" in the common room—not "no way" or "absolutely not" or "there's no way I'd ever do that." None of that is consistent with the idea that Jane was choked by John hours before and supposedly was afraid of him the rest of her time visiting Princeton.

154. Indeed, the evidence also showed that Jane lied about where she slept during the rest of her time visiting Princeton that week. She told the investigator that she spent every night in Sarah's room because she was afraid of John. John, however, submitted photo evidence showing Jane had slept in his room two of those nights, and Sarah slept in his room one of those nights as well.

155. The evidence further showed that Jane had lied about when and why she ended her friendship with John. She said in her second interview that she "stopped talking [to John] after she learned he was no longer in therapy." But John produced texts proving they stayed in communication for more than a month after she learned he was no longer in therapy, and that Jane continued to ask him to hang out with him and sought him out as a source of comfort. He even produced a photograph showing that Jane and Sarah *stayed at his home for several nights in late August*—a full month after they learned he ceased therapy. And finally, as noted above, he submitted evidence showing that, one week *after bringing her allegations* against John, Jane was still in contact with him, asking his advice about how to handle Student X.

156. The evidence also repeatedly contradicted Jane about how she supposedly initially learned she had been choked. As explained above, Jane initially claimed not to remember what happened between her and John due to a PTSD attack and her intoxication level, but only to have learned she was choked because people who had seen it had told her so. As early as April 2,

45

however, she admitted to John—in text messages he submitted—that Sarah had not seen the alleged choking, but had only looked up after Jane had collapsed.  Yet in her first interview on September 20, Jane claimed that "[t]he only person who witnessed the choking was [Sarah]."  But in their interviews, both Sarah and Student 3 would make clear that neither of them had seen any kind of choking or physical interaction between John and Jane whatsoever.

157.    Finally, the evidence also revealed an alternative possibility for what might have triggered Jane's reaction, presuming her reaction was even genuine.  As Student 8 (Sarah's female roommate) testified, "Initially, [Sarah] told them that [John] mentioned a past boyfriend to Jane and it triggered her."  (That boyfriend, the investigation would elsewhere reveal, had choked Jane when they were dating.)  Student 8 testified that she then heard the same explanation from Jane herself: "In the morning, . . . [Jane] said, 'He said something that triggered me, and other stuff happened.'"  Student 4 went further: He testified that the following night Jane told him John "did not choke her, but he put his hand on her neck and it brought back the memory" of her prior assault.  It was no coincidence that Jane would admit this only to the sole eyewitness of the incident, who would know her story of being lifted off the ground was a lie.

D.    **The Evidence Also Undermines Sarah's Claims**

158.    The evidence packet also overwhelmingly undermined Sarah's testimony about her own alleged choking.  She claimed in her first interview that John "had his hand on her throat and was using that hand to hold her in place."  But her friends and roommates consistently testified that, despite telling them she'd been upset at John for yelling at her that night, had never claimed or suggested he'd assaulted her.  When she was reinterviewed, Sarah told a different story more consistent with that fact, claiming that John hadn't actually "meant to choke [her]" at

46

all. She also said John did not actually "grasp" or "squeeze" her neck, but "was more pushing"—*a change in description virtually identical to the change Jane had made.*

159. To make her claim more believable, Sarah claimed to the investigator that she spoke little with John the summer after the incidents. John, however, submitted photo evidence showing that she and Jane spent several nights at his family home in August—which not only was over the summer but was *after* Sarah and Jane learned he had stopped going to therapy, and even required her to *fly* to his location.

160. Sarah also claimed that the last time she spent time with John alone together after lawn parties was September 10. John submitted text message evidence proving they spent time together as late as September 12 and September 18, of which, at least September 18 was time alone together.

161. The evidence, in short, repeatedly showed that Sarah was not credible.

## VII.   The Hearing

162. On November 6 at 7:27PM, Mr. Doe's hearing began. At the hearing, the COD heard evidence on both accusations of Mr. Doe's alleged incidents of choking, even though the two incidents were completely unrelated to one another and occurred weeks apart. In fact, Jane had not even met Sarah at the time of her alleged incident, let alone witnessed it. Nevertheless, the two allegations were heard jointly before the same panel at the hearing. Additionally, Jane decided to not attend the hearing—yet the panel did not dismiss her complaint, and instead questioned Mr. Doe at length about her accusations.

163. The panel's questioning at the hearing confirmed what the source involved in the panel's deliberative process would later convey: that it had prejudged the case. It repeatedly attacked the testimony of John and Student 4, and just as repeatedly treated Sarah and the

47

witnesses supporting the complainants with kid gloves, if not total disinterest, as though nothing they could say could matter to the outcome.

164.    At the hearing, Mr. Doe was the first person to be questioned by the panel. His questioning lasted for over an hour and a half. The one-sided, demanding nature of the questions reflected that the panel presumed Mr. Doe to be responsible, especially when compared to the simpler questions the female witnesses received.  The panel repeatedly asked questions challenging Mr. Doe's account, but did not ask Sarah any similarly pressing questions—even though Mr. Doe had raised concerns about the many problems with her story.

165.    For instance, the first question at the hearing was asked solely to bolster the female witnesses' prior statements to the investigators that they did not see what happened between Jane and Mr. Doe, and to cast doubt on the one eyewitness who had told the investigators that he saw what happened and saw that Mr. Doe did not put his hands on Jane's neck. The very first question of the night was from Professor Harmon who asked, "This is in the dark, right? This is a nighttime event, right?"

166.    Members of the panel *repeatedly* demanded that John be able to persuasively explain Jane's and Sarah's motives, as though the burden of proof lay with John and as though their testimony would be deemed credible—despite all the contrary evidence—unless John could explain *why* they were lying.  One member asked him, for instance, "You think that the fact that Jane spent time with you means that she wasn't concerned about you as a danger, and how do you square that with her repeatedly demanding that you go to therapy, telling you that you have a serious problem, telling you that you need to tell your parents that you were violent with her?"

167.    Similarly, when John identified for the panel all the ways that Sarah's testimony had changed, a panel member shot back, "I guess, have you given any *reason* for [Sarah] to react

48

this way?" It didn't matter to the panel member *that* Sarah had contradicted herself, unless *John* could explain *why*.

168. John then noted for the panel that, despite Jane and Sarah *both* belatedly claiming that Jane had bruising on her neck, **neither of them ever tried—or even claimed they'd tried—to show that bruising to him to prove he'd choked her**. He then noted all of the ways that *Jane's* story had changed over time. The panel's response, incredibly, was to ask whether pressing against the front of her neck wouldn't *also* be a serious assault—as though it didn't matter how dramatically Jane changed her story so long as each version of it amounted to a serious, even if completely contradictory, claim.

169. This type of questioning continued, with COD members primarily asking questions hostile to Mr. Doe's account. And if Mr. Doe did not provide the answer the COD members were seeking, they would continue asking the same question in different ways. For instance, Professor Harman asked Mr. Doe what he was talking to Jane about in the moment after Jane and Sarah kissed. Mr. Doe stated he could not remember. Professor Harman asked again, "So you don't have any recollection of having said anything to her that would have upset or triggered any sort of reaction?" Mr. Doe again said he did not remember that moment. Professor Harman then pressed, "Yeah, I'm talking about in that moment." Mr. Doe insisted he did not remember but speculated that he may have used a word that triggered Jane due to her history of sexual abuse, but assured her that he did not do anything physical in the moment.

170. Despite having just insisted on not remembering anything about the nature of the conversation, Professor Harman continued, "So do you assume that because you can't recall anything really about that conversation, that it was a conversation that was not angry or upsetting or disturbing in some way to her? Or that you weren't talking about anything that would have

**JA 78**

stirred up a lot of emotion because you can't recall it? What I think I'm hearing you say, and you tell me, I don't want to put words in your mouth. You tell me if this is right, but it was such a benign conversation that you just have no memory of it at all." Pressured to answer differently, Mr. Doe said, "It's benign in contrast to the rest of that night."

171.    Still, Professor Harman continued, "What you're saying is that there was nothing about the—do you believe that if you had said something to her that was upsetting, that caused this reaction, you would've remembered it?" Mr. Doe said, "I'm not certain, I don't—what I'm saying is that there—" Professor Harman cut him off and said, "That's some word that you didn't have any idea what that conversation was about. And what you're saying is I don't remember anything about it. And I'm asking you if you think you would've remembered, had that conversation been angry or upsetting or where you were confronting her about something and then she falls on the ground. Do you think you would remember that?"

172.    Again, despite having just answered that he was not certain if he would remember, but then being pressured to answer it in a different way, Mr. Doe responded that it would be "more likely" to remember a conversation that was emotionally charged, but that given the alleged incident occurred a long time ago and the entire night was emotionally charged, he still didn't remember. He again insisted the reaction was not caused by something physical he did. Professor Harman then said that no witness offered any explanation about what was discussed beforehand and why Sarah collapsed, and Mr. Doe again insisted, "Right. I don't have an explanation to this moment."

173.    Professor Harman later asked Mr. Doe about why three women stopped to ask if he and Sarah were okay when they were talking at the party. She asked, "What was it about that situation that caused those three women to stop and ask her if she was okay?" Mr. Doe explained

that Princeton is a very conscientious community and it was not uncommon for someone to stop and check in when they saw a six foot one man leaning over and arguing with a five foot two woman. He also explained that there was a safety officer in the room who could have checked in and didn't, which further showed that the people who stopped were just being conscientious.

174.    That did not satisfy Professor Harman, who then said "there was obviously something more to this encounter that caused these three women to stop and ask Sarah if she were okay," as though an argument could never be enough to make passerby care.

175.    Another board member then tried to turn Mr. Doe's comment about a safety officer being present against him, by saying, "So Mr. Doe, it's true that Student 3 had had a prior incident at an eating club that caused you to be concerned about her safety right? And I just wanted to bring to your attention that what you're arguing right now is that even with the safety officer present and with people coming to speak to you and Sarah, when you were having this argument, you were still concerned about Student 3's safety when she was in the same sort of situation. There was a safety officer for her, and yet you still felt the need to have someone look after her. Is that correct?"  That panel member gave no explanation why John's concern for Student 3's safety was somehow an indicator that he was a violent person.

176.    Later, when the COD was questioning Student 4 about whether Jane had a coat on the night of the incident—in an attempt to establish that her bruising could not have been visible—Mr. Doe showed the COD a picture of Jane and himself from that night, demonstrating that she was not wearing a coat. Professor Harman stated, "I was actually seeking to understand whether or not people had coats because it was early April." Mr. Doe clarified that the picture was taken that night and that she was wearing exactly what was in the picture. Professor Harman

51

then argued with him, pressing him to make a different statement, by saying, "It was 11 o'clock. It's early April."

177.    The COD also asked Mr. Doe questions that were completely irrelevant to the issues, and were solely focused on whether or not he had good character—despite explicitly telling Mr. Doe that character witnesses were not permitted at the hearing because it would focus only on the incidents at hand, and after telling him that Student X could not testify because he did not have firsthand knowledge of the incident and only knew about the character of Jane. One COD member asked Mr. Doe, "You've referred a couple times to the fact that you were concerned about Student 3. Is that right? Who you wanted people to look out for? And I think what you're saying is 'Look at me. I'm a good guy. I was concerned about Student 3.' And I just wanted to ask you if you could address a sort of different way of seeing this, which is that it's intrusive for you to decide to make sure that Student 3's okay by having people follow her. And indeed, she was followed by the one guy following her who you asked to follow her, that's intrusive and controlling potentially. And then also that you are getting mad at someone for kissing Jane is also, you are taking yourself to have a say in how these other women in your life behave in an intrusive and controlling manner. Can you just see something if someone had that reaction to the stories that are being told?"

178.    Mr. Doe responded asking for clarification: "I guess I'm trying to understand the question. So the idea is that because I was trying to look out for Student 3 and someone could think that looking out for Student 3 is actually an intrusion, and so I'm the kind of person who makes intrusions, and so I'm the kind of person who would be upset about a kiss enough to attack someone. Is that the question?" The COD member responded, "I just wanted you to agree to say something to the perspective that someone might react by saying this is intrusive and

controlling. You think you have a say and an entitlement to tell these women, friends of yours, how they should behave, what should be happening to them." Whether or not Mr. Doe asking a friend to watch Student 3 at a party was intrusive and controlling is completely irrelevant to whether Mr. Doe choked Sarah at this party, yet he was forced to defend his character at the hearing.

179. In a similar vein, another member stated, "Just a simple question, Mr. Doe, and I think I can probably foresee how you'll respond. I just thought that it was pertinent to bring up the fact that [Jane] and [Sarah] both characterize you as sort of the controlling person in the friendship, and they've both alleged that at one time or another you threatened to commit suicide if they didn't do what you wanted them to do. Can you for the record tell us whether you have ever threatened that?" John denied it, but whether he had ever spoken about suicide or was a controlling friend was irrelevant to whether he choked Jane or Sarah; that question shows yet again how biased the COD was against him.

180. This line of questioning continued as a member asked, "Do you have any reason besides what we've been over previously to believe that it is more likely that Jane would be the controlling person in the friendship than you would be since it's sort of like a they said this, you and maybe [Student 4] both said this type of situation." Again, whether either Mr. Doe or Jane, or both of them, were controlling has no bearing on whether the alleged incidents occurred. And indeed, Mr. Doe responded that he was unaware that he would be asked about this topic of who was the more controlling friend and offered to show text messages that exhibited Jane's character in that regard. The COD member simply stated that they "don't think we can enter things into the record this late" and asked "whether there are any additional details about whether we should consider Jane the controlling person in the friendship."

53

**JA 82**

181.    The questioning of Mr. Doe ended after almost an hour and a half.  Then Student 6, who during his interviewhad said that Sarah and Jane told him Mr. Doe had been "aggressive" the night of the incident with Jane, testified. Only when asked if choking was mentioned, Student 6 had said he thought it was. Student 6 was not pressed on this at the hearing. And, unlike the repeated questioning of Mr. Doe when he said he did not remember something, when Student 6 said he could not remember what Jane was wearing the day after the incident, a COD member stated "that's fair" and moved on. And when Student 6 claimed that Jane had a raspy voice when he saw her after the incident, the COD member responded, "Awesome." He was questioned for a total of ten minutes.

182.    Student 4 was the next witness. In his previous interview, he had said that he actually saw the alleged incident between Jane and Mr. Doe. He said that Mr. Doe did not touch Jane and that Jane just randomly collapsed into Mr. Doe. Like Mr. Doe, he was pressed hard on potential inconsistencies and asked to explain why other witnesses might be incorrect. For instance, he was told that Student 3—with whom he had been walking—said she did not see what happened between Mr. Doe and Jane. The COD member said, "She was a little surprised that you were in a position to see that. So that's why I'm asking about relation to where you were at that time to where Student 3 was."  (The COD member did not ask Student 3 why her account differed from Student 4.)

183.    A COD member then confronted Student 4 with a statement the investigator wrote about his interview: "He did not see any physical altercation between Mr. Doe and Jane, but it could have happened." It continued: "Perhaps it happened if she is saying it and it triggered a memory in her head. I don't think it's that bad. I don't think [John] choked her really really hard. I think it is being portrayed a lot worse than it was." Student 4 testified ***unequivocally*** that he

54

had not said this during his interview and was misquoted. When he tried to explain what he had actually said and meant, Professor Harman interrupted him and said, "Can I ask a question about time? Its 10:03. I don't know that we need to share [the written interview summary] on the screen. We've heard it read out. We've heard his response. I'm just concerned about time. I actually don't know what the plan is with time for this event." The questioning continued for a bit, with COD members prefacing their questions by saying "sorry" and "two quick things." Finally Student 4 was able to explain that he thought he believed he had been misquoted by the investigator—yet continued to be challenged on that point by members of the panel.

184. In total, Student 4 was questioned for 40 minutes—far longer than any witness who testified in support of Jane and Sarah.

185. Before the next witness was called, a COD member said, "Procedural question. Professor Harman was bringing this up earlier. I don't see us getting through all these witnesses in like 20 minutes." Professor Harman responded, indicating that her mind was already made up even before Sarah herself had been questioned: "Yeah, I'm confused about the time. I should say we have received a ton of information. We've received a huge amount of written information. We've had a long conversation already…What is the longest that we'll go? I should say my strong preference is that we do complete tonight. I understand that I'm not in charge. If we wanted to complete tonight how long are we giving ourselves that we are going to be together?" The COD Chair responded that they would discuss privately. As the final witnesses were called, the COD asked substantially fewer questions than they had of Mr. Doe and Student 4.

186. Next, Student 7 testified for 11 minutes about Sarah telling her some details about the alleged incident with Mr. Doe, but she could not recall if Sarah mentioned Mr. Doe putting a hand on her throat or choking the first time she spoke to her about the incident. At the end of her

55

testimony, she said she actually did remember that Sarah told her that information (which contradicted Sarah's own testimony that she had not told anyone that John choked her in the immediate aftermath of the alleged incident).

187.   Then, the investigator was called for 5 minutes simply to rebut Student 4's testimony that the investigator had misquoted him. The investigator did not show her notes on screen during the hearing, but merely confirmed that her notes said what was in her report in the hearing packet.

188.   The last witness to be called was Sarah. At the beginning of her testimony, a COD member apologized to her for the late hour and that the hearing was taking longer than expected. Later in her testimony, the COD Chair said, "I also want to encourage everyone to try to focus questions on the charges that are before us" and asked Sarah to "keep her answers as concise as possible" because of the late hour. Another member prefaced a question by saying, "I'll keep my question brief and I think it has a brief answer." Another member prefaced a question by saying, "Two questions. One I think is also pretty simple." In total, her examination did not even last 30 minutes.

189.   **In contrast to Professor Harman's intense and prolonged questioning of Mr. Doe, she did not ask Sarah even a single question. Sarah's testimony mattered so little to her prejudged view of the case that she actually fell asleep during it:**

56



190.    And the questions that were asked of Sarah had almost nothing to do with her account of the incident or the inconsistencies in her story; instead, they focused heavily on Mr. Doe and his character. She was asked about what Mr. Doe was normally like when he was intoxicated, whether Mr. Doe was drunk during the incident with Jane, whether Jane thought requiring Mr. Doe to stop drinking was important, whether Mr. Doe ever violated the condition that he stop drinking, and whether Jane slept in her room the remainder of the week she was visiting.

191.    Unlike with John, the COD members did not press Sarah on challenging topics. Not a single one asked her, for example, about her dramatic change from saying Jane had *no* bruises on her neck to saying she supposedly did.  The most confrontational question they asked her was whether she "ever felt pressured by Jane to have certain views?" Sarah literally gave a one-word answer—"No"—and the panel member simply responded with, "Okay.  Yeah, that's my question."  One member even teed up questions for Sarah by telling her what she had previously said and assuring her she was being consistent: "You mentioned you were on the ground when this is going on. I know you've been consistent about that, and you said in one of your last statements you were about 10 feet away. Does that sound right?"  No such leading and

57

**JA 86**

favorable questions were ever asked of John or his witnesses.  Indeed, John had been told 45 minutes before the hearing he was not allowed to ask any leading questions of witnesses.

192.    Following Sarah's testimony and Mr. Doe's closing statement, the hearing ultimately concluded shortly after 11:30 p.m. Given the short timeframe, the panel's own statements that they needed to move quickly and wanted to complete deliberations that night, and the fact that a source who was involved in the panel's deliberative process said the panel had prejudged guilt, their deliberations were, upon information and belief, extremely limited and were indeed completed that night.

193.    At no point did the COD seek expert evidence or testimony on PTSD or whether Jane's purported reaction and memories were consistent in any way with a genuine PTSD reaction.

## VIII.   The Panel's Decision and Sanction

194.    At 10:00 a.m. the next morning—just 10-11 hours after the hearing ended—Dean Chen emailed John to set up a Zoom call to tell him the COD's decision.  On that Zoom call she told John that the COD had found him responsible for the charges against him.

195.    The COD then issued its formal decision letter and rationale on November 8, 2023.  It found John responsible for assaulting Jane, responsible for assaulting Sarah, and responsible for violating the alcohol policy by hosting the pregame event in April where adults under 21 were present.  Its almost nonexistent rationale, and the speed with which it was issued, confirmed all the more that the panel, as confirmed by the source involved in the panel's deliberative process, had prejudged the case, and that the actual evidence received at the hearing didn't matter.

196.     The decision stated in boilerplate fashion that the COD had considered all of the information obtained in the investigation and presented at the hearing, but its actual analysis of that evidence was almost nonexistent. Its rationale that there was "clear and persuasive evidence" of John's guilt consisted of just two things: "the women's continued and consistent descriptions of the incidents in communications and conversations with others" and "the admissions and acknowledgements you made in text messages." It stated, without explanation, that it "did not find persuasive" his claim that he made those admissions "only because you were being blackmailed," even though *Jane had never even been questioned* about that claim.

197.     That was the sum total of the COD's attempt to explain its analysis of the evidence. It said *literally nothing* about the way Jane's story had repeatedly changed, in dramatic ways, or how it could credibly state that her story had been "consistent" despite those changes. It said *literally nothing* about the way Sarah's story had also changed. It also said *literally nothing* about Student 4's eyewitness testimony, or *any* of the other evidence it purportedly considered. Its entire rationale consisted in the two conclusory sentences described above.

198.     In perhaps the clearest sign that its "rationale" was anything but, **the COD never even said *which* version of Jane's or Sarah's story it found there to be "clear and conclusive evidence" of.** It did not state whether John was being found responsible for choking Jane in a way she could not remember and which no one witnessed (her first version of events); whether he was being found responsible for literally lifting her off the ground by her throat (her second version); or whether he was being found responsible for having applied pressure to the front of her neck in a way that made the *aftermath* the thing that really upset Jane (her third version).

Likewise for Sarah, the COD's decision letter said nothing about which version of Sarah's story it found "clear and persuasive evidence" of John having done.

199. The rationale, in short, implicitly acknowledged that Jane's story had changed in dramatic and irreconcilable ways and that the evidence did not support one version over the other.

200. Nor did the panel identify for John which of his "text messages" contained the "admissions and acknowledgements" that he had choked her.

201. As explained in detail above, John repeatedly refused to agree that he had choked Jane, even when Jane threatened him in various ways. He apologized for how he had mistreated her but repeatedly stated, diplomatically, that he had no memory of having choked her. That the panel was unable to identify any specific text message where John "admitted" or "acknowledged" choking her only underscores that point.

202. Notably, the panel did *not* state that the audio recording of John's phone call with his parents was an "admission" or "acknowledgment" in that regard—it expressly limited those purported admissions to "text messages."

203. The decision letter said it was suspending John "for two years," meaning he would not be eligible to return "until the fall of 2025." That is an unprecedented sanction at Princeton for the charges John was found responsible for.

204. The decision letter's rationale for handing down that sanction was that, in addition to the two undefined assaults it found John responsible for, it said he had also had a "prior disciplinary infraction in June 2023 stemming from an assault in March 2023 (which resulted in probation)." The decision letter did not quote any document, or otherwise explain, why it

**JA 89**

believed it could characterize that prior disciplinary infraction an "assault." Nor did it say anything at all about the actual nature of that other incident.

205.    Indeed, the "assault" was nothing of the sort: It stemmed from an incident in which John and Student 3—who often practiced Muay Thai together—were rough-housing. Student 3 expressly told Princeton, when it investigated that incident, that *everything that happened between her and John in that incident was done with* "my informed and continuous consent." Princeton—which, as shown above, finds almost everyone guilty for everything— nevertheless found John responsible for "endangering a student" for that incident. But the COD wrongly and unfairly characterized it as an "assault" in reaching John's sentence on Jane's and Sarah's charges.

## IX.    The Appeal

206.    Mr. Doe's deadline to appeal was November 20.

207.    Given that he intended to argue on appeal, among other things, that one of the COD members fell asleep during the hearing, he asked Dean Chen if he could review the video footage of the hearing. Dean Chen informed him that he could only review the audio of the hearing "as that captures the content of the hearing." He was instructed to schedule a time to listen to the audio in a room on Princeton's campus, as he was not permitted to keep a copy of the audio.

208.    Mr. Doe asked why he could not view the video, and if he could use technology to create a transcript of the hearing. Dean Chen informed him that the policy is to allow the student to listen to the audio "since it contains all the content they would need for the appeal." She instructed that he was not permitted to record or use a service to transcribe the audio hearing, but that he could manually transcribe the hearing by writing it out himself. Mr. Doe also asked if he

JA 90

could bring an individual not affiliated with Princeton (i.e., an attorney) to listen to the hearing with him, and Dean Chen instructed him that he could not.

209.    On November 20, Mr. Doe submitted his appeal, raising various arguments. Mr. Doe argued that Ms. Sandman treated male and female witnesses differently during the investigation as she interviewed the female complaints three times each, but interviewed him only once. Additionally, he argued that he was never offered any follow-up interviews to respond to the statements the complainants had made in their interviews, while the female complainants were provided additional interview opportunities to respond to his written statements. He stated that Student 4, a male witness, was only interviewed once, while Student 3, a female witness, was interviewed twice.

210.    He argued that Ms. Sandman and Dean Chen interviewed numerous additional witnesses suggested by the female complainants but ignored Mr. Doe's request to interview a male exculpatory witness. Additionally, he raised the fact that Sarah and Student 3 provided conflicting testimony in their initial interviews about whether Jane had bruising on her neck, but none of the male witnesses were even asked about bruising.

211.    Moreover, he argued that the committee was presented with prejudicial information about others' opinions that he was racist, sexist, and pro-life, and that the investigator failed to probe the inconsistent stories of female witnesses.

212.    On November 20, Christine Gage confirmed receipt of Mr. Doe's appeal and stated that the review panel would convene on November 29. She stated that she was hopeful to have a decision by December 1. On November 29, Ms. Gage emailed Mr. Doe that the panel was assessing his appeal.

JA 91

213.    On December 4, despite the University Rights, Rules, and Responsibilities not contemplating inquiries from the appeal panel, Ms. Gage emailed Mr. Doe a series of questions implying that the appeal panel had spoken with members of the COD and/or Dean Chen—an *ex parte* communication not contemplated by the policy—and implying that Mr. Doe's appeal would be denied due to his allegedly not having made certain requests during the investigative and hearing process. For instance, Ms. Gage asked "You claim that it was unfair that you were interviewed by the investigator only once. Can you let us know whether you requested to meet with the investigator more than once and were denied that request?" But at the time, Mr. Doe had no reason to request an additional interview—because he had not yet learned that, unlike him, the complainants had been interviewed multiple times.

214.    As to the argument that the hearing was rushed, Ms. Gage asked, "Can you let us know whether you informed the COD of this concern, and whether you requested that the COD allot additional time to hear the case?" This question, too, made no sense: Mr. Doe could not, in the middle of the hearing, be reasonably expected to have complained to the COD, which would decide his liability and his sanction, that it was rushing through the case too quickly.

215.    And because Mr. Doe had argued that he was restricted 45 minutes before the hearing from asking leading questions, Ms. Gage asked, "Can you let us know whether there were any questions that you tried to ask witnesses that the COD did not permit you to ask?" But this also made no sense: Mr. Doe had been told he couldn't ask leading questions, so he didn't.

216.    Mr. Doe responded to the inquiries to the best of his ability on December 6.

217.    On December 20, the appeal panel denied Mr. Doe's appeal. It stated that no procedural irregularity existed in Mr. Doe's hearing. As to Mr. Doe's argument that the investigator did not interview Student X who had sued Jane for defamation for falsely accusing

63

him of choking her, the panel stated that Mr. Doe was provided with the opportunity for Student X to submit a written statement, and that character witnesses and other witnesses without direct knowledge of the incident are not interviewed—even though the investigator interviewed Students 6-10, who also did not have direct knowledge of the incidents.

218.    As to Mr. Doe's argument that he was only interviewed once while the complainants were interviewed multiple times, the panel found that Mr. Doe submitted written materials four days after his interview, which ended up contradicting some of the information provided by the complainants. It stated it "understood" that the investigator then asked additional questions to the complainants based on the information Mr. Doe submitted, and that Mr. Doe did not request an additional interview but rather submitted supplemental written materials.

219.    As to Mr. Doe's argument that he was given restrictions about asking leading questions just 45 minutes prior to the hearing, the panel stated that the COD's practice is to not allow questions eliciting information already in evidence. The panel further stated that it learned John had met with the Secretary of the COD on October 24, 2023, to review the hearing procedures and that Mr. Doe did not object to the procedures at that meeting. Despite clearly having spoken with Dean Chen about this meeting, the panel did not provide John an opportunity to inform them about what did or did not take place at that meeting.

220.    Finally, as to Mr. Doe's argument that the penalty of a two-year suspension fell outside of the range of penalties for similar conduct and that in the last two years, the COD hasn't imposed a two-year suspension for *any* offense, the panel stated that the COD considered precedents not just from the last two years but from prior years. It noted that Mr. Doe was found responsible for assaulting two different students and had been found responsible for an additional

assault earlier in the year. As it was a pattern of concerning behavior, the COD issued a two-year suspension which was appropriate according to the panel.

221. The panel did not address many of Mr. Doe's arguments raised in his appeal. It did not address Mr. Doe's concern that a male eyewitness was interviewed just once, while a female witness who did not witness the evidence was interviewed twice. Nor did it address Mr. Doe's argument that female witnesses were asked about whether the complainant had bruising after the alleged incident, and provided conflicting accounts, while no male witness was asked about bruising. It also did not address the argument that the interview reports contained irrelevant and prejudicial opinions about Mr. Doe's character.

