## In the
# United States Court of Appeals for the Third Circuit

Case No. 25-2014

JOHN DOE,
*Plaintiff-Appellant*,

v.

THE TRUSTEES OF PRINCETON UNIVERSITY,
*Defendant-Appellee.*

*On Appeal from an Order entered by the United States District Court for the District of New Jersey*

## BRIEF OF APPELLEE THE TRUSTEES OF PRINCETON UNIVERSITY

**SAUL EWING LLP**

James A. Keller (PA ID No. 78955)
Amy L. Piccola (PA ID No. 208888)
Patrick F. Nugent (PA ID No. 313979)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1964 / -8405 / -7134
Fax: (215) 972-4152 / -1871 / -7725
james.keller@saul.com
amy.piccola@saul.com
patrick.nugent@saul.com

*Counsel for Defendant-Appellee*
*The Trustees of Princeton University*

Dated: September 24, 2025

## United States Court of Appeals for the Third Circuit

## <u>Corporate Disclosure Statement and<br>Statement of Financial Interest</u>

No. <u>25-2014</u>

John Doe

v.

The Trustees of Princeton University

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1,
makes the following disclosure:

The Trustees of Princeton University
_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations: Not applicable.

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Not applicable.

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

Not applicable.

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.

/s/ James A. Keller
_____
(Signature of Counsel or Party)

Dated: September 24, 2025
         _____

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION......................................................................3

STATEMENT OF THE ISSUES...........................................................................4

STATEMENT OF RELATED CASES AND PROCEEDINGS .............................5

STATEMENT OF THE CASE...............................................................................5

   I.    Relevant Facts Alleged ...............................................................................5

      A.   The Complaints Against Doe and the University's Investigation .............5

      B.   The Committee Hearing and Disciplinary Outcome ................................8

      C.   Doe's Appeal and the University's Final Decision ..................................9

   II.   Procedural History and Rulings Presented for Review ...............................11

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT .......................................................................................................14

   I.    Standard of Review....................................................................................14

   II.   The District Court Correctly Dismissed Doe's Breach of Contract Claim ..........................................................................................14

      A.   Princeton Complied with the RRR and Applied the Clear and Persuasive Evidence Standard .................................................................15

         1.   Doe's Allegations Do Not Plausibly Show That Princeton Violated the RRR in Adjudicating the Charges Against Him...........................................15

         2.   None of Doe's Criticisms Have Merit .................................................20

      B.   Doe's Allegations Do Not Plausibly Show That Princeton Violated the RRR in Denying His Appeal .........................................................................25

      C.   *Princeton III* Does Not Dictate a Different Result ..................................29

III.  The Court Properly Dismissed Doe's Implied Covenant Claim Because Doe Does Not Allege Bad Faith Conduct ...................................................................31

  A.  *Princeton III* Does Not Save Doe's Deficiently-Pled Claim....................32

  B.  Doe's Implied Covenant Claim Is Also Improper Because It Is Duplicative of His Breach of Contract Claim ......................................................................38

IV.  The District Court Properly Dismissed Doe's Title IX Claim Because He Failed to Plausibly Allege Gender Bias ................................................................39

  A.  The University Conducted a Thorough Investigation and Hearing under the RRR, and the Outcome Was Supported by the Evidence...........................39

  B.  Doe Failed to Plead a Causal Link Between the Challenged Procedures and His Sex ..........................................................................................................43

  C.  The Court Should Not Consider Issues and Arguments That Doe Failed to Preserve and Raises for the First Time on Appeal ..........................................50

  D.  Doe Did Not Plausibly Allege That the University Was Motivated by External Pressure to Discriminate Against Men..............................................52

CONCLUSION .......................................................................................................55

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Borough of Longport v. Netflix, Inc.*,
  94 F.4th 303 (3d Cir. 2024) ............................................................14

*Doe v. Oberlin College*,
  963 F.3d 580 (6th Cir. 2020) .........................................................40

*Doe v. Princeton Univ.*,
  No. 17-CV-1614 (PGS), 2018 WL 2396685 (D.N.J. May 24, 2018), *aff'd*, 790
  F. App'x 379 (3d Cir. 2019) .....................................................*passim*

*Doe v. Princeton Univ.*,
  No. CV 22-5887, 2023 WL 8755232 (D.N.J. Dec. 19, 2023)...........................50

*Doe v. Princeton University*,
  30 F.4th 335 (3d Cir. 2022) .....................................................*passim*

*Doe v. Rider Univ.*,
  No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225 (D.N.J. Jan. 17, 2018) .53, 55

*Doe v. St. Joseph's Univ.*,
  832 F. App'x 770 (3d Cir. 2020) ........................................43, 44, 49

*Doe v. Stonehill Coll., Inc.*,
  55 F.4th 302 (1st Cir. 2022).................................................18, 19

*Doe v. University of Sciences*,
  961 F.3d 203 (3d Cir. 2020) .....................................................*passim*

*Doe v. William Marsh Rice University*,
  67 F.4th 702 (5th Cir. 2023) .........................................................40

*Gendia v. Drexel Univ.*,
  Civ. No. 20-1104, 2020 WL 5258315 (E.D. Pa Sept. 2, 2020)...................44, 49

*Hills v. Bank of America*,
  No. 13–4960, 2015 WL 1205007 (D.N.J. Mar. 17, 2015) ................................38

*Holk v. Snapple Beverage Corp.*,
  575 F.3d 329 (3d Cir. 2009) .........................................................14

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996) ...................................................4

*Saravanan v. Drexel Univ.*,
  No. CV 17-3409, 2017 WL 4532243 (E.D. Pa. Oct. 10, 2017) ........................49

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992), *as amended* (May 27, 1992) ..................................4

*Simko v. U.S. Steel Corp.*,
  992 F.3d 198 (3d Cir. 2021), cert. denied, 142 S. Ct. 760 (2022)...............50, 52

*Vengalattore v. Cornell University*,
  36 F.4th 87 (2d Cir. 2022) ..........................................................40, 47

*Verdu v. Trustees of Princeton Univ.*,
  No. 19-12484, 2020 WL1502849 (3d Cir. Mar. 30, 2020) .......................*passim*

*Weber v. McGrogan*,
  939 F.3d 232 (3d. Cir. 2019) ...................................................4

*Wysocki v. Wardlaw-Hartridge Sch.*,
  No. 2:21-CV-14132, 2022 WL 2168212 (D.N.J. June 16, 2022) .....................32

*Yapak, LLC v. Massachusetts Bay Ins. Co.*,
  No. CIV. 3:09-CV-3370, 2009 WL 3366464 (D.N.J. Oct. 16, 2009)...............31

STATE CASES

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*,
  864 A.2d 387 (N.J. 2005) ...................................................31

*R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*,
  773 A.2d 1132 (N.J. 2001) ...................................................31, 32

*Wade v. Kessler Inst.*,
  778 A.2d 580 (N.J. Super. Ct. App. Div. 2001) ....................................31, 32, 38

FEDERAL STATUTES AND RULES

20 U.S.C. § 1681 ...................................................*passim*

28 U.S.C. § 1291 ...................................................3

28 U.S.C. § 1331 ...............................................................................3

28 U.S.C. § 1332 ...............................................................................3

Fed. R. App. P. 3(a)(1) ......................................................................4

Fed. R. App. P. 4(a)(1)(A) ................................................................4

Fed. R. Evid. 201 .............................................................................54

# <u>GLOSSARY</u>

| | |
|---|---|
| Committee | The University's Committee on Discipline |
| Doe | Plaintiff-appellant John Doe |
| JA | Joint Appendix |
| R. | Record citation to District Court document number from District Court docket |
| Roe | Complainant Jane Roe |
| RRR | The University's Rights, Rules, and Responsibilities policy |
| Smith | Complainant Sarah Smith |
| University | Defendant-appellee The Trustees of Princeton University |

# **INTRODUCTION**

This appeal arises from an internal student disciplinary proceeding against John Doe ("Doe"), a student at the Trustees of Princeton University (the "University"). Doe was accused of violating the University's "Personal Safety" policy when placing his hands on the necks of two different individuals on two separate occasions and applying pressure. The University adhered to its applicable student disciplinary policy and procedures. Specifically, Doe received advance notice of these charges; Doe was given access to all of the evidence before the adjudicators; Doe was provided multiple opportunities to respond to the evidence and submit his own evidence; Doe attended a live hearing, accompanied by an advisor of his choice, before the University's Faculty Student Committee on Discipline (the "Committee"), at which Doe presented evidence and questioned witnesses. After that hearing, the Committee, comprised of faculty members, students, and administrators, found Doe responsible for violating the University's "Personal Safety" policy and imposed the penalty of two years' suspension. Doe received and exercised his right to appeal in accordance with the applicable policies and procedures. The appellate panel, comprised of trained senior University officials, including the dean of the college, the dean of the Graduate School, the vice president for campus life, and the chair of the Judicial Committee of the Council of

the Princeton University Community, upheld the Committee's finding of responsibility and the sanction.

Dissatisfied with the outcome, and the District Court's well-supported ruling that Doe failed to state a claim for relief in this civil action, Doe argues that his Complaint must be reinstated. Doe's main argument is that his allegations purportedly mirror those in *Doe v. Princeton University* ("*Princeton III*"), 30 F.4th 335 (3d Cir. 2022), and *Doe v. University of Sciences* ("*U. Sciences*"), 961 F.3d 203 (3d Cir. 2020). The similarities between Doe's allegations and those in *Princeton III* and *U. Sciences* are superficial. In those cases, the plaintiffs alleged concrete procedural deficiencies and gender-specific disparities: (i) the absence of a live hearing, (ii) the asymmetric enforcement of no-contact orders, and (iii) active discouragement or encouragement of complaints based on gender. No such irregularities are alleged here. Instead, Doe alleges dissatisfaction with the Committee's credibility determinations and finding of responsibility, and such dissatisfaction does not constitute breach of contract or gender discrimination.