222. Tellingly, the panel also did not address his argument that the investigator failed to probe the dramatic inconsistencies of the female witnesses, while probing male witnesses on supposed inconsistencies.

223. The panel did not address Mr. Doe's argument that his manner of questioning was restricted even though the Rights, Rules, and Responsibilities did not allow for such a restriction. The panel merely stated that Mr. Doe did not object to the restriction.

224. The panel did not address Mr. Doe's argument that it was unfairly prejudicial for the COD to hear both of the allegations against him related to choking in the same hearing in front of the same COD members, or his analogy that in the criminal justice system, charges would be tried separately when there is a significant risk that a joint adjudication of the charges would inhibit the factfinder's ability to make reliable findings.

225. The panel did not address Mr. Doe's argument that the COD found him responsible based on the fact that two women accused him of assault as opposed to actually weighing the evidence of each assault to determine whether there was sufficient evidence.

**JA 94**

226.    The panel did not address Mr. Doe's argument that the COD rushed his hearing due to the late hour and that one of the COD members fell asleep during the hearing.

227.    The panel did not address Mr. Doe's argument that he was questioned for over an hour by the COD at the beginning of the hearing, but the COD only examined Sarah for half an hour at 10:50 p.m., or that the COD rushed their deliberations after the hearing ended at midnight.

228.    The panel did not address Mr. Doe's argument that the COD misapplied the applicable standard of "clear and persuasive" evidence, that it the cited the complainants' testimony as consistent when the evidence showed the contrary, and that it ignored the testimony of a male eyewitness who testified that Mr. Doe did not choke Jane.

229.    Finally, the panel did not address the argument that the COD took into account Mr. Doe's prior probation for "assault" when Mr. Doe was only found responsible for "endangering a student," or that the process was infected by gender bias.

## CAUSES OF ACTION

### Count I – Breach of Contract

230.    Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

231.    At all times relevant hereto, a contractual relationship existed between the University and Mr. Doe.  The University's Code was a part of that contract.  Under that contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, in the process of sanctioning students, and in resolving appeals.

66

232. The University breached this contract with Mr. Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

**A.    Failure to Apply the "Clear and Persuasive" Evidence Standard**

233. The Code promises that the University will not find a student responsible for misconduct unless "the evidence presented constitutes a clear and persuasive case in support of the charges against the student."

234. As stated above, the University was aware of a large amount of evidence that called Jane's and Sarah's credibility into question and undermined their claims. It was further aware that they repeatedly changed their stories. It was also aware that John had testified consistently and was supported by the only third-party witness to the incident between himself and Jane. And it knew it was required to appropriately discount Jane's testimony since she never showed for the hearing and therefore could not be challenged on the many ways her story had changed.

235. Despite that, it still found against Doe, based on a rationale that was almost entirely conclusory, which falsely stated that Jane's and Sarah's stories had remained consistent, which refused to identify (because it couldn't) which of Jane's stories was more credible, and which refused to identify any actual texts in which John admitted or acknowledged having choked Jane (because it couldn't).

236. The finding against Mr. Doe and its rationale were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor of Jane and Sarah.

237. In all of those ways, and the ways described in more detail above, Princeton failed to apply the "clear and persuasive" evidence standard.

**JA 96**

**B.        Denial of Mr. Doe's Appeal**

238.    The Code also promises that disciplinary decisions may be appealed on three grounds, including that "[t]he procedures" used to investigate and resolve the complaint "have not been fair and reasonable," and that "[t]he imposed penalty does not fall within the range of penalties imposed for similar misconduct."

239.    As explained above, Mr. Doe's appeal documented several ways in which the procedures used to investigate and resolve Jane's and Sarah's complaints were neither fair nor reasonable. Among other things, the COD failed to pursue relevant testimony, evidenced gender bias in the collection of evidence and conduct at the hearing, treated the parties disparately, refused to call relevant witnesses, refused to allow Mr. Doe to submit relevant text message evidence, and conducted the hearing at an unreasonable hour, causing at least one panel member to fall asleep.

240.    Mr. Doe's appeal also explained why his sanction was not "within the range of penalties imposed for similar misconduct."

241.    As a direct result of the University's breaches of its contract with Mr. Doe, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a woman-abuser which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

**Count II – Breach of the Covenant of Good Faith and Fair Dealing**

242.    Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

68

243.   Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.  It required the University to implement the contract in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

244.   For all of the reasons stated in Count I, the University breached the covenant of good faith and fair dealing.

245.   Princeton breached the covenant in several additional ways as well.

**A.    Failure to Conduct a Fair Investigation**

246.   First, the Code promises that Princeton will "investigate alleged infractions" of the Code.  Princeton was required by the covenant to conduct that investigation in a way that did not deny Mr. Doe the fruits of the contract.  As described above, however, its investigation was remarkably deficient in a number of ways.  Among other things, and as described more fully above, Princeton:

- Conducted a joint investigation despite the lack of factual overlap on Sarah's claim.

- Failed to interview relevant witnesses.

- Gave Jane and Sarah multiple interview opportunities to respond to testimony before the hearing without doing the same for John.

- Failed to press Jane and Sarah as firmly as it did John.

- Failed to redact highly prejudicial and irrelevant testimony.

- Conducted a rushed investigation—despite Jane's and Sarah's delayed reporting— that devoted more resources to obtaining evidence for Jane and Sarah than for John.

- Evidenced gender bias through the witnesses who were pursued and what they were (and were not) asked.

**B.    Failure to Conduct a Fair Hearing**

247.    Second, the Code also states that disciplinary charges will be resolved by being "presented to . . . the Committee on Discipline" at a hearing.  The hearing that Princeton conducted breached the covenant for several significant reasons.  Among other things, and as described more fully above, Princeton:

- Conducted a combined hearing despite the lack of factual overlap on Sarah's claim.

- Prejudge the outcome of Mr. Doe's hearing before it even started, as stated by the source with knowledge of the panel's deliberations.

- Engaged in unbalanced questioning of the witnesses.

- Repeatedly treated John as though the burden of proof were his by demanding he explain *why* Jane and Sarah had acted as they had, even when the evidence proved they'd contradicted themselves.

- Refused to call relevant witnesses.

- Refused to accept relevant text message evidence.

- Conduced the hearing at an unreasonable hour that caused it to be rushed and led to at least one panel member falling asleep.

**C.    Failure to Provide a Meaningful Rationale**

248.    Third, the Code states that the committee must "inform[] the student promptly of the decision" and, "[i]f a penalty is imposed," make a "special effort . . . to ensure that the student fully understands why the penalty was imposed[.]"  Princeton's decision letter, however, offered almost no rationale for its decision.  It stated just two things: that the complainants had purportedly offered "continued and consistent descriptions of the incidents," and that Mr. Doe had made "admissions and acknowledgements . . . in text messages."  It said literally *nothing* about the many ways the complainants' stories provably had *not* been consistent, nor offered any explanation at all in support of its conclusion about their consistency.  And as to Mr. Doe's

70

"admissions," it stated simply that it did not believe they had been made because he was "being blackmailed," again with zero further elaboration. That was the sum total of the panel's explanation for why it found Mr. Doe responsible. It based its decision on a rationale that was almost entirely conclusory, which falsely stated that Jane's and Sarah's stories had remained consistent, which refused to identify (because it couldn't) which of Jane's stories was more credible, and which refused to identify any actual texts in which John admitted or acknowledged having choked Jane (because it couldn't). The decision failed to offer any kind of meaningful explanation of the panel's decision.

249. The finding against Mr. Doe and its rationale were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor of Jane and Sarah.

250. As a direct result of the University's violation of the covenant of good faith and fair dealing, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

251. Accordingly, the University is liable to Mr. Doe for violation of the covenant of good faith and fair dealing and for all damages arising out of that violation.

## Count III – Violation of Title IX (20 U.S.C. § 1681)

252. John Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

**JA 100**

253.    The University receives federal funding, including in the form of federal student loans given to students, and therefore is subject to the requirements of Title IX.

254.    Title IX prohibits gender discrimination in the educational setting.

255.    Unlawful discrimination exists when gender bias is a motivating factor in a student's discipline, which in turn occurs when gender bias motivates an outcome or sanction at least in part.

256.    The finding and sanction against John Doe were the product of gender bias at least in part, as exhibited by all of the following things, among others:

- Extreme pressure upon Princeton by the federal government to give deferential treatment to claims of assault brought by women against men, exhibited both by nationwide enforcement of the Dear Colleague Letter and the resolution agreement Princeton entered into in 2014;

- Extreme pressure from Princeton's student body and alumni to enforce a gendered view of claims of violence brought by women against men (particularly in the wake of rescission of the Dear Colleague Letter) and to identify things like "toxic masculinity" as the root cause of the problem;

- The University's responsiveness to that gender-biased pressure, including:

  - actions taken in the wake of on-campus protests and publications;

  - Princeton's pledge to adhere as closely as possible to the DCL's gender-biased regime;

  - Princeton's adoption of a complicated two-track system for resolving claims of sexual misconduct designed to limit the reach of the 2020 regulations;

- The statements and actions of a biased investigator and hearing panel which, among other things:

  - Repeatedly questioned John much more pointedly and confrontationally than it did Jane and Sarah, despite the glaring contradictions and inconsistencies they told;

72

- o Found that Jane and Sarah had told "consistent" stories despite the many changes to their stories, including on the most central parts of their allegations;

- o Refused to pursue exculpatory witnesses, even when requested by John;

- o Pursued female witnesses on behalf of Jane and Sarah but not similarly situated male witnesses on behalf of John;

- o Asked female witnesses, but not similarly-situated male witnesses, questions about whether Jane had any bruising;

- A conclusory and unsupported rationale that calls the decision against John into grave doubt, and failed to address significant exculpatory evidence. as explained above.

- A permanent, disclosable sanction that will gravely impact John's future and which is disproportionate to the violation he was (wrongly) found to have committed.

257.    As a direct result of the University's violation of Title IX, and as a direct and proximate cause thereof, Mr. Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

258.    Accordingly, Princeton is liable to Mr. Doe for violations of Title IX and for all damages arising out of that violation.

### Count IV – Gross Negligence

259.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

260.    In conducting its investigation and adjudication of Jane's and Sarah's claims, the University owed a common law duty to Mr. Doe to exercise reasonable care, with due regard for

73

**JA 102**

the truth and to apply procedures evenhandedly, with due consideration of the important and irreversible consequences of its actions, as well as John's various liberty and property rights and interests generally.

261.    Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of Mr. Doe.

262.    In particular, the University has negligently hired, trained and supervised the people it employs to investigate and adjudicate disciplinary claims or otherwise implement its policies and procedures, as described above.

263.    By way of further example, and upon information and belief, those individuals are trained (1) to implement the goal of combating "toxic masculinity" and "rape culture," a chief element of which is to not express any doubt about the sincerity of claims of assault brought by women against men; and (2) to otherwise credit the testimony of claimants unless there is clear and convincing evidence, or something akin to that, of its falsity, in contravention of the requirement that all facts be determined by a preponderance of the evidence.

264.    As a direct result of the University's negligence, and as a direct and proximate cause thereof, Mr. Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

74

265.    Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against the University, and order relief against Defendant as follows:

a.    That this Court issue permanent injunctive relief: (1) ordering the University to vacate and expunge its finding of responsibility as to Doe; (2) restraining the University from reflecting, in any manner whatsoever, in John Doe's records or elsewhere, the findings or sanctions imposed upon Doe based on its adjudication of Jane Roe's and Sarah Smith's complaints; (3) restraining the University from maintaining any records related to that sanction, as it was the product of the University's erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and (4) ordering that Mr. Doe be immediately readmitted to Princeton.

b.    That the University be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by its misconduct; and

c.    That the University be ordered to pay punitive damages; and

d.    That this Court award John Doe his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

JA 104

Respectfully submitted,

DATED: June 20, 2024

/s/ Justin Dillon
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
Kimberly Blasey (D.C. Bar. No. 90003791)
DILLON PLLC
1717 K Street, Suite 900
Washington, DC 20005
T: (202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Applications for admission* pro hac vice *forthcoming*

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano (NJ Bar No. 426422024)
Bryan W. McCracken (NJ Bar No. 416362022)
FORD O'BRIEN LANDY LLP
275 Madison Ave., Fl. 24
New York, NY 10016
T: (212) 858-0040
jsolano@fordobrien.com
bmccracken@fordobrien.com

*Attorneys for Plaintiff John Doe*

**JA 105**

**Certification Pursuant to L. Civ. R. 11.2**

We hereby certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, as contemplated by 28 U.S.C. § 1746: that the matter in controversy here is not the subject of any other action pending in any court, or of a pending arbitration proceeding; that no other action or arbitration proceeding is contemplated; and that we know of no other parties who should be joined in this action at this time.

Executed on June 20, 2024

/s/ Justin Dillon
Justin Dillon

/s/ Jamie Hoxie Solano
Jamie H. Solano

**Certification Pursuant to L. Civ. R. 201.1(d)(1)**

This matter does not fall within the compulsory arbitration requirement set forth in L. Civ. R. 201.1(d)(1) because John Doe seeks injunctive relief in addition to money damages.

77

**JA 106**

**SAUL EWING LLP**
James Keller, Esq. (NJ Bar ID No. 020991996)
Amy L. Piccola, Esq. (NJ Bar ID No. 012682008)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-8405 (Piccola) / (215) 972-1964 (Keller)
Email: Amy.Piccola@saul.com / James.Keller@saul.com
*Attorneys for Defendant the Trustees of Princeton University*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, <br><br> Plaintiff, <br><br> v. <br><br> THE TRUSTEES OF PRINCETON UNIVERSITY, <br><br> Defendant. | Case No. 24-CV-7125 <br><br><br> Motion Day: October 7, 2024 |

TO:  Justin Dillon
 Christoper C. Muha
 Kimberly Blasey
 Dillon PLLS
 1717 K Street, Suite 900
 Washington, DC 20005
 *Attorneys for Plaintiff John Doe*

 Jamie Hoxie Solano
 Bryan W. McCracken
 Ford O'Brien Landy LLP
 275 Madison Ave., Fl. 24
 New York, NY 10016
 *Attorneys for Plaintiff John Doe*

51739830.1

**JA 107**

**PLEASE TAKE NOTICE** that on October 7, 2024, Defendant the Trustees of Princeton University ("Princeton" or the "University") by and through its counsel, shall move before the Honorable Zahid N. Quraishi, U.S.D.J. at the United States District Court, District of New Jersey, Clarkson S. Fisher Building, & U.S. Courthouse, 402 East State Street, Trenton, NJ 08608 for an Order dismissing the Complaint against it (Doc. 1), filed by Plaintiff John Doe ("Plaintiff"), pursuant to Fed. R. Civ. P. 12(b)(6) ***with prejudice***.

**PLEASE TAKE FURTHER NOTICE** that Princeton will rely on the attached Brief in support of its Motion. A proposed form of Order is attached to this Notice of Motion.

<b>SAUL EWING LLP</b>

*/s/ James Keller*
James Keller, Esq.
Amy L. Piccola, Esq.
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1964
James.Keller@saul.com
*Attorneys for Defendant the*
*Trustees of Princeton*
*University*

Dated: September 13, 2024

2

51739830.1

<b>JA 108</b>

**SAUL EWING LLP**
James Keller, Esq. (NJ Bar ID No. 020991996)
Amy L. Piccola, Esq. (NJ Bar ID No. 012682008)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-8405 (Piccola) / (215) 972-1964 (Keller)
Email: Amy.Piccola@saul.com / James.Keller@saul.com
*Attorneys for Defendant the Trustees of Princeton University*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>v.<br><br>THE TRUSTEES OF PRINCETON UNIVERSITY,<br><br>                    Defendant. | Case No. 24-CV-7125<br><br><br>Motion Day: October 7, 2024 |

## MEMORANDUM OF LAW OF DEFENDANT
## THE TRUSTEES OF PRINCETON UNIVERSITY IN SUPPORT OF ITS
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE

**JA 109**

# **TABLE OF CONTENTS**

**Page**

Introduction ...................................................................................................... 1

Alleged Facts and Procedural Background ...................................................... 1

   A.   Multiple Misconduct Complaints against Doe and the University's
Investigation. ................................................................................................... 1

   B.   Hearing, Adjudication, and Appeal of the Misconduct Complaints
against Doe. ...................................................................................................... 5

Argument .......................................................................................................... 7

   A.   Standard of Review. .................................................................................. 7

   B.   Doe's Breach of Contract Claim (Count I) against the University Must Be
Dismissed. Doe has not Plausibly Alleged that the University Substantially
Violated the RRR's terms in Conducting its Disciplinary Process. ..................... 9

      1.   The Investigation and Hearing ................................................................. 10

      2.   Doe's Appeal .......................................................................................... 12

   C.   Doe's Breach of Good Faith and Fair Dealing Claim (Count II) also Fails as
a Matter of Law because Doe has not Plausibly Alleged that the University
Acted in Bad Faith. ............................................................................................ 17

   D.   Doe's Title IX Claim (Count III) Fails as a Matter of Law because the
Complaint does not support a Plausible Inference that the University
Discriminated against Doe on the Basis of his Sex, Nor Otherwise Demonstrate
that Sex was a Motivating Factor in the University's Decision to Impose
Discipline. .......................................................................................................... 21

      1.   The University Conducted a Thorough Investigation and Hearing, and
the Outcome of the Process was Supported by Clear and Convincing
Evidence. ............................................................................................................ 22

      2.   Doe has not plausibly alleged that the University was Motivated by
External Pressure to Discriminate against Men. ................................................ 27

   E.   Doe fails to State a Gross Negligence Claim (Count IV) against the
University. .......................................................................................................... 29

Conclusion. ....................................................................................................... 29

# TABLE OF AUTHORITIES

FEDERAL CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................7, 8

*Behne v. Union Cnty. Coll.*, No. CV146929, 2018 WL 566207 (D.N.J. Jan. 26, 2018) ...............................................................................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................8

*Byers v. Intuit, Inc.*, 600 F.3d 286 (3d Cir. 2010) ....................................................1, 8

*Christian v. Lannett Co., Inc.,* No. CV 16-963, 2018 WL 1532849 (E.D. Pa. Mar. 29, 2018) .......................................................................................................8

*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) .................................................2

*Doe v. Princeton Univ.*, 790 F. App'x 379 (3d Cir. 2019)...........................9, 16, 26

*Doe v. Princeton Univ.*, No. 17-CV-1614 (PGS), 2018 WL 2396685 (D.N.J. May 24, 2018), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) ...................................2, 15, 17

*Doe v. Princeton Univ.*, No. CV 22-5887, 2023 WL 8755232 (D.N.J. Dec. 19, 2023) ..............................................................................................21, 26, 29

*Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225 (D.N.J. Jan. 17, 2018) .....................................................................................................21, 28

*Doe v. St. Joseph's Univ.*, 832 F. App'x 770 (3d Cir. 2020)....................................25

*Donohue v. Capella Univ., LLC*, No. CV 22-5634, 2023 WL 5425503 (D.N.J. Aug. 22, 2023) .....................................................................................................29

*Gendia v. Drexel Univ.*, No. 20-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020) ...............................................................................................................26

*Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002)...............................8

*Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159 (3d Cir. 2010).8

*Saravanan v. Drexel Univ.*, No. CV 17-3409, 2017 WL 4532243 (E.D. Pa. Oct. 10, 2017) .............................................................................................................26

JA 111

*Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL 4482457 (3d Cir. Sept. 27, 2022) ...............................................................................passim

*Wysocki v. Wardlaw-Hartridge Sch.*, No. 2:21-CV-14132, 2022 WL 2168212 (D.N.J. June 16, 2022) ...............................................................................19

*Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464 (D.N.J. Oct. 16, 2009).....................................................................17

**STATE CASES**

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210 (2005)............................................................................................17

*Mittra v. Univ. of Med. & Dentistry of New Jersey*, 316 N.J. Super. 83, 719 A.2d 693 (App. Div. 1998) .......................................................................9

*R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132 (N.J. 2001) ...............................................................................................18

*Sons of Thunder, Inc. v. Borden*, 690 A.2d 575 (N.J. 1997) ...................................17

*Wade v. Kessler Inst.*, 778 A.2d 580 (N.J. Super. Ct. App. Div. 2001) ......17, 18, 19

**STATE STATUTES**

Rule 12(b)(6)............................................................................................7, 9

Rule 15(a).................................................................................................8

**OTHER AUTHORITIES**

RRR, <u>Alcohol Policy</u>............................................................................................3

RRR, <u>Personal Safety</u>...................................................................................1, 3, 20

University's *Rights, Rules, and Responsibilities* ....................................................2

## INTRODUCTION

Plaintiff John Doe ("Plaintiff" or "Doe") is a student at Defendant the Trustees of Princeton University ("Princeton" or the "University"). In September 2023, two different individuals came forward (one a University student and one a non-University student) and alleged that, on separate occasions on campus, Doe had placed his hands around their necks and choked them. Consistent with its policies, Princeton handled these allegations of choking in accordance with its published student discipline procedures. Following an investigation, an in-person hearing before the University's Faculty-Student Discipline Committee, and an appeal to senior University officials, Doe was found responsible for violating the University's Personal Safety policy and suspended for two years. While Doe acknowledged his misconduct, he is unhappy with this outcome.

Doe's unhappiness does not support a federal lawsuit. His Complaint should be dismissed with prejudice.

## ALLEGED FACTS[1] AND PROCEDURAL BACKGROUND

### A. Multiple misconduct complaints against Doe and the University's investigation.

In September 2023, two individuals, identified in Doe's Complaint as Roe and Smith, came forward to the University and accused Doe of physically assaulting

---

[1] The University accepts as true the allegations in Doe's Complaint, as required at this stage of the case. *Byers v. Intuit, Inc.*, 600 F.3d 286, 297 (3d Cir. 2010) ("[A]s a general rule we must accept as true the allegations contained in a complaint

**JA 113**

them during social interactions. Roe, who did not attend Princeton, reported that Doe choked her on the night of April 1-2, 2023 on the University's campus. (Complaint ¶ 115). During the investigation into Roe's complaint, Smith, a Princeton undergraduate student, separately reported to the University that Doe had also choked her on the University campus in March 2023. (*Id.*) Doe also was accused of having served alcohol to underage individuals in his dorm room. (*Id.* ¶ 123).

The University's Faculty-Student Committee on Discipline (the "Committee") adjudicated these complaints against Doe pursuant to the University's *Rights, Rules, and Responsibilities* policy (the "RRR"). The relevant sections of the RRR are excerpted as "**Exhibit A**."[2] The RRR provides the Committee with jurisdiction to delegate an investigator to look into "any potentially serious alleged infraction (except allegations of sex discrimination or sexual misconduct; see section 1.3) involving undergraduate students for which the penalty might interrupt the

attacked by a 12(b)(6) motion to dismiss . . . ."). To be clear, the University disputes most of the allegations in Doe's Complaint.

[2] The Court may consider the relevant excerpts of the RRR, which are integral to Doe's Complaint, when deciding the instant Motion to Dismiss. *Doe v. Princeton Univ.* ("*Princeton III*"), 30 F.4th 335, 345–46 (3d Cir. 2022) ("Because the Panel Report was 'integral to' and 'explicitly relied upon in the complaint,' consideration is appropriate."); *Doe v. Princeton Univ.*, No. 17-CV-1614 (PGS), 2018 WL 2396685, at *2 n.1 (D.N.J. May 24, 2018) ("*Princeton I*") (considering panel report and letter when dismissing Title IX claims because they are "undisputedly authentic documents upon which the Complaint's claims are based"), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) ("*Princeton II*").

**JA 114**

student's academic career." (Ex. A, Subsection 2.5.1). Doe was investigated for potential violations of Subsection 1.2.5(5) of the RRR, Personal Safety, which relates to "[a]ny physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results."[3] (*Id.*). Doe was further investigated pursuant to Subsection 2.2.9(2)(d) of the RRR, Alcohol Policy, which explains that a violation of the policy occurs "when alcohol is served, provided, or made available by or to persons under the age of 21. Violations involving juveniles, such as high school applicants or visitors to the University, will be deemed particularly serious." (*Id.*, Subsection 2.2.9). The University classifies the "serving, providing, or making available of hard alcohol (in any quantity)" as a higher risk violation. (*Id.*)

The RRR specifically provides that a Dean or University investigator will investigate alleged infractions. (*Id.*, Subsection 2.5.2). Following the investigation, the student has the following rights:

- The student may obtain from the Committee's secretary all documents pertaining to reports of the alleged misconduct and the names of the members of the committee;
- The student has the option of submitting any additional written materials that may assist the Committee in reaching a decision.

---

[3] Subsection 1.2.5 Personal Safety also explains that "[a]ctions that threaten or endanger in any way the personal safety or security of others will be regarded as serious offenses."

**JA 115**

(*Id.*)

Once the investigation is concluded, the RRR mandates that "[m]atters shall be presented to the committee with all reasonable promptness." (*Id.*) In all cases referred to the Committee, the student involved will be informed in writing of the charge(s) and of the specific day and time when the student is to appear before the Committee. (*Id.*) The RRR outlines the hearing procedures as follows:

- The student may be accompanied at the committee hearing by an adviser, who must be a current member of the resident University community, and who may participate in the hearing in accordance with instructions issued by the chair;
- At the hearing, any person with information about the matter before the committee may be requested to appear by the student, the dean of undergraduate students, or the committee, subject to reasonable limits agreed on by the committee;
- In an opening statement the student has an opportunity to explain the circumstances from a personal point of view and may also question individuals who have provided information and may in turn be questioned by the committee members;
- The student may make a closing statement.

(*Id.*) In order to determine that a student has violated a University rule, a majority of the voting committee members present must conclude that the evidence presented "constitutes a clear and persuasive case in support of the charges against the student." (*Id.*)

In compliance with the RRR, the University initiated an investigation into the complaints against Doe and, specifically, into whether he violated the RRR's above-

referenced policies on personal safety and alcohol use. (*Id*. ¶¶ 116, 120). The Committee appointed an investigator who conducted a comprehensive investigation, which included: (1) interviewing Doe, (2) interviewing both complainants, (3) interviewing five witnesses, and (4) collecting information, including numerous text messages, and two written statements from Doe. (*Id*. ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180). Following the investigation, the Committee scheduled a disciplinary hearing, and in advance of that hearing, Doe was provided all of the information that was also provided to the Committee. (*Id*. ¶ 122).

> **B.** **Hearing, adjudication, and appeal of the misconduct complaints against Doe.**

On November 6, 2023, a panel of the Committee—composed of two faculty members and three students, as well as the then-Dean of Students, Kathleen Deignan, who served as the Chair of the Committee—held the hearing. (*Id*. ¶ 120). Doe was present. Doe was accompanied by an adviser, he had the ability to present information to the Committee and offer testimony, and he had the ability to call and ask questions of witnesses. As permitted by the RRR, Doe also submitted a written account of the events. (*Id*. ¶ 120). Doe also offered evidence pertaining to a student identified as Student X, whom Doe identified as having information related to Roe's credibility. (*Id*. ¶ 118). As the investigation progressed, Doe submitted additional materials related to Student X and two supplemental written statements. (*Id*. ¶¶ 118,

**JA 117**

128, 131). Doe also submitted to the Committee numerous text messages between and among the involved parties. (*Id*. ¶¶ 77, 156, 160, 180).

After reviewing all evidence presented, including Doe's submissions, and conducting a four-hour hearing, the Committee found Doe responsible for three violations of the RRR: two violations of subsection 1.2.5, <u>Personal Safety</u>, and one violation of subsection 2.2.9, <u>Alcohol Policy</u>.[4] Notably, Doe's own Complaint concedes that he violated the <u>Alcohol Policy</u>.[5] As a result of these multiple, serious violations of the RRR, Doe was sanctioned with a two-year suspension from the University. (*Id*. ¶¶ 1, 16, 162, 192).

The RRR states that a student found to have violated University policy has the right to appeal the decision. (Ex. A, Subsection 2.5.2). The appellate panel is comprised of neutral, senior University officials. (*Id*.) There are only three grounds for appeal, namely:

- The procedures have not been fair and reasonable. The period of time under review starts when a student is formally charged with a violation and ends when the

---

[4] The RRR classifies violations of subsection 1.2.5 as "serious offenses." (Ex. A, Subsection 1.2.5) Similarly, violations of subsection 2.2.9 for providing alcohol to minors where visitors to the University are involved, such as Roe, are "deemed particularly serious." (*Id*., Subsection 2.2.9). Further, violations involving hard alcohol are classified as "higher risk." (*Id*.).

[5] Doe's Complaint states that on Roe's second night visiting him at the University, the two of them "had drinks" with other students in Doe's dorm room. (Compl. ¶ 94). As Doe concedes this violation of the RRR, the University does not address it further.

> committee issues a final decision. Neither the choice of venue nor the nature of the investigation is grounds for appeal;
> - There exists substantial relevant information that was not presented, and reasonably could not have been presented to the committee;
> - The imposed penalty does not fall within the range of penalties imposed for similar misconduct.