Unable to align his case with precedent, Doe invents a "bundle of sticks" standard under which a plaintiff may compile a large number of criticisms, no matter how minor, meritless, or unconnected to sex, and attribute them to sex based on volume alone. That is not the law. The proper legal standard requires a plausible

causal link between the challenged procedures and the student's sex. Doe alleges none.

Doe's contract theories fare no better. Doe recasts *Princeton III* as creating per se "categories" that always state a contract claim, and then declares that his allegations check those boxes. But *Princeton III* did not announce talismanic categories; it instead evaluated case-specific, concrete, and well-pleaded facts showing (if true) that the University failed to follow its own procedures. Here, Doe alleges no such procedural breach.

The District Court gave Doe leave to amend his claims, and Doe declined. There is no basis to disturb the District Court's decision now. For all the reasons articulated by the District Court and below, this Court should affirm.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1332. (*See* Mem. Op., R. 24, at 7, JA10.)

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court entered an Opinion and Order on April 28, 2025 dismissing all Doe's claims. (*See* Mem. Op., R. 24, JA4; Order, R. 25, JA3.)[1] Although the District Court's Order

---

[1] "R." refers to the record citation and uses the document numbers from the District Court's docket. Citations to pages from documents on the District Court's docket refer to the page numbers assigned by the District Court's electronic case filing system.

granted Doe leave to amend within 30 days, Doe chose "to stand on the allegations in the dismissed complaint" and filed a timely Notice of Appeal on May 23, 2025. *See* Fed. R. App. P. 3(a)(1); Fed. R. App. P. 4(a)(1)(A); Order, R. 25, JA3; Notice of Appeal, R. 26, JA1; *See Weber v. McGrogan*, 939 F.3d 232, 240 (3d. Cir. 2019) (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 705 (3d Cir. 1996)) (explaining that "a clear and unequivocal intent to decline amendment and immediately appeal that leaves no doubt or ambiguity can allow [this Court] to exercise jurisdiction"); *In Westinghouse*, 90 F.3d at 705 ("The principle is well-settled in this circuit that an order dismissing a complaint without prejudice is not a final and appealable order, unless the plaintiff no longer can amend the complaint because, for example, the statute of limitations has run, *or the plaintiff has elected to stand on the complaint.*") (quoting *Newark Branch, N.A.A.C.P. v. Harrison*, 907 F.2d 1408, 1416–17 (3d Cir. 1990)) (citations and footnotes omitted) (emphasis added); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 278 (3d Cir. 1992), *as amended* (May 27, 1992) (rejecting argument that this Court "lack[s] jurisdiction because plaintiffs failed to obtain an explicit dismissal with prejudice").

## STATEMENT OF THE ISSUES

1.     Whether this Court should affirm dismissal of Doe's breach of contract claim where his allegations did not plausibly show that the University failed to

substantially comply with its Rules, Rights, and Responsibilities policy and where *Princeton III* involved materially different facts?

2.      Whether this Court should affirm dismissal of Doe's claim for breach of the implied covenant of good faith and fair dealing where the claim was duplicative of his deficient contract claim, and also alleged no facts plausibly suggesting bad faith?

3.      Whether this Court should affirm dismissal of Doe's Title IX claim where his complaint failed to allege facts plausibly connecting the disciplinary proceedings and outcome to his sex?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously. The University is not aware of any related cases or proceedings within the meaning of Local Appellate Rule 28.1(a)(2).

## STATEMENT OF THE CASE

### I.      Relevant Facts Alleged[2]

### A.      The Complaints Against Doe and the University's Investigation

In September 2023, two individuals submitted separate reports alleging that Doe physically assaulted them on campus. (Compl., R. 1, at ¶¶ 115, 123, JA62-65.)

---

[2] The University disagrees with many of the facts set forth in Doe's Complaint, but it and the District Court were required to accept them as true for purposes of the University's Motion to Dismiss.

One of the complainants, referred to in the Complaint as Jane Roe ("Roe"), did not attend Princeton. (*Id.*) Roe alleged that Doe placed his hands on her neck in a choking manner during a visit to the University campus on April 1-2, 2023. (*Id.*) While the University was investigating Roe's report, a second complainant, Sarah Smith ("Smith"), a Princeton undergraduate student, reported that Doe had similarly placed his hands on her neck in March 2023 at a University eating club event. (*Id.*) The University also received information suggesting that Doe served alcohol to underage individuals in his dorm room. (*Id.*)

These reports triggered a formal investigation under the University's *Rights, Rules, and Responsibilities* policy (the "RRR"), which governs the University's disciplinary process. (*Id.* at ¶¶ 116, 120, 123, JA62-65.) The RRR[3] provides that the Committee has jurisdiction over potentially serious undergraduate infractions that may interrupt a student's academic career, including violations of the University's personal safety and alcohol policies. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.1, JA158.) Doe was investigated for alleged violations of:

---

[3] The District Court was able to consider relevant excerpts of the RRR that were integral to Doe's Complaint while ruling on the Motion to Dismiss. *Princeton III*, 30 F.4th at 345–46 ("Because the Panel Report was 'integral to' and 'explicitly relied upon in the complaint,' consideration is appropriate."); *Doe v. Princeton Univ.*, No. 17-CV-1614 (PGS), 2018 WL 2396685, at *2 n.1 (D.N.J. May 24, 2018) ("*Princeton I*") (considering panel report and letter when dismissing Title IX claims because they are "undisputedly authentic documents upon which the Complaint's claims are based"), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) ("*Princeton II*").

- Subsection 1.2.5(5) of the RRR, Personal Safety, which prohibits "[a]ny physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results"; and

- Subsection 2.2.9(2)(d) of the RRR, Alcohol Policy, which prohibits serving, providing, or making available alcohol to persons under the age of 21. Violations involving juvenile visitors to the University are deemed particularly serious, and the provision of hard alcohol in any quantity is classified as a higher-risk violation.

(*Id.* at §§ 1.2.5(5), 2.2.9, JA146, JA153-54.)

The RRR outlines detailed procedures to ensure fairness in the investigation and adjudication process. (*Id.* at § 2.5.2, JA158-61.) The RRR provides that the Committee will appoint a Dean or University investigator to investigate alleged infractions. (*Id.*) The student involved will be informed in writing of the charges and the hearing date. (*Id.*) At the conclusion of the investigation, the student may obtain all documents pertaining to reports of the alleged misconduct. (*Id.*) The student may also submit any additional written materials that may assist the Committee in reaching a decision. (*Id.*)

Once the investigation is concluded, the RRR states that "[m]atters shall be presented to the committee with all reasonable promptness." (*Id.*) At the hearing itself, the student may be accompanied by an advisor, make opening and closing statements, question witnesses, and present additional witnesses with information

about the matter before the Committee. (*Id.*) A finding of responsibility requires that the evidence establish a "clear and persuasive" case in support of the charges. (*Id.*)

Consistent with these procedures, the University initiated an investigation into the complaints against Doe and whether he violated the RRR's policies on personal safety and alcohol use. (Compl., R. 1, at ¶¶ 116, 120, JA62-64.) The Committee appointed an investigator, and the investigation included: (1) interviewing Doe; (2) interviewing both complainants; (3) interviewing five witnesses; and (4) collecting information, including numerous text messages, and two written statements from Doe. (*Id.* at ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180, JA53-56, JA64-69, JA74-82.) Doe was also informed in writing of the charges against him and the hearing date. (*Id.* at ¶¶ 121-23, JA64-65.) Following the investigation, the Committee scheduled a hearing; in advance of that hearing, Doe was provided all of the information that was also provided to the Committee. (*Id.*)

### B.     The Committee Hearing and Disciplinary Outcome

On November 6, 2023, a five-member panel of the Committee held the hearing on the charges against Doe. (*Id.* at ¶¶ 120, 162, JA64, JA76.) Doe was present, accompanied by an advisor, and participated in the proceedings. (*Id.* at ¶¶ 124, 164, JA65, JA77.) Doe had the opportunity to present information to the Committee, offer testimony, and call and ask questions of witnesses. (*Id.* at ¶¶ 164, 167-68, 194, JA77-78, JA87.) As permitted by the RRR, Doe also submitted written

materials to the Committee, including: (1) a written account of the events; (2) two supplemental written statements; and (3) numerous text messages between and among the involved parties. (*Id.* at ¶¶ 77, 118, 120, 128, 131, 156, 160, 180, JA53, JA63-67, JA74-76, JA82.) Doe also offered evidence pertaining to a student identified as Student X, whom Doe identified as having information related to Roe's credibility. (*Id.* at ¶¶ 77, 118, 128, 131, JA53, JA63-67.) The hearing lasted approximately four hours. (*Id.* at ¶¶ 13, 192, JA33, JA87.)

After deliberation, the Committee found Doe responsible for three violations of the RRR: two violations of subsection 1.2.5, Personal Safety, and one violation of subsection 2.2.9, Alcohol Policy. (*Id.* at ¶¶ 192-95, JA87.) Doe concedes that he violated the Alcohol Policy.[4] As a result of these multiple, serious violations of the RRR, the Committee sanctioned Doe with a two-year suspension. (*Id.* at ¶ 16, JA34.)

## C.  Doe's Appeal and the University's Final Decision

Doe exercised his right to appeal the Committee's decision to an appellate panel of senior University administrators. (*Id.* at ¶¶ 209, 212, 217, JA91-93.) The RRR explains that "[t]he purpose of an appeal is not to initiate a review of substantive issues of fact or to reach a new determination of whether a violation of

---

[4] Doe's Complaint states that on Roe's second night visiting him at the University, the two of them "had drinks" with other students in Doe's dorm room. (*Id.* at ¶ 94, JA57.)

University rules has occurred." (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA160-61.) Under the RRR, appeals are limited to three grounds:

- The procedures have not been fair and reasonable … Neither the choice of venue nor the nature of the investigation is grounds for appeal;

- There exists substantial relevant information that was not presented, and reasonably could not have been presented to the committee;

- The imposed penalty does not fall within the range of penalties imposed for similar misconduct.