(*Id*.) The RRR makes clear that the purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. (*Id*.) The appellate panel may decide to uphold the original decision of the Committee; to reduce the imposed penalty; or to return the case to the original hearing body for additional proceedings. (*Id*.)

Doe submitted an appeal. (Compl. ¶¶ 209, 212, 217). The appeal panel, after seeking and receiving requested clarifications from Doe, upheld the outcome and the sanction. (*Id*.). Doe then filed this lawsuit.

**ARGUMENT**

### A. Standard of Review.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

**JA 119**

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citation omitted). While the complaint must be construed in the "light most favorable to the plaintiff," *Byers*, 600 F.3d at 291 (citation and internal quotations omitted), "'labels and conclusions' [and] . . . 'naked assertion[s]' devoid of 'further factual enhancement'" are not entitled to the presumption of truthfulness. *Iqbal*, 556 U.S. at 678 (citations omitted). Ultimately, if the factual allegations fail "to raise a right to relief above the speculative level," the reviewing court must dismiss the claim. *Twombly*, 550 U.S. at 555 (citation omitted).

Although a plaintiff whose complaint is dismissed for failure to state a claim may be granted leave to amend his complaint, if amendment would be futile, the claims should be dismissed with prejudice and without leave to amend. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 111 (3d Cir. 2002). Stated differently, where a claim as originally pled is legally insufficient, and no amendment will cure the insufficiency, the claim should be dismissed with prejudice. *See Christian v. Lannett Co., Inc.,* No. CV 16-963, 2018 WL 1532849, at *7 (E.D. Pa. Mar. 29, 2018); *see also Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) ("Under Rule 15(a), futility of amendment is a sufficient basis to deny leave to amend.").

**JA 120**

Doe has not stated a claim under Rule 12(b)(6) and the deficiencies of his Complaint cannot be cured by amendment. His Complaint against the University should be dismissed in its entirety, with prejudice.

> **B.** **Doe's Breach of Contract Claim (Count I) against the University Must Be Dismissed. Doe has not Plausibly Alleged that the University Substantially Violated the RRR's terms in Conducting its Disciplinary Process.**

Under New Jersey law,[6] "the relationship between a private university and its students should not be analyzed in purely contractual terms." *Mittra v. Univ. of Med. & Dentistry of New Jersey*, 316 N.J. Super. 83, 85, 719 A.2d 693, 694 (App. Div. 1998); *Princeton III*, 30 F.4th at 345–46. New Jersey courts have consistently rejected rigid application of contractual principles in university-student disputes. *Mittra*, 719 A.2d at 697; *Behne v. Union Cnty. Coll.*, No. CV146929, 2018 WL 566207, at *7 (D.N.J. Jan. 26, 2018). Instead, the focus is on whether the university substantially complied with its established procedures. *Id*.

As applied to the RRR, the Third Circuit has held that New Jersey law requires a plaintiff-student to show "the institution violate[d] in some substantial way its rules and regulations." *Princeton II*, 790 F. App'x at 385 (emphasis added) (*quoting Mittra*, 719 A.2d at 698); *see also Princeton III*, 30 F.4th at 346–47 (discussing the RRR and holding, "New Jersey law requires at least that the school follow its own

---

[6] There is no dispute that New Jersey law applies in this case.

established procedures and that those procedures be fundamentally fair."). A plaintiff "may not prevail where the evidence is closely balanced or inconclusive." *Id*. at 347.

Here, Doe alleges that the University failed to follow the RRR in investigating and resolving the charges against him and thereby breached its "contract" with him by failing to: (1) apply the "clear and persuasive" evidence standard mandated by the RRR, and (2) grant his appeal. However, the allegations of Doe's own Complaint confirm that the University "follow[ed] its own established procedures." *Id*. at 346.

### 1.     *The Investigation and Hearing*

The RRR requires the University to (1) "investigate alleged infractions," (2) resolve charges through the Committee at a hearing, and (3) apply the "clear and persuasive evidence" standard. (Compl. ¶¶ 28, 233, 237, 247; *see also* Ex. A, Subsection 2.5.2). The University did all of these things.

*First*, the University conducted an extensive investigation, which included: (1) interviewing Doe, (2) interviewing both complainants, (3) interviewing five witnesses, and (4) collecting information, including numerous text messages, and three written statements from Doe. (*Id*. ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180). Doe suggests that the University could have done something more, or different. Doe's suggestion is of no moment. The University's obligation, on the face of the

**JA 122**

RRR, is to "investigate."  It did so. Neither Doe nor any student (or other individual) controls the nature, extent, or duration of that investigation.

*Second*, the Committee adjudicated the charges against Doe at a hearing that afforded Doe the process prescribed by the RRR. (*Id*.  ¶¶ 1, 16, 162, 192). Doe was allowed to submit written statements and evidence prior to the hearing, to identify and question witnesses, and to have an adviser present. (*Id*.). He did all of these things.

*Third*, the Committee determined Doe's responsibility for the alleged policy violations using the clear and persuasive evidence standard. Doe cites to no factual evidence to the contrary; he simply disagrees with the outcome, and therefore contends that the evidence could not have been clear and persuasive. That Doe believes this does not make it so. Most salient to the pending motion to dismiss, there are facts pled in ***Doe's own Complaint*** that support the Committee's determination by clear and persuasive evidence. For example, Doe <u>acknowledged his responsibility</u> for misconduct toward Ms. Roe (1) in a text message where he stated, "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done last night," (*Id*. ¶ 108), and (2) in a phone call to his parents, when he admitted that he "damaged [Roe's] windpipe ever so slightly." (*Id*. ¶ 111). Doe suggests that he was somehow effectively blackmailed into writing that text and making those statements to his own parents; the Committee did not find those suggestions credible.

**JA 123**

Further, a neutral witness at the hearing corroborated key facts, testifying that one of the impacted individuals (Roe) "had a raspy voice when he saw her after the incident." (*Id*. ¶ 181). Based on all of the evidence presented, including the corroborating evidence just cited and acknowledged in Doe's own Complaint, the Committee credited Ms. Roe's account of events.

As for Ms. Smith, Doe admitted that he "confronted [Smith] in **actions he would come to regret**." (*Id*. ¶ 89) (emphases added). Doe also admitted that "[h]e spoke closely and loudly with [Smith], in part out of anger," and acknowledged that three bystanders who witnessed his confrontation felt it necessary to intervene on Smith's behalf. (*Id*.) The Committee ultimately credited Smith's account of events after hearing her testimony at the hearing and considering these admissions from Doe.

The Committee applied the "clear and persuasive evidence" standard. (*Id*.) Doe cites to no plausible evidence to the contrary. The fact that the University did not reach the conclusion that Doe desired does not mean that the Committee deviated from the required standard. And that Doe does not like the outcome certainly does not support a claim for breach of contract.

### 2. *Doe's Appeal*

Doe next alleges that the University somehow breached a "contract" by not granting his appeal, because "[t]he procedures" used to resolve the complaint[s]

"have not been fair and reasonable." (*Id*. ¶ 238; *see also* Ex. A, Subsection 2.5.2).

As a reminder, the grounds for appeal (RRR, Section 2.5.2) are:

- The procedures have not been fair and reasonable. The period of time under review starts when a student is formally charged with a violation and ends when the committee issues a final decision. Neither the choice of venue nor the nature of the investigation is grounds for appeal;
- There exists substantial relevant information that was not presented, and reasonably could not have been presented to the committee;
- The imposed penalty does not fall within the range of penalties imposed for similar misconduct.

In support of his claim, Doe alleges that the Committee "failed to pursue relevant testimony, evidenced gender bias" during the investigation and hearing, "treated the parties disparately, refused to call relevant witnesses, refused to allow Mr. Doe to submit relevant text message evidence, and conducted the hearing at an unreasonable hour." (*Id*. ¶ 239). "Failing to pursue" testimony and the time of day of a hearing, as an initial matter, are not stated grounds for an appeal.

More fundamentally, there is no cognizable breach of contract claim stated here. Doe believes the Committee should have granted his appeal for the reasons he notes. The Committee did not grant his appeal. Doe nowhere explains why his disagreement with the Committee's appeal decision somehow constitutes a breach of contract, or why this Court should second-guess the decision making of the Committee. Additionally, Doe's allegations are simply wrong. As detailed above

**JA 125**

and in his own Complaint, Doe had a full chance to present evidence during the investigation and at the hearing. He plainly thought he had presented enough evidence to prevail. Doe's after-the-fact rationalization that more or different evidence should have been considered is too late, and does not support any breach of contract claim.

To the extent the Court deems it necessary to evaluate the underlying claims of Doe's internal appeal, they can similarly be dismissed. Doe first alleges that the Committee failed to pursue relevant testimony because neither the investigator nor the Committee interviewed Student X, an individual identified by Doe who brought a defamation lawsuit against Roe, nor Doe's roommate, who interacted with Roe and Smith in the days after the incident with Roe. (*Id*. ¶ 136). Doe's own Complaint concedes, however, that after the investigation was concluded he was provided with the evidence packet and informed "that he had the option to request additional interviews be conducted based on the information in the packet." (*Id*. ¶ 122). Doe did not request that Student X or his roommate be interviewed. Doe's Complaint further concedes that the students who ***were*** interviewed were "identified by the female complainants." (*Id*. ¶ 136). In other words, Roe and Smith identified witnesses, and they were interviewed. Doe did not. This was Doe's choice. Doe's failure to take advantage of the process available to him does not support a breach of contract claim.

**JA 126**

To support his allegation of gender bias (stated here as a breach of contract claim, not a Title IX claim), Doe alleges that a male student who witnessed the alleged incident between Doe and Roe was interviewed once, while a female student who was involved in a prior disciplinary issue pertaining to Doe was interviewed twice. The appellate body did not find this conclusory allegation of "gender bias" to support Doe's appeal. There is no basis for this federal court to second-guess the University's decision in this regard. *See Princeton I*, 2018 WL 2396685, at *4 (a court must "weed out the conclusory statements" and "exclude[] the[m] . . . from its analysis").

Doe also alleges that the Committee somehow acted improperly because it "refused to call relevant witnesses." (*Id.* ¶ 239). In fact, the Committee refused to compel a single witness, Student X, to appear at the hearing (*Id.* ¶¶ 177, 239), and Doe himself acknowledges that Student X had no knowledge of the incidents being adjudicated. (*Id.*). The refusal of the Committee to mandate testimony from a student witness with no knowledge of the incidents at issue is consistent with the RRR's requirement that those persons "***with information about the matter before the committee***" may testify. (*Id.* ¶ 29; RRR, Section 2.5.2) (emphasis added). And even without Student X testifying, Doe was permitted to submit written materials pertaining to Student X to the Committee for consideration on two separate occasions. (*Id.* ¶ 118, 131).

**JA 127**

Doe next alleges that his appeal should have been granted because he was precluded from submitting additional, previously undisclosed text messages during the hearing. As Doe acknowledges, however, he was allowed to (and did) submit text messages *prior* to the hearing, during the factfinding investigation. (*Id*. ¶¶ 77, 156, 160, 180). His attempt to submit new text messages at the hearing was contrary to the RRR's established procedures, as a student "has the option of submitting any additional written materials that may assist the committee in reaching a decision" following the investigation, but before the hearing– not at the hearing itself. (Ex. A, Subsection 2.5.2).

Doe finally alleges that the hearing was conducted at an "unreasonable hour," but that is also a post-hoc rationalization from Doe. As the Committee is made up of professors and students, the hearing was reasonably scheduled at 7:27 PM, after the conclusion of the school-day. (*Id*. ¶ 162). More importantly, Doe nowhere suggests, nor could he, that there is a contractual obligation for a conduct hearing to take place at a particular time of day.

In sum, Doe has not alleged facts showing that Princeton substantially violated the RRR's terms in conducting its disciplinary process or in considering Doe's appeal. Rather, Doe's own allegations show that Princeton adhered to "its own rules" and followed "fundamentally fair" procedures. *Princeton II*, 790 F. App'x at 385. Because the University followed its procedures as outlined in the RRR, Doe's

**JA 128**

breach of contract claim must be dismissed. *Princeton I,* 2018 WL 2396685, at *8 (dismissing contract claim alleging violations of the RRR where the University followed its procedures as outlined in the RRR).

### C. Doe's Breach of Good Faith and Fair Dealing Claim (Count II) also Fails as a Matter of Law because Doe has not Plausibly Alleged that the University Acted in Bad Faith.

Every contract in New Jersey "contains an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 778 A.2d 580, 584 (N.J. Super. Ct. App. Div. 2001), aff'd as modified, 798 A.2d 1251 (N.J. 2002); *Sons of Thunder, Inc. v. Borden*, 690 A.2d 575, 587 (N.J. 1997) (same). While there is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, "two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009). Further, a plaintiff "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005) (quotation omitted).

**JA 129**

The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith had engaged in some conduct that denied the benefit of the bargain originally intended by the parties. *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132 (N.J. 2001). Proof of bad motive or intention is vital to an action for breach of the covenant of good faith and fair dealing. *Id*. Bad faith allegations "should not be permitted to be advanced in the abstract and absent an improper motive." *Wade*, 798 A.2d at 1260. Doe's allegations do not plausibly indicate that the University acted in bad faith.

Doe alleges that the University breached the covenant of good faith and fair dealing by: (1) failing to conduct a fair investigation, (2) failing to conduct a fair hearing, and (3) failing to provide a meaningful rationale. (Compl. ¶¶ 245-251). As an initial matter, and as detailed above, Doe fails to adequately plead exactly what the "contract" is in this case.  Even if Doe has adequately pled the existence of a contract, he fails to adequately allege any "bad faith conduct" or "malicious motive" on behalf of the University. This Count II is just a repackaging of Doe's breach of contract claim. Doe disagrees with the outcome of the disciplinary process, but other than saying so in conclusory fashion, he provides no plausible factual allegations to contradict the following: there was a thorough investigation, an investigation packet was provided for his review, the Committee conducted a hearing at which Doe was

**JA 130**

permitted to testify, and Doe had an opportunity to appeal the outcome, which he did. (*See, e.g,* Compl. ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180). Doe's subjective suggestion that he would have done something differently, or that he wished the Committee did something differently, are of no moment to his breach of contract claim. (Compl. ¶¶ 246-247).

Doe's final "bad faith" allegation is that the University failed to provide a meaningful rationale for its disciplinary decision. (*Id*. ¶ 248). Yet, in the same exact paragraph of his Complaint, Doe actually cites the precise rationale that the University shared, and the basis for same. That Doe (not surprisingly) disagrees with the University's rationale does not render it deficient.

Allegations of bad faith "should not be permitted to be advanced in the abstract and absent an improper motive." *Wade*, 798 A.2d at 1260. The "bad faith" advanced by Doe is all speculation; there are no plausible allegations of malice on the University's behalf. *See Wysocki v. Wardlaw-Hartridge Sch.*, No. 2:21-CV-14132, 2022 WL 2168212, at \*3 (D.N.J. June 16, 2022) (dismissing claim where "[t]he Court cannot discern coherent factual allegations supporting Plaintiffs' bare assertion that [the defendant school] violated and breached the implied covenant of good faith and fair dealing").

Doe almost surely will attempt to analogize this case to a Title IX lawsuit involving the University (*Princeton III*), where, after an appeal to the Third Circuit,

**JA 131**

a breach of the covenant of good faith and fair dealing claim survived a motion to dismiss. The present case is unlike *Princeton III* for several reasons. First, here Doe was found to have violated the University's <u>Personal Safety</u> policy, not the University's Title IX policy. Second, Doe has not alleged plausible facts showing that the University "[s]ubject[ed] [Doe] to a discriminatory disciplinary process," "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe]," "constru[ed] all discrepancies and inconsistencies in [Roe's] favor," and "ignor[ed] evidence corroborative of [Doe's] counter claims." *Princeton III*, 30 F.4th at 348.

As an initial matter, *Princeton III* involved complaints by a male student against his female girlfriend, and vice versa. The crux of the Plaintiff's breach of contract arguments in *Princeton III*, which the Third Circuit ultimately determined were sufficient to survive a motion to dismiss, was that Doe sufficiently alleged that the Committee "disregard[ed] evidence that tended to inculpate Roe and exculpate Doe." 30 F. 4th at 347. Here, by contrast, there were not cross-claims by Doe against Roe (or Smith). The Committee here did not and could not have disregarded ***incriminating*** evidence against Roe or Smith, because Doe did not file any complaints against either of them. Further, the Committee could not have "ignored Doe's counterclaims," because he did not file any. Finally, as detailed above, the Committee here did not disregard "exculpatory" evidence that Doe sought to

**JA 132**

introduce; rather, Doe failed to timely present this "evidence," and the evidence, in any event, was from a witness (Student X) who had no information about Roe and Smith's allegations at all. Doe has not adequately pled a claim for the Breach of Good Faith and Fair Dealing, and Count II should be dismissed with prejudice.

> **D.      Doe's Title IX Claim (Count III) Fails as a Matter of Law because the Complaint does not support a Plausible Inference that the University Discriminated against Doe on the Basis of his Sex, Nor Otherwise Demonstrate that Sex was a Motivating Factor in the University's Decision to Impose Discipline.**

In Count III, Doe alleges that the University discriminated against him on the basis of sex in violation of Title IX when it investigated and found him responsible for violations of the RRR.[7]  (Compl. ¶ 123). To state a Title IX claim, Doe must allege facts supporting a plausible inference that the University discriminated against him on the basis of sex, and that sex was "a motivating factor in the decision to discipline." *Doe v. Princeton Univ.*, No. CV 22-5887, 2023 WL 8755232, at *6 (D.N.J. Dec. 19, 2023) (*quoting Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020)); *See also Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225, at *9 (D.N.J. Jan. 17, 2018) (holding that, because Title IX liability requires an allegation that the defendant's conduct was motivated by gender bias, "the Court

---

[7] Doe was not investigated for alleged violations of the University's Title IX Sexual Harassment Policy, nor its Sexual Misconduct Policy. He was investigated for student conduct violations. In this way, too, Doe's case is distinct from other cases upon which he seems to have patterned his Complaint.

**JA 133**

need not probe into the theory-specific requirements necessary to state a claim" if the plaintiff fails to sufficiently allege that the defendant's conduct was motivated by gender bias). "Allegations that may support gender bias include 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL 4482457, at *4 (3d Cir. Sept. 27, 2022) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Doe's pleading fails to support a plausible inference that the University discriminated against him on the basis of his sex and fails to demonstrate that his sex was the motivating factor in the disciplinary outcome.

1. ***The University conducted a thorough investigation and hearing, and the outcome of the process was supported by clear and convincing evidence.***

Doe alleges that the investigator and Committee were biased because: (1) Doe was questioned "more pointedly and confrontationally" than the complainants, (2) the complainants were found to have told "consistent" stories despite "changes to their stories," (3) the Committee refused to pursue exculpatory witnesses on behalf of Doe, (4) female witnesses were pursued on behalf of the complainants, but not similarly situated male witnesses on behalf of Doe, and (5) male witnesses were not questioned as to whether Roe had any bruising on her neck, but female witnesses were. (Compl. ¶ 256).

**JA 134**

As to the first allegation, even if Doe is right that he was questioned more "pointedly and confrontationally" than Roe or Smith, (*Id*. ¶ 256), he fails to plausibly plead how that treatment was tied to his status as a male, rather than to his status as the respondent/alleged assailant. *See, e.g., Verdu*, 2022 WL 4482457, at *3 (stating that "the purported differences in how Princeton treated [the respondent] and [his victim] are too conclusory to support a plausible claim for relief.").

Regarding the second allegation, Doe is essentially challenging the decision-making process of the Committee. He contends that the Committee "got it wrong" and should have found that the complainants (Roe and Smith) provided inconsistent testimony, not consistent testimony. Doe no doubt currently believes this. But that subjective belief does not mean the Committee actually got it wrong, and Doe provides zero plausible facts indicating that, even if the Committee did "get it wrong," it did so *because Doe is a man*.

Doe next contends that the University "pursued" female witnesses on behalf of complainants, but no male witnesses on behalf of Doe. There are no plausible allegations to suggest that the investigator did anything other than investigate those witnesses identified as having actual information about the events at issue, regardless of their sex. Doe's own Complaint concedes that he was interviewed by the investigator, was provided the list of witnesses interviewed during the fact-finding process, and was informed "that he had the option to request additional interviews

**JA 135**

be conducted." (*Id.* ¶ 122). Doe did not request a follow-up interview and did not request that the investigator interview *any* additional witnesses on his behalf, regardless of sex. By contrast, Doe's own Complaint concedes that many of the students interviewed were "***identified*** by the female complainants." (*Id.* ¶ 136). Doe cannot credibly complain that he was somehow subject to gender discrimination because the University interviewed witnesses who happened to be identified by female parties, but did not clairvoyantly decide to interview male witnesses never identified by Doe.

Doe also alleges that male witnesses were not questioned at the hearing about whether Roe had any bruising on her neck. (*Id.* ¶ 137). Specifically, Doe alleges that "Student 4, 6, and [Doe]" were not asked about bruising on Roe's neck. (*Id.*). This is contradicted within Doe's own Complaint, where he acknowledges that the Committee did question Student 4 about bruising at the hearing "in an attempt to establish that [Roe's] bruising could not have been visible." (*Id.* ¶ 176). Doe could have questioned Student 4 on this point at the hearing as well. Doe also could have questioned Student 6, who was present at the hearing, about bruising. (*Id.* ¶ 181). Doe did not do so – almost surely because Student 6 had already testified that Roe "had a raspy voice when he saw her after the incident." (*Id.*). Further, as Doe confirms he gave a statement at the hearing, absolutely nothing was stopping him

**JA 136**

from testifying himself about Roe's bruising if he thought it was helpful to his position. (*Id*. ¶ 192).

Finally, Doe alleges that his male roommate, Student 5, was not questioned during the investigation about whether Roe had any bruising on her neck. However, Doe **never identified** Student 5 as a witness – not at the outset of the investigation, and not after being provided the witness list and being informed "that he had the option to request additional interviews be conducted." (*Id*. ¶ 122). Therefore, the investigator could not have questioned Student 5 at all, let alone about any bruising on Roe's neck, because of Doe's failure to identify him as a witness. Doe's failure to meaningfully participate in his own defense cannot support his allegations of gender bias.

In short, even if Doe disagrees with the process and the outcome of his case, he has presented no credible, plausible allegations of gender bias to support a claim under Title IX. *See Verdu*, 2020 WL 1502849, at *4-5 (plaintiff failed to show Title IX violation where he admitted to violation of University's policies and "failed to allege that he received different treatment by Princeton than a similarly situated female"); *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774–75 (3d Cir. 2020) (noting panel's investigation, which failed to question Roe's credibility or memory, may have been "shoddy," but did not give rise to gender bias where "allegations" did not "relate to bias on account of sex") (*quoting Doe v. Columbia Univ.*, 831 F.3d 46, 57

**JA 137**

(2d Cir. 2016)); *Doe v. Princeton Univ.* ("Princeton II"), 790 F. App'x 379, 384 (3d Cir. 2019) (affirming dismissal of Title IX claim where plaintiff pled conclusory statements that Princeton would have treated him differently if he were a female, failed to plead facts "reflecting that the disciplinary process and results for female victims are different from men," and found his "many grievances about how the process was conducted and how he was treated" did not show "unfavorable treatment due to his sex"); *Gendia v. Drexel Univ.,* No. 20-1104, 2020 WL 5258315, at *3 (E.D. Pa. Sept. 2, 2020) (no Title IX allegations where investigator "assumed Roe's truthfulness" and made evidentiary determinations that favored Roe over plaintiff); *Saravanan v. Drexel Univ.,* No. CV 17-3409, 2017 WL 4532243, at *4 (E.D. Pa. Oct. 10, 2017) (holding that plaintiff's complaint did not demonstrate Title IX claim where plaintiff alleged "an adverse and erroneous outcome" and "blanket allegations of discrimination" (citations omitted)). At most, Doe has suggested that Princeton had a bias in favor of the complaining parties, Roe and Smith. Without further plausible allegations specifically tying that favoritism to gender, those suggestions fail to adequately state a Title IX claim. *Doe v. Princeton Univ.,* No. CV 22-5887 (RK) (DEA), 2023 WL 8755232, at *8 (D.N.J. Dec. 19, 2023), reconsideration denied, No. CV 22-5887 (RK) (JTQ), 2024 WL 3580747 (D.N.J. July 29, 2024).

Doe's Title IX claim (Count III) should be dismissed with prejudice.

**JA 138**

## 2. *Doe has not plausibly alleged that the University was motivated by external pressure to discriminate against men.*

As an alternative method to try to support his Title IX claim, Doe contends that the University faced internal and external pressure to respond aggressively to allegations made by female complainants against male respondents. (Compl. ¶¶ 37-74). As an initial matter, this extensive discussion in Doe's Complaint entirely relates to claims of sexual assault and the related internal Title IX processes at the University. This case, by contrast, is not a sexual assault case. Princeton's Title IX processes were not involved.

In any event, allegations about "pressure" are too abstract and conclusory to sufficiently allege that gender bias specifically impacted Doe's case. Courts have held that similar allegations are insufficient to survive a motion to dismiss. "[E]xternal pressure alone is not enough. Rather, '[i]n the cases where public pressure was found to support claims of erroneous outcome [under Title IX], that public pressure targeted the *specific* disciplinary action being challenged.'" *Verdu*, 2020 WL 1502849, at *5 (quoting *Doe v. Univ. of Cincinnati*, No. 1:16CV987, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018) (collecting cases holding same). In *Verdu*, for example, the court held that the plaintiff failed to allege that gender bias affected the relevant proceedings because he failed to "point to any public pressure directed at any single individual involved in his specific case," and instead cited to federal investigations by Office of Civil Rights into the University's broad handling

**JA 139**

of sexual assault accusations and general criticisms of an unrelated academic department. *Verdu*, 2020 WL 1502849, at *5 ("Without any allegations specifically connecting the external pressure on the University to Plaintiff's specific case, there is simply no basis to plausibly infer that the outcome of the [investigation] was motivated by his gender."); *see also Rider Univ.*, 2018 WL 466225 at *12 (allegation that pressure from 2011 Dear Colleague Letter resulted in gender bias was conclusory and insufficient on its own to carry Title IX claim).

Finally, the now-rescinded 2011 Dear Colleague Letter was issued over 12 years ago, with two intervening presidential administrations and a significant overhaul of Title IX regulations occurring since then. It is implausible that the Dear Colleague Letter, which was rescinded in 2017, had any impact on the University's conduct, and Doe alleges no facts to the contrary. The Third Circuit has confirmed that resting a Title IX discrimination claim on the Dear Colleague Letter is insufficient: "'pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination,' it factors into the total mix of information supporting a plausible Title IX discrimination claim." *Princeton III*, 30 F.4th at 345 (quoting *Univ. of Scis.*, 961 F.3d at 210).

**JA 140**

In sum, Doe fails to allege any plausible facts to support his claim that the University's conduct was motivated by gender bias. For this reason, too, Plaintiff's Title IX claim (Count III) should be dismissed, with prejudice.

### E. Doe fails to State a Gross Negligence Claim (Count IV) against the University.

New Jersey courts have held that universities owe no duty of care to students when carrying out disciplinary procedures. *Donohue v. Capella Univ., LLC*, No. CV 22-5634, 2023 WL 5425503, at *7 (D.N.J. Aug. 22, 2023) (holding that there is no "authority indicating that a private university or its employees owe a certain duty of care to its students under New Jersey law when carrying out disciplinary procedures."); *Doe*, 2023 WL 8755232, at *13 ("Because the University owes Plaintiff no duty of care under New Jersey law, his gross negligence claim must fail."). Doe's gross negligence claim (Count IV) must be dismissed with prejudice.

## CONCLUSION.

For the foregoing reasons, Doe's Complaint against the University should be dismissed in its entirety, with prejudice.

**JA 141**

# Exhibit A

Rights, Rules, Responsibilities

# 1.2 University-Wide Conduct Regulations

### 1.2.1 Respect for Others

Respect for the rights, privileges, and sensibilities of each other is essential in preserving the spirit of community at Princeton. Actions which make the atmosphere objectively intimidating, threatening, or hostile to individuals are therefore regarded as serious offenses. Abusive or harassing behavior, verbal or physical, which demeans, intimidates, threatens, or injures another and is sufficiently severe and/or pervasive to have the effect of unreasonably interfering with an individual's educational experience, working conditions, or living conditions is subject to University disciplinary sanctions. Making tolerance of such behavior or submission to it a condition of employment, evaluation, compensation, or advancement is an especially serious offense. Procedures for resolving complaints or grievances regarding abusive, harassing, or disrespectful conduct are discussed under Rights, Rules, Responsibilities section **1.2.2** (/2023/university-wide-regulations/12-university-wide-conduct-regulations#comp122) (Discrimination or Harassment (Based on a Protected Characteristic)), section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct) (Title IX Sexual Harassment and University Sexual Misconduct) and section **2.2.5** (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life#comp225) (Disorderly and Disrespectful Conduct), as well as Human Resources policy **1.1.3** (https://hr.princeton.edu/myhr/policies/responsibilities-employees) (Responsibilities of Employees).

Princeton University strives to be an intellectual and residential community in which all members can participate fully and equally, in an atmosphere free from all manifestations of bias and from all forms of discrimination, harassment, exploitation, or intimidation. As an intellectual community, it attaches great value to freedom of expression and vigorous debate, but it also attaches great importance to mutual respect, and it deplores expressions of hatred directed against any individual or group. The University seeks to promote the full inclusion of all members and groups in every aspect of University life.