(*Id.*) The RRR explains that the appellate panel may decide to uphold the original decision of the Committee, to reduce the imposed penalty, or to return the case to the original hearing body for additional proceedings. (*Id.*)

Doe raised several arguments on appeal under the guise of procedural infirmity, but none were found to have merit. (Compl., R. 1, at ¶ 217, JA92-93.) The appellate panel sought clarification of the issues he raised and asked him to provide details in support of his claims. (*Id.* at ¶ 212-15, JA91.) For example, Doe argued that the female complainants were interviewed three times, while he was interviewed once. (*Id.* at ¶¶ 209-10, JA91.) In response, the appellate panel inquired whether Doe requested additional interviews and been denied. (*Id.* at ¶ 213, JA92.) The panel found that Doe did not request an additional interview, but rather chose to submit supplemental written materials four days after his initial interview. (*Id.* at ¶ 218, JA93.)

Doe also argued in his appeal that the Committee erred in not calling Student X as a witness. (Opening Brief at 23.) The appellate panel confirmed, however, that under the RRR, character witnesses without direct knowledge of the incident are not called at hearings. (Compl., R. 1, at ¶ 217, JA93.)

Ultimately, Doe's appeal amounted to disagreements with the Committee's determinations, not claims within the RRR's three narrow grounds for appeal. (*Id.* at ¶ 217, JA92-93.) After reviewing Doe's submissions, the appellate panel concluded that no procedural irregularity occurred and upheld the finding of responsibility and two-year suspension. (*Id.* at ¶¶ 209, 212, 217, JA91-93.)

## II. Procedural History and Rulings Presented for Review

Doe filed his Complaint on June 20, 2024. (Compl., R. 1, JA105.) The Complaint asserted claims against the University for: (1) breach of contract (Count One); (2) breach of the implied covenant of good faith and fair dealing (Count Two); (3) gender discrimination, in violation of Title IX, 20 U.S.C. § 1681 (Count Three); and (4) gross negligence (Count Four). (*Id.* at ¶¶ 230-65, JA95-104.)

The University moved to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Mot. to Dismiss, R. 16, JA107-08.) On April 28, 2025, the District Court entered an Opinion and Order granting the University's motion and dismissing all Doe's claims. (*See* Mem. Op., R. 24, JA4; Order, R. 25, JA3.) The District Court dismissed Doe's claims without prejudice and granted Doe leave

to amend within 30 days (*id.*); however, Doe chose to stand on his original Complaint and appeal the District Court's Opinion and Order to this Court. (Notice of Appeal, R. 26, JA1.)

## SUMMARY OF THE ARGUMENT

This Court should affirm for each of the following reasons:

1.      Doe's breach of contract claim fails because the University substantially complied with the RRR. Under New Jersey law, that is the measure of the University's obligation. *See Princeton II*, 790 F. App'x at 385; *Princeton III*, 30 F.4th at 346–47 ("New Jersey law requires at least that the school follow its own established procedures and that those procedures be fundamentally fair.") (internal citations omitted). Doe's allegations confirm that he received notice of the charges, had repeated opportunities to submit evidence and responses, had full access to the evidence against him, maintained the ability to request additional witness interviews, and participated in a full live hearing with the opportunity to confront witnesses. (Compl., R. 1, at ¶¶ 117-31, 162, 181-82, JA63-67, JA76, JA83.) Unlike the plaintiff in *Princeton III*, Doe does not allege that the University ignored his counterclaims, pressured his accusers to file charges, or applied its policies asymmetrically to male and female complainants. *Id.* at 343. Instead, his contract claim rests on dissatisfaction with the outcome, which is not actionable under *Princeton III* or otherwise.

2. Doe's implied covenant claim fares no better. Doe alleges no facts that plausibly suggest bad faith or improper motive by University officials; his criticisms of the process amount to nothing more than dissatisfaction with credibility determinations that New Jersey law leaves to the University. *See Princeton II*, 790 F. App'x at 385 (holding that courts do not second guess credibility determinations absent well-pleaded allegations of procedural irregularity or bad faith). Moreover, his arguments on appeal reveal that his covenant claim is coextensive with his contract claim, which New Jersey law does not recognize. *See Princeton III*, 30 F. 4th at 348 (citing *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.*, 2006 WL 2162455, at *10 (N.J. Super. Ct. App. Div. Aug. 3, 2006) (per curiam) (dismissing implied covenant claim where it appeared redundant of breach of contract claim)).

3. Doe's Title IX claim was also properly dismissed. Doe was required to plead facts plausibly showing that sex was a motivating factor in the disciplinary outcome, but he did not. *U. Sciences*, 961 F.3d 203, 209-10 (3d Cir. 2020); *Princeton III*, 30 F.4th at 342-43. This Court's decisions in *U. Sciences* and *Princeton III* make clear that a Title IX claim requires specific factual allegations plausibly linking the university's actions to the plaintiff's gender. *U. Sciences*, 961 F.3d at 209-10; *Princeton III*, 30 F.4th at 342-43. In *U. Sciences*, the university investigated a male student while ignoring allegations that female students violated the same policy, thereby plausibly showing selective enforcement based on sex. 961 F.3d at 210. In

*Princeton III*, the university allegedly treated the male plaintiff's countercomplaints as less serious than the female complainant's, and enforced a mutual no-contact order only against him. 30 F.4th at 343. Doe's allegations here do not resemble the allegations in those cases. Doe identifies no similarly situated female who received more favorable treatment nor any policy enforced differently against men and women. Instead, he advances criticisms untethered to gender and invokes generalized claims of external pressure that have no connection to his specific proceeding.

## ARGUMENT

### I.     Standard of Review

This Court reviews rulings on motions to dismiss *de novo*, *see Borough of Longport v. Netflix, Inc.*, 94 F.4th 303, 306 (3d Cir. 2024), and may affirm the judgment on any basis in the record, *see Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 335 (3d Cir. 2009) (quoting *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line Inc.*, 85 F.3d 1098, 1107 (3d Cir. 1996)).

### II.    The District Court Correctly Dismissed Doe's Breach of Contract Claim

In *Princeton II*, this Court held that to successfully plead a breach of contract claim arising from a private university's disciplinary proceedings, a student must plausibly allege that the school "violate[d] in some substantial way its rules and regulations." 790 F. App'x at 385. As this Court explained in *Princeton III*, "New

Jersey law requires at least that the school follow its own establishes procedures and that those procedures be fundamentally fair." 30 F.4th at 345-46.

Measured against the *Princeton II* standard, Doe's breach of contract claim falls short. Doe advances two theories of breach: *first*, that Princeton failed to apply the RRR's "clear and persuasive" evidentiary standard; and *second*, that Princeton breached the RRR by denying Doe's appeal. Neither theory withstands scrutiny.

### A.  Princeton Complied with the RRR and Applied the Clear and Persuasive Evidence Standard

#### 1.  Doe's Allegations Do Not Plausibly Show That Princeton Violated the RRR in Adjudicating the Charges Against Him

Doe's allegations confirm that the University adhered to the RRR's procedures. The RRR requires that an investigator first gather information pertaining to alleged infractions under the jurisdiction of the Committee, after which the student is informed of the charges in writing, provided access to the evidence collected, and afforded the opportunity to submit written materials in response. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA158-60.) The process culminates in a hearing before the Committee, at which the student may be accompanied by an advisor, request witnesses subject to reasonable limits, question witnesses, and present statements. (*Id.*) The Committee, in turn, must decide whether the charges are supported by a "clear and persuasive" evidentiary showing after deliberating in "closed session." (*Id.*)

Doe's Complaint acknowledges that each of these steps occurred in his case. (*Id.*) *First*, the investigation was consistent with RRR § 2.5.2. The Committee appointed an investigator who interviewed Doe, both complainants (Roe and Smith), and five witnesses. (Compl., R. 1, at ¶¶ 116-20, 136, JA62-64, JA69.) The investigator also collected and reviewed extensive documentary evidence, including numerous text messages, Doe's written account of events, and evidence pertaining to Student X, an individual identified by Doe who brought a defamation lawsuit against Roe. (*Id.* at ¶¶ 77, 85-86, 122, 130-31, 156, 160, 180, JA53-56, JA64-67, JA74-82.)

Throughout the investigation, Doe was repeatedly given access to the developing evidence, invited to request further interviews, and allowed to submit supplemental statements. (*Id.* at ¶ 122, JA64.) On October 25, 2023, the investigator sent Doe a formal written notice of the charges and the developing record and expressly invited him to identify additional interviews. (*Id.*) On October 31, 2023, Doe submitted a supplemental statement, but did not identify any interviews he wished to occur. (*Id.* at ¶ 125, JA65.) That same day, the investigator sent Doe an updated evidence packet reflecting interview summaries of witnesses the complainants had requested be interviewed. (*Id.* at ¶ 126, JA66.) On November 3, 2023, Doe submitted another statement along with materials pertaining to Student X. (*Id.* at ¶ 131, JA67.) By November 4, 2023, Doe received the finalized evidence

packet, which incorporated follow-up interviews the investigator conducted in response to points Doe raised in his submissions. (*Id.* at ¶ 132, JA67-68.) In sum, and consistent with the RRR § 2.5.2, prior to the hearing Doe was given the evidence packet, notified of the charges, and offered the chance to request additional interviews and submit written materials. (*Id.* at ¶ 122, JA64.) These are precisely the process steps the RRR prescribes. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA158-61.)

*Second*, the hearing was consistent with the RRR's hearing procedures. (*Id.*) On November 6, 2023, the Committee held a four-hour hearing. (Compl., R. 1, at ¶ 120, JA64.) The RRR requires that the panel consist of two faculty members, three students, and the Dean of Students as chair. The Committee composition complied with the RRR's requirements and consisted of two faculty members, three students, as well as the then-Dean of Students, Kathleen Deignan, who served as chair of the Committee. (*Id.*) Doe was present at the hearing and accompanied by an advisor. (*Id.* at ¶¶ 124, 164, JA65, JA77.) The evidence Doe submitted was before the Committee, including: (1) his written account of events; (2) materials pertaining to Student X; (3) two supplemental statements written by Doe; and (4) numerous text messages identified by Doe. (*Id.* at ¶¶ 77, 85-86, 122, 130-31, 156, 160, 180, JA53-56, JA64-67, JA74-82.) At the hearing, Doe had the ability to present information to the Committee, to offer testimony, and to call and ask questions of witnesses. (*Id.* at

¶¶ 164, 167, JA77-78.) Doe's Complaint alleges, in detail, the defense he put on before the Committee. (*Id.* at ¶¶ 164, 167-69, 172-73, 176, 182, 192, JA77-87.)