Mutual respect requires special sensitivity to issues of bias. Expressions of bias directed at individuals or groups undermine the civility and sense of community on which the well-being of the University depends. They devalue the distinctive contributions of the individuals affected and impair their ability to contribute their views and talents to the community and to benefit fully from participating in it. By alienating those individuals, they harm the whole community. The University calls on all its members to display the appropriate sensitivity and to challenge expressions of bias whenever they encounter them.

### 1.2.2 Discrimination or Harassment (Based on a Protected Characteristic)

Princeton University is committed to creating and maintaining an educational, working, and living environment free from discrimination and harassment based on a protected characteristic. Princeton University's Policy on Discrimination and/or Harassment prohibits such discrimination and harassment and applies to all members of the University community.

When the University becomes aware of a complaint that a member of the University community may have been subjected to or affected by discriminatory and/or harassing behavior based on a protected characteristic, the University will take prompt action. The vice provost for institutional equity and diversity in the Office of the Provost will conduct an initial assessment of the information provided in the complaint to consider whether the alleged conduct, if substantiated by a preponderance of the evidence, could constitute prohibited conduct under the University's Policy on Discrimination and/or Harassment. If so, the vice provost for institutional equity and diversity may determine that the complaint may proceed to investigation. Complaints against undergraduate students only or graduate students only would be referred to the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School, respectively, for investigation. If the alleged conduct involves faculty members or staff, the matter would be referred to the University's Investigations Unit for investigation. If it is determined after investigation that a violation of University policy has occurred, appropriate action will be taken to stop the discrimination and/or harassment. The action taken by the University, including any remedial measures, will depend on the particular facts and circumstances involved.

**Protected characteristics** are those personal traits, characteristics, and/or beliefs that are defined by applicable law as protected from discrimination and/or harassment. They include race, creed, color, sex, gender identity or expression, pregnancy and related conditions, age, national origin, ancestry, religion, physical or mental disability, genetic information, veteran status, marital or domestic partnership status, affectional or sexual orientation, and/or other characteristics protected by applicable law.

**Discrimination** is adverse treatment of an individual based on a protected characteristic, rather than individual merit. Examples of conduct that can constitute discrimination if based on an individual's protected characteristic include but are not limited to:

Singling out or targeting an individual for different or less favorable treatment (e.g., more severe discipline, lower salary increase) because of their protected characteristic.

**JA 143**

Failing or refusing to hire or admit an individual because of their protected characteristic.

Terminating an individual from employment or an educational program based on their protected characteristic.

**Harassment** is unwelcome verbal or physical behavior which is directed at a person based on a protected characteristic, when these behaviors are sufficiently severe and/or pervasive to have the effect of unreasonably interfering with an individual's educational experience, working conditions or living conditions by creating an intimidating, hostile, or offensive environment. Examples of conduct that can constitute harassment if based on an individual's protected characteristic include but are not limited to:

Unwelcome jokes or comments about a legally protected characteristic (e.g., racial or ethnic jokes).

Disparaging remarks to a person about a legally protected characteristic (e.g., negative or offensive remarks or jokes about a person's religion or religious garments).

Displaying negative or offensive posters or pictures about a legally protected characteristic.

All communications, including those conveyed electronically, such as by email, telephone or voicemail, text messaging, social media or other internet use, that violate this policy.

**Retaliation** is prohibited against any individual or group of individuals involved in filing a report, complaint or grievance under the Policy on Discrimination and/or Harassment (or with an external entity), opposing in a reasonable manner an action believed to constitute a violation of University policy, participating in a University investigation, compliance review, or disciplinary proceeding, or filing a request for an accommodation under a University policy. (For purposes of this policy, "retaliatory action" Is defined as intimidation, threat, coercion, discrimination, or adverse educational or employment action; acts of politeness and the like typically do not qualify.)

Depending on the circumstances referenced above, retaliatory acts may include (but are not limited to): adverse employment action; adverse action relating to participation in an educational program; unreasonably interfering with the academic or professional career of another individual; engaging in conduct which constitutes stalking, harassment, or assault; engaging in efforts to have others engage in retaliatory actions on one's behalf.

The full text of the Policy on Discrimination and/or Harassment, including examples of prohibited conduct, resources, and options for addressing concerns, can be viewed online at: **https://inclusive.princeton.edu/addressing-concerns/policies/policy-discrimination-andor-harassment** (https://inclusive.princeton.edu/addressing-concerns/policies/policy-discrimination-andor-harassment) in an accompanying set of Frequently Asked Questions: **http://inclusive.princeton.edu/addressing-concerns/faqs** (http://inclusive.princeton.edu/addressing-concerns/faqs). Members of the University community are expected to be familiar with and adhere to the regulations set forth in the policy.

## 1.2.3 Peaceful Dissent, Protests, and Demonstrations

Free speech and peaceable assembly are basic requirements of the University as a center for free inquiry and the search for knowledge and insight. These rights involve a concurrent obligation on the part of all members of the University, guests, and visitors to maintain on the campus an atmosphere conducive to scholarly pursuits and to respect the rights of all individuals.

In view of Princeton's obligation to promote the free expression of all views, the campus is open to any speaker whom students or members of the faculty have invited and for whom official arrangements to speak have been made with the University. The right of free speech in a university also includes the right to acts of peaceful dissent, protests in peaceable assembly, and orderly demonstrations which include picketing and the distribution of leaflets. These are permitted on the Princeton campus, subject to approval as to schedule and location, unless, or until, they disrupt regular and essential operations of the University or significantly infringe on the rights of others, particularly the right to listen to a speech or lecture.

All individuals and groups planning to engage in activities of the sort described in the previous paragraph should seek approval from the Office of the Dean of Undergraduate Students. Locations generally approved for these activities include the following:

The area adjacent to Chancellor Green Center (on the Firestone Library side).

The area in front of Frist Campus Center on the north side, by the Frist "gateway."

The areas to the west and south of Alexander Hall, and to the east of Alexander Hall, between Stanhope Hall and Morrison Hall.

The area in the vicinity of the east entrance to the University Store.

The area between Whig and Clio halls.

The cobblestone area between Firestone Library and Washington Road.

The area in the vicinity of the arch near the entrance to McCosh Hall, Room 50.

**JA 144**

Scudder Plaza at Robertson Hall.

The area adjacent to Shapiro Walk between the Department of Computer Science and Mudd Manuscript Library.

The walkway in front of Nassau Hall.

The area in the vicinity of the north entrance to Jadwin Gymnasium.

In asking groups and individuals to seek prior approval for schedule and location, the University's goal is not to restrict free speech or peaceable assembly. Rather, it is to give the University the opportunity to provide space that accommodates the reasonable needs of both the University community and those engaged in acts of speech or protest. The University reserves the right to determine the time, place, and manner of all such activities.

Whenever appropriate, the Office of the Dean of Undergraduate Students, with assistance from and in consultation with the Department of Public Safety, will designate clearly marked areas for protests and demonstrations from among the list that appears above. In addition to those on this list, other locations may be designated because of particular circumstances associated with a protest or demonstration (for example, to schedule a protest in the vicinity of a campus public lecture held in a location not near those on the list). To the extent practicable, the marked areas will be within reasonable sight and sound of the speaker's and the audience's ingress to and egress from the location of the event. The University reserves the right to refuse permission to use a particular area for protests or demonstrations, including those on the designated area list. When such a decision is reached, the University will provide reasons when asked.

It is a violation of these policies whenever any individual prevents, or willfully attempts to prevent, the orderly conduct of a University function or activity, such as lectures, meetings, interviews, ceremonies, and public events; or blocks, or willfully attempts to block, the legitimate activities of any person on the campus or in any University building or facility.

Whenever a member of the University community, that is a member of the faculty, staff, or student body, violates these policies, that individual may be subject to University-imposed sanctions, including being barred from campus and/or arrested. Whenever a nonmember of the University community violates these policies, that individual may be barred from campus and/or arrested. Decisions to invoke University disciplinary action or arrest in the course of a protest or demonstration will be made after due warning and, wherever possible, such decisions will be made by officers of the University (see the Bylaws of the Board of Trustees).

All members of the press and media, both those affiliated with the University and those with no affiliation to the University, are fully subject to these provisions unless special arrangements for press coverage have been authorized by the University's Office of Communications. Ordinarily, arrangements of some kind to permit press coverage will be made when circumstances allow, and will be administered by the Office of Communications.

More detailed information about University policies and practices pertaining to Peaceful Dissent, Protests, and Demonstrations can be found on the website **https://odus.princeton.edu/protests** ⬀ (https://odus.princeton.edu/protests).

## 1.2.4 Distribution of Written Materials by Members of the University Community

Free inquiry, free expression, and civility within this academic community are indispensable to the University's objectives. Inclusion of the name, telephone number, and/or email address of the University sponsoring organization or individual member of the University community on material resembling petitions, posters, leaflets distributed on campus, including materials disseminated using campus information technology resources or University internet access is encouraged, since such attribution promotes and facilitates civility as well as vigorous debate in the academic community. Anonymous public postings without sponsorship of a registered University organization or individual shall be removed or deleted if a complaint by a member of the University is lodged with the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School.

### Posting of Notices

Posters or notices of any kind may be affixed only to bulletin boards in dormitory entryways, food service units, academic and administration buildings, and outdoor kiosks, lampposts, and bulletin boards. Individuals are encouraged to remove outdated material from kiosks and bulletin boards rather than postering over existing notices.

## 1.2.5 Personal Safety

Actions that threaten or endanger in any way the personal safety or security of others will be regarded as serious offenses.

The following offenses will be regarded as extremely serious:

1. Deliberate participation in a riot or general disturbance that threatens the safety, or seriously threatens the property, of either University members or members of the local community.
2. Intimidation by violence, by a threat of violence, or by property damage, which seeks to interfere with the free expression of ideas, or attempts to punish such free expression.

**JA 145**

3. The possession, storing, or use on campus (including in any University housing) of (a) firearms (including antique firearms and imitation firearms); (b) any guns that shoot projectiles (including paintball, BB, air); (c) ammunition for any firearm; or (d) any explosive or incendiary device (including firecrackers and other fireworks). The use of prop guns in theatrical productions and the like requires advance written permission from the Office of the Dean of Undergraduate Students. (Easily identifiable toys, such as brightly colored or clear water guns, are not covered by this provision.)

4. The possession of weapons or the use or threatened use of weapons or objects capable of being used as weapons. (Students may possess small pocket-knives or kitchen implements and may use them for their intended purposes only.)

5. Any physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results.

6. Any other act that seriously endangers human life, or threatens serious physical or psychological injury.

## 1.2.6 Programs Involving Minors

The University is dedicated to the welfare and safety of all individuals who participate in its programs and activities, with particular concern for minors, who are defined as individuals who are under the age of 18 years old and are not a matriculated college student at Princeton University or elsewhere. Members of the University community who interact with minors are expected to be acquainted with and abide by the University's Policy for Programs Involving Minors. For more information about this policy, see the following website: **https://minorsoncampus.princeton.edu** (https://minorsoncampus.princeton.edu/).

## 1.2.7 Quiet

Activities that take place in the vicinity of University residences, classrooms, the library, the chapel, and similar facilities must be conducted in such a way as to respect the necessity for maintaining a reasonable degree of quiet in such areas. (See "Noise" under section **2.2.1** (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life) for more information.)

## 1.2.8 TigerCards (ID Cards) and Other Identification

TigerCards are issued to eligible members of the University community and are intended for campus use only. Members of the community are asked to carry their cards while on campus. TigerCards are nontransferable and must be presented on request to authorized University representatives. TigerCards should not be lent or given to others even for short periods of time.

Possession, manufacture, sale, use, or transfer of false identification of any sort is a violation of the law and of University policy.

Rights, Rules, Responsibilities

## 2.2 Regulations Concerning Specific Aspects of Student Life

### 2.2.1 Dormitory Regulations

A student resident in a University dormitory agrees to the terms and conditions outlined in the University room contract. In general, dormitory residents themselves have authority to make their own social rules, so long as those rules conform to the general guidelines defined in the following paragraphs, as well as to the University's general conduct regulations. Note: there are a companion set of regulations available for graduate student apartments.

Undergraduate students who choose gender inclusive housing may be assigned to the same room regardless of gender. In graduate dormitory housing, students of different genders generally may not share the same room or suite, but they may share the same bathroom. However, specifically designated rooms, bathrooms, or suites in graduate dormitories may be made available for shared occupancy or use as gender-neutral housing.

Space in University dormitories is made available to regularly enrolled students of Princeton for their personal use, and use of such space cannot be transferred to any other individual. While students are permitted to have guests (including Princeton students staying in a room for which they do not have a housing contract) for short periods of time, extended visits are not permitted. Where applicable, the privilege of having overnight guests is subject to the approval of all roommates.

Students are responsible for ensuring that they and their guests abide by all University conduct regulations within their assigned room or suite. Generally, students will be subject to disciplinary action for any violation of University policy that takes place within their assigned room or suite, unless they neither knew about nor consented to the behavior or activity in question, or could not reasonably have been expected to foresee that a violation would ensue. Members of the dormitory community are expected to act with a considerate regard for the rights, privileges, and sensibilities of others. Dormitory residents should respect the desire of all members of the community for a reasonable degree of privacy.

It is expected that residents will show consideration for the property of their peers and of the University. The student is responsible for loss or damage to University property (including the furniture, life safety and security devices, and the accommodations) provided for the use of the student. In the event of loss or damage, the student using the accommodations will be charged for necessary repairs or replacements. In addition, students who damage private property or University property will be subject to University disciplinary action. Students may be held liable for all losses or damages resulting from negligent and/or purposeful acts and may also be liable for any loss or damage incurred by their guests who are non-University members.

Students may not appropriate University furniture from common spaces for use in a dorm room, nor remove from a dorm room the University furniture assigned to that room except as noted on the Housing and Real Estate Services website. Additionally, students may not remove furniture from furnished apartments.

Failure to fully vacate a dormitory room by the date required in the dormitory contract is considered an unauthorized occupancy of a residential unit (see section **1.4.7** (/2023/university-wide-regulations/14-university-law-and-property-rights#comp147)).

The faculty retains general oversight of undergraduate dormitories. The University Student Life Committee is responsible for making policy recommendations to the vice president for campus life and the executive director of housing. Violations of dormitory regulations are adjudicated by the Office of the Dean of Undergraduate Students, the Faculty-Student Committee on Discipline, the Residential College Disciplinary Board, the Office of the Dean of the Graduate School, or the Housing and Real Estate Services Office. Housing policies, regulations, and services are outlined on the Housing and Real Estate Services website.

Undergraduate students and graduate students living in the undergraduate dormitories, Graduate College and Annexes or in University rentals should consult: **https://hres.princeton.edu/policies** (https://hres.princeton.edu/policies)

### Noise

Every Princeton student residing on campus has the right to a reasonably quiet environment in which to study and to pursue other interests. The University expects all students to respect this right and to be aware of the impact of their activities on their neighbors. Audio speakers, for example, should be placed in such a way as not to interfere with the activities of others. Normally, audio equipment should be placed away from doors and open windows. While social gatherings are an essential part of campus life, students responsible for hosting parties are urged to be considerate of their neighbors. Throughout the academic year, including reading period and exam times, if the Department of Public Safety receives complaints about a loud party or other noisemaking activity prior to midnight on weeknights or 2 a.m. on weekends (Friday–Saturday and Saturday–Sunday nights only), the public safety officers will ask the hosts to reduce the noise level. After the curfew hour, or at any time after a second call for a noise violation at the same location, the public safety officers are authorized to end the activity in question. Dormitory residents

**JA 147**

concerned about excessive noise should feel free, at any time, to call the public safety officers for assistance. All noise complaints are noted by the Department of Public Safety. Violations of this noise policy may result in disciplinary action by the Office of the Dean of the Graduate School or the Office of the Dean of Undergraduate Students.

## Animals in Housing

The only pets that may be kept in dormitory rooms are fish contained in tanks that do not exceed 10 gallons. Students requesting an assistance animal due to a documented disability may do so at any time, but should plan to submit a request by July 1st for requests to bring the assistance animal to campus at the start of the academic year. Any student wishing to bring an assistance animal to campus must submit a request for accommodation to the Office of Disability Services. Information on the University's Service and Assistance Animals policy can be found at: **https://inclusive.princeton.edu/addressing-concerns/policies/service-and-assistance-animals-policy** (https://inclusive.princeton.edu/addressing-concerns/policies/service-and-assistance-animals-policy). Requests for Assistance Animals will be considered on a case-by-case basis. Students seeking to have a service or guide dog in housing should contact the Office of Disability Services.

## Smoking

Princeton University is committed to providing a healthy, smoke-free living environment for all its students. Further, New Jersey law prohibits smoking in all dormitories/annexes, including private student rooms and common areas. In accordance with the University's smoking policy, smoking is not permitted anywhere within Princeton University dormitories/annexes or graduate student apartment buildings or units. More information on the University's smoking policy can be found at: **https://ehs.princeton.edu/health-safety-the-campus-community/smoking-campus** (https://ehs.princeton.edu/health-safety-the-campus-community/smoking-campus).

## Fire Safety Policy

Students are required to comply with all policies governing fire safety. These policies are intended to create a safe environment for members of the University community and to minimize potential fire and life safety hazards. Students are expected to evacuate dormitories and all other University buildings when a fire alarm activates or when instructed to do so by public safety or other University staff. For more information, students should consult the Fire Safety Policies on the Housing and Real Estate Services website at: **https://hres.princeton.edu/policies/fire-safety** (https://hres.princeton.edu/policies/fire-safety).

## Candle/Flammable Liquid/Incense/Fireworks Policy

The University candle/incense ban is a total ban in all dormitories and annexes. Candles/incense do not have to show signs of use and/or be out of manufacturer's wrapping. All candles/incense will be confiscated and immediately disposed of. A $100 fine will be issued along with possible disciplinary action by the dean's office for lit or unlit candles/incense. If damage occurs to a room due to candles/incense, the student will be held liable for charges to restore the room to its original condition. Fireworks are also prohibited in University dormitories. See section **1.2.5** (/2023/university-wide-regulations/12-university-wide-conduct-regulations#comp125).

## Storage

Storage space is extremely limited in the dormitories. During the academic year, therefore, students may store their possessions only in their suites or in designated storage areas. Possessions found in other areas will be treated as abandoned goods, and will be disposed of by the University at its sole discretion. During the summer vacation, all personal possessions must be removed from dormitory rooms.

## Lofts

Lofts which conform to University standards and that incorporate the bed frames and mattress are permitted in dormitory rooms. Please consult the Housing Office for information regarding appropriate specifications.

## Privacy and Right of Re-entry

The University respects the privacy of the student but reserves the right to re-enter and take possession of the accommodations upon breach of any term of this agreement. The University may enter the accommodations during reasonable hours to provide efficient service and maintenance. The University may enter the accommodations without notice for the purposes of emergency service, safety and room condition inspections, or if there is reason to believe that any term or condition of this agreement or any University policy is being violated. When entering accommodations, the University may be accompanied by an outside party, such as a municipal fire inspector.

## Search of Dormitory Rooms

An administrative search of dormitory rooms (excluding safety inspections) will be carried out only with adequate cause, and with the explicit authorization of the dean of undergraduate students, the dean of the Graduate School, or some other senior administrative officer. Such a search may be conducted, for example, where there is reason to believe that the health and safety of

**JA 148**

an individual (or the campus community) is at stake or a term or condition of this agreement or a University policy is being violated. Should such a search be necessary, every effort will be made to have the resident present at the time of the search. If it is impossible to arrange to have the resident present, the resident will be informed of the action as soon as possible following the search.

## 2.2.2 Other Building Policies

### Posting of Notices

Posters or notices of any kind may be affixed only to bulletin boards in dormitory entryways, food service units, academic and administration buildings, and outdoor kiosks, lampposts, and bulletin boards. Individuals are encouraged to remove outdated material from kiosks and bulletin boards rather than postering over existing notices. (See also section **1.2.4** (/2023/university-wide-regulations/12-university-wide-conduct-regulations#comp124).)

### Safety Regulations

Entering mechanical areas (rooms, steam, and utility tunnels, etc.), construction sites, or other restricted areas is prohibited. Entering upon exterior elevated surfaces of campus buildings (roofs, fire escapes, terraces, balconies, parapets, or ledges above the first floor) is prohibited except in emergencies or in the circumstances described below:

1. Authorized persons may, for purposes of research, enter upon the following elevated areas constructed especially for such research: the roof of Jadwin Laboratory, the terrace of the Engineering Research Laboratory, the Butler College rooftop garden, Sherrerd Hall rooftop, and the Andlinger Center for Energy and the Environment rooftop garden and Lewis Center for the Arts rooftop terrace. Prox access is required. Entrance upon these areas may be authorized at the discretion of the responsible administrators or faculty departmental chairs.
2. The New College West and Yeh rooftop spaces are available to students with residential college approval only. Prox access is required. Entrance to these areas is authorized at the discretion of the residential colleges.
3. In addition, members of the faculty and staff may, for purposes of research, request authorization to enter upon elevated surfaces other than those specified above. Such requests will be reviewed by the Office of Environmental Health and Safety in conjunction with the Department of Facilities. Student requests must be sponsored by a faculty or staff member.
4. Any persons may enter upon the following terraces and on-grade plazas clearly designed for foot traffic and gatherings: Jadwin Plaza, New College West and Yeh College plaza, Simpson International Building balcony, and the Lewis Center for the Arts plaza.
5. University employees or contractor personnel are authorized to enter upon any elevated surfaces in the performance of official functions.

These regulations are intended to prevent injuries to members of the University community, and to prevent physical damage to surfaces, areas, or equipment not designed for traffic or public use.

This policy specifically prohibits buildering on any elevated surface on the campus. The policy also prohibits entering upon any dormitory exterior areas above the first floor. (While some exterior elevated areas of the dormitories may appear to have been designed for foot traffic or gatherings, all such spaces are to be used only as a second means of egress in case of fire.)

No items, including antennas and wire, lights, flags, banners, etc., may be placed on or affixed to the outside of any building. No items may be placed on fire escapes at any time, under any circumstances.

Because of the seriousness of the regulations regarding fire safety and use of steam and utility tunnels and exterior elevated surfaces of campus buildings, the University will take disciplinary action on a first offense. Such action may include the imposition of a fine by the Housing Office. Undergraduate students and graduate students should refer to the applicable fire safety policies on the Housing and Real Estate Services website for specific information regarding such fines at: **https://hres.princeton.edu/policies/fire-safety-policies** (https://hres.princeton.edu/policies/fire-safety-policies). Graduate students and undergraduate students living in rental units should consult: **https://hres.princeton.edu/policies/apartment-living** (https://hres.princeton.edu/policies/apartment-living).

The University has the right, moreover, to require students who have violated these safety rules (or any other dormitory regulations) to vacate their accommodations with no financial credit for the remainder of the semester.

In order to ensure the safety of students engaged in certain academic, research, and extracurricular activities, the University has established policies governing safety practices in research facilities and machine shops. These regulations are explained during safety training required of all participants and students are expected to adhere to all regulations and lab and shop safety postings. Failure to do so may result in disciplinary action.

For clarification of the above safety regulations, please consult the Housing Office, Office of Environmental Health and Safety, the University Fire Marshal's Office, or the Office of the Dean of Undergraduate Students.

**JA 149**

### 2.2.3 Campus Dining Regulations

All first-year and sophomores are required to sign a Campus Dining meal contract for the unlimited plan. Juniors and seniors have the option of the unlimited plan, Block 105 or no Campus Dining meal plan. Students requesting accommodations for medical reasons should contact the Office of Disability Services. Detailed terms of dining contracts are available at **https://dining.princeton.edu/meal-plans** ⬀ (https://dining.princeton.edu/meal-plans).

## 2.2.4 Health Regulations

Health Services offerings and services are outlined on the University Health Services website at **uhs.princeton.edu** ⬀ (https://uhs.princeton.edu/). University Health Services has policies and procedures governing the confidentiality of student health records and the extent to which information may or may not be released consistent with state and federal law. Specific immunizations are required for enrolled students by the University and the state of New Jersey. An up-to-date list of immunizations that are required can be found at **uhs.princeton.edu/medical-services/immunizations-allergy-shots/required-recommended-immunizations** ⬀ (https://uhs.princeton.edu/medical-services/immunizations-allergy-shots/required-recommended-immunizations). For further information, contact University Health Services.

## 2.2.5 Disorderly and Disrespectful Conduct

Students are expected to conduct themselves in accordance with the law and commonly accepted standards of behavior. Unauthorized entry into restricted spaces, combative or disruptive conduct with local or University medical, law enforcement, fire, emergency or other personnel, excessive noise, public nudity, public urination, disrespect for spaces that requires cleanup by University staff members, or other behaviors that clearly disrupt and disrespect the working and/or living conditions of others, may be met with disciplinary sanctions.

## 2.2.6 University Ban on the Nude Olympics

For a number of years undergraduates, predominantly members of the sophomore class, gathered as a group in Holder Courtyard on the night of the first snowfall, virtually naked, and in an environment that included student alcohol abuse, underage drinking, lack of concern for the welfare of fellow students, and risk of harm to themselves, to other people, and to property. This gathering came to be known as the "Nude Olympics."

In the spring of 1999, the president of the University and the Board of Trustees accepted the recommendation of the Committee on the Nude Olympics that this activity be banned, effective immediately, because of the severe health and safety risks posed by the event. The undergraduate student body is advised that they may not attempt to organize or engage in any activity that is perceived to perpetuate gatherings or events that contain or encourage some or all of the behaviors that have been associated with past Nude Olympics. These prohibitions apply to the campus, as well as to public and private property in the surrounding communities.

Any undergraduate engaging in activity that, in the judgment of the dean of undergraduate students or a designee, could reasonably appear to others to perpetuate gatherings or events that contain or encourage such behaviors is subject to suspension from the University for a period of at least one year. The penalty will be increased for aggravating behaviors, such as committing acts of vandalism, harassment, or avoiding apprehension by campus public safety officers or municipal police. Normal disciplinary procedures will apply, except that (1) the dean of undergraduate students, or a designee, will hear the case and assign the penalty, and (2) appeals will be brought to a subcommittee of the Faculty-Student Committee on Discipline.

The president and board ask members of the University community to report information they have regarding possible violations of this policy to the Department of Public Safety or the Office of the Dean of Undergraduate Students.

## 2.2.7 Hazing

Hazing can be a violation of New Jersey law as well as a violation of University policy. A student may be found responsible for violating University policy even if not charged or found guilty of a crime under New Jersey law.

### New Jersey Law

Included below is a summary of New Jersey's hazing law; for a complete copy of the law, consult N.J.S.A. Title 2C, Sections 40-3 through 40-5. Under New Jersey law:

a) A person is guilty of hazing, if, in connection with initiation of applicants to or members of a student or fraternal organization, whose membership is primarily students or alumni of the organization or an institution of higher education, the person knowingly or recklessly:

    1. causes, coerces, or otherwise induces another person to commit an act that violates federal or State criminal law;

**JA 150**

2. causes, coerces, or otherwise induces another person to consume any food, liquid, alcoholic liquid, drug or other substance which subjects the person to a risk of emotional or physical harm or is otherwise deleterious to the person's health;
3. subjects another person to abuse, mistreatment, harassment, or degradation of a physical nature, including, but not limited to, whipping, beating, branding, excessive calisthenics, or exposure to the elements;
4. subjects another person to abuse, mistreatment, harassment, or degradation of a mental or emotional nature, including, but not limited to, activity adversely affecting the mental or emotional health or dignity of the individual, sleep deprivation, exclusion from social contact, or conduct that could result in extreme embarrassment;
5. subjects another person to abuse, mistreatment, harassment, or degradation of a sexual nature; or
6. subjects another person to any other activity that creates a reasonable likelihood of bodily injury to the person.

Hazing shall not include any reasonable and customary athletic, law enforcement, or military training; contests; competitions; or events.

b) Hazing is a crime of the third degree if an actor commits an act of hazing which results in death or serious bodily injury to another person and is a crime of the fourth degree if the actor commits an act of hazing which results in bodily injury to another person. Otherwise, hazing is a disorderly persons offense.

c) In addition to any other sanctions or penalties that may be imposed under law, knowingly or recklessly promoting or facilitating a person to commit an act of hazing shall be subject to a fine under law of not less than $1,000 or more than $5,000 for an initial violation, and a fine of not less than $5,000 or more than $15,000 for each subsequent violation.

d) A person, student or fraternal organization, or institution of higher education, and another person acting in concert with the person, organization, or institution, shall be immune from prosecution under this section if the person, or an employee, officer, or other agent acting on behalf of the organization or institution, as the case may be.

1. called 9-1-1, or otherwise contacted campus security, police, or emergency services, and reported that a person was in need of medical assistance due to an act of hazing as described in this section;
2. the caller provided the caller's name and, if applicable, the name of the person acting in concert with the caller to the 9-1-1 operator or other recipient of the emergency contact;
3. the caller was the first to make the 9-1-1 report or other emergency report; and the caller and, if applicable, the person acting in concert with the caller remained on the scene with the person in need of medical assistance until assistance arrived and cooperated with the emergency services on the scene.