*Finally*, the Complaint does not plausibly allege that the Committee failed to apply the "clear and persuasive" standard. To the contrary, the Complaint's allegations describe a record that the Committee could reasonably find clear and persuasive. For example, Doe acknowledged his responsibility for misconduct toward Roe (1) in a text message where he stated, "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done last night" (*Id.* at ¶ 108, JA60), and (2) in a phone call to his parents, when he admitted that he "damaged [Roe's] windpipe ever so slightly." (*Id.* at ¶ 111, JA61.)

Doe relies on an out-of-Circuit decision for the proposition that the Committee should not have considered such text messages. *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 325-26 (1st Cir. 2022). Doe's reliance on *Stonehill* is misplaced. In *Stonehill*, the plaintiff was investigated for sexual assault arising from a sexual relationship both parties acknowledged had been consensual. *Id.* The plaintiff alleged that the university unfairly treated his post-incident Snapchat messages "as a substitute for the searching analysis of 'consent' that was required of them." *Id.* Because the parties' longstanding consensual relationship was undisputed, those messages were essentially the only evidence contrasting the complainant's and respondent's

accounts. *Id.* The plaintiff further alleged that he told investigators that the messages were untrue and that he sent them only to "make [Roe] feel better." *Id.*

Here, Doe alleges nothing of the sort. He does not allege that his text messages were the sole evidence at issue during the hearing, nor that he told the Committee the messages were untrue or offered only to comfort Roe. Doe alleges only that the Committee should believe he had been "blackmailed" into saying what he did, an argument that the Committee considered, but did not find persuasive. (Compl., R. 1, at ¶ 196, JA88.)

Further, a neutral witness at the hearing corroborated key facts, testifying that one of the complainants (Roe) "had a raspy voice when he saw her after the incident." (*Id.* at ¶ 181, JA83.) It bears emphasis that the Complaint acknowledges that Roe consistently alleged the same core fact: that Doe placed his hands on her neck and applied pressure. (*Id.* at ¶¶ 123, 147, 168, JA64-65, JA71-72, JA78.) That allegation was the basis of the charge, and it never changed. (*Id.*) Based on all of the evidence presented, including the corroborating evidence acknowledged in Doe's Complaint, the Committee credited Roe's account of events.

As for complainant Smith, Doe admitted that he "confronted [Smith] in *actions* he would come to regret." (*Id.* at ¶ 89, JA56 (emphasis added).) Doe also admitted that "[h]e spoke closely and loudly with [Smith], in part out of anger," and acknowledged that three bystanders who witnessed his confrontation felt it necessary

to intervene on Smith's behalf. (*Id.*) Smith also alleged the same central conduct: that Doe placed his hands on her neck and applied pressure. (*Id.* at ¶¶ 123, 158, JA64-65, JA75-76.) The Committee ultimately credited Smith's account of events after hearing her testimony at the hearing and considering these admissions from Doe.

To be sure, Doe would have weighed the evidence differently and wished the Committee did so. But that does not mean that the Committee breached the RRR or deviated from the "clear and persuasive" evidentiary standard.

## 2. None of Doe's Criticisms Have Merit

Doe's Opening Brief raises a number of meritless criticisms of the conduct proceeding. (Opening Brief at 30-35.) Doe argues that the Committee "disregarded" Student 4, whom he calls "the only eyewitness," by interviewing him only once and questioning him aggressively at the hearing. (*Id.* at 30.) The Complaint alleges, however, that the Committee, rather than "disregard" Student 4, instead permitted him to testify at the hearing for approximately forty minutes and to clarify his testimony "unequivocally." (Compl., R. 1, at ¶ 183, JA83-84.) What Doe actually takes issue with is that Student 4's account was tested against the observations, or lack thereof, of Student 3, another witness present during the incident with Roe. The Complaint alleges that Student 3, who was walking with Student 4, could not see the incident and expressed surprise that Student 4 could see it. (*Id.* at ¶ 182, JA83.)

Against the backdrop of these contextual allegations, the Committee's questioning of Student 4 about what he could actually perceive was a routine credibility inquiry, not a procedural defect as Doe now argues. Moreover, the RRR guarantees the opportunity to present and test testimony; it does not guarantee that the Committee must credit a witness in the manner Doe prefers. Further, the RRR does not contain any requirement that the Committee explain in detail how it weighed every piece of evidence before it, which is the invented standard Doe would have this Court apply in lieu of the RRR.

Doe further claims the University "disregarded" evidence[5] concerning Student X (Opening Brief at 31), but the Complaint alleges that Doe twice submitted written materials regarding Student X and that those materials were included in the packet the Committee considered. (*Id.* at ¶¶ 118, 131, JA63-67.) Moreover, Student X had no firsthand knowledge of the charged incidents. (*Id.* at ¶¶ 177, 239, JA81, JA97.) The RRR permits the parties to request the testimony of any person "with information about the matter," subject to reasonable limits. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA159.) Declining to compel live testimony from a non-eyewitness whom Doe did not ask the investigator to interview during the fact-gathering phase

---

[5] The only specific evidence Doe identified pertaining to Student X was a letter from Student X's attorney to Roe accusing her of defaming Student X. (Compl., R. 1, at ¶ 118, JA63.)

was consistent with those reasonable limits and with the orderly conduct of a hearing.

Doe further faults the University for not interviewing his roommate, Student 5, to address whether Roe slept in Doe's room later in the same week of the alleged assault. (Opening Brief at 31.) Yet Doe never identified Student 5 as a witness—not at the outset of the investigation, and not after being provided the witness list and being informed "that he had the option to request additional interviews be conducted." (Compl., R. 1, at ¶ 122, JA64.) Furthermore, whether Roe spent the night in Doe's room has no bearing on whether Doe choked Roe earlier in that same week. Whether Roe and Smith spent time with Doe after the charged incidents is similarly irrelevant. (Opening Brief at 31.) The Committee deliberated within its discretion to determine what weight, if any, to give this evidence.

Relatedly, Doe argues that he should have been allowed to introduce additional text messages at the hearing. (Opening Brief at 21.) However, Doe fails to acknowledge that the subject of such text messages concerned only whether he or Roe was a "controlling friend." (Compl., R. 1, at ¶ 180, JA82.) By Doe's own admission, such issues "have no bearing on whether the alleged incidents occurred." (*Id.*) In any event, the Complaint concedes that Doe had the opportunity to (and did) submit text messages during the factfinding investigation, prior to the hearing. (*Id.* at ¶¶ 77, 156, 160, 180, JA53, JA74-76, JA82.) His attempt to introduce additional

and new text messages at the hearing was inconsistent with the RRR, which only allows a student to submit written materials during the investigation, not at the hearing itself. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA159.)

Doe further contends that the Committee ignored inconsistencies in Roe's and Smith's accounts. (Opening Brief at 32.) The Complaint, however, alleges that: (1) the investigator followed up with both complainants after receiving Doe's statements; (2) the finalized evidence packet included information generated as a result of those follow-ups; and (3) the Committee conducted a live hearing that allowed testing of these accounts through available witnesses. (Compl., R. 1, at ¶¶ 132-34, 162, JA67-68, JA76.) Through their written and any live testimony, both complainants consistently alleged the same core conduct: that Doe placed his hands on their necks. (*Id.* at ¶¶ 123, 147, 158, 168, JA64-65, JA71-78.) This is the conduct that Doe was charged with and found responsible for. (*Id.*)

Finally, Doe's assertion that the hearing began at an "unreasonable hour" is not a plausible procedural infirmity. As the Committee is made up of professors and students, the hearing was reasonably scheduled after the conclusion of the academic day. (*Id.* at ¶ 162, JA76.) More importantly, Doe nowhere suggests, nor could he, that there is a contractual obligation for a conduct hearing to take place at a particular time of day.

In sum, Doe has not alleged facts showing that the University substantially violated the RRR's terms in conducting its disciplinary process. Rather, Doe's own allegations show that the University adhered to "its own rules" and followed "fundamentally fair" procedures. *Princeton II*, 790 F. App'x at 385; *Princeton III*, 30 F.4th at 346. Because the Complaint's allegations demonstrate that the University followed its procedures as outlined in the RRR, Doe's breach of contract claim was properly dismissed. *Princeton I*, 2018 WL 2396685, at *8 (dismissing contract claim alleging violations of the RRR where the University followed its procedures as outlined in the RRR).

Doe nonetheless argues that the University, and the District Court, erred because the Committee's written decision did not catalog every piece of evidence in the record. But the RRR does not require that the written decision provide an exhaustive explanation regarding how each piece of evidence was weighed. The RRR provides that deliberations occur in closed session and obligates the Committee only to inform the student of its decision and, if a penalty is imposed, to ensure the student understands the sanction and its consequences. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA159-60.) That is exactly what occurred here.

In the absence of a specific breach of the RRR's procedures, Doe must argue as a last resort that the procedures in his case were fundamentally unfair. Doe again relies on *Princeton III*, but unlike *Princeton III*, where there was no live hearing

during which the decisional body could test credibility, here Princeton afforded Doe a live hearing at which he had the opportunity to present evidence and question witnesses. That is the hallmark of a fundamentally fair process. *See U. Sciences*, 961 F.3d at 2015 (holding that, in the context of Title IX sexual-misconduct proceedings, "fairness" requires a "real, meaningful hearing" and "the opportunity for cross-examination of witnesses"). Because Doe received precisely that process, *Princeton III* offers him no refuge, and the District Court properly dismissed his claim.