Consent shall not be available as a defense to a prosecution under law, and it shall not be an affirmative defense to a prosecution under law that the conduct in which the actor engaged was sanctioned or approved.

Conduct constituting an offense under the law may be prosecuted under any applicable provision of the New Jersey Code of Criminal Justice.

## University Policy Prohibiting Hazing

All students shall have the right to be free of all activities which might constitute hazing, while attempting to become a member of, or maintain membership in, a fraternity, sorority, athletic team, student organization, eating club, or other organization. Organizations, their members, and their prospective members are prohibited from engaging in or encouraging others to engage in activities that are defined as hazing.

Hazing encompasses a broad range of behaviors that (a) may place another person in danger of bodily injury, or (b) that demonstrates indifference or disregard for another person's dignity or well-being.

Examples of hazing include but are not limited to the following:

- Ingestion of alcohol, food, drugs, or any undesirable substance.
- Participation in sexual rituals or assaults.
- Emotionally or psychologically abusive or demeaning behavior.
- Acts that could result in physical, psychological, or emotional deprivation or harm.
- Physical abuse, e.g., whipping, paddling, beating, tattooing, branding, and exposure to the elements, or the threat of such behaviors.
- Participation in illegal activities or activities prohibited by University policy.
- Requiring nudity.
- Requiring the completion of errands.

Where an activity amounts to hazing, a person's consent to the activity is not a defense. In order to encourage students who may hesitate to report incidents of hazing for fear of revealing other policy violations, the University may offer leniency to a reporting student with respect to the behavior reported, depending on the circumstances involved.

See also section **1.4** (/2023/university-wide-regulations/14-university-law-and-property-rights), providing that members of the University community are expected to act in accordance with applicable law.

JA 151

## Acceptable Behavior

Any new member initiation process should be conducted in a manner that respects the dignity of new members and protects their mental and physical well-being. Examples of acceptable behavior include the promotion of scholarship or service, the development of leadership or social skills or of career goals, involvement with alumni, building an awareness of organizational history, development of a sense of solidarity with other organization members, or activities that otherwise promote the mission of the organization or of the University.

For additional information, see **https://odus.princeton.edu/community-standards/hazing** ⬀ (https://odus.princeton.edu/community-standards/hazing).

# 2.2.8 Fraternities and Sororities

The University does not recognize fraternities and sororities because, in general, they do not add in positive ways to the overall residential experience on the campus. These organizations can contribute to a sense of social exclusiveness and often place an excessive emphasis on alcohol. Students are discouraged from participating in these organizations.

Sororities and fraternities are not permitted to use any University resources or participate in University-sponsored events (e.g., Student Activities Fair, Princeton Preview Program, etc.).

## Prohibited Activities

First-year students may not affiliate with a fraternity or sorority. Affiliation includes but is not limited to: membership; "pledging" (i.e., participating in new member programming); participating in "rush" (i.e., formal recruitment); attending or participating in any activity sponsored by a fraternity or sorority; or contributing funds to a fraternity or sorority.

Students may not solicit the participation of any first-year students in a fraternity or sorority, including by electronic means. Solicitation includes but is not limited to: conferring membership on a first-year student; inviting a first-year student to pledge or participate in new member programming; including a first-year student in rush or formal recruitment; inviting a first-year student to attend or participate in any activity sponsored by a fraternity or sorority; organizing a sponsored event to which first-year students are invited; or soliciting or accepting funds from a first-year student on behalf of a fraternity or sorority.

Indications that an activity is "sponsored" by a fraternity or sorority may include but are not limited to: an invitation to participants on behalf of a fraternity or sorority; the use of fraternity or sorority funds to support the activity; or an announcement or other explicit identification of fraternity or sorority sponsorship. The presence of individuals who are members of the fraternity or sorority is not, alone, evidence of sponsorship.

This policy applies to activities that occur both on and off campus.

## Students Covered by This Policy

A student will only be held responsible for actions which a reasonable person in that student's position would have known were contrary to this policy. A student who is not a member of a fraternity or sorority will not be held responsible for solicitation unless there is clear and persuasive evidence that the student acted on behalf of or actively and intentionally enabled members of a fraternity/sorority in violating the policy. For the purposes of this policy, Bridge Year Program participants and students who have been admitted to Princeton but who have not yet matriculated are considered first-year students. Students are considered first-year students until the end of the final examination period of their second semester at Princeton.

## Definition of a Fraternity or Sorority

For the purposes of this policy, a fraternity or sorority

- is a student organization (i.e., an entity with a leadership or financial structure that has or intends to have a persisting identity over time),
- is not recognized by the University, and
- either has Greek letters in its name and an affiliation with a national organization or has a primarily social purpose and an exclusive membership.

This policy does not apply to the eating clubs or to any organization whose membership is not open to any Princeton student.

## Consequences

Any violation of this policy will be regarded as a serious matter. A student who engages in solicitation, as defined above, should expect to be suspended. A first-year student who joins, pledges, or rushes a fraternity or sorority should expect to be suspended. A first-year student who attends or participates in any other activity or event sponsored by a fraternity or sorority may be subject to a lesser penalty (e.g., disciplinary probation). All relevant facts and circumstances will be taken into account in determining the appropriate penalty.

**JA 152**

The University may offer leniency to a student who has been extraordinarily forthcoming during an investigation under this policy where that student might otherwise have been implicated in an infraction.

## 2.2.9 Alcohol Policy

Students at Princeton University are responsible for knowing and abiding by both state and University regulations regarding the consumption of alcohol. The University provides educational programs and information on alcohol and drug abuse as well as counseling services related to alcohol and other drug use. Students are expected and encouraged to be aware of the social, physiological, and psychological consequences and personal risks of excessive drinking in order to make responsible and informed decisions about the serving and consumption of alcohol. Students who take prescription drugs, over-the-counter medications, or herbal or other supplements are expected to be aware of the consequences of drinking alcohol in combination with those medications.

The University alcoholic beverage policy is consistent with the laws of the state of New Jersey that, in general, prohibit the consumption and serving of alcoholic beverages by and to persons under 21 years of age. Students will be deemed to have served alcohol when they have made alcohol available to others, regardless of whether any alcohol is actually consumed. Students' responsibility for violations of University policy that take place within their assigned room or suite is described in section **2.2.1** (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life). Students are responsible for their behavior, whether or not they are under the influence of alcohol. The consumption of alcohol does not constitute a mitigating circumstance when it contributes to the violation of University regulations. The policy affirms the need for mutual respect and personal responsibility within a diverse community.

The University respects the right to privacy, and its representatives will not enter dormitory rooms without substantive cause (e.g., without reasonable suspicion that University policies or regulations have been violated, or that someone's safety is in jeopardy). However, those whose behavior infringes on the rights of others have, in essence, forfeited that privacy.

### What Are the Responsibilities of Princeton University Students?

Alcoholic beverages normally will not be provided at events where persons under the legal drinking age for consumption of alcoholic beverages are present, including those sponsored by the University, the residential colleges, the University centers, the Undergraduate Student Government, and the classes.

Availability of alcoholic beverages shall not be the primary focus of advertising for campus social events. Those given approval to serve alcoholic beverages are responsible for ensuring that only those of legal drinking age are served, that alcohol is consumed— if at all—in a legal, healthy, and responsible way, and that no intoxicated individuals are served.

It is the immediate obligation of those in the presence of a severely intoxicated person to contact appropriate University or local medical or safety personnel (such as the Department of Public Safety, University Health Services (UHS) staff, local hospital staff, or local police or members of the rescue squad). Neither intoxication nor admission to UHS for intoxication will be grounds for disciplinary action. Contacting the Department of Public Safety for assistance in transporting a student in need of medical attention will not, in itself, lead to disciplinary action. Disciplinary action will occur only if other circumstances indicating a violation of University policy are observed. In such an instance, failure to call for assistance will be considered an especially serious violation of policy. In order to encourage calls for assistance, the University may offer leniency with respect to other violations which may come to light as a result of such calls, depending on the circumstances involved.

### When Will the Department of Public Safety or Other University Administrators Intervene?

Public Safety (or another University administrator) may enter a room whenever there is reasonable cause to believe that someone's safety may be in jeopardy or that a violation of the alcohol policy is taking place.

Public Safety will investigate possible alcohol violations when indicators of alcohol provision are observed. Such indicators may include—but are not limited to—kegs, bottles, cans, spilled alcohol, an individual leaving a room in possession of alcohol, or intoxicated behavior.

In the event of a noise complaint, Public Safety will go to the room and knock on the door. If no one answers, Public Safety may enter the room and instruct the residents of the room to control the noise. Regardless, Public Safety may enter the room where there is cause to investigate further, as described above.

### When Are Princeton University Students in Violation of the Alcohol Policy?

1. On campus and in the local vicinity, students are in violation of the University alcohol policy under any or all of the following circumstances, and alcohol, kegs, and/or taps used in violation of the below regulations may be confiscated:
   a. When participating in or organizing an activity that encourages excessive drinking (e.g., drinking games, pre-gaming with hard alcohol, initiation activities, hazing), as these acts can endanger the individual being served. These are especially serious violations.
   b. When the serving or consumption of alcohol contributes to behavior that (i) intimidates or harasses others; (ii) injures or threatens to injure others (e.g., driving under the influence of alcohol, assault); (iii) leads to the destruction of

**JA 153**

or (iv) infringes on the peace and privacy of others. These are especially serious violations. In keeping with state law, when a student has been detained by Public Safety or local law enforcement officials on suspicion of driving under the influence of alcohol, the refusal to submit to the taking of breath samples for the purpose of determining blood alcohol content will be taken as conclusive evidence that the student was driving under the influence of alcohol.

c. Violations of local ordinances or state laws by students may also be grounds for University disciplinary action, regardless of where such violations occur, if they clearly violate University standards of conduct. Additional state and federal laws can be found at **https://odus.princeton.edu/community-standards**↗ (https://odus.princeton.edu/community-standards).

d. When they fail to immediately contact appropriate University or local medical or safety personnel (such as the Department of Public Safety, University Health Services (UHS) staff, local hospital staff, or local police or members of the local rescue squad) on behalf of a severely intoxicated person.

2. On campus, students are in violation of the University alcohol policy under any or all of the following circumstances, and alcohol, kegs, and/or taps used in violation of the below regulations will be confiscated:

a. When carrying or possessing an open container of alcohol (defined as any container not sealed by the manufacturer) in or across common spaces (lounges, game rooms, courtyards, dining areas, hallways, etc.).

b. When in possession of a keg and/or tap or other evidence of intent to serve alcohol, including alcohol delivered in large quantities to the University Mailroom (unless permission has been granted by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School).

c. When, under the age of 21, in possession of any container of alcohol in common spaces of the University, including alcohol delivered to the University Mailroom.

d. When alcohol is served, provided, or made available by or to persons under the age of 21. Violations involving juveniles, such as high school applicants or visitors to the University, will be deemed particularly serious.

e. When procuring alcohol for persons under the age of 21 or by using false identification or falsifying identification.

## What Are the Consequences of Violating the Alcohol Policy?

Students who are in violation of the alcohol policy are subject to a range of University sanctions: Warning, Reprimand, Disciplinary Probation (including housing, and/or campus service sanctions), Withholding of Degree, Suspension (Not Served), Suspension, Suspension with Conditions, Expulsion, and Censure. In keeping with the University's particular concern about high-risk alcohol use, the consequences for violations of the alcohol policy will reflect the level of risk represented by the behavior as well as the impact of the behavior upon the community.

In general, first instance lower-risk violations will result in a dean's warning or reprimand; subsequent violations will result in, at a minimum, disciplinary probation. Examples of lower-risk alcohol violations include, but are not necessarily limited to, situations where:

- Only low-proof alcohol (under 30 proof) is present;
- A modest amount of alcohol is available, appropriate to the number of persons present;
- No high-risk drinking, including drinking games, is occurring;
- No "common sources" of alcohol, such as kegs or alcoholic punch, are present;
- Neither the serving nor the consumption of alcohol has contributed to behavior that infringes on the peace and privacy of others (e.g., disorderly conduct, harassment, vandalism or property damage, injuring or threatening to injure others, or driving under the influence of alcohol).

The University regards higher-risk violations of the alcohol policy as more serious than lower-risk violations. In general, a student who commits a first higher-risk alcohol violation is placed on disciplinary probation. Discipline for a second higher-risk offense will be more serious and may involve a long term of disciplinary probation, campus service, and/or revocation of on-campus residential privileges. Students should expect to be suspended for a third higher-risk alcohol or alcohol-related offense or for any particularly egregious first or second offense. Higher-risk alcohol violations include, but are not necessarily limited to, the following:

- The serving, providing, or making available of hard alcohol (in any quantity);
- The possession of hard alcohol by underage persons in common spaces of the University;
- The possession of kegs or other common sources of alcohol;
- Drinking games, including those where some participants are playing with nonalcoholic beverages;
- The possession of any large quantity of alcohol (of any kind) relative to the number of people present;
- Violations that result from intoxication, such as assault, harassment, disorderly conduct, vandalism, or property damage;
- Failing to immediately contact appropriate University or local medical or safety personnel on behalf of a severely intoxicated person.

Deans may notify a student's parents following any significant incident of drug/alcohol-related misconduct. Alcohol, kegs, and/or taps used in violation of the above regulations will be confiscated.

Students who violate the University's alcohol or drug policies are encouraged to avail themselves of the services of the Alcohol and Other Drug Program offered by the University Office of Counseling and Psychological Services. When appropriate, deans may require an alcohol/drug evaluation by University Health Services staff (UHS).

**JA 154**

## 2.2.10 Drug Policy

Princeton University does not condone the possession, use, manufacture, or distribution of controlled substances, marijuana, cannabis, or drug paraphernalia of any kind in any amount, or the possession, use, manufacture, or distribution of prescription drugs without a prescription. This prohibition applies on-campus and to participation in University activities off-campus, including but not limited to work-study programs, off-campus events, and off-campus research projects. Students in violation of this policy may be jeopardizing their own well-being as well as the well-being of the University community.

In general, a student who violates this policy for the first time will be issued a reprimand or placed on probation, depending on the substance and the circumstances. Discipline for a second offense will be more serious and may involve lengthening the probation, campus service, and/or revocation of on-campus residential privileges. Students should expect to be suspended for a third offense. Students involved in such cases, when their conduct is in violation of the law, cannot be guaranteed immunity from either arrest or prosecution.

Among those violations considered to be most serious are the manufacture, sale, or distribution of controlled substances or prescription drugs without a prescription; any involvement in controlled substance use or traffic with minors, particularly from the local area; and possession or use of the more dangerous or highly addictive drugs. Students engaged in activities described in this paragraph should expect a lengthy separation or expulsion from the University upon a first offense.

Students possessing, using, selling, or manufacturing controlled substances may also be subject to mandatory penalties prescribed by the state.

It is the immediate obligation of those in the presence of a person suffering adverse consequences of using drugs to contact appropriate University or local medical or safety personnel (such as the Department of Public Safety, University Health Services staff (UHS), local hospital staff, or local police or members of the rescue squad). In order to encourage calls for assistance, the University may offer leniency with respect to violations which may come to light as a result of such calls, depending on the circumstances involved.

The Department of Public Safety (or another University administrator) may enter a room whenever there is reasonable cause to believe that someone's safety may be in jeopardy or that a violation of the drug policy is taking place, unless otherwise prohibited by law.

## 2.2.11 Conduct at Prospect Avenue Clubs

Standards of behavior by University students in the independent Prospect Avenue clubs are to conform with established standards in the University as a whole. In particular, club members are to act with considerate regard for the rights, privileges, and sensibilities of others. It is expected that they will show due consideration for the property of their fellow members and guests, as well as for the property of the club itself. Physical violence, intimidation of others, or offensive and disorderly behavior will not be tolerated in any club or on the walks and streets outside clubs. It is also the immediate obligation of those in the presence of a severely intoxicated person or a person suffering from adverse consequences from using drugs to contact appropriate University or local medical or safety personnel (see section **2.2.9** (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life#comp229)). University policy in cases in which misconduct is alleged to have taken place in the clubs is governed by the provisions set forth concerning off-campus activities (see section **1.4.2** (/2023/university-wide-regulations/14-university-law-and-property-rights#comp142)).

## 2.2.12 Transportation and Parking Services

### Undergraduate Student Parking Policy

All students must be familiar with the Princeton University parking regulations since students are responsible for their own and their guests' vehicles. Frequent violations of the parking rules and regulations will result in the revocation of parking privileges and/or may result in disciplinary action.

Detailed regulations and campus maps are available online at **https://transportation.princeton.edu** ⧉ (https://transportation.princeton.edu/).

### Undergraduate Student Parking

Princeton University is a pedestrian campus; students are expected to walk, bike, or ride TigerTransit to classes, eating clubs, and athletic practices and events. Undergraduate students are generally not permitted to bring a vehicle to campus. For alternate transportation options, please visit **https://transportation.princeton.edu** ⧉ (https://transportation.princeton.edu/).

Transportation and Parking Services (TPS) has an exemption process available to those undergraduates with a compelling need for a parking permit. A compelling need will be defined as a need that cannot be reasonably accommodated by University, commercial, regional transit or transportation options, and would therefore cause a hardship.

**JA 155**

Requests for exemptions, together with supporting documentation, should be submitted to Transportation and Parking Services through the process outlined on the TPS website at **https://transportation.princeton.edu** ⧉ (https://transportation.princeton.edu/). The Parking Committee will review all requests. Medical exemption requests must have supporting documentation from a physician and will be reviewed by University Health Services. The committee, at its discretion, may request additional information. Students will be notified in a timely manner. If approved, students will need to register their vehicles and pay a fee in order to obtain a permit for campus parking.

A current state-issued vehicle registration card and a valid TigerCard is necessary to obtain a parking permit. With a valid Princeton University parking permit, students are permitted day and overnight parking in designated lots as determined by TPS. Repeated violations of the parking policy will result in the revocation of the parking permit. Any student who seeks to register a vehicle on behalf of another student, nonstudent, or student who is not currently enrolled, will be reported for disciplinary action.

Public parking in University parking lots and garages is permitted only after 4 p.m. and on weekend. Students parking in any University lot or garage during the weekday hours of 7 a.m. to 4 p.m. without a permit will result in a citation, boot, or tow.

Parking in areas next to buildings (e.g., Bloomberg, Scully, Frist, etc.) is restricted at all times. Parking in these areas will result in towing without prior warning or citation. Students who continuously violate the parking rules and regulations will be reported for disciplinary action and revocation of future parking privileges.

## Guests

Parking arrangements for guests are the responsibility of the inviting party. To avoid citations and possible towing of a vehicle, students must make parking arrangements through the Service Point for their guests. For a fee, temporary parking permits will be issued to guests who require parking from Monday, 7 a.m., through Friday, 4 p.m. On weekends, from Friday, 4 p.m., through Monday, 7 a.m., guests may park for free in designated lots as listed on the TPS website at **https://transportation.princeton.edu** ⧉ (https://transportation.princeton.edu).

## 2.2.13 Legal Assistance

The Office of the Dean of Undergraduate Students and the Office of the Dean of the Graduate School are authorized to provide specific kinds of aid to students who have been charged with violations of the law or who are actually under arrest. In such cases, University officials may:

1. Provide the student with the names of a few local attorneys; the student may or may not choose to consult with persons from this list.
2. Help to arrange bail, if the student or parents cannot provide immediate funds for bail. In special circumstances, the University may make a loan for the amount of bail (or of a bondsman's fee) if the student and/or parent so authorizes.

In all instances, the cost of bail, as well as the cost of legal counsel, are the full responsibility of the student and the student's family. The University's actions in such cases are undertaken in an effort to ensure the protection of the student's rights and safety, and are not to be construed as efforts to afford the student special treatment in respect to the law.

## 2.2.14 Financial Regulations

Students are responsible for satisfying all student account obligations by the due date on the student bill. A student who fails to meet all financial obligations may be subject to one or more of the following: (a) prohibited from course selection and/or course changes, (b) placed on leave of absence until all financial obligations are met, (c) prohibited from enrolling or being readmitted to the University, (d) denied a diploma document at graduation, and (e) payment of all reasonable collection agency fees, attorney charges, and legal fees necessary for the collection of outstanding indebtedness. If a balance remains due after graduation or separation from the University, the student's account will be considered in default and may be immediately assigned to an external party for collections. Additional financial information regarding tuition and terms of payment is available online at **www.princeton.edu/studentaccounts** ⧉ (http://www.princeton.edu/studentaccounts).

Payments in excess of the balance should not be made to a student's account unless they are associated with estimated costs, as reflected in the student budget determined by the Financial Aid Office. In all cases Princeton reserves the right to return any overpayment.

## 2.2.15 Use of University Monies (Including Student Fees)

University funds, including fees collected by the University from all students (or their parents) as a condition of enrollment in the University, can be used only for purposes integrally related to student activities at the University. Such funds should not be used to make grants to organizations outside the University, thus rendering the University, in effect, a conduit for the transfer of funds. An annual fee is assessed to all enrolled graduate students in residence in order to fund activities of the Graduate Student Government, and at the discretion of the Graduate Student Government, to support other organizations and events. Undergraduate activity monies can be allocated through the Undergraduate Student Government for the support of the on-campus activities of campus groups, including provision of funds to assist in fund-raising efforts, in educational and informational

**JA 156**

campaigns, and the like. University policy stipulates, however, that each of the many causes that compete for student attention should make its own case to potential sources of funds on campus and should solicit from individuals voluntary contributions specifically for the particular purposes of that organization.

# 2.5 University Discipline

## 2.5.1 Jurisdiction

The Faculty-Student Committee on Discipline, comprising students, faculty members, and administrators, is responsible for the administration of the stated rules and regulations governing undergraduate student conduct, for assessing reported violations, and, when necessary, for assigning appropriate penalties.

### Cases Involving Undergraduates

All alleged academic violations involving undergraduates that do not implicate the honor system (section **2.3** (/2023/students-and-university/23-undergraduate-honor-system)) fall under the jurisdiction of the Faculty-Student Committee on Discipline. The Faculty-Student Committee on Discipline also adjudicates any other potentially serious alleged infraction (except allegations of sex discrimination or sexual misconduct; see section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)) involving undergraduate students for which the penalty might interrupt the student's academic career. Where an undergraduate student is alleged to have committed a behavioral infraction and for which the penalty will not interrupt the student's academic career, the Faculty-Student Committee on Discipline delegates jurisdiction to the Residential College Disciplinary Board. (See section **2.5.3** (/2023/students-and-university/25-university-discipline#comp253) regarding the resolution of infractions that do not result in separation.)

Under no circumstances will a student whose disciplinary matter is pending be permitted to receive a degree.

### Cases Involving Graduate Students

Alleged violations of academic and nonacademic rules and regulations (except allegations of sex discrimination or sexual misconduct; see section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)) involving graduate students are discussed in section **2.6.7** (/2023/students-and-university/26-graduate-school#comp267).

### Cases Involving Both Undergraduates and Graduate Students

In the event that one or more undergraduate students and one or more graduate students are alleged to have violated University policy, where the facts and circumstances of the case are inextricably intertwined, special procedures apply. See section **2.5.7** (/2023/students-and-university/25-university-discipline#comp257).

### Sexual Harassment and Sexual Misconduct

The Title IX coordinator, in consultation with appropriate University officials, may direct a Title IX panel to investigate and adjudicate charges normally handled by the Faculty-Student Committee on Discipline or by other judicial authorities described in section **2.5.3** (/2023/students-and-university/25-university-discipline#comp253) and section **2.6.7** (/2023/students-and-university/26-graduate-school#comp267), when those charges are raised in connection with an investigation under the policies on Title IX Sexual Harassment and University Sexual Misconduct (section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)).

## 2.5.2 The Faculty-Student Committee on Discipline

### Membership

The committee consists of the following voting members: at least six members of the faculty (no more than four of whom may be present during any hearing); a dean from the Office of the Dean of the College; and eight undergraduate students (no more than five of whom may be present during any hearing). The dean of undergraduate students serves as chair and votes only in the event of a tie as set forth below, and a dean from the office of the dean of undergraduate students serves as secretary without vote. A quorum consists of at least three student members and at least two faculty members. The representative from the Office of the Dean of the College shall have the duties and powers of the dean of undergraduate students in the dean's absence.

### Investigation of Alleged Infractions

A dean or University investigator will normally investigate alleged infractions under the jurisdiction of the Faculty-Student Committee on Discipline. Other representatives of the Office of the Dean of Undergraduate Students (including investigators retained for this purpose) may assist in the investigation of such matters.

**JA 158**

Following the investigation, the student may obtain from the committee's secretary all documents pertaining to reports of the alleged misconduct and the names of the members of the committee. The student has the option of submitting any additional written materials that may assist the committee in reaching a decision.

Other than complaints related to sexual misconduct, where the alleged behaviors are those of a student, complaints of discrimination or harassment, including both complaints regarding discrimination or harassment based on a protected characteristic and complaints regarding harassment that does not involve a protected characteristic, are normally investigated and resolved through the student disciplinary process, administered by the Office of the Dean of Undergraduate Students as described in this section.

For complaints of discrimination and/or harassment based on a protected characteristic, an initial assessment will be made by the Office of the Vice Provost for Institutional Equity and Diversity. (Information relating to the University's Policy on Discrimination and/or Harassment, including available resources and how to file a complaint under the policy, can be found at **https://inclusive.princeton.edu/addressing-concerns/bias-discrimination-harassment** ⧉ (https://inclusive.princeton.edu/addressing-concerns/bias-discrimination-harassment)). If that office makes a determination that the complaint should proceed to an investigation, it will be forwarded to the dean responsible for disciplinary matters in the Office of the Dean of Undergraduate Students.

All disciplinary cases involving allegations of sexual harassment and sexual misconduct are investigated and adjudicated in accordance with the procedures outlined in section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct).

## Notice and Convening of Hearings

Matters shall be presented to the committee with all reasonable promptness. In all cases referred to the Committee on Discipline, the student involved will be informed in writing of the charge(s) and of the specific day and time when the student is to appear before the committee. Where a matter is first presented to the Office of the Dean of Undergraduate Students within one week of the end of an academic term, it may be held for consideration until the following term.

In certain circumstances, an undergraduate student whose case falls under the jurisdiction of the Faculty-Student Committee on Discipline may request that the dean of undergraduate students adjudicate the matter, waiving the right to a hearing by the committee. If the dean or their designee agrees to hear the case, the student retains the right to appeal the decision except on procedural grounds. There are no procedural appeals in such cases.

## Enrollment and Residence Status

Normally, pending action on the charges by the committee or pending an appeal, the student will be permitted to remain in residence on campus, attend classes, and make use of some or all University facilities, except for circumstances relating to the physical or emotional safety or well-being of a member (or members) of the University community, or the ability of the University to carry out its essential functions.

The student should understand that if the committee's decision proves adverse, or if an appeal proves unsuccessful, the decision of the committee will normally be considered effective as of the date of the original decision. In cases adjudicated prior to the last day of classes, if the final decision is a separation from the University (i.e., suspension, suspension with conditions, or expulsion), the student will normally not earn credit for the semester in which the infraction occurred. If the case is adjudicated during reading period obtaining credit for the semester will be at the discretion of the committee. If the case is adjudicated during exam period and the final decision is a separation from the University the student must complete the term and the committee's penalty will take effect immediately thereafter.

Pending a hearing or the student's decision about whether to appeal a separation from the University or the withholding of the degree, and/or while an appeal is in process, an administrative hold will be placed on the student's University transcript. Should the student decide not to appeal a separation or the withholding of the degree, or should an appeal not result in an alteration of the committee's decision to dismiss the student or withhold the degree, the registrar will record the fact of the penalty on the student's transcript.

## Conduct of Hearings

The student may be accompanied at the committee hearing by an adviser, who must be a current member of the resident University community, and who may participate in the hearing in accordance with instructions issued by the chair.

At the hearing, any person with information about the matter before the committee may be requested to appear by the student, the dean of undergraduate students, or the committee, subject to reasonable limits agreed on by the committee. In an opening statement the student has an opportunity to explain the circumstances from a personal point of view and may also question individuals who have provided information and may in turn be questioned by the committee members. At the chair's discretion, an individual who has brought forward a charge may also ask questions.

The student may make a closing statement and is then excused while the committee deliberates in closed session.

JA 159

There may be some occasions in which, because of external legal proceedings, the student believes that there are compelling reasons for refusing to speak or to answer questions. In the event that (1) legal proceedings—including but not limited to arrest, summons, and indictment—have been instituted against a student in state or federal courts as a result of alleged involvement in the matters that the committee is considering and (2) the alleged misconduct is more serious than a disorderly person offense, the student will be granted permission not to speak or to answer questions without prejudicing the committee's decision. In the case of other external proceedings, the dean will consider the student's reasons for declining to speak, and if these reasons are deemed legitimate, will excuse the student from giving information without prejudice to the disposition of the case. In instances as set forth above, when a student has chosen not to speak and when in the dean's judgment the committee does not have enough information to come to a conclusion without the student's testimony, at the dean's discretion the hearing may be postponed until more complete information is available. In such instances, when the dean believes that circumstances are present that seriously affect the health or well-being of any person, or where physical safety is seriously threatened, or where the ability of the University to carry out its essential operations is seriously threatened or impaired, the dean normally will bar the student from campus, pending disposition of the legal proceedings and recommencement of the hearing. This decision will be subject to review in accordance with section **1.1.8** (/2023/university-wide-regulations/11-university-principles-general-conduct-and-regulations#comp118), and without prejudice to the committee's eventual consideration of the charges. If a hearing proceeds before external legal matters are resolved, the chair of the committee must explain to the student the risks either of speaking freely or of not speaking at all.