**B.    Doe's Allegations Do Not Plausibly Show That Princeton Violated the RRR in Denying His Appeal**

The RRR allows appeals on only three grounds: (1) unfair or unreasonable procedures; (2) substantial new evidence; or (3) a penalty outside the range imposed for similar misconduct. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA160-61.) The Complaint does not plausibly allege any of these grounds. Doe invokes "unfairness," but fails to identify a single "procedure" that was actually denied to him. (Opening Brief at 36.) Doe second-guesses the Committee's credibility determinations, but those criticisms have nothing to do with whether the procedures employed were unfair or unreasonable. The District Court was correct to find that "the Complaint does not sufficiently allege that the investigation or procedure was unfair or not in accordance with the [RRR]. Therefore, the appeals panel was not in breach for rejecting an appeal on fairness grounds." (Mem. Op., R. 24, at 16, JA19.)

To the extent the Court deems it necessary to evaluate the underlying claims of Doe's internal appeal, they are easily dispatched. Doe alleges that the Committee failed to pursue relevant testimony because neither the investigator nor the Committee interviewed Student X or Doe's roommate, Student 5 (who interacted with Roe and Smith in the days after the incident with Roe). (Compl., R. 1, at ¶ 136, JA69.) Doe's Complaint concedes, however, that after the investigation was concluded, and *before* the hearing, he was provided with the evidence packet and informed "that he had the option to request additional interviews be conducted based on the information in the packet." (*Id.* at ¶ 122, JA64.) Doe did not request that Student X or Student 5 be interviewed.

Doe's Complaint further concedes that the students who were interviewed were "***identified*** by the female complainants." (*Id.* at ¶ 136, JA69 (emphasis added).) In other words, Roe and Smith identified witnesses, and they were interviewed. Doe did not do the same. This was Doe's choice. Doe's failure to take advantage of the process available to him does not support a breach of contract claim. The District Court properly found that the Committee could not have pursued Student X because he was not identified as a witness by Doe.[6] (Mem. Op., R. 24, at 16, JA19.)

---

[6] Student X was not an eyewitness to the incident and therefore would not have been identified in the University's investigation of the incident.

Doe next objects that Student X did not testify at the hearing. Doe argues this was because "he [Student X] was not interviewed." (Opening Brief at 39.) But Doe's Complaint makes clear he was informed that: (1) "[c]haracter witnesses were not permitted at the hearing because it would focus only on the incidents at hand;" and (2) "Student X could not testify because he did not have firsthand knowledge of the incident and only knew about the character of [Roe]." (Compl., R. 1, at ¶ 177, JA81.) Thus, Doe's contrary arguments—that he was never told an interview was required, that the RRR imposed such restriction, or that the District Court drew improper inferences on these bases—are meritless. (Opening Brief at 38-40.) It is undisputed that Student X was not an eyewitness to either of the incidents at issue, and the RRR expressly limits testimony to individuals "with information **about the matter before the committee** … subject to reasonable limits agreed on by the committee." (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA159 (emphasis added).) Student X, by Doe's own account, had no knowledge of the alleged choking incidents involving Roe or Smith. (Compl., R. 1, at ¶ 177, JA81.)

The RRR provides broader latitude for written submissions: a student "has the option of submitting any additional written materials that may assist the committee in reaching a decision." (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA159.) The University honored that here. Doe twice submitted written materials concerning Student X, and those submissions were included in the evidence packet that the

27

Committee reviewed. (Compl., R. 1, at ¶¶ 118, 131, JA63-67.) Thus, Doe had the opportunity to put Student X's information before the Committee, and the Committee considered it.

Doe next argues that a male student (Student 4) who witnessed the alleged incident between Doe and Roe was interviewed once, while a female student (Student 3) who was involved in a prior disciplinary issue pertaining to Doe was interviewed twice.[7] (Opening Brief at 30.) Notably, this female student was also an eyewitness to the incident involving Doe and Roe, and was present on the night of the incident with Smith. (*Id.* at ¶¶ 89, 99, 205, JA56-58, JA90.) The University appellate body did not find that his conclusory allegation of "gender bias" supported Doe's appeal. (*Id.* at ¶¶ 209, 217, 221, JA91-94.) There is no basis for the Court to second-guess the University's decision in this regard. *See Princeton I*, 2018 WL 2396685, at *4 (a court must "weed out the conclusory statements" and "exclude[] the[m] . . . from its analysis") (citations omitted).

Similarly, Doe objects that the University's process was unfair because Roe and Smith were interviewed three times, while he was interviewed only once. (Opening Brief at 37.) But the appellate panel directly addressed this point, noting that instead of participating in an additional interview, Doe opted to supplement his

---

[7] The prior disciplinary matter arose from an incident in which Doe and Student 3 were "rough-housing" on the University campus; however, Student 3 was not a complainant against Doe in that proceeding. (*Id.* at ¶ 205, JA90.)

account through written submissions, including a detailed statement filed four days after his initial interview. (Compl., R. 1, at ¶¶ 213, 218, JA92-93.) Doe's dissatisfaction with how he chose to proceed does not establish a procedural defect.

In sum, Doe has not alleged facts showing that the University substantially violated the RRR's terms in conducting its disciplinary process or in considering Doe's appeal. Rather, Doe's allegations show that the University adhered to "its own rules" and followed "fundamentally fair" procedures. *Princeton II*, 790 F. App'x at 385; *Princeton III*, 30 F.4th at 346.

### C. *Princeton III* Does Not Dictate a Different Result

Doe relies heavily on this Court's decision in *Princeton III* and contends that the District Court made the "same error" that this Court corrected in *Princeton III*. (Opening Brief at 35.) That comparison is misplaced.

*Princeton III* concerned claims that the University applied inconsistent standards to male and female parties where the University allegedly pressed one party to pursue charges while discouraging the other, enforced a no-contact order unevenly, and resolved the matter without a live hearing. 30 F.4th at 345–46. Against that factual backdrop, the plaintiff plausibly alleged a breach of contract. *Id.* Here, Doe pleads none of those things. What Doe pleads instead is his disagreement with the Committee's credibility determinations and finding of responsibility. *See Princeton II*, 790 F. App'x at 385 (holding that courts do not second guess credibility

determinations absent well-pleaded allegations of procedural irregularity or bad faith). Doe's disagreement does not establish a breach of contract under New Jersey law. *Princeton III*, 30 F.4th at 345–46.

Additionally, in *Princeton III*, this Court cautioned that district courts may not credit the truth of "integral documents" (such as a panel report) over contrary factual allegations in a complaint. 30 F.4th at 342. That may be true, but it is of no moment to the current appeal, as the District Court did no such thing here. Unlike *Princeton III*, the District Court relied on Doe's pleadings alone to confirm that the University followed the steps required by the RRR.

Doe also misstates the District Court's reasoning. Doe argues that the District Court effectively equated the volume of evidence with procedural fairness, suggesting that the District Court believed the Committee's decision was insulated from challenge simply because it considered a large amount of evidence. (Opening Brief at 33-35.) That is not what the District Court ruled. Rather, the District Court ruled that, even crediting Doe's allegations in full, he failed to identify any procedural irregularity. (Mem. Op., R. 24, at 13-16, JA16-19.) And contrary to Doe's claim that the District Court disposed of his contract claim in "two sentences," the District Court devoted several pages to analyzing the claim and explaining why the Complaint established substantial compliance with the RRR. (*Id.*)

For all of these reasons, this Court should affirm the District Court's dismissal of Doe's breach of contract claim.

## III. The Court Properly Dismissed Doe's Implied Covenant Claim Because Doe Does Not Allege Bad Faith Conduct

Every contract under New Jersey law "contains an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 778 A.2d 580, 584 (N.J. Super. Ct. App. Div. 2001), aff'd as modified, 798 A.2d 1251 (N.J. 2002). While there is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, "two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009). Further, a plaintiff "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (citations omitted).

The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith had engaged in some conduct that denied the benefit of the bargain originally intended by the parties. *R.J. Gaydos Ins. Agency, Inc. v. Nat'l*

*Consumer Ins. Co.*, 773 A.2d 1132 (N.J. 2001). Proof of bad motive or intention is vital to an action for breach of the covenant of good faith and fair dealing. *Id*. Bad faith allegations "should not be permitted to be advanced in the abstract and absent an improper motive." *Wade*, 798 A.2d at 1260 (citations omitted); *Wysocki v. Wardlaw-Hartridge Sch.*, No. 2:21-CV-14132, 2022 WL 2168212, at *3 (D.N.J. June 16, 2022) (dismissing claim where "[t]he Court cannot discern coherent factual allegations supporting Plaintiffs' bare assertion that [the defendant school] violated and breached the implied covenant of good faith and fair dealing") (internal quotations omitted).

Doe's Complaint does not plausibly allege that the University acted with bad faith or an improper motive. Instead, his allegations reflect dissatisfaction with credibility determinations and outcomes, not malice or sabotage of his contractual rights. The District Court correctly recognized this deficiency and dismissed Doe's claim. (*See* Mem. Op., R. 24, at 18, JA21.)

### A. *Princeton III* Does Not Save Doe's Deficiently-Pled Claim

Doe again attempts to rescue his deficiently-pled claim by misreading this Court's decision in *Princeton III*. He argues that *Princeton III* creates three "categories" of allegations that suffice to plead an implied covenant violation: that the University "[s]ubject[ed] [Doe] to a discriminatory disciplinary process;" "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against

[Roe];" and "constru[ed] all discrepancies and inconsistencies in [Roe's] favor." (Opening Brief at 43); *Princeton III*, 30 F.4th at 348. But *Princeton III* did not announce a categorical checklist for pleading implied covenant claims. Instead, this Court held that the particular allegations in that case, taken as true, supported an inference of bad faith. *Id.* at 347-48.

Even if this Court had established a checklist that supplanted ordinary pleading requirements for an implied covenant claim, Doe's allegations do not check the boxes. *Princeton III* involved cross-claims between two students, where the University (1) allegedly pressed the female party to file charges while discouraging the male party, (2) enforced a no-contact order asymmetrically, (3) ignored incriminating evidence against the female party, and (4) adjudicated the matter without any live hearing. *Id.* at 341-44, 347-48. Those allegations supported a plausible inference of bad faith.