## Deliberations and Findings

In order to determine that a student has violated a University rule, a majority of the voting committee members present must conclude that the evidence presented constitutes a clear and persuasive case in support of the charges against the student. If the student is found responsible for one or more of the violations charged, the committee will consult applicable rules and precedents to determine the proper penalty. If the student is found to have misled the committee during the hearing, the committee may take that fact into account in reaching a conclusion and assigning a penalty.

If the voting members are evenly divided on a particular case, the case must be reconsidered at the next meeting of the committee. If at the second meeting at which the case is considered the regular voting members are still evenly divided, the dean of undergraduate students votes to break the tie.

The chair or the secretary of the committee informs the student promptly of the decision. If a penalty is imposed, special effort is made in this discussion to ensure that the student fully understands why the penalty was imposed and its nature and consequences. The student has the right to receive a summary report of the proceedings upon request.

## Appeals in Behavioral Cases

If a student is found by the Committee on Discipline to have violated University policy, the student found responsible (sometimes referred to as the "respondent") has the right to appeal the decision.

The appellate body has the following five members: the dean of the college, the dean of the Graduate School, the vice president for campus life, the chair of the Judicial Committee of the Council of the Princeton University Community, and another faculty member appointed by the president. The members will be impartial and unbiased. One member will be appointed by the president to serve as its chair.

Each appeal will be heard by three members of the appellate body (i.e., appeal panel). The chair will assign the appeal panel for each case. All decisions shall be made by a majority of the appeal panel.

Grounds for appeal are:

1. The procedures have not been fair and reasonable. The period of time under review starts when a student is formally charged with a violation and ends when the committee issues a final decision. Neither the choice of venue nor the nature of the investigation is grounds for appeal.
2. There exists substantial relevant information that was not presented, and reasonably could not have been presented to the committee.
3. The imposed penalty does not fall within the range of penalties imposed for similar misconduct.

The purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. The appeal panel may decide to uphold the original decision of the committee; to reduce the imposed penalty; or to return the case to the original hearing body for additional proceedings, a rehearing or other action. If a student requests a review of a penalty, it cannot be increased on appeal.

The deadline for filing an appeal in a behavioral case is one week from the date of decision by the Faculty-Student Committee on Discipline.

**JA 160**

A student wishing to appeal a decision of the Committee on Discipline in a case involving an academic infraction may appeal to the dean of the college, seeking a review of a decision or penalty on the grounds that (1) there exists substantial relevant information that was not presented, and reasonably could not have been presented, to the Faculty-Student Committee on Discipline, or (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct. The purpose of such an appeal is not to initiate a review of substantive issues of fact, or a new determination of whether a violation of rules has occurred. If the dean concludes after such a review that additional proceedings or a rehearing is warranted, the original hearing body will normally perform these functions. Also, if the dean determines that a penalty of the Faculty-Student Committee on Discipline (or the dean of undergraduate students) should be altered, the dean will make a recommendation to the president, describing the reasons for the proposed modification, and the president will decide whether or not to implement the recommendation. If a student requests a review of a penalty, it cannot be increased on appeal.

A student has the right to appeal questions of procedural unfairness only to the Judicial Committee of the Council of the Princeton University Community, in accordance with the appeal procedures defined by the Judicial Committee (see section **1.9.4** (/2023/university-wide-regulations/19-judicial-committee-council-princeton-university-community#comp194)).

The associate secretary of the University will serve as secretary for all appeals of decisions by the Committee on Discipline and will have primary responsibility for interactions with the parties and for the gathering of information needed for the appeal.

The deadline for filing an appeal in an academic case is one week from the date the decision is communicated to the student by the Faculty-Student Committee on Discipline.

## 2.5.3 Adjudication of Infractions That Do Not Result in Separation (Undergraduate)

### General Procedures

Normally, if a student is alleged to have committed a behavioral infraction, other than sex discrimination or sexual misconduct, for which precedents are available and for which the penalty will not interrupt the student's academic career, the matter will be resolved by the Residential College Disciplinary Board (RCDB), comprising of deputy, associate, and assistant deans of undergraduate students responsible for discipline and the seven assistant deans for student life. General procedures are as follows:

The student will first be asked to meet with the appropriate dean or a University investigator. All complaints will be investigated promptly. Before the case is adjudicated, the student may read all statements, reports, or other information relevant to the allegation. The facts of the case will be discussed and the student given ample opportunity to present the student's own account of the incident in question, including a written account, witnesses, or other relevant information, or to request clarification of any relevant information submitted by other parties. The student will be notified of the specific violation the student is alleged to have committed before the case is considered by RCDB.

The assistant dean for student life will then bring the case, with a recommendation regarding the student's responsibility for the alleged infraction, to the RCDB. The RCDB will consider the case and determine the appropriate action, up to and including disciplinary probation (including housing and/or campus service sanctions or other restrictions on access to space, resources, or activities).

Other representatives of the Office of the Dean of Undergraduate Students (including investigators retained for this purpose) may assist in the investigation and/or resolution of infractions under the jurisdiction of the RCDB.

### Appeals

A student has the right to appeal to the dean of undergraduate students or their designee any disciplinary decision of the Residential College Disciplinary Board. The appeal should be submitted in writing. The purpose of the appeal is to seek a review of a decision or penalty on the grounds that (1) there exists substantial relevant information that was not presented, and reasonably could not have been presented, to the dean or the RCDB; (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct; or (3) a procedural irregularity occurred in the adjudication of the incident in question. The purpose of such an appeal is not to initiate a review of substantive issues of fact, or a new determination of whether a violation of rules has occurred. The deadline for filing such an appeal is one week from the date the student was informed in writing of the penalty. The decision of the dean of undergraduate students or their designee shall be final.

## 2.5.4 Records of Proceedings (Undergraduate)

Confidential records of all disciplinary proceedings involving undergraduate students are maintained by the Office of the Dean of Undergraduate Students. The use of these documents is restricted according to the rules and procedures concerning the confidential nature of student records.

**JA 161**

Disciplinary procedures normally involve only the student and the University. Generally, the student's family is not informed while disciplinary procedures are underway. When, however, in the judgment of the University the welfare of the student or the community warrants communication, family members may be contacted during the disciplinary process. All disciplinary decisions resulting in serious penalties (especially, but not exclusively, withholding of degree, suspension, suspension with conditions, and expulsion) will be communicated to the student's family or other legal guardian, unless the student has before the commencement of the term in question filed a statement certifying that the student is not financially dependent as defined by the federal income tax laws.

## 2.5.5 Penalties

Penalties that may be applied by all University disciplinary bodies are set forth under section **1.1** (/2023/university-wide-regulations/11-university-principles-general-conduct-and-regulations) "University Principles of General Conduct and Regulations."

## 2.5.6 Grievance Procedures

Students are also afforded certain protections under federal and state laws and, in addition to or in the alternative of filing an internal complaint, may elect to file a harassment or discrimination complaint with a federal or state agency authorized to investigate such complaints. The appropriate agency will depend on the nature of the complaint and the status of the parties involved. One such agency is the United States Department of Education, Office for Civil Rights.

Information concerning grievance procedures is available under section **1.7** (/2023/university-wide-regulations/17-resolution-complaints-against-members-university-community).

## 2.5.7 Special Procedures in Cases Involving Both Undergraduate and Graduate Students

In the event that one or more undergraduate students and one or more graduate students are alleged to have violated University policy, where the facts and circumstances of the case are inextricably intertwined, the following special procedures apply.

In such situations, an ad hoc joint committee comprising representatives from the Faculty-Student Committee on Discipline and the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School will adjudicate all alleged academic infractions that do not implicate the honor system (see section **2.3** (/2023/students-and-university/23-undergraduate-honor-system)) and all other potentially serious alleged infractions (except allegations of sex discrimination or other sexual misconduct; see section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)) for which the penalty might interrupt any student's academic career. The joint committee will be appointed by the deans of the undergraduate students and the Graduate School. The joint committee will be comprised of one faculty member and two undergraduate students from the Faculty-Student Committee on Discipline and one faculty member and two graduate students selected in accordance with the procedures of the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School. The chair of the joint committee will be drawn from either the Faculty-Student Committee on Discipline or the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School, and the secretary of the joint committee will be drawn from the other. The joint committee will conduct hearings and render decisions according to the procedures and standards of the Faculty-Student Committee on Discipline (see section **2.5.2** (/2023/students-and-university/25-university-discipline#comp252)).

Students whose cases fall under the jurisdiction of an ad hoc joint committee may request that the dean of the Graduate School and the dean of undergraduate students alone adjudicate the matter, waiving the right to a hearing by an ad hoc joint committee. All students who would fall under the jurisdiction of an ad hoc joint committee in such a case would need to agree to the request. If the deans agree to hear the case, the students retain the right to appeal the decision except on procedural grounds. There are no procedural appeals in such cases.

Where one or more undergraduate students and one or more graduate students are alleged to have committed a behavioral infraction for which precedents are available and for which the penalty will not interrupt the students' academic career, the Faculty-Student Committee on Discipline and the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School delegate jurisdiction to an associate dean of the Graduate School and one of the chairs of the Residential College Disciplinary Board, who will jointly investigate and adjudicate the case, assisted by other deans, investigators and directors in the Office of the Dean of Undergraduate Students and the Graduate School as necessary and appropriate. In investigating and adjudicating such cases, the associate dean of the Graduate School and the chair of the Residential College Disciplinary Board will follow the procedures and standards of the Residential College Disciplinary Board (see section **2.5.3** (/2023/students-and-university/25-university-discipline#comp253)).

**JA 162**

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JOHN DOE,<br>Address Withheld,<br><br>           Plaintiff,<br><br>    v.<br><br>THE TRUSTEES OF PRINCETON<br>UNIVERSITY,<br>Princeton, NJ 08544<br><br>          Defendant. | **Case No. 3:24-cv-07125-ZNQ-TJB**<br><br><br><br>**Motion Day: October 7, 2024** |

**JOHN DOE'S OPPOSITION TO MOTION TO DISMISS
BY THE TRUSTEES OF PRINCETON UNIVERSITY**

**JA 163**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ..............................................................................................................3

   A. The Investigation...................................................................................................3

   B. The Final Evidence Packet ....................................................................................5

   C. The Hearing...........................................................................................................8

   D. The Rationale .......................................................................................................9

   E. The Appeal .........................................................................................................10

STANDARD OF REVIEW .............................................................................................10

ARGUMENT ...................................................................................................................10

I. The Complaint States a Claim for Breach of Contract Under Clearly Established Circuit Precedent...........................................................................................................................10

   A. Breach of the "Clear and Persuasive Evidence" Standard....................................11

   B. Breach of Basis for Granting an Appeal ...............................................................14

II. The Complaint Also States a Claim for Breach of the Implied Covenant. ..............................16

III. The Complaint States a Title IX Claim Based on the "Total Mix" of Several Sources of Potential Gender Bias. ...............................................................................................................18

IV. The Complaint Also States a Claim for Gross Negligence .....................................................29

CONCLUSION.................................................................................................................30

**JA 164**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................................10

*Bak-A-Lum Co. v. Alcoa Bldg. Prod., Inc.,*
69 N.J. 123 (1976) .......................................................................................................16

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,*
182 N.J. 210 (2005) .....................................................................................................17

*Collick v. William Patterson Univ.,*
No. 16-cv-471, 2016 WL 6824374 (D.N.J. Nov. 17, 2016) .......................................29

*Doe v. Amherst Coll.,*
238 F. Supp. 3d 195 (D. Mass. 2017) .........................................................................13

*Doe v. Baum,*
903 F.3d 575 (6th Cir. 2018) .......................................................................................21

*Doe v. Coll. of New Jersey,*
No. 22-cv-3283, 2023 WL 2812362 (D.N.J. April 6, 2023)............................... 20, 28-29

*Doe v. Columbia Univ.,*
831 F.3d 46 (2d Cir. 2016)................................................................................18, 20, 22

*Doe v. Dordt Univ.,*
616 F. Supp. 3d 872 (N.D. Iowa 2022)..............................................................13, 15, 26

*Doe v. The George Washington Univ.,*
366 F. Supp. 3d 1 (D.D.C. 2018) ................................................................................19

*Doe v. Miami Univ.,*
882 F.3d 579 (6th Cir. 2018) .......................................................................................19

*Doe v. Oberlin Coll.,*
963 F.3d 580 (6th Cir. 2020) ................................................................................21, 22

*Doe v. Princeton Univ.,*
30 F.4th 335 (3d Cir. 2022) ................................................................................ *passim*

**JA 165**

*Doe v. Princeton Univ.*,
   No. 19-cv-7853, 2023 WL 1778832 (D.N.J. Feb. 6, 2023) ....................................................28

*Doe v Purdue Univ.*,
   928 F.3d 652 (7th Cir. 2019) ........................................................................... 20, 21-22

*Doe v. Regents of the Univ. of California*,
   23 F.4th 930 (9th Cir. 2022) ................................................................................. 22-23

*Doe v. Rider Univ.*,
   No. 3:16-cv-4882, 2020 WL 634172 (D.N.J. Feb. 4, 2020) ...................................................29

*Doe v. St. Joseph's Univ.*,
   832 Fed. App'x 770 (3d Cir. 2020) ...........................................................................27

*Doe v. Stonehill College, Inc.*,
   55 F.4th 302 (1st Cir. 2022) ................................................................ 13, 14, 19-20

*Doe v. Univ. of Ark.*,
   974 F.3d 858 (8th Cir. 2020) ...............................................................................22

*Doe v. Univ. of Miss.*,
   361 F. Supp. 3d 597 (S.D. Miss. 2019) ...................................................................19

*Doe v. Univ. of the Sciences,*
   961 F.3d 203 (3d Cir. 2020)............................................................................. *passim*

*Doe v. Univ. of the South,*
   No. 4:09-cv-62, 2011 WL 1258104 (E.D. Tenn. March 31, 2011) .......................................30

*Donohue v. Capella Univ., LLC*,
   No. 22-cv-5634, 2023 WL 5425503 (D.N.J. Aug. 22, 2023) ..............................................30

*Dunphy v. Gregor*,
   136 N.J. 99 (1994) .............................................................................................30

*Flowers v. Mississippi*,
   588 U.S. 284 (2019)...........................................................................................28

*Gendia v. Drexel Univ.*,
   No. 20-cv-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020)...............................................27

*Menaker v. Hofstra Univ.*,
   935 F.3d 20 (2d Cir. 2019)...............................................................................25-26

iii

**JA 166**

*Papelino v. Albany Coll. of Pharmacy of Union Univ.,*
633 F.3d 81 (2d Cir. 2011)...................................................................... 29-30

*Roebuck v. Drexel Univ.,*
852 F.2d 715 (3d Cir. 1988)...........................................................................19

*Saravanan v. Drexel Univ.,*
No. 17-cv-3049, 2017 WL 4532243 (E.D. Pa. Oct. 10, 2017) ...............................27

*Schwake v. Ariz. Bd. of Regents,*
967 F.3d 940 (9th Cir. 2020) ......................................................................10

*Tsuruta v. Augustana Univ.,*
No. 16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016)........................................30

*Vengalattore v. Cornell Univ.,*
36 F.4th 87 (2d Cir. 2022) ........................................................................21

*Verdu v. Trustees of Princeton Univ.,*
No. 19-cv-12484, 2020 WL 1502849 (E.D. Pa. March 30, 2020)................................... 26-27

*Verdu v. Trustees of Princeton Univ.,*
No. 20-cv-1724, 2022 WL 4482457 (3d Cir. Sept. 27, 2022) ..................................25

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.,*
429 U.S. 252 (1977)...........................................................................18, 22

*Wade v. Kessler Inst.,*
172 N.J. 327 (2002) .............................................................................16

*Wilson v. Amerada Hess Corp.,*
168 N.J. 236 (2001) .............................................................................16

*Yusuf v. Vassar Coll.,*
35 F.3d 709 (2d Cir. 1994)........................................................................23

iv

**JA 167**

**INTRODUCTION**

Jane Roe is no ordinary campus complainant. She has a history of fabricating false choking allegations at universities she does not attend—in 2023, she did it to someone else, and she actually texted John Doe that she'd be willing to lie under oath about it if ever asked. She even texted John that Sarah Smith, who'd later falsely accuse John, would help her do so. Princeton was aware of these texts. So one might have assumed, being so aware, that Princeton would take *especially* seriously its contractual obligation to investigate misconduct allegations fairly and to carefully apply its "clear and persuasive evidence" evidentiary standard in student conduct cases—which is significantly higher than the "preponderance of the evidence" standard used in Title IX cases. But Princeton did not do that—or anything close to it.

For years, Princeton had been under significant pressure to credit claims of violence made by women against men. On top of that, its Committee on Discipline—the body that would weigh Jane's and Sarah's allegations against John—has a whopping 98% conviction rate. That Committee ran John's disciplinary proceeding *exactly* how you'd expect a body with a 98% conviction rate to run it. It rushed him to an interview before telling him what exactly he was accused of doing. It took proactive steps to collect evidence for his accusers that they never requested yet failed to do the same for him. It gave him little time to review and respond to the evidence. And when his accusers dramatically changed their stories during the investigation, it did nothing. Indeed, according to an insider, by the time the matter made it to a hearing, the Committee had literally pre-judged the case and decided that John was guilty. That may be why one of the panelists actually fell asleep, Compl. ¶189—there was really nothing to see here.

The Committee ran John's hearing like the kangaroo court it was. It started the hearing at night, as though it knew it wouldn't need much time to weigh the evidence. It refused to let John

**JA 168**

call a clearly exculpatory witness who would testify that Jane had made a false choking

allegation against *him* as well. It grilled John Doe and Student 4, the *only eyewitness* to Jane

Roe's allegations, who said he saw no assault whatsoever. It did the exact opposite with Sarah

Smith, pressing her on none of the glaring contradictions she'd told during the investigation. And

it asked nothing of Jane Roe at all—because she didn't even bother to attend.

The evidence showed overwhelmingly that Jane's and Sarah's claims were false:

- The sole eyewitness to the event (Student 4) said he saw no assault.

- Jane had changed her story from saying John had squeezed her throat and lifted her off the ground "for 5-6 seconds" to saying he had done *neither* of those things, but had merely pushed against her throat from the front.

- Jane had changed her story from saying she "immediately" collapsed to the ground when he released her to saying she "'tried to put some distance between herself and [John].'"

- Sarah had changed her story from saying John had choked her to saying he had merely pushed against her throat from the front—oddly, the same change Jane made.

- Sarah had also changed from saying she'd seen *no* bruises on Jane's neck the next day to saying she saw a bruise on the "left side" of Jane's neck—even though Jane, in her revised story, said John *had not squeezed the sides of her neck.*

- Both Jane and Sarah had claimed they'd cut off contact with John during the summer; John had produced *photographic evidence* that they'd *stayed at his family home for several nights more than a month after they'd supposedly done that.*

- Finally, the Committee completely ignored the texts showing Jane had falsely accused Student X of choking, that she'd lie under oath, and that she'd get Sarah to help her.

None of that mattered to the Committee. It found John responsible just hours after the

hearing—*without even deciding what John had actually done to either Jane or Sarah.* It asserted,

without explanation and in the face of tremendous evidence to the contrary, that Jane and Sarah

had been "consistent" in their allegations. It asserted that John had admitted guilt in "text

messages," but didn't identify which ones—because there aren't any. And it failed to say which

version of the accusers' stories it believed had actually happened—because doing so would

2

**JA 169**

implicitly prove those versions were so different from each other that the Committee had to choose one over the other. In *three paltry sentences*, the Committee labeled John a woman-beater, suspended him for two years, and ensured that Jane's and Sarah's allegations would follow him around in his education records for the rest of his life.

Princeton's arguments in defense of the Committee's baseless decision are ones it has trotted out before, both in this Court, in other courts in this District, and in the Third Circuit. This Court should reject them, as it and those other courts have repeatedly done, so that John may have his future back.

## BACKGROUND

Sometime in 2023, after a male friend at another university upset her, Jane Roe told people there that he had threatened to choke her. Compl. ¶3. When she found out he was about to sue her, she texted John for advice. *Id.* ¶85. She told John she would lie under oath if she had to. "'[H]e can't prove [I said it],'" she told John. *Id.* ¶3. "'[I]f it even got to court, which I doubt, . . . all I would say is 'no I didn't.'" *Id.* She also told John she could get Sarah to lie for her too. *Id.*

Less than a month later, Jane did the same thing to John after learning he had badmouthed her to another friend over the summer. *Id.* ¶76. She told Princeton that John had choked her back in April, when she'd come to visit him on campus. Princeton investigated.

### A. The Investigation

Princeton required John to sit for an interview on September 29 before telling him anything about Jane's allegations. *Id.* ¶117. When he asked the next day how long he had to submit evidence, he was simply told "as soon as you can." *Id.* ¶118. He submitted a written response the very next day that attached the evidence he could find, including a letter from Student X accusing Jane of defaming him. *Id.* John heard nothing more until October 23, when

3

**JA 170**

Dean Joyce Chen Shueh asked to meet with him. *Id.* ¶120. The next day, she told him that his hearing would take place just three days later, on October 27. *Id.* John still hadn't been formally charged or provided with written notice of the actual allegations against him. *Id.*

John finally received formal notice of the charges against him and the evidence that the school had collected on October 25—a mere two days before the hearing. *Id.* ¶122. He was told that if he wanted any further investigating to take place, he had to let the school know as soon as possible. *Id.* He barely had time to review the evidence and prepare for the hearing, let alone figure that out. He asked to push the hearing back so he could meaningfully review the evidence and prepare for the hearing. *Id.* Princeton did so, but only by five days, to November 1. *Id.*

As John reviewed the large volume of evidence, he asked for the hearing to be further extended to November 3 or November 6. *Id.* ¶124. Yet by October 31, the day before the hearing, he had received no response to this request. So that day he submitted a supplemental statement addressing the allegations and again asked for the hearing to be postponed. He also asked how to call Student X as a witness at the hearing. *Id.* Dean Chen instead sent him *60 additional pages* of evidence, without responding to his request to postpone the hearing. *Id.* ¶126. John responded by again asking for more time to prepare for the hearing, especially in light of the new evidence. Dean Chen responded later that night that she *did not know* if the hearing could be delayed, even though she had literally just sent him 60 pages of new evidence. *Id.* ¶128. Instead, she sent John *still more* evidence about 20 minutes later. *Id.* And she told John that Student X could not be called as a witness because he had not been interviewed. *Id.* ¶128.

Not until the following afternoon, just *six hours* before the hearing would start, would Dean Chen postpone it until November 6 or 7. *Id.* ¶130.  Princeton then spent the next few days collecting evidence favorable to Jane and Sarah, *id.* ¶¶131-32, yet did not seek to interview

**JA 171**

Student X, even though John had expressly asked for him to be a witness at the hearing and was told his not being interviewed was the only barrier to that. Dean Chen explained to John that the new evidence collected for Jane and Sarah was not evidence they themselves had requested Princeton collect, but instead was evidence that Dean Chen took upon herself to seek out in light of statements that John had made. *Id.* ¶132.

> **B.      The Final Evidence Packet**

The final evidence packet showed how strongly the evidence supported John, despite how one-sided Princeton's investigation had been. Princeton had interviewed John just one time, *before* providing him with notice of what he was being accused of. *Id.* ¶134. It also interviewed Student 4, the only eyewitness to Jane's incident, just once. *Id.* ¶135. And it didn't interview any of the male witnesses who could confirm or deny that Jane had bruising on her neck. *Id.* ¶12.

Princeton, however, interviewed Jane three times and interviewed Sarah twice. *Id.* ¶134. It did so after telling them what John had said in response to their allegations, precisely so that they could respond to it before the hearing—something they never did for John. *Id.* Princeton also interviewed all of the female roommates and potential witnesses who might corroborate Jane's and Sarah's stories. *Id.* ¶12. Those witnesses were given as much attention as the actual eyewitness to Jane's incident. And they received far more attention than similarly situated male witnesses John had identified and who could have confirmed or denied parts of Jane's story.

The evidence packet showed that Jane and Sarah had both contradicted the stories they had originally told. Jane offered three different stories about the choking: first, that she had no memory of it; second, that John had lifted her almost fully off the ground by her throat for five or six seconds; and third, that he had not squeezed her neck, and had not lifted her up, but simply had pushed against her throat from the front. *Id.* ¶3. She told two different stories about what

5

**JA 172**

happened next: first, that she had immediately collapsed to the ground, and second, that she had immediately tried to put distance between herself and John, but that John then grabbed her by the waist and pulled her backwards. *Id.* ¶¶148-49. Knowing that Sarah would support her, Jane said in her first interview that Sarah directly witnessed the choking. *Id.* ¶156. But the evidence also showed that on April 2, Jane had admitted to John via text that Sarah had not witnessed the incident, meaning Jane *knew* it was false when she claimed otherwise in her interview. *Id.* Jane also claimed in her first interview that when they got back to the dorm immediately after the incident, she asked to speak with John and was "furious" with him— but said in her third interview that she didn't remember anything about the night until she woke up the following day, which means she *couldn't* have been "furious" with John earlier that morning. *Id.* ¶149.

The evidence showed that John was bewildered by Jane's having collapsed to the ground in a crying fit that night and that Jane believed John had no memory of allegedly choking her. Jane told a friend in private text messages that John "'doesn't even remember'" choking her. *Id.* ¶151. She texted still another friend that John "'didn't believe her'" when she said he had choked her. *Id.* And even Sarah admitted that John looked "'bewildered'" when Jane started crying and that he "'expressed shock'" when Jane claimed that he had choked her. *Id.*

Jane lied about other things as well. She claimed she spent every single night after the incident sleeping in someone else's room; John submitted evidence showing she'd stayed in his room on at least two of those nights. *Id.* ¶155. She claimed she had stopped talking to John midway through the summer; John submitted evidence showing she had stayed at his parents' home for several nights nearly a month later than that, and that they had been in friendly contact up until the week before Jane made her report. *Id.* She even sought advice from John about Student X in that time. *Id.* ¶85. The evidence packet also contained the testimony of Student 8,

**JA 173**

who said that, the day after Jane's incident, both Jane and Sarah had separately told her that John's mentioning the name of Jane's ex-boyfriend, who had choked her during their relationship had triggered the reaction she had that night. *Id.* ¶157.

Even the evidence Jane tried to use against John undercut her credibility. She submitted a voice recording John had made of a call with his parents, which he made because Jane said she would report him to Princeton if he did not. *Id.* ¶111. In the call, he told his parents he had "'damaged her windpipe ever so slightly'" as he "'pull[ed] [her] in to talk to her.'" *Id.* That story did not match Jane's allegations at all—yet Jane never told John it was inaccurate or never told him to do it again, as she would have if John had refused to tell his parents what Jane had demanded. *Id.*

The evidence also showed that Sarah was not credible. She, too, had changed her story. She said in her first interview that John had "his hand on her throat" and was using that hand to literally "hold her in place." *Id.* ¶158. But she said in her second interview that he never "meant to choke her," that he never "grasped" or "squeezed" her neck, but merely "was pushing" on her—a change similar to the one Jane had made. *Id.* Like Jane, she also claimed that she had "spoke[n] little with John [over] the summer," but John produced evidence that she had spent several nights with him and Jane at his parents' house in August *and* that they had spent time alone together in September.

Sarah also changed her testimony about Jane's allegations: She said in her first interview that she "'did not see marks on Jane's throat,'" yet said in her second interview— undoubtedly, after talking to Jane—that she "saw a slight bruise on the left side of Jane's neck." *Id.* ¶150. Yet as noted above, by Jane's third interview, she denied that John had squeezed her neck at all, meaning it would have been impossible for Sarah to have seen a bruise on the side of her neck.

7

**JA 174**

## C.     The Hearing

Princeton conducted a joint hearing on Jane's and Sarah's claims, despite their lack of factual overlap and the clear risk of prejudice. *Id.* ¶162. They began the hearing at approximately 7:30 p.m. *Id.* The panel aggressively questioned John for an hour and a half. *Id.* ¶164. When, for example, he listed the many contradictions in Sarah's story, the panel demanded he explain *why* she would make it up—as if he could possibly know that. *Id.* ¶167. When John noted that neither Jane nor Sarah had claimed that they had tried to show him the bruises on Jane's neck when John did not believe that he had choked her, the panel responded by asking whether it was not also assault if he had really pressed against her neck from the front. *Id.* ¶168. In short, the panel simply did not care that Jane and Sarah had changed their stories; it had already decided they were credible and cared only whether *whatever* story they landed on still constituted assault.

The panel spent an extraordinary amount of time trying to establish a collateral issue that would help Jane and Sarah—specifically, that John was the controlling one in the relationship. *Id.* ¶¶176-80.  When John responded that he was hearing this allegation for the first time and had text messages on his phone that would disprove it, the panel refused to consider them. *Id.* ¶180.