Doe alleged none of those things. He never filed counterclaims against Roe or Smith, so there was no "incriminating evidence against" them to disregard. *Id.* at 348. There are no allegations in this case of asymmetrical enforcement of orders. There are no allegations of pressure on Roe or Smith to file complaints. And most significantly, Doe received a four-hour live hearing with the ability to submit statements, present evidence, question others, and be assisted by an advisor.

(Compl., R. 1, at ¶¶ 120, 124, 164, JA64-65, JA77.) The factual landscape here bears little resemblance to *Princeton III*, aside from the identity of the defendant.

Undaunted, Doe contends that Princeton subjected him to a "discriminatory process" in three ways: by (1) giving Roe and Smith more opportunities to explain themselves before the hearing; (2) proactively seeking testimony for them; and (3) treating his witnesses more harshly. (Opening Brief at 43-44.) The Complaint undermines each of these claims.

*First*, the pleadings show that the investigator followed up with Roe and Smith in response to issues Doe raised, memorialized those points in the evidence packet, and provided the information to Doe. (Compl., R. 1, at ¶ 132, JA67-68.) Each time he received an updated evidence packet, Doe submitted additional statements and evidence, which the investigator added to the record. (*Id.* at ¶¶ 125-32, JA65-68.) Doe also concedes that he was expressly told he could request additional interviews, but chose not to do so, opting instead to submit written evidence. (*Id.* at ¶¶ 122, 125-32, JA64-68.)

*Second*, Doe acknowledges that the witnesses interviewed during the investigation were "***identified*** by the female complainants," while he, despite being expressly told he could request additional interviews, failed to identify his own witnesses. (*Id.* at ¶ 136, JA69 (emphasis added).) That allegation cannot be reframed

as the University "proactively" seeking testimony for Roe and Smith; it reflects only that Roe and Smith identified witnesses when Doe chose not to.

*Third*, the claim that his witnesses were questioned "more aggressively" fares no better. Asking probing questions is necessary to test credibility and does not by itself plausibly show malice or an intent to frustrate contractual rights. Accordingly, the District Court correctly ruled that, "the Complaint does not plausibly allege that the Committee acted in bad faith or with malice toward Plaintiff." (*See* Mem. Op., R. 24, at 18, JA21.)

Next, Doe claims that the University "disregarded exculpatory evidence." (Opening Brief at 44.) But unlike *Princeton III*, where the University allegedly "[d]isregard[ed] exculpatory evidence for [Doe] ***and incriminating evidence against [Roe]***," the Committee here did not disregard (and could not have disregarded) incriminating evidence against Roe or Smith, because Doe did not file any complaints against either of them. *Princeton III*, 30 F.4th at 348 (emphasis added). Moreover, the only "exculpatory" evidence Doe points to is testimony from (1) Student X, who had no knowledge of the incidents but allegedly had unrelated information about Roe's credibility, and (2) Student 5, who could say only whether Roe slept in Doe's room days after the alleged assault. (Compl., R. 1, at ¶¶ 122, 136, JA64, JA69.) Neither witness could speak to whether Doe placed his hands on Roe's or Smith's necks. Additionally, the Complaint concedes that Doe never identified

either witness for interview when invited to do so. (*Id.*) Moreover, the RRR distinguishes between live witnesses, who must have "information about the matter before the committee," and written submissions, which may include broader context. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA159.) Consistent with that framework, the Committee admitted Doe's written submissions about Student X but declined to compel his live testimony. That judgment is not evidence of bad faith; it is application of the governing rules.

Doe also faults the Committee for not pressing Smith on this supposed "exculpatory" evidence at the hearing. (Opening Brief at 44.) But the Complaint itself shows there was nothing to press her on: Student X and Student 5 had no information bearing on Smith's allegations, and the Committee did ask Smith directly whether she ever felt pressured to lie for Roe—she answered no. (Compl., R. 1, at ¶¶ 188-91, JA85-87.) That exchange demonstrates the Committee's willingness to test potential bias and undermines Doe's conclusory assertion that it ignored exculpatory evidence.

Doe also complains that the Committee failed to address this purported "exculpatory" evidence in its written decision. The RRR requires only that the Committee inform the student of its decision, and, if a penalty is imposed, ensure the student understands the sanction and its consequences. (Mot. to Dismiss, Ex. A, R. 16, at § 2.5.2, JA160.) There is no requirement that the Committee catalogue or

rebut every piece of evidence presented in writing. *Id.* The Complaint acknowledges that the Committee issued a written decision and conducted a Zoom call with Doe to inform him of the decision. (Compl., R. 1, at ¶¶ 194-95, JA87.) While Doe may have wished that the Committee explain how it weighed every single piece of evidence, the RRR does not impose that obligation, and the absence of such detail is not evidence of bad faith.

Finally, Doe asserts that the University "construed all discrepancies" in Roe's and Smith's favor by labeling their testimony "consistent." (*Id.* at ¶ 196, JA88.) The Complaint shows why the Committee could reasonably reach that conclusion. Both complainants consistently reported that Doe placed his hands on their necks, which was the conduct charged under the RRR. (*Id.* at ¶¶ 123, 147, 158, 168, JA64-65, JA71-78.) Nowhere in Doe's 265-paragraph Complaint does he actually allege that he did *not* place his hands on Roe's or Smith's necks. Doe takes issue with the characterizations of how the assault happened, but not *whether* it happened in the most basic and critical sense. Moreover, for Roe, that core fact was corroborated by a neutral witness who observed Roe with a raspy voice shortly after the incident, and by Doe's own statements, including a text acknowledging "what I must have done last night" and a recorded call admitting he "damaged [Roe's] windpipe ever so slightly." (*Id.* at ¶¶ 108, 111, 181, JA60-61, JA83.) Accordingly, the Committee's

description of the complainants' testimony as "consistent" was supported and appropriate under the RRR—it certainly was not plausible evidence of bad faith.

Ultimately, Doe disagreed with the Committee's credibility determinations. Under New Jersey law, courts do not second guess such determinations absent well-pleaded allegations of procedural irregularity or bad faith. *See Princeton II*, 790 F. App'x at 385. There are none here.

### B. Doe's Implied Covenant Claim Is Also Improper Because It Is Duplicative of His Breach of Contract Claim

Although the District Court ruled that Doe's implied covenant claim was not duplicative of his breach of contract claim, Doe reveals on appeal that he regards these claims as coextensive. Doe argues that dismissal of his covenant claim was erroneous "for the same reasons" that dismissal of his contract claim was erroneous. (Opening Brief at 44.) That admission reveals that the covenant claim adds nothing beyond the contract claim, and dismissal was separately proper for that reason as well. *See Princeton III,* 30 F.4th at 348 (citing *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.*, 2006 WL 2162435, at *10 (N.J. Super. Ct. App. Div. Aug. 3, 2006) (per curiam) (dismissing implied covenant of good faith and fair dealing claim where it appeared redundant of breach of contract claim)); *Wade*, 172 N.J. at 327, 798 A.2d 1251 (holding that a breach of the implied covenant of good faith and fair dealing does not create an independent cause of action when it is based on the same underlying conduct as the breach of contract claim); *Hills v. Bank of America*, No.

13–4960, 2015 WL 1205007, at *4 (D.N.J. Mar. 17, 2015) (same). Much of Doe's argument repeats the same criticisms of the investigation and hearing already addressed under his contract theory; relabeling those same allegations as breach of the implied covenant cannot salvage them.

## IV. The District Court Properly Dismissed Doe's Title IX Claim Because He Failed to Plausibly Allege Gender Bias

### A. The University Conducted a Thorough Investigation and Hearing under the RRR, and the Outcome Was Supported by the Evidence

To state a Title IX claim, Doe must allege facts supporting a plausible inference that the University discriminated against him on the basis of sex and that sex was a motivating factor in the decision to discipline. *U. Sciences*, 961 F.3d at 209-10; *Princeton III*, 30 F.4th at 342-43. "Allegations [that may support gender bias include] 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Verdu v. Trustees of Princeton Univ.*, No. 19-12484, 2020 WL1502849, at *4 (3d Cir. Mar. 30, 2020) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Dissatisfaction with an investigation or outcome does not suffice; the allegations must plausibly connect the disciplinary decision to gender bias. *Id.*

Doe's Complaint does not make that connection. Instead, he leans heavily on out-of-circuit decisions that neither bind this Court nor resemble his allegations. For

example, in *Doe v. William Marsh Rice University*, 67 F.4th 702, 711 (5th Cir. 2023), the university imposed discipline untethered to any published rule, whereas Princeton disciplined Doe for the exact conduct alleged under the RRR's Personal Safety Policy.

Similarly, in *Vengalattore v. Cornell University*, 36 F.4th 87, 107 (2d Cir. 2022), a university invoked an inapplicable policy and refused to interview ten witnesses the accused had specifically identified. The Second Circuit held those allegations plausibly suggested bias. *Id.* Doe alleges nothing comparable; he does not dispute that the RRR applied, and he concedes that he did not identify Student 5 and Student X, the witnesses he now claims should have been pursued. (Compl., R. 1, at ¶ 136, JA69.)

*Doe v. Oberlin College*, 963 F.3d 580, 587-88 (6th Cir. 2020) is likewise inapposite. There, the university panel expressly found the complainant "incapacitated" despite record evidence showing she was conscious, communicative, and reasoning—a clear misapplication of Oberlin's own definition of "incapacitation." *Id.* Nothing like that occurred here. Doe disagrees with how credibility was assessed, but does not suggest that the Committee misinterpreted or ignored the RRR's definitions.

What controls here is this Court's precedent. And contrary to Doe's suggestion, both *U. Sciences* and *Princeton III* underscore why Doe's allegations fall short.