The panel questioned Student 4 in the same hostile manner. They tried to make him admit he could not have seen what he claimed. They pressed him on a statement in his interview summary which said that, if something *had* happened between John and Jane, it could not have been that severe. *Id.* ¶183. When he tried to explain what he meant, Prof. Harman cut him off, noted it was already 10:03 p.m., and said the hearing needed to conclude that night. *Id.* Student 4 then added that he'd been misquoted by the investigator, but the panel continued to press him.

Despite the panel's concerns about the time, and despite the fact that Sarah herself had not yet been questioned, the panel called in the investigator as an impromptu witness to

8

**JA 175**

challenge Student 4's statement that he had been misquoted. *Id.* ¶187. When the panel asked her if her interview summary was accurate, she unsurprisingly responded that it was and reflected what was in her notes—which the panel never asked to see. *Id.* On any point that favored Jane and Sarah, the panel was happy to take a witness's testimony at face value. On any point that did not favor them, the panel aggressively pushed back and searched for reasons to discredit it.

The final witness was Sarah. She was questioned for fewer than 30 minutes. *Id.* ¶188. She was never asked about the change in her testimony regarding how she supposedly was choked. She was never asked about the change in her testimony regarding Jane's bruising. She was never asked why she had not told John back in April about the bruising when he claimed not to remember having choked Jane. Instead, she was mostly asked questions about John's character. *Id.* ¶190. As for Jane, she did not even bother to appear. *Id.* ¶7.

### D.     The Rationale

The hearing concluded at 11:30, and the panel announced its decision just 11 hours later. *Id.* ¶194. It found John responsible for assaulting both Jane and Sarah. Its "rationale" was only three sentences long. *Id.* ¶196. It found John responsible based on two things: "'the women's continued and consistent descriptions of the incidents'" and John's supposed "'admissions and acknowledgments . . . in text messages.'" *Id.* The decision letter said nothing about the changes to Jane's and Sarah's stories, or how their testimony could be characterized as consistent in the light of those changes. *Id.* ¶197. It didn't say anything about Student 4's testimony or why it was being disregarded. *Id.* It didn't even say *which* of Jane's or Sarah's version of events it believed—whether John had supposedly grabbed Jane's throat and lifted her off the ground for 5-6 seconds, or whether he had instead pushed against it from the front. *Id.* ¶198. To this day, he still does not know what exactly they claim that he did.

9

**JA 176**

### E.    The Appeal

John timely appealed the Committee's decision. *Id.* ¶239. He argued, among other things, that it had been wrong not to call Student X as a witness; wrong not to collect the male witness testimony described above; and wrong not to let him submit text message evidence at the hearing on a topic that only then had become relevant. *Id.* ¶209. That appeal was denied. *Id.* ¶217.

<strong>STANDARD OF REVIEW</strong>

"On a motion to dismiss, a court must accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (cleaned up) ("*Princeton III*"). A complaint survives when the pleaded facts "support a plausible inference" of a legal wrong. *Id.* at 343. Legal wrongdoing need not be "the only plausible explanation . . . or even the most plausible . . . to survive a Rule 12(b)(6) motion to dismiss," *Id.* at 344. Rather, a complaint states a claim when there is "more than a sheer possibility" of a violation, even if other explanations are plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "There is no heightened pleading standard for Title IX claims." *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020).

<strong>ARGUMENT</strong>

### I.    The Complaint States a Claim for Breach of Contract Under Clearly Established Circuit Precedent.

In *Princeton III*, the Third Circuit held that Princeton is liable for breach of contract when it *purports* to apply various provisions in its "Rights, Rules & Responsibilities" (RRR) in a disciplinary proceeding but fails to properly do so. *Princeton III*, 30 F.4th at 347.[1] The plaintiff

---

[1] Princeton asserts that John has not pled that the RRR provisions at issue in this case are part of his contractual relationship with Princeton, but that simply is not true. *See* Compl. ¶23-27 (alleging that, on matriculation, Princeton promised it would comply with numerous policies and

10

<strong>JA 177</strong>

alleged that Princeton, while purporting to apply the "preponderance of evidence" standard promised by the RRR, had in fact "disregard[ed] evidence that tended to inculpate Roe and exculpate Doe"—meaning it had not, in fact, *actually* applied the preponderance standard to him. *Id.* He also alleged that Princeton, while promising to provide him with "impartial and unbiased panelists," in fact gave him panelists who "applied inconsistent standards to assess [Roe]'s and [Doe]'s credibility," "overlooked or minimized glaring and substantial factors that would tend to undermine [Roe]'s veracity," and "disregarded compelling exculpatory evidence which contradicted [Roe]'s allegations"—thus breaking its promise in the RRR. *Id.* The Court held that allegations of this nature state a breach of contract claim at the motion to dismiss stage.

### A. Breach of the "Clear and Persuasive Evidence" Standard

John amply pleads that kind of breach in two ways. First, he alleges that Princeton failed to properly apply the even *higher* evidentiary standard that the RRR promised would apply in his type of case: the "clear and persuasive evidence" standard. *Id.* ¶8. As in *Princeton III*, John extensively pleads how Princeton, while purporting to apply that standard, in fact "disregard[ed] evidence that tended to . . . exculpate [him]" and "overlooked or minimized glaring and substantial factors that would tend to undermine [Roe]'s veracity." *Princeton III*, 30 F.4th at 347. Among other things, the Committee ignored the glaring inconsistencies in Jane's and Sarah's testimony. Compl. ¶196. It disregarded, without explanation, the testimony of the only eyewitness to Jane's incident, who said that no choking whatsoever occurred. *Id*. It disregarded, without explanation, that Jane and Sarah provably remained friendly with John *far* longer than they had claimed, going so far as to travel to his family home and stay with him for several

---

procedures, including the RRR, in exchange for John's tuition). Princeton offers no argument why the RRR provisions here are contractually different than those in *Princeton III* and may not make that argument for the first time in reply.

**JA 178**

nights more than a month after they had allegedly broken contact with him. *Id.* And it disregarded, without explanation, the fact that Jane had accused another student of a choking incident, had texted John she had lie about it under oath, and had texted John she would get Sarah to lie for her as well. *Id.* The Committee did more than just "disregard[]" and "minimize[]" exculpatory evidence; it locked it in the basement and threw away the key. If allegations showing that Princeton "disregarded and "minimized" exculpatory evidence suffice to support a breach of a *preponderance of evidence* evidentiary standard, all the more do they suffice to plead a breach of the "clear and persuasive evidence" standard at issue here.

Princeton responds by arguing there is at least *some* evidence "that supports the Committee's determination." Mem. at 11. But that will be true in every case, and surely was true in *Princeton III*. At the pleading stage, however, Princeton is not entitled to an inference that the evidentiary standard still would have been satisfied had the exculpatory evidence not been "disregarded" and "minimized"; all reasonable inferences must instead be drawn in *John's* favor. *Princeton III*, 30 F.4th at 342.

The evidence Princeton points to, in any event, does little to support the Committee's decision. As to Jane's allegations, Princeton points to just two things: (1) John's supposed admissions of guilt in a text message and a voice recording, and (2) the fact that a witness said she had a "raspy" voice the next morning. Mem. at 11-12. None of that holds up. It was undisputed that Jane "fell to the ground screaming and crying loudly" and continued doing so for "the next 1-2 hours," which would easily explain the raspy voice. *Id.* ¶¶98, 101. And as for the text admission that Princeton identifies—"'it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done,'" Mem. at 11 (quoting Compl. ¶108)—it is the exact *opposite* of an admission and certainly must be construed that way at the pleading stage,

**JA 179**

*Princeton III*, 30 F.4th at 342. As John documented in the Complaint, Jane *repeatedly* tried to get him to admit he choked her and John *repeatedly* refused to do so. Compl. ¶¶108-11. Indeed, she admitted in private texts to two separate friends (which Princeton saw!) that John seemed truly not to know that he had supposedly choked her. *Id.* ¶151. This text, in any event, shows John taking Jane at her word, speculating that he must just not yet remember something he'd done, and apologizing for *whatever it may be*—which means he can't actually be admitting guilt.[2]

The "voice recording admission" is irrelevant for an even more fundamental reason: ***It is not something that the Committee based its decision on***. The letter expressly based its finding on: (1) the allegedly consistent testimony of Jane and Sarah, and (2) purported admissions in "text messages." Compl. ¶196-97. It said nothing about the voice recording, and for good reason: what John said was not an admission. Her allegation was not that John "'damaged her windpipe ever so slightly,'" *id.* ¶111; it was that he squeezed her neck, lifted her up, held her there for a full 5-6 seconds, and bruised her neck in the process, *id.* ¶3. That is surely why the Committee did not rely on it—it directly contradicted what Jane had told them. Princeton can't have it both ways; it can't rely on a piece of evidence that, if accurate, would undercut its rationale.[3]

---

[2] These kinds of "mea culpa" texts that try to make someone feel better but stop short of admitting guilt are nothing new; that the Committee so quickly read them as admissions, *without explaining why in its decision letter*, just further supports John's own claims here. *Doe v. Stonehill College, Inc.*, 55 F. 4th 302, 325 (1st Cir. 2022) (college breached contract with disciplined student by failing, among other things, to explain why it rejected his explanation for "mea culpa" texts he sent to complainant after the incident).

[3] Furthermore, the fact that John literally recorded a secret call with his parents; told them he had hurt Jane; and *gave that recording to Jane to keep*, is incredibly strong circumstantial evidence he was indeed being blackmailed—something that the Committee ignored entirely. *Cf. Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 894 (N.D. Iowa 2022) (denying school's summary judgment motion on Title IX claim in part because "allegations of blackmail were not prioritized").

13

**JA 180**

The same is true as to Sarah. The only evidence Princeton identifies there is John's statement that he regretted how he confronted her and that he "'spoke closely and loudly'" with her, "'in part out of anger.'" Mem. at 12 (quoting Compl. ¶89). That argument might make sense if the only way one could "regret" a confrontation is if it turned physical. But that's obviously not true. Apologizing for yelling doesn't mean you're apologizing for something else, too.

### B. Breach of Basis for Granting an Appeal

John also pleads a breach of the contractual provision stating that appeals of disciplinary decisions will be granted if "[t]he procedures" used to investigate and resolve the matter "have not been fair and reasonable." Compl. ¶32. John's appeal argued that the Committee "failed to pursue relevant testimony," "evidenced gender bias in the . . . conduct of the hearing," "treated the parties disparately," refused him the opportunity "to submit relevant text message evidence at the hearing," and held the hearing at an unreasonably late hour. *Id.* ¶239. Princeton strangely responds that these "are not stated grounds for appeal," Mem. at 13, but they are just ways that a proceeding can not be "fair and reasonable"—which is the stated ground for appeal. Contractual promises that require schools to conduct "fair" proceedings capture exactly such violations. *See, e.g.*, *Stonehill College, Inc.*, 55 F.4th at 323-25 (school breached its "promise to conduct a fair and thorough investigation" by failing "to adequately probe the most important part of [the complainant's] account"; failing "to verify Roe's intoxication level"; and failing to explain why it rejected Doe's explanation for "mea culpa" texts he sent after the incident); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 218 (D. Mass. 2017) (school breached promise to conduct a "'thorough, impartial and fair'" investigation by failing to pursue "significant, exculpatory information" while giving plaintiff "no reasonable opportunity . . . to remedy that deficit" ).

14

**JA 181**

Princeton then pivots and tries to argue that the reasons John said the process was unfair in his appeal don't actually establish that. Mem. at 14-16. It first says John could have asked Student X and other witnesses to be interviewed but did not do so. Mem. at 14, 15. But the RRR tasks *Princeton*, not John, with the responsibility for conducting a "fair" investigation, and Princeton was long on notice of the relevance of Student X, Student 5 (John's roommate), and other witnesses it should have called. John gave Princeton Student X's name on October 2, well in advance of the hearing. Compl. ¶118. He also asked on October 31 for Student X to be called as a witness at the hearing and was told for the first time that would not happen because Student X had not been interviewed. *Id.* ¶¶ 125, 128. And when the hearing date was extended from Nov. 1 to Nov. 7, Princeton still failed to contact Student X. As for Student 5, Princeton knew that John had a roommate and that there was a dispute as to whether Jane had slept in their room that week. *Id.* ¶139. Student 5's relevance was obvious, and Princeton cannot shirk its duty to pursue relevant evidence it knows about. *Cf. Dordt Univ.*, 616 F. Supp. 3d at 897 (failure to collect and consider "certain exculpatory evidence" that was "mentioned in witness interviews" supplied evidence of gender bias at summary judgment stage).

That is doubly true here because the Complaint pleads at least one instance in which Princeton *did* seek out unrequested testimony—*for Jane and Sarah*. Dean Chen went to them late in the process to get their responses to John's statement in advance of the hearing, without anyone asking her to do that. Compl. ¶132. It *was* the Committee's duty to collect evidence it knew was relevant, and it did just that—for one side only.

Princeton next argues that the refusal to let John submit text message evidence at the hearing was not unfair because John was permitted to submit text message evidence before the hearing. Mem. at 16. But Princeton elides that the texts were on a topic that became relevant only

15

**JA 182**

at the hearing and was the focus of extended attention (*viz.*, who was the "controlling" friend among John, Jane and Sarah). *Id.* ¶180. John could not have reasonably anticipated their relevance before the hearing—yet still was denied the chance to submit them. *Id.*

Princeton's last argument is that it was reasonable to start the hearing at 7:27 p.m. because professors and students made up the committee. Mem. at 16. This a curious argument, as few people have more flexible schedules than college professors and college students. Nevertheless, if 7:30 p.m. were indeed the earliest reasonable start time, nothing prevented Princeton from holding the hearing over two or three days, especially when it became clear that panelists were growing tired (even sleeping!) and asking to cut things short. *Id.* ¶¶183, 189.

**II.      The Complaint Also States a Claim for Breach of the Implied Covenant.**

As Princeton acknowledges, every contract contains within it an implied covenant of good faith and fair dealing. *Wade v. Kessler Inst.*, 172 N.J. 327, 340 (2002). The covenant prohibits a party from complying with the terms of a contract in a way that has "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Bak–A–Lum Co.,* 69 N.J. 123 (1976)). It thus "differs from a 'literal violation of a contract.'" *Id.* at 340 (quoting *Bak–A–Lum Co.,* 69 N.J. at 130). It means that "when [a] party "is vested with the exercise of discretion under a contract," it "must exercise discretion reasonably with proper motive, not arbitrarily, capriciously, or in [a] manner inconsistent with [the] reasonable expectations of parties." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 247 (2001).

John alleges three ways Princeton nominally complied with the RRR yet did so in ways that denied him the fruits of the contract: conducting a one-sided investigation (Compl. ¶246), conducting a one-sided hearing (Compl. ¶247), and issuing a virtually non-existent rationale that did not tell John what it thought he had done (Compl. ¶248).

**JA 183**

Princeton's primary argument is that John supposedly has not pled that Princeton engaged in "'bad faith conduct'" or acted with "'malicious motive.'" Mem. at 18. That is wrong for at least two reasons. First, "bad faith" is satisfied even when a party engages in "[s]ubterfuges and evasions in the performance of a contract, . . . believ[ing] his conduct to be justified." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs*, 182 N.J. 210, 226 (2005). The Committee need not have acted out of actual malice when it questioned John and Student 4 so disparately, or issued a rationale that refused to identify what John had supposedly done since that would require calling one of Jane's stories true and the other false; it need only have known that in doing those things, it was not providing John with the kind of fair hearing and rationale that any student would reasonably expect.

Second, *Princeton III* itself identified three categories of allegations that served to adequately plead an implied covenant claim based on the RRR: that Princeton "[s]ubject[ed] [Doe] to a discriminatory disciplinary process," "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe]," and "constru[ed] all discrepancies and inconsistencies in [Roe's] favor." *Princeton III*, 30 F.4th at 348. John pleads those as well, and they capture all three of his implied covenant claims. He was subjected to a discriminatory process that gave Jane and Sarah more opportunities to explain themselves before the hearing; proactively sought testimony for them; and treated John and his witnesses far more harshly at the hearing. *Id.* ¶¶13, 132, 134. He pleads that Princeton "disregarded exculpatory evidence" by failing to collect it in the investigation, failing to press Sarah on it at the hearing, and ignoring it completely in its rationale. *Id.* ¶¶12, 188-91, 196. And he pleads that Princeton "construed all discrepancies" in favor of Jane and Sarah in the decision letter, labeling their testimony

17

**JA 184**

"consistent," without explanation, when it was anything but, and refusing even to say which versions of their stories it believed to be true, so as not to label the other a lie. *Id.* ¶196.

Princeton tries to distinguish this case from *Princeton III* on the basis that there, the respondent had also filed a counter-complaint against his complainant and had alleged both that Princeton had disregarded exculpatory evidence as to the respondent (like here) and had disregarded inculpatory evidence as to the complainant (unlike here). Mem. at 20. But Princeton does not even try to explain why that difference should matter. Because it doesn't: If the plaintiff there had never filed a counter-complaint, his reasonable expectations as a respondent still would have been breached by Princeton's refusal to consider exculpatory evidence. The fact that the plaintiff there had dual roles just meant that Princeton could—and did—plausibly breach the covenant there in two distinct ways. John amply pleads a breach of the implied covenant here.

**III.    The Complaint States a Title IX Claim Based on the "Total Mix" of Several Sources of Plausible Gender Bias.**

The Complaint also amply pleads that Princeton violated Title IX when it disciplined John. Title IX "bar[s] the imposition of university discipline when sex is a motivating factor in the decision to discipline." *Doe v. Univ. of the Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). As in related contexts, sex bias is a "motivating factor" when it is responsible for a decision "at least in part." *Columbia Univ.*, 831 F.3d at 56; *cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (Equal Protection Clause "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes"). The question is not whether a single item is unambiguous enough to support an inference of gender bias, but whether "the total mix of information" plausibly does. *Princeton III*, 30 F.4th at 345; *Univ. of the Sciences*, 961 F.3d at 211 (allegations of nationwide government pressure "combined with" allegations of procedural

**JA 185**

irregularities "state[] a plausible claim of sex discrimination").[4] It is about the bundle, not the stick.

John pleads several sources of potential gender bias that, together, overwhelmingly plead a Title IX claim. *First*, the Complaint explains in detail how Princeton for years was under external pressure from the federal government to favor claims of assault brought by women against men, and how Princeton showed itself to be responsive to that pressure. Compl. ¶¶37-46. That pressure—characterized by the Education Department's implementation of the 2011 "Dear Colleague Letter" (DCL)—is widely recognized as lending support to an inference of gender bias, even after the letter's rescission. *See, e.g.*, *Univ. of the Sciences*, 961 F.3d at 209-10. The Complaint explains how, even when the DCL regime ended, high-level Princeton administrators wanted to hew to that biased regime and took significant steps to do so. Compl. ¶¶47-52, 62-64. Those kinds of statements—even when remote in time—are plausible bases on which to infer bias. *See, e.g.*, *Roebuck v. Drexel University*, 852 F.2d 715, 733 (3d Cir. 1988) (single statement by university president five years before plaintiff's denial of tenure was evidence of racial bias under Title VII because "jury was entitled to infer that Hagerty, as president of the University, had a significant influence on the attitudes and procedures of the tenure decisionmakers").

*Second*, the Complaint explains how Princeton, in the years leading up to John's proceeding, was under significant *internal* pressure to favor assault claims brought by women against men. Courts have widely recognized that type of internal pressure as supplying significant evidence of gender bias. *See, e.g.*, *Stonehill Coll.*, 54 F.4th at 336 (explaining why

---

[4] *See also Doe v. The George Washington University*, 366 F. Supp. 3d 1, 3 (D.D.C. 2018) ("combination of" evidence sufficed "to avoid dismissal at this point in the litigation"); *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (combination of disparate impact evidence and generic nationwide pressure supported inference of gender bias); *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 608 (S.D. Miss. 2019).

**JA 186**

internal campus pressure typically is more suggestive of bias than nationwide government pressure); *Columbia Univ.*, 831 F.3d at 58 (campus pressure at time of proceeding supplied especially strong evidence of gender bias). The PIXR protests, which began in May 2019 and blamed sexual assault in part on "'toxic masculinity,'" became a touchstone on campus for how to view the problem of sexual assault, so much so that in May 2023—just months before John's proceeding—they were the subject of a lengthy article in the *Daily Princetonian* (*id.* ¶73), which had been repeatedly critical of Princeton's handling of sexual assault (*id.* ¶¶61-72).

*Third*, the Complaint demonstrates how, against that backdrop, Princeton gave preferential treatment to Jane and Sarah vis-à-vis John in their disciplinary proceeding. *Princeton III* itself recognized that the disparate treatment of a male respondent vis-à-vis a female complainant is potential evidence of gender bias. *Princeton III*, 30 F.4th at 344; *see also Doe v. Coll. of New Jersey*, No. 22-cv-3283, 2023 WL 2812362, at *6 (D.N.J. Apr. 6, 2023) (school's failure "to ask Roe any questions that would challenge her credibility" and "to question Roe about her inconsistent statements throughout the investigation" supported inference of gender bias). As explained above, Jane and Sarah were given multiple chances during the investigation to address the evidence; John was given one. Compl. ¶12. Dean Chen proactively went to Jane and Sarah when John offered evidence that contradicted them, to give them a chance to respond before the hearing. *Id.* ¶132. And at the hearing itself, John was aggressively questioned for an hour and a half while Sarah was gently questioned for 30 minutes and Jane *could not* be questioned at all. *Id.* ¶181, 188. All of this is evidence of gender bias. *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (citing "the panel members' hostility toward John" as "further support[ ] . . . that Jane's allegation was all they needed to hear to make their decision").

**JA 187**

*Fourth*, the Complaint shows how Princeton treated John's male witnesses very differently than Jane's and Sarah's female witnesses. *See, e.g.*, Compl. ¶12. That, too, is a recognized source of potential gender bias. *See, e.g.*, *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107 (2d Cir. 2022) (lopsided investigation supported inference of gender bias where school failed to "interview certain witnesses or ask certain questions that could have produced information favorable to" male respondent); *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018) (disparate treatment of respondent's male witnesses and complainant's female witnesses suggested gender bias). Princeton interviewed several female witnesses who were expected to provide support for Jane's and Sarah's claims, yet failed to interview a number of male witnesses it knew could confirm or deny parts of their stories, including whether Jane had bruises on her neck and whether Jane refused to sleep in John's dorm the rest of the week as she'd claimed. Compl. ¶139. Princeton tries to blame John for this, but that ignores two things: (1) the RRR tasks *Princeton*, not John, with conducting a "fair" investigation; and (2) on at least one occasion, Dean Chen took proactive steps to seek out evidence (from Jane and Sarah) in response to other evidence she had heard in the case. Compl. ¶132. Whether John could have remedied Princeton's investigatory failures says nothing about why Princeton committed those failures in the first place.

*Fifth*, multiple courts of appeals have recognized that when the rationale for disciplining a student is irrational, illogical, or departs significantly from the evidence before the decisionmaker, the rationale itself supplies evidence of gender bias. In *Doe v. Oberlin College*, for instance, the court held that, as a "matter of common sense," the "merits of [a] decision itself" is strong evidence of bias when it is "arguably inexplicable." *Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020). So too here: The Committee could not even say *which* of Jane's diametrically opposed stories had actually happened. *Purdue Univ.*, 928 F.3d at 669

21

**JA 188**

("perplexing" decision is evidence of gender bias). In fact, the Committee made no mention of that contradiction at all—not at the hearing, and not in its rationale. That is still more evidence of plausible gender bias. *Oberlin Coll.*, 963 F.3d at 587 ("the failure of the hearing panel even to comment on the flat contradiction" by complainant was a "[p]rocedural irregularit[y]" that "provide[d] strong support for Doe's claim of bias").[5] And finally, the fact that its rationale went "against the substantial weight of the evidence" is still *more* evidence of gender bias. *Doe v. Univ. of Ark.*, 974 F.3d 858, 864 (8th Cir. 2020). That rationale claimed Jane and Sarah had been "consistent" in their stories, which is preposterous; it ignored the eyewitness testimony of Student 4; it ignored that Sarah *couldn't* have seen bruises on the "side" of Jane's neck if John had merely pushed on her neck from the front; and it ignored the evidence that Jane had openly said she would lie, under oath, about a *different* choking allegation and would get Sarah to lie for her as well. The rationale itself supports a plausible inference of gender bias here.

The "total mix" of that evidence amply states a Title IX claim. When a school that is experiencing prolonged gender-based pressure treats female complainants and witnesses so differently than a male respondent and witnesses, and issues a decision that can't make sense of the evidence or even *decide what happened,* it is at least plausible to infer—even if there are other possible explanations, *Princeton III*, 30 F.4th at 344—that gender bias affected the decision "at least in part," *Columbia Univ.*, 831 F.3d at 56. After all, "at some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased

---

[5] This idea is not some outlier that has weirdly cropped up in Title IX litigation; it is a bedrock principle for determining discriminatory bias in other contexts as well. *See, e.g., Vill. of Arlington Heights*, 429 U.S. at 267 (factors to consider in determining whether "discriminatory purpose was a motivating factor" under Equal Protection Clause include both procedural irregularities and "[s]ubstantive departures" from the evidence).

**JA 189**

proceeding despite the [university's] protests otherwise." *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022).

That conclusion also aligns with Third Circuit precedent. The plaintiff in *University of the Sciences* alleged just two sources of bias: (1) that disparate standards were applied to him vis-à-vis the two female complainants (specifically, that he was as intoxicated as they were, yet the school refused to charge them with potential conduct violations when he filed a counter-complaint); and (2) that the school was experiencing the DCL regime's nationwide external pressure to treat claims of assault in gender-biased ways. *Univ. of the Sciences*, 961 F.3d at 210-11. Unlike here, that case involved no allegations of *internal* campus pressure. And unlike here, that case involved no allegations about a rationale that was *inexplicable and irrational*, and that therefore suggested that something besides the actual evidence is what explained it.

Princeton will undoubtedly try to argue that this case is different than *University of the Sciences* because the disparate treatment in that case was different. But that is a distinction that no longer carries legal significance. Before *University of the Sciences*, the Third Circuit used an artificial framework for Title IX cases formulated decades earlier in the Second Circuit. *See Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). Under that framework, one of the limited ways a plaintiff could prove a Title IX claim was through "selective enforcement," which indeed required him to argue that the decision to *charge* him in the first place was due in part to gender, *id.* at 715—precisely the kind of claim that the plaintiff in *University of the Sciences* advanced, because *Yusuf* was still the approach used in the Third Circuit. But *University of the Sciences* expressly did away with that framework in favor of the more straightforward approach adopted by the Seventh Circuit in *Purdue*, which simply asked directly whether gender bias, in any form,

23

**JA 190**

was a motivating factor in the decision to discipline a student. *Univ. of the Sciences*, 961 F.3d at 209 (expressly adopting the *Purdue* framework).

That approach makes sense. There is nothing inherently more gendered about applying a disparate *charging* standard than applying a disparate *investigatory* standard, *questioning* standard, or *credibility* standard. All are just different ways that a school can treat parties disparately. The only question is whether there is some basis to think it's *plausible* that the disparate treatment, whatever it is, is due to gender. In *University of the Sciences*, the nationwide external pressure the school had been facing made it plausible. John pleads far more here.

Similarly, in *Princeton III*, the Court found it plausible that gender bias motivated the outcome at least in part based on the "mix" of just two things: (1) Princeton's application of different standards of treatment to the female complainant and male respondent, and (2) the internal pressure Princeton was under in 2019 (the time of the PIXR protests) "to respond aggressively and 'over-correct' by favoring protection of female accusers at the expense of finding male respondents guilty." *Princeton III*, 30 F.4th at 344-45. The different standards there consisted of: (1) the claim that Princeton encouraged the female complainant to file a report but steered the male respondent toward counseling services based on similar conduct; and (2) the claim that respondent's violation of a no-contact order during the proceeding was dealt with more harshly than the complainant's violation of the order on a different occasion. *Id.* at 344. Princeton argued there, as here, that the differential treatment was not due to gender bias, but only to "bias in favor of victims or complainants."[6] But the Court held that, while that explanation may be plausible, the "total mix" also made gender bias a plausible explanation. *Princeton III*, 30 F.4th at 345. The same is true here, where John pleads (in addition to his

---

[6] *Doe v. Princeton Univ.*, No. 21-1458, ECF No. 27 at 30 (3d Cir. June 17, 2021).

24

**JA 191**

disparate treatment vis-a-vis Jane and Sarah) both targeted pressure on Princeton, the disparate treatment of witnesses, and an inexplicable rationale that sharply contradicts the evidence.

Princeton's argument to the contrary ignores Circuit precedent. It first argues that John has not pled how his disparate treatment vis-à-vis the complainants "was tied to his status as a male." Mem. at 23. But neither did the plaintiffs in *University of the Sciences* or *Princeton III*: they simply noted the differential treatment, and the courts found it plausible it was due to gender bias in light of the "total mix" of the other evidence. *Univ. of the Sciences*, 961 F.3d at 210; *Princeton III*, 30 F.4th at 344, 345. Tellingly, Princeton cites neither *University of the Sciences* nor *Princeton III* in support of its argument; it instead cites an unpublished decision, *Verdu*, as stating that the allegations of differential treatment in that case were "'too conclusory to support a plausible claim for relief.'" Mem. at 23 (citing *Verdu v. Trustees of Princeton University*, No. 20-cv-1724, 2022 WL 4482457, at *3 (3d Cir. Sept. 27, 2022)). But *Verdu* did not hold that allegations of differential treatment, if adequately pled, do not support an inference of gender bias; it held that the plaintiff *there* had not actually *pled* differential treatment. *Verdu*, 2022 WL 4482457 at *3.