In *U. Sciences*, the male respondent alleged that the university enforced its Title IX policies against him while declining to investigate female students who also committed violations. 961 F.3d at 210. He pleaded specific facts showing that administrators had actual notice of misconduct by the female students, yet affirmatively permitted and encouraged them to breach Title IX confidentiality rules in order to build a case against him. *Id.* That selective enforcement, applied differently to male and female students accused of Title IX violations, gave rise to a plausible inference of sex discrimination. *Id.*

*Princeton III* presented similar allegations of asymmetry. 30 F.4th at 343-45. The male plaintiff there alleged a volatile relationship with mutual abuse, yet the university treated the female student's complaints with seriousness and urgency while trivializing or ignoring his. *Id.* The university allegedly declined to act on the plaintiff's counter-complaints and sanctioned him for minor violations of a no-contact order, while encouraging the female student to press charges and refusing to enforce the no-contact order against her. *Id.* This Court held that such asymmetric treatment plausibly supported an inference that gender was a motivating factor. *Id.*

Doe does not identify any similarly-situated female respondent who received more favorable treatment. He does not allege that Princeton pressured his accusers to file charges, applied its policies asymmetrically, or that he filed any counter-complaints, let alone that they were ignored. To the contrary, as the District Court recognized:

> To the extent that Plaintiff attempts to allege that the process was one-sided or irregular, the Complaint reveals that Plaintiff received notice of the charges filed against him (Compl. ¶ 126), was given all the evidence collected (*id.*), had the opportunity to submit a statement and otherwise respond to the charges (*id.* ¶ 118, 131), and could identify witnesses as sources of potential favorable information to him to be interviewed (*id.* ¶ 122). Plaintiff was additionally afforded a hearing and the ability to confront one of his accusers (Sarah) as well as other witnesses.

(Mem. Op., R. 24, at 11-12, JA14-15.) These facts, alleged by Doe himself, foreclose any plausible inference of discrimination.

In short, this Court's precedent shows what a viable Title IX claim looks like, but Doe's Complaint bears none of those hallmarks. *See U. Sciences*, 961 F.3d at 209-10; *Princeton III*, 30 F.4th at 342-43. The University applied the correct policy, afforded Doe extensive process, and disciplined him for the precise conduct alleged. His disagreement with the Committee's determination is not evidence of gender bias.

**B.     Doe Failed to Plead a Causal Link Between the Challenged Procedures and His Sex**

Doe's Title IX claim rests on a rhetorical device rather than law. He insists that if he piles together enough grievances, a "bundle of sticks," then the Court must infer gender bias. But that is not the test. This Court requires allegations that plausibly tie the challenged outcome to sex discrimination. *See U. Sciences*, 961 F.3d at 209-10; *Princeton III*, 30 F.4th at 342-43. The "total mix of information" standard asks whether the facts, considered together, plausibly support a causal link between the discipline imposed and the plaintiff's sex. *Id.* It does not invite courts to credit scattershot criticisms that, even when aggregated, still lack any connection to gender.

This distinction matters. In both *U. Sciences* and *Princeton III*, the plaintiffs alleged concrete facts showing that their sex was a motivating factor: selective enforcement in *U. Sciences*, and asymmetric treatment of male and female parties in *Princeton III*. Here, by contrast, none of Doe's alleged "sticks" have anything to do with sex. They reflect his dissatisfaction with how the Committee weighed evidence, not evidence that the Committee discriminated against him because he is a man. Courts have consistently rejected such attempts to bootstrap routine procedural disputes into Title IX claims. *See Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774–75 (3d Cir. 2020) (noting that the university panel's investigation, which failed to question the complainant's credibility or memory, may have been "shoddy," but did not give rise to gender bias where, like here, the "allegations" did not "relate to bias

on account of sex") (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016)); *Gendia v. Drexel Univ.*, Civ. No. 20-1104, 2020 WL 5258315, at *4 (E.D. Pa Sept. 2, 2020) (finding that the plaintiff did not connect a credibility determination or inclusion or exclusion of certain evidence against the plaintiff to gender).

Nor can Doe salvage his claim by pointing to the sheer number of criticisms he has raised. Each is either contradicted by his own Complaint or, at most, challenges credibility determinations squarely within the Committee's defined role. As the District Court recognized, making a credibility determination does not demonstrate bias on account of his status as a male. (*See* Mem. Op., R. 24, at 11, JA14.) Aggregating a large number of meritless, non-gender-related claims does not transform them into a plausible Title IX violation. Doe's individual "sticks" collapse under even gentle scrutiny.

*First*, Doe argues the Committee erred by crediting Roe's and Smith's accounts as consistent. (Opening Brief at 51.) But credibility determinations, even if imperfect, are precisely what a hearing panel is tasked with making. Such determinations do not support an inference of sex bias. *See St. Joseph's Univ.*, 832 F. App'x at 774–75; *see also Gendia*, 2020 WL 5258315, at *4. At most, Doe is alleging the Committee "got it wrong," not that it discriminated against him because he is a man.

*Second*, Doe contends the Committee failed to account for Student 4's testimony, which he characterizes as exculpatory. (Opening Brief at 51, 54.) But his Complaint acknowledges that Student 4 testified for forty minutes, clarified his observations "unequivocally," and was questioned extensively about consistencies highlighted by another witness, Student 3, who doubted whether Student 4 could see the events he described. (Compl., R. 1, at ¶¶ 182-83, JA83-84.) That exchange illustrates the Committee performing its core function: probing the credibility of witnesses with conflicting accounts. The Committee's decision not to embrace Student 4's version wholesale is not evidence of gender bias.

Next, Doe argues the Committee's findings were fatally unclear because they did not specify whether he had lifted Roe by the neck or pressed her throat. (Opening Brief at 52.) That is of no moment. In either circumstance, Doe is placing his hands on the complainant's neck—conduct that falls squarely within the RRR's prohibition on threats to personal safety. This quibble is not significant in any way, let alone evidence of discrimination on account of sex.

Doe also suggests the University gave preferential treatment to Roe and Smith throughout the investigation and hearing. (*Id.*) This statement is not only conclusory, but also contradicted by Doe's own Complaint. Doe concedes that he submitted five rounds of supplemental evidence, that he received updated evidence packets incorporating his submissions, and that he was permitted to question witnesses at a

live hearing. (Compl., R. 1, at ¶¶ 77, 85, 86, 122, 130-31, 156, 160, 180, JA53-56, JA64-67, JA74-82.) These averments show that the University repeatedly accommodated Doe's efforts to defend himself.

Relatedly, Doe asserts that the investigator "proactively" sought out evidence for Roe and Smith, but not for him. (Opening Brief at 53.) Again, his Complaint demonstrates otherwise. During the investigation, Doe had many opportunities to present and respond to evidence and, in turn, Roe and Smith were questioned about the evidence that Doe presented. (Compl., R. 1, at ¶¶ 122, 125-26, 129-31, JA64-67.) In other words, the University **acknowledged** Doe's statements and evidence and **confronted** Roe and Smith with the information. That allegation cannot plausibly be reframed as the University "proactively" seeking testimony for Roe and Smith.

Doe next contends that he was questioned more aggressively at the hearing than Smith. Even if Doe was right that he was questioned more "pointedly and confrontationally" than Smith, (*Id.* at ¶ 256, JA101-02), he fails to plausibly plead how that treatment was tied to his status as a male, rather than to any number of other differentiators, such as his status as the respondent/alleged assailant. *See, e.g.*, *Verdu*, 2022 WL 4482457, at *3 (stating that "the purported differences in how Princeton treated [the respondent] and [his victim] are too conclusory to support a plausible claim for relief").

Doe also complains that the investigator did not interview additional male witnesses who could have supported him. (Opening Brief at 53-54.) There are no plausible allegations to suggest that the investigator did anything other than interview those witnesses identified as having actual information about the events at issue, regardless of their sex. Doe's Complaint concedes that he was interviewed by the investigator, provided the list of witnesses interviewed during the fact-finding process, and informed "that he had the option to request additional interviews be conducted." (Compl., R. 1 at ¶ 122, JA64.) Doe did not request a follow-up interview and did not request that the investigator interview any additional witnesses on his behalf, regardless of sex. Doe's Complaint also concedes that many of the students interviewed were "identified by the female complainants." (*Id.* at ¶ 136, JA69.) Doe cannot credibly complain that he was somehow subject to gender discrimination because the University interviewed witnesses who were affirmatively identified by female parties, but did not interview male witnesses never identified by Doe. This case therefore bears no resemblance to *Vengalattore*, where the accused *identified* ten favorable witnesses whom the university refused to interview. 36 F.4th at 107.

Next, Doe argues that males were not interviewed about whether Roe had bruises on her neck. (Opening Brief at 53-54.) But the Complaint concedes that Student 4, a male, was questioned about bruising at the hearing "in an attempt to establish that [Roe's] bruising could not have been visible." (Compl., R. 1, at ¶ 176,

JA80.) Doe also concedes that Student 6, another male witness, testified that Roe had a raspy voice the next day. (*Id.* at ¶ 181, JA83.) If Doe believed further testimony on bruising was important, he could have questioned Student 4 or Student 6 directly at the hearing. His failure to do so undermines any inference of bias.

Doe additionally contends that the University failed to interview a male witness, Student 5, about whether Roe slept in his dorm room later in the week after the alleged incident. (Opening Brief at 53.) However, Doe **never identified** Student 5 as a witness—not at the outset of the investigation, and not after being provided the witness list and informed "that he had the option to request additional interviews be conducted." (*Id.* at ¶ 122, JA64.) Moreover, as Doe points out in instances less favorable to him, whether Roe and Smith were "friendly" with Doe after the incidents has no direct bearing on whether he physically assaulted either individual. (*Id.* at ¶ 180, JA82 (arguing, "whether either Mr. Doe or Jane, or both of them, were controlling has no bearing on whether the alleged incidents occurred").)

Lastly, Doe points to the absence of testimony from Student X in an effort to save his claim. (Opening Brief at 53-54.) The Complaint acknowledges, however, that Doe was permitted to submit his evidence pertaining to Student X in line with the RRR and that it was included in the evidence packet. (*Id.* at ¶¶ 118, 125, 131, JA63-67.) The fact that the Committee ultimately declined to give that evidence the weight Doe wanted is not discriminatory; it is the ordinary function of a disciplinary

body to weigh credibility. Doe fails to include any allegations that tie this to Doe's status as a male.