Princeton next argues, in similar fashion, that John does not specifically allege how the decision in his case shows the Committee got it wrong "*because Doe is a man.*" Mem. at 23 (emphasis in original). But again, neither did the plaintiffs in *Oberlin College*, *Purdue University*, or *University of Arkansas*; those courts held instead that a rationale that is inexplicable, illogical, or against the great weight of the evidence suggests that something besides the evidence is driving it, and thus can supply evidence of gender bias simply by being inexplicable. The greater that kind of "procedural irregularity," the less additional evidence required to conclude that gender bias may plausibly explain the decision. *See, e.g., Menaker v.*

25

**JA 192**

*Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("[W]hen combined with clear procedural irregularities, . . . even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination.") (emphasis in original).

Princeton next argues that the disparate pursuit of witnesses is not evidence of bias because there "are no plausible allegations" that Princeton did anything other than "investigate those witnesses identified as having actual information about the events at issue," and that John could have "request[ed] a follow-up interview." Mem. at 23-24, 25. But that just is not true: the Complaint alleges that Dean Chen, on at least one occasion, proactively sought additional information from Jane and Sarah after hearing information (from John) to which they might have wanted to respond. Compl. ¶132. Princeton also failed to interview John's roommate to resolve the dispute as to whether Jane had slept in their room that week. *Id.* ¶12. Princeton's failure to pursue relevant exculpatory evidence further supports an inference of gender bias. *See Dordt*, 616 F. Supp. 3d at 897 (failure to collect and consider "certain exculpatory evidence" that was "mentioned in witness interviews" supplied evidence of gender bias on summary judgment).

Princeton's final sally is to rely on a grab-bag of cases that mostly predate *University of the Sciences* and *Princeton III* and that are materially distinguishable from John's case. Mem. at 25-26. It cites the district court decision in *Verdu v. Trustees of Princeton University*, where the court rejected a Title IX claim because the plaintiff had "'failed to allege that he received different treatment by Princeton than a similarly situated female.'" Mem. at 25 (supposedly quoting *Verdu*, No. 19-cv-12484, 2020 WL 1502849, at *4-5 (E.D. Pa. March 30, 2020)). That quote does not actually appear anywhere in the decision, but a similar *idea* is discussed under the plaintiff's selective enforcement claim, *Verdu*, 2020 WL 1502849 at *6-7—part of the artificial framework that *University of the Sciences* rejected two years later. *Verdu* also held that, to

26

**JA 193**

supply evidence of gender bias, external or internal pressure had to target "the specific disciplinary action being challenged" or had to "specifically connect" to it. *Verdu*, 2020 WL 1502849, at *5, which *University of the Sciences* also rejected. *Verdu* is no longer good law in this Circuit.

Princeton also strangely relies on *Doe v. St. Joseph's University*—an unpublished *summary judgment* decision where the plaintiff did not get the benefit of any reasonable inferences one could draw from his allegations. 832 Fed. App'x 770, 772 (3d Cir. 2020). What's more, the court there held that, while the plaintiff may have pled that there had been a poor investigation (and thus "half" of a claim), he had not also shown "internal or external pressure" that contained "indicia of specific intent to punish male students." *Id.* It cited the external nationwide pressure from the DCL regime alleged in *University of the Sciences*, *which John alleges here*, as the kind of allegations sufficient to round out the claim, along with other examples of internal pressure.[7] *Id. St. Joseph's University* does not support Princeton.

Princeton just as strangely relies on *Saravanan v. Drexel University*, where the court initially dismissed an accused student's Title IX claim because he made only "'blanket allegations of discrimination.'" Mem. at 26 (quoting *Saravanan v. Drexel Univ.*, No. 17-cv-3049, 2017 WL 4532243, at *4 (E.D. Pa. Oct. 10, 2017)). Unlike John, he hadn't cited any kind of campus pressure on the school. What's more, he then amended his complaint to include more precise allegations of discrimination. And the very next month, in the very same case, in a

---

[7] *Gendia v. Drexel Univ.*, No. 20-cv-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020), on which Princeton also relies, suffers similarly: the complaint did not even cite *federal* pressure against males accused of sexual assault, much less detail the type of intense campus pressure at Princeton outlined in John's complaint. *Gendia v. Drexel Univ.*, No. 2:20-cv-01104, Docket No. 1 (E.D. Pa. Feb. 25, 2020).

27

**JA 194**

decision Princeton fails to cite, the court *denied* Drexel's motion to dismiss. *Saravanan v. Drexel Univ.*, 2017 U.S. Dist. LEXIS 193925, *12-15 (E.D. Pa. Nov. 24, 2017)

The only thing that Princeton's cases show is that it's possible—especially pre-*Princeton III*—to find Title IX decisions in which a single source of potential bias was pled in isolation, and to quote that decision as though it means that that source generally does not supply evidence of gender bias. Princeton tries in that manner to get the Court to view each source of bias in isolation—and therefore to discard it—rather than considering each source in the light of the "total mix." "[D]isparate questioning . . . of black and white prospective jurors" *by itself* may not suggest racial bias, but when viewed through "the whole picture" of potential evidence, it can change in character and "become telling." *Flowers v. Mississippi*, 588 U.S. 284, 310, 314 (2019). So too with the "disparate questioning" of male complainants and female respondents.

That is the approach that *University of the Sciences* and *Princeton III* require. For instance, in *Doe v. Princeton Univ.*, No. 19-cv-7853, 2023 WL 1778832 (D.N.J. Feb. 6, 2023) (Quraishi, J.), the plaintiff alleged gender bias due to: (1) government and campus pressure "to aggressively prosecute and severely punish men accused of sexual misconduct"; (2) disparate treatment during his proceeding, including Princeton's failure to "conduct a proper investigation" and "determinations that conflicted with actual evidence"; and (3) disparate treatment in its decision to charge the plaintiff but not his accuser based on similar conduct. *Id.* at *4-6. This Court held that when those three things are "combined," they "state[] a plausible claim of sex discrimination." *Id.* at 8. Though "anti-male bias [wa]s still a plausible explanation," the Court reminded Princeton that it "must construe the facts in the light most favorable to Doe." *Id.* at 7.

Similarly, in *Doe v. College of New Jersey*, another court in this District found that a plaintiff adequately pled a Title IX claim based on the combination of (1) "external pressures" on

28

**JA 195**

the school to act in gender-biased ways, and (2) a one-sided proceeding in which, like here, the

school "failed to ask Roe any questions that would challenge her credibility," "failed to question

Roe about her inconsistent statements throughout the investigation," and "failed to properly

apply the preponderance of the evidence standard, and instead made a decision that went against

the weight of evidence." 2023 WL 2812362, at *6; *see also Doe v. Rider University*, No. 16-cv-

4882, 2020 WL 634172, at *11 (D.N.J. Feb. 4, 2020) (cleaned up) (holding that "allegations that

the disciplinary proceedings were significantly one-sided, that the proceedings were flawed, and

that [the plaintiff] was punished severely," combined with allegations of government and campus

pressure, "gives rise to an inference of bias"); *Collick v. William Paterson Univ.*, No. 16-cv-471,

2016 WL 6824374, at *11 (D.N.J. Nov. 17, 2016) (holding that plaintiffs' allegations that their

accuser was prejudged as credible; that they "did not receive proper notice of the specific

charges, were not permitted to confront or cross-examine their accuser, were not given a list of

witnesses against them, and more generally were not afforded a thorough and impartial

investigation," combined with the external pressure on the school from the DCL regime, sufficed

to state a claim for gender bias). Even if other explanations for Princeton's actions are

plausible—or even probable—it is also plausible that gender bias influenced John's discipline "at

least in part." That is enough to state a claim at this stage.

## IV.    The Complaint Also States a Claim for Gross Negligence.

Finally, the Complaint also states a claim that Princeton was grossly negligent in

disciplining John. Courts across the country have recognized that private universities have

common law duties of care in disciplining students that pre-date (and survive) whatever

contractual promises they may also make in that regard. *See, e.g., Papelino v. Albany Coll. of

Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (denying college's summary judgment

29

**JA 196**

motion as to negligence and breach of contract claims because college "had a duty to administer the Honor Code proceedings in a fair and impartial manner" and reasonable jury "could conclude . . . that the College was negligent in its handling of the proceedings").[8] In New Jersey, the "indispensable cornerstone" of duty continues to be "foreseeable risk," and "[u]ltimately, whether a duty exists is a matter of fairness." *Dunphy v. Gregor*, 136 N.J. 99, 108 (1994). It is eminently foreseeable that erroneous discipline poses substantial risks to students, and eminently fair to require schools to exercise reasonable care when disciplining them.

Princeton's primary support for its argument to the contrary is an unpublished decision in which the plaintiff "fail[ed] to advance any respective argument" supporting his negligence claim. Mem. at 30 (citing *Donohue v. Capella Univ., LLC*, No. 22-cv-5634, 2023 WL 5425503, at *7 (D.N.J. Aug. 22, 2023)). But Princeton cannot avoid the fact that it has set up a disciplinary system which convicts 98% of the students it charges, *even under a "clear and persuasive evidence" standard*. It owed John a duty to neutrally investigate and resolve the charges against him, free of bias and prejudgment. It utterly failed to do that.

### CONCLUSION

For the foregoing reasons, John Doe respectfully asks this Court to deny Princeton's motion to dismiss.

---

[8] *See also Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Dkt. No. 13 (D.S.D. June 16, 2016) (denying university's motion to dismiss negligence and breach of contract claims by student disciplined for sexual misconduct); *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104 at *21 (E.D. Tenn. March 31, 2011) (denying motion to dismiss negligence and breach of contract claims, holding that university owed common law duty to student disciplined for sexual misconduct "especially" because "the harm was severe: a wrongful conviction by a disciplinary committee").

**JA 197**

DATED: September 23, 2024

Respectfully submitted,

/s/ Justin Dillon
Justin Dillon (*pro hac vice*)
Christopher C. Muha (*pro hac vice*)
Kimberly Blasey (*pro hac vice*)
DILLON PLLC
1717 K Street, Suite 900
Washington, DC 20005
T: (202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano (NJ Bar No. 426422024)
Bryan W. McCracken (NJ Bar No. 416362022)
FORD O'BRIEN LANDY LLP
275 Madison Ave., Fl. 24
New York, NY 10016
T: (212) 858-0040
jsolano@fordobrien.com
bmccracken@fordobrien.com

*Attorneys for Plaintiff John Doe*

31

**JA 198**

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of September, 2024, the foregoing was served upon

counsel of record through the Court's CM/ECF filing system.

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano (NJ Bar No.
426422024)
FORD O'BRIEN LANDY LLP
275 Madison Ave., Fl. 24
New York, NY 10016
T: (212) 858-0040
jsolano@fordobrien.com

*Counsel for Plaintiff John Doe*

**SAUL EWING LLP**
James Keller, Esq. (NJ Bar ID No. 020991996)
Amy L. Piccola, Esq. (NJ Bar ID No. 012682008)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-1964 (Keller) / (215) 972-8405 (Piccola)
Email: James.Keller@saul.com / Amy.Piccola@saul.com
*Attorneys for Defendant the Trustees of Princeton University*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, | Case No. 24-CV-7125 |
| Plaintiff, | |
| v. | Motion Day: October 7, 2024 |
| THE TRUSTEES OF PRINCETON UNIVERSITY, | |
| Defendant. | |

## REPLY OF DEFENDANT THE TRUSTEES OF PRINCETON UNIVERSITY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE

**JA 200**

# **TABLE OF CONTENTS**

**Page**

Introduction ...........................................................................................................1

Argument ...............................................................................................................2

    A.   Doe's Breach of Contract Claim (Count I) against the University Must Be Dismissed. Doe has not Plausibly Alleged that the University Substantially Violated the RRR's Terms in Conducting its Disciplinary Process. ......................2

        1.   The University Applied the "Clear and Persuasive Evidence" Standard .........................................................................................3

        2.   The University Properly Denied Doe's Appeal .........................................6

    B.   Doe's Arguments in Response to the University's Motion to Dismiss do not Support a Plausible Inference that the University Discriminated Against Doe on the Basis of his Sex. ...............................................................................7

Conclusion ..........................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe v. Dordt Univ.*, 616 F. Supp. 3d 872 (N.D. Iowa 2022)................................5, 6

*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) ................................1, 2, 3, 7, 8

*Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225
    (D.N.J. Jan. 17, 2018) .................................................................................7

*Doe v. Stonehill College, Inc.*, 55 F.4th 302 (1st Cir. 2022) ....................................5

*Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL
    4482457 (3d Cir. Sept. 27, 2022) ........................................................................7

## **INTRODUCTION**

In response to allegations that Plaintiff John Doe, on two separate occasions, placed his hands on the necks of two individuals and choked them, Defendant the Trustees of Princeton University ("Princeton" or the "University") conducted an investigation and a live hearing in accordance with its published student discipline procedures. Doe's *Opposition to Motion to Dismiss by the Trustees of Princeton University* (the "Opposition") does not seriously challenge the University's legal arguments regarding the soundness and fairness of those procedures. Instead, the Opposition relies heavily on the decision in *Doe v. Princeton Univ.* ("*Princeton III*"), 30 F.4th 335 (3d Cir. 2022), ignoring the significant factual and procedural differences between that case and Doe's, and weaves a narrative of "ignored" exculpatory evidence premised on fact and credibility arguments that were specifically addressed by the University's Committee on Discipline (the "Committee") and otherwise on ancillary issues not before the Committee for resolution.[1] Put most simply – because Doe does not like the way things turned out, he contends that the process must have been flawed.

---

[1] The Committee was tasked with resolving two issues: (1) whether Doe physically assaulted Jane Roe; and (2) whether Doe physically assaulted Sarah Smith.

Doe's arguments are unavailing and, for the reasons explained in the University's Motion to Dismiss ("MTD") and herein, Doe's Complaint should be dismissed.[2]

## **ARGUMENT**

**A.    Doe's Breach of Contract Claim (Count I) against the University Must Be Dismissed. Doe has not Plausibly Alleged that the University Substantially Violated the RRR's terms in Conducting its Disciplinary Process.**

New Jersey law requires that a university "follow its own established procedures" in response to a conduct complaint about a student. *Princeton III*, 30 F.4th at 346. Doe has not plausibly alleged that the University failed to follow the *Rights, Rules, and Responsibilities* ("RRR") when investigating and adjudicating the complaints that Doe physically assaulted Roe and Smith. In his Opposition, Doe argues, in essence, "because a breach of contract claim survived in *Princeton III*, my claim must too be deemed legally sufficient." This, of course, is not enough to save Doe's breach of contract claim. Even accepting as true the story that Doe has crafted in the Complaint, that story is nothing more than Doe's lengthy and unsurprising

---

[2] This Reply Brief addresses only Doe's arguments concerning Counts I and III of his Complaint. The University does not view Doe's responses to the University's Motion to Dismiss as to Counts II and IV—which are no more than a repetition of the allegations of the Complaint—as requiring further reply as they do not address the University's arguments that those claims fail as a matter of law because: (1) Doe has not plausibly alleged that the University acted in bad faith (Count II); and (2) New Jersey courts have held that universities owe no duty of care to students when carrying out disciplinary procedures (Count IV).

**JA 204**

criticism of a disciplinary decision that was unfavorable to Doe; not, as required, well-pleaded allegations that the University materially strayed from the procedures outlined in the RRR.

### 1.    The University Applied the "Clear and Persuasive Evidence" Standard

Doe argues, citing to *Princeton III*, that the University failed to apply the "clear and persuasive" evidence standard by disregarding exculpatory evidence and minimizing inconsistencies in the complainants' statements. (Opp. at 11). To support this allegation, Doe contends that the Committee ***ignored*** the "glaring inconsistencies" in Roe's and Smith's testimony. (Opp. at 11). However, the allegations of Doe's Complaint contradict this statement, highlighting that the University conducted an investigation and hearing as called for under the RRR.

During the investigation, Doe had many opportunities to present and respond to evidence and, in turn, Roe and Smith were questioned about the evidence that Doe presented. *See, e.g.,* Compl. ¶¶ 122, 125-126, 129-131. In other words, the University ***acknowledged*** Doe's statements and evidence and ***confronted*** Roe and Smith with the information—exactly what Doe was entitled to under the RRR. (MTD, Ex. A, Subsection 2.5.2). All of that information was then presented to the Committee for consideration. That the Committee chose to credit Roe's and Smith's accounts over Doe's does not, as Doe suggests, mean that the Committee "disregarded" such evidence. (Opp. at 11).

**JA 205**

Doe is also incorrect in his assertion that "[The Committee] disregarded, without explanation, the testimony of the only eyewitness to Jane's incident [Student 4], who said that no choking whatsoever occurred." (Opp. at 11). Student 4, as Doe acknowledges, testified for 40-minutes and was permitted to clarify his testimony "unequivocally." (Compl. ¶ 183). The credibility of Student 4's observations was challenged by Student 3, another witness who was at the scene of Doe's choking of Roe. Student 3, who was standing next to Student 4 during the incident, told the Committee that she was unable to see what happened between Roe and Doe, and that she was surprised that Student 4 was in a position to see what happened. (Compl. ¶ 182). At the hearing, Student 4 was questioned about this. This is the exact type of credibility assessment that the Committee would be expected to undertake, not some unfounded decision to "disregard" Student 4's testimony.

Doe's other challenges to the Committee's weighing of the evidence are similarly unpersuasive as they again reflect no more that Doe's disagreement with the Committee's application of the "clear and convincing" standard. For example, Doe argues that the Committee disregarded evidence that Roe and Smith remained "friendly" with Doe after the incidents. (Opp. at 11). But just as Doe points out in instances less favorable to him, whether Roe and Smith were "friendly" with Doe after the incidents has no direct bearing on the assessment of whether he physically assaulted either individual. (Compl. ¶ 180 (arguing, "whether either Mr. Doe or Jane,

**JA 206**

or both of them, were controlling has no bearing on whether the alleged incidents occurred.")). The Committee was within its discretion to determine what weight, if any, to give this evidence, when resolving the two questions at issue, *i.e.,* whether Doe assaulted Roe and whether he assaulted Smith. The same is true with regard to Roe's alleged prior accusation against another individual, Student X: this is credibility evidence that the Committee was entitled to weigh as it felt appropriate in the context of all other evidence, including eyewitness testimony and Doe's own admissions.

Doe cites two out-of-Circuit decisions—*Doe v. Stonehill College, Inc.*, 55 F.4th 302, 325 (1st Cir. 2022) and *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 894 (N.D. Iowa 2022)—to support his position that the Committee could not have properly applied the clear and convincing evidentiary standard. These cases are unavailing. In *Stonehill,* the subject Snapchat messages (which Doe likens to the text messages in his case) were "corroborated" by "significant information" provided by the respondent-student. *Stonehill*, 55 F.4th at 326. Unlike the student in *Stonehill,* Doe did not provide "significant" corroborating information that would suggest the Committee should have read Doe's text saying "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done" as something other than an admission. (*Stonehill*, 55 F.4th at 325-26 (noting that the student "repeatedly" told investigators that "he sent the messages to make [the alleged

**JA 207**

victim] feel better."); Compl. ¶ 108). Instead, Doe argued only that the Committee should believe he had been "blackmailed" into saying what he did, an argument that the Committee considered, but did not find persuasive. (Compl. ¶ 196).

On the question of that "blackmail" evidence, Doe suggests that *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 894 (N.D. Iowa 2022) is instructive. (Opp. at 13, n.3). It is not. In *Dordt*, the respondent-plaintiff was not making self-serving claims that he had been blackmailed and so the evidence against him should not be credited (as Doe does here). Instead, in *Dort*, it was a neutral party who came forward and made a formal allegation to the Title IX investigator that a *witness* was being blackmailed to offer evidence against the respondent. 616 F. Supp. 3d at 894. Those allegations were not investigated. *Id*. Here, the Committee *did* hear Doe's argument that he was being blackmailed, it just did not agree that this was a plausible, or that it outweighed the other evidence before it.

### 2.    __The University Properly Denied Doe's Appeal__

Doe argues that the University breached its contract with him by failing to grant his appeal on the basis that he had been denied a fair process. In so doing, he merely restates the allegations of the Complaint. (Opp. at 14-16). As argued in the University's Motion to Dismiss, and reemphasized herein, the University conducted a complete and thorough investigation—including by interviewing all eyewitnesses

**JA 208**

identified by the parties—and held a hearing during which relevant evidence was considered. (MTD at 12-17).

> **B. Doe's Arguments in Response to the University's Motion to Dismiss do not Support a Plausible Inference that the University Discriminated Against Doe on the Basis of his Sex.**

In his Opposition, Doe argues that his Complaint plausibly alleges sex discrimination because "[i]t is about the bundle, not the stick." (Opp. at 18-19). Unfortunately for Doe, the allegations of his Complaint, whether viewed independently or as a "bundle," are insufficient to save his Title IX claim (Count III) from dismissal.

*First,* Doe does nothing to remedy the failure of the Complaint to "specifically connect[]" the alleged pressures on the University to his "specific case." *Verdu v. Trustees of Princeton Univ.,* No. 20-1724, 2022 WL 4482457, at *5 (3d Cir. Sept. 27, 2022), *cert. denied,* 143 S. Ct. 784 (2023); *see also Doe v. Rider Univ.,* No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225, at *12 (D.N.J. Jan. 17, 2018) (holding that allegation that pressure from 2011 Dear Colleague Letter resulted in gender bias was conclusory and insufficient on its own to carry Title IX claim). Instead, Doe yet again relies on *Princeton III* to save his claim. *Princeton III,* 30 F.4th at 343. In *Princeton III,* the Third Circuit held that the "total mix" of the plaintiff's allegations **combined** with internal and external pressure on the University was sufficient to support a plausible Title IX claim. *Id.* at 345. However, the Third Circuit in

**JA 209**

*Princeton III* pointed to two very specific facts that supported the plaintiff's argument that gender was a potential factor in the decision-making process: "Roe's report of misconduct was treated with greater urgency and seriousness than his own, and Roe's violation of the Order produced only a mild University response." *Id.* at 343. No such facts exist here. As argued in the University's Motion to Dismiss, and reemphasized herein, none of Doe's allegations support his claim that gender was a motivating factor in his disciplinary decision.

It is also important to note that the "pressures" to which Doe cites reflect an increased emphasis by the United States Department of Education on having educational institutions thoroughly deal with allegations of sexual misconduct covered by Title IX.  While Doe's Opposition might lead one to think otherwise, *Doe was not accused of a Title IX violation*. In other words, the alleged "pressure" to more fully enforce Title IX policies at Princeton, and elsewhere, is of no moment in this case.

*Second,* Doe's argument that Roe and Smith were given "preferential treatment" during the disciplinary process because they were given "multiple chances during the investigation to address the evidence," while he was given one, (Opp. at 20), is belied by the allegations of the Complaint. Indeed, as alleged, Doe was provided with, and was able to address, incoming evidence on at least *five* separate occasions as the investigation progressed:

- On September 29, 2023, Doe attended an interview with the Committee's investigator and was given an opportunity to respond to the allegations against him. (Compl. ¶ 117).

- On October 2, 2023, Doe "addressed the evidence" when he submitted a written response to the allegations and his own evidence. (*Id*. at ¶ 118).

- On October 25, 2024, Dean Chen provided Doe with "a packet of the evidence that had been collected" and informed him that he could request "any additional interviews to be conducted based on the information in the packet." (*Id*. at ¶ 122).

- On October 31, 2024, Doe submitted a supplemental statement addressing the allegations and the information in the evidence packet. (*Id*. at ¶ 125).

- Also on October 31, 2024, Dean Chen sent Doe an updated version of the evidence packet which included "additional pages of evidence, including interview summaries of witnesses whom the accusers had requested be interviewed." (*Id*. at ¶ 126).

- Dean Chen continued to send Doe additional evidence as it was compiled and informed Doe that he could respond with supplemental responsive statements. (*Id*. at ¶¶ 129-130). Doe took advantage of this opportunity and sent another supplemental statement, and additional evidence. (*Id*. at ¶ 131).

Doe was continually given the opportunity to respond to the evidence as it was collected, and he took advantage of those opportunities by submitting multiple written statements addressing such evidence.

*Finally,* Doe's assertion that the University "treated John's male witnesses very differently than Jane's and Sarah's female witnesses" (Opp. at 21) is likewise unsupported by the facts as pleaded. By Doe's own admission, the University interviewed several female witnesses who were **"<u>identified</u>** by the female complainants." (Compl. ¶ 136 (emphasis added). Doe was informed that he also

**JA 211**

could identify additional witnesses; he failed to do so. (*Id*. at ¶ 122). That "Dean

Chen took proactive steps to seek out evidence (from Jane and Sarah) in response to

other evidence she had heard in the case" (Opp. at 21), hardly substantiates a

plausible inference of gender bias, particularly where Doe himself was also given at

least five opportunities to review and respond to evidence as it was gathered (*see*

above).

## CONCLUSION

For the foregoing reasons, and those in the University's Memorandum of Law

in Support of its Motion to Dismiss, Doe's Complaint against the University should

be dismissed in its entirety, with prejudice.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of May, 2025, the foregoing was served upon

counsel of record through the Court's CM/ECF filing system.

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano

JA 213



December 5, 2024

**VIA ECF**
The Honorable Tonianne J. Bongiovanni
U.S. Magistrate Judge
U.S. District Court, District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

> **Re: John Doe v. The Trustees of Princeton University,**
> **Civil Case No. 3:24-cv-07125-ZNQ-TJB**
> **Request for Initial Pretrial Conference**

Dear Judge Bongiovanni,

Plaintiff, John Doe, submits this letter request in lieu of a more formal motion to respectfully request that the Court schedule an initial Rule 16 pretrial conference so the parties can move forward with discovery in this case. Plaintiff has conferred with counsel for the defendant, the Trustees of Princeton University ("Princeton"), who has relayed that Princeton opposes a pretrial conference while its motion to dismiss is pending.

By way of background, the Complaint in this case brings claims for breach of contract, negligence, and gender-based discrimination. The claims arise from Princeton suspending Plaintiff after he was accused of choking on separate occasions two women who were friends with each other. As highlighted in the Complaint, the process by which Princeton arrived at Plaintiff's suspension was problematic for a host of reasons, including overlooking significant credibility issues involving the complainants and—as depicted in the photograph in the Complaint—a disciplinary officer falling asleep during the hearing that ultimately has changed Plaintiff's life. Princeton was served with the Complaint in this case on June 21, 2024 and filed a motion to dismiss on September 13, 2024. Princeton's motion rests on arguments that the 76-page Complaint insufficiently states a claim for relief.

The allegations that led to Plaintiff's suspension were made in 2023. Plaintiff is eager to commence discovery and proceed forward with this case as quickly as possible to clear his disciplinary record before his career trajectory is irreparably damaged. The longer Plaintiff must wait for discovery to commence, the more of a tactical advantage Princeton will get as witnesses' memories will fade. *See generally Udeen v. Subaru of America, Inc.*, 378 F. Supp. 3d 330, 333 (D.N.J. 2019) (permitting discovery to move forward notwithstanding pending motion to dismiss and recognizing that "the longer the case languishes the greater chance exists that relevant evidence may be lost or destroyed"). And, "[g]enerally, the filing of a dispositive motion does not constitute 'good cause' under Rule 26(c) to stay discovery." *Morgan v. Quest Diagnostics Inc.*, 2020 WL 7183503, at *1 (D.N.J. June 8, 2020) (citing *Gerald Chamales Corp. v. Oki Data*

*Ams., Inc.*, 247 F.R.D. 453, 454 (D.N.J. 2007)). That is especially true here, where Princeton's arguments in its motion do not involve issues of standing, statutory authority, or jurisdiction.

Plaintiff is especially eager to depose complainant Jane Roe. His Complaint already details how Jane Roe changed her accuasations several times, did not bother to show up to the disciplinary hearing, and previously falsely accused another male college student of choking her. But now, Plaintiff has learned that Jane Roe—under penalty of perjury—has retracted her allegation against the other male student and *admitted* that, in fact, he had not actually choked her or been physically violent with her in *any* way. Proceeding with discovery, including Jane Roe's deposition, could likely lead to a quick and efficient resolution of this case and allow Plaintiff to proceed forward down his educational path without further delay.

Accordingly, we respectfully request that the Court schedule an initial pretrial conference so that discovery may proceed forward.

Respectfully submitted,

FORD O'BRIEN LANDY LLP

*s/ Jamie Hoxie Solano*
Jamie H. Solano
Bryan McCracken
275 Madison Avenue, 24th Floor
New York, NY 10016
(212) 858-0040
jsolano@fordobrien.com
bmccracken@fordobrien.com

DILLON PLLC
Justin Dillon (pro hac vice)
Chris Muha (pro hac vice)
Kimberly Blasey (pro hac vice)
DILLON PLLC
1717 K Street, Suite 900
Washington, DC 20006
T: (202) 787-5858

**JA 215**