Taken together, the referenced allegations show nothing more than Doe's dissatisfaction with the outcome. This is insufficient to plausibly plead a claim of sex discrimination under Title IX. *See Verdu*, 2020 WL 1502849, at \*4-5 (no Title IX claim where plaintiff failed to allege differential treatment from a similarly situated female); *St. Joseph's Univ.*, 832 F. App'x at 774–75 (finding investigation may have been "shoddy" but allegations did not relate to bias on account of sex); *Princeton II*, 790 F. App'x at 384 (affirming dismissal of Title IX claim where plaintiff pled conclusory statements that Princeton would have treated him differently if he were a female, failed to plead facts "reflecting that the disciplinary process and results for female victims are different from men," and found his "many grievances about how the process was conducted and how he was treated" did not show "unfavorable treatment due to his sex"); *Gendia*, 2020 WL 5258315, at \*3 (no Title IX allegations where investigator "assumed Roe's truthfulness" and made evidentiary determinations that favored Roe over plaintiff); *Saravanan v. Drexel Univ.*, No. CV 17-3409, 2017 WL 4532243, at \*4 (E.D. Pa. Oct. 10, 2017) (holding that plaintiff's complaint did not demonstrate Title IX claim where plaintiff alleged "blanket allegations of discrimination" (citations omitted)). At most, Doe has suggested that Princeton had a bias in favor of the complaining parties, Roe and

Smith. Without further plausible allegations specifically tying that favoritism to gender, those suggestions fail to adequately state a Title IX claim. *Doe v. Princeton Univ.*, No. CV 22-5887, 2023 WL 8755232, at *6-8 (D.N.J. Dec. 19, 2023).

### C. The Court Should Not Consider Issues and Arguments That Doe Failed to Preserve and Raises for the First Time on Appeal

On appeal, Doe attempts to bolster his Title IX claim by raising a host of arguments and factual assertions that were never raised or ruled upon below. "It is well-established that arguments raised for the first time on appeal are not properly preserved for appellate review." *Simko v. U.S. Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021), cert. denied, 142 S. Ct. 760 (2022). "The general rule requiring preservation 'serves several important judicial interests,' such as protecting the parties from unfair surprise, 'preventing district courts from being reversed on grounds that were never urged or argued before [them],' and promoting finality and the conservation of judicial resources." *Id.* Even in instances of forfeiture—when a party fails to timely raise, but has not intentionally abandoned, an argument (which constitutes waiver)—this Court will consider reviewing unpreserved issues only in "truly exceptional circumstances." *Id.* (quotations omitted). These truly exceptional circumstances are "very limited" and reserved for cases where the public interest requires that the issue be heard or when a manifest injustice would result from the failure to consider the new issues. *Id.* at 205-06. (citing *United States v. Anthony Dell'Aquila, Enters. & Subsidiaries*, 150 F.3d 329, 335 (3d Cir. 1998)).

Doe has not attempted to identify "exceptional circumstances" that could justify his preservation failures, and none are present. This appeal does not raise an issue of overriding public interest, nor does declining to consider Doe's new theories risk manifest injustice. Nevertheless, even if the Court were inclined to address them, Doe's new arguments fail on their own terms.

*First*, Doe now argues that the University's rationale was "inexplicable," and therefore must have been motivated by gender bias, because it relied on text a message where Doe stated, "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done last night." (*Id.* at ¶ 108, JA60; Opening Brief at 51.) However, Doe fails to connect how the Committee's consideration of this text messages connects to his gender. It is also not clear what about considering this text message is "inexplicable"—"what I must have done" actually seems quite clear and certainly relevant.

Doe also now highlights that Roe allegedly texted a friend that "Doe didn't *think* he choked her." (Opening Brief at 51.) To the extent the Complaint alleges that the Committee received this text, this does not plausibly suggest that the University's decision was motivated by Doe's sex. At most, it suggests that Doe himself was uncertain about what happened.

Doe also now contends the Committee should have considered that Roe and Smith stayed overnight at his family's home after the alleged incidents. (Opening Brief at 51.) This argument is immaterial to whether the choking incidents occurred.

Finally, Doe argues the Committee made "no finding" in its written rationale. (*Id.* at 52.) What Doe is really asking for is a comprehensive written narrative detailing exactly what occurred during the incidents. The RRR does not require that detail. The Committee found that Doe placed his hands on the complainants' necks— conduct that violated the Personal Safety Policy. (Mot. to Dismiss, Ex. A, R. 16, at § 1.2.5, JA145-46.) That Doe disagrees with the University's rationale does not render it gender bias.

In short, Doe's new factual allegations and legal theories were never preserved for appellate review and should be disregarded. *Simko*, 992 F.3d at 205. But even if this Court were to consider them, none alters the analysis or the outcome.

**D.  Doe Did Not Plausibly Allege That the University Was Motivated by External Pressure to Discriminate Against Men**

As a final attempt to salvage his Title IX claim, Doe argues that the University was under pressure to respond aggressively to complaints by female students against male students. (Opening Brief at 54-57.) To begin with, Doe was charged under Princeton's Personal Safety Policy, not under the University's Title IX policy addressing sexual assault. As the District Court recognized, "[i]t is further unclear how probative this allegation is in this case since [Doe] was not charged with a

violation of the University's Title IX policies on sexual misconduct or sexual assault." (Mem. Op., R. 24, at 13, JA16.)

Even setting that aside, generalized allegations of "pressure" are insufficient as a matter of law. "[E]xternal pressure alone is not enough. Rather, '[i]n the cases where public pressure was found to support claims of erroneous outcome [under Title IX], that public pressure targeted the *specific* disciplinary action being challenged.'" *Verdu*, 2020 WL 1502849, at *5 (quoting *Doe v. Univ. of Cincinnati*, No. 1:16CV987, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018) (collecting cases holding same)). In *Verdu*, for example, the court held that the plaintiff failed to allege that gender bias affected the relevant proceedings because he failed to "point to any public pressure directed at any single individual involved in his specific case," and instead cited to federal investigations by Office of Civil Rights into the University's broad handling of sexual assault accusations and general criticisms of an unrelated academic department. *See Verdu*, 2020 WL 1502849, at *5 ("Without any allegations specifically connecting the external pressure on the University to Plaintiff's specific case, there is simply no basis to plausibly infer that the outcome of the [investigation] was motivated by his gender."); *see also Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225, at *12 (D.N.J. Jan. 17, 2018) (allegation that pressure from 2011 Dear Colleague Letter resulted in gender bias was conclusory and insufficient on its own to carry Title IX claim). The same is true

here: Doe does not identify a single official involved in his proceeding who was influenced by external actors, nor does he allege any pressure targeted at his case.

Nor can Doe rely on the now-rescinded 2011 Dear Colleague Letter. That guidance was withdrawn in 2017, over six years before his disciplinary proceeding.[8] It is implausible that the rescinded 2011 Dear Colleague Letter had any impact on the University's handling of Doe's case over a decade later (which was not under Title IX), and Doe alleges no facts to the contrary. This Court has already confirmed that "'pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination,' it factors into the total mix of information supporting a plausible Title IX discrimination claim." *Princeton III*, 30 F.4th at 345 (quoting *U. Sciences*, 961 F.3d at 210). In short, such generalized factual allegations cannot substitute for specific facts showing that sex was a motivating factor in the decision under review. *Id.*

Yet Doe relies entirely on generalized allegations and foregoes precision. Doe offers a sweeping claim that federal regulators, campus activists, and the media created a climate unfavorable to accused men. However, Doe does nothing to remedy the failure of the Complaint to "specifically connect[]" the alleged pressures on the University to his "specific case." *Verdu*, 2022 WL 4482457, at *5; *see also*

_____

[8] The guidance's withdrawal is a matter of public record subject to judicial notice under Fed. R. Evid. 201.

*Rider Univ.*, 2018 WL 466225, at *12. This is insufficient to sustain a Title IX claim, and it was properly dismissed.

## **CONCLUSION**

For each of the foregoing reasons, the University respectfully requests that this Court affirm.

Respectfully submitted this 24th day of September, 2025.

By:   *s/ James A. Keller*

James A. Keller (PA ID No. 78955)
Amy L. Piccola (PA ID No. 208888)
Patrick F. Nugent (PA ID No. 313979)
**SAUL EWING LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1964 / -8405 / -7134
Fax: (215) 972-4152 / -1871 / -7725
james.keller@saul.com
amy.piccola@saul.com
patrick.nugent@saul.com

*Counsel for Defendant-Appellee*
*The Trustees of Princeton University*

## CERTIFICATE OF BAR ADMISSION

## 3d Cir. L.A.R. 28.3(d) Bar Membership Certification

Pursuant to Third Circuit Local Rule of Appellate Procedure 28.3(d), Appellee The Trustees of Princeton University hereby certifies that James A. Keller, Amy L. Piccola, and Patrick F. Nugent of Saul Ewing LLP are members of the bar of this Court.

Dated: September 24, 2025

*s/ James A. Keller*

James A. Keller (PA 78955)
**SAUL EWING LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1964
Fax: (215) 972-4152
james.keller@saul.com

*Counsel for Defendant-Appellee*
*The Trustees of Princeton University*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE OF APPELLATE PROCEDURE 31.1(C)

I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains **12,974** words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the

paper copies, and the SentinelOne 24.2.3.471 has been run on the file containing the

electronic version of this brief and no viruses have been detected.


Dated:  September 24, 2025          *s/ James A. Keller* _____

James A. Keller (PA 78955)
**SAUL EWING LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1964
Fax: (215) 972-4152
james.keller@saul.com

*Counsel for Defendant-Appellee*
*The Trustees of Princeton University*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that the foregoing Brief was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: September 24, 2025

_s/ James A. Keller_

James A. Keller (PA 78955)
**SAUL EWING LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1964
Fax: (215) 972-4152
james.keller@saul.com

_Counsel for Defendant-Appellee_
_The Trustees of Princeton University_